**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HELENA WORLD CHRONICLE, LLC<br>403 Cherry Street<br>Helena, AR 72342 | CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |
| _Plaintiff_, | |
| v. | |
| GOOGLE LLC<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043 | |
| and | |
| ALPHABET INC.<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043 | |
| _Defendants_. | |

**<u>COMPLAINT</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   JURISDICTION AND VENUE ..................................................................... 5

III.  PARTIES............................................................................................................ 6

   A.  Plaintiff. ...................................................................................................... 6

   B.  Defendants. ................................................................................................. 7

IV.  AGENTS AND CO-CONSPIRATORS......................................................... 7

V.   FACTUAL ALLEGATIONS........................................................................... 8

   A.  Concentration and Dominance of Digital Platforms.................................. 8

   B.  The Relevant Markets or Lines of Commerce at Issue................................ 10

      1.  Google Possesses Monopoly Power And A Dominant Position In The General Search Market Or Line Of Commerce. ..................................................... 10

      2.  Google Possesses Monopoly Power And A Dominant Position In The Search Advertising Market............................................................................. 13

      3.  Google Possesses Dominant Position In The Line Of Commerce For Digital News And Reference Searches........................................................ 16

   C.  Anticompetitive Conduct ........................................................................... 22

      1.  Acquisitions............................................................................................ 22

      2.  Barriers to Entry. .................................................................................... 27

      3.  Foreclosure Contracts............................................................................. 29

      4.  Tying. ...................................................................................................... 35

      5.  Introduction And Implementation of Bard.............................................. 55

      6.  Introduction And Implementation of SGE. ............................................. 68

      7.  Changing of Rates in AdSense................................................................ 75

      8.  Spoliation................................................................................................ 76

VI.  ANTICOMPETITIVE EFFECTS ............................................................. 78

VII. REGULATORY FINDINGS....................................................................... 80

VIII. CLASS CERTIFICATION ....................................................................... 83

IX.  CAUSES OF ACTION................................................................................. 86

**X.  RELIEF** ............................................................................................................................ **91**

    A.  DEMAND FOR JUDGMENT ......................................................................................... 91

    B.  JURY DEMAND ............................................................................................................ 92

Plaintiff Helena World Chronicle, LLC ("HWC"), on behalf of itself and all other publishers of original news and reference websites ("Publishers"),[1] brings this Class Action Complaint (the "Complaint") against Defendants Google LLC and its parent entity, Alphabet, Inc. (collectively, "Google") for violations of: Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1-3) and Section 7 of the Clayton Act (15 U.S.C. § 18). Plaintiff seeks treble damages, injunctive relief, and damages pursuant to 15 U.S.C. §§ 15 and 26, as a result and consequence of Defendants' unlawful conduct. The relevant Class Period extends from November 1, 2019 through the date on which a Class is certified.

## I.      INTRODUCTION

1.      Google is starving the free press. Every year, it siphons off billions of readers and billions of dollars from Publishers through an anticompetitive scheme that extracts their content, publishes it on Google, and diverts readers and ad revenue. This scheme is part of an unlawful strategy to attract, trap, and maximize users within a "walled garden" that entrenches Google's monopoly as the world's largest search engine. Google has coerced Publishers into a Hobson's choice: surrender their content or disappear from search and lose the single largest source of referral traffic and associated revenue.

2.      The key to this scheme is Google's structure and dominance as a digital platform. Digital platforms serve as gatekeepers to online markets by leveraging key barriers to entry: scale, network effects, and switching costs. No platform has greater power than Google. That power now rests on Google's monopoly over general search services, where it controls nearly 90% of the

---

[1] The term "Publishers" as used herein refers to publishers of original news and reference websites that produce and publish original, non-fiction content in digital format, including digital newspapers, magazines, blogs, weather reports, opinion and editorials, and reference works.

market and which it monetizes through search advertising. Google's search monopoly is at the heart of its dominance as a digital platform. It abuses that dominance to lessen competition in associated and dependent lines of commerce—including digital news and reference publishing.

3.      Google maintains its search monopoly and abuses it dominance through various tying arrangements that lock in and exploit Publishers as input suppliers; through foreclosure contracts that block rival search engines, and through more than 260 mergers and acquisitions that enable it to entrench and enlarge its dominant position.

4.      *First*, Google **attracts** users through unlawful tying arrangements, where it misappropriates Publishers' content and re-publishes it on Google's platform. The tying product is Google's general search service. The tied product is digital news and reference content published on Google Search through its patented question-and-answer technologies. Google launched this tying scheme in 2012 through its WebAnswers project. In 2023, it amplified this scheme using generative artificial intelligence ("GAI") (in the form of its Bard chatbot, which provides answers to a user's questions in natural language) and its Search Generative Experience ("SGE"), which responds to a user's search by directing him or her to its own summary of what other websites say. Google has repeatedly abused its dominance to force Publishers to supply the inputs for this tying arrangement: their content. It falsely told Publishers that its modifications to Google Search would increase their referral traffic and revenue, but the truth was the opposite. As one of Google's AI engineers recently admitted: "Direct answers reduce search referral traffic" and "[p]ressure" Publishers to "develop alternative revenue streams."[2]

5.      *Second*, Google **traps** users through a series of exclusionary agreements with Apple, Samsung and other mobile device manufacturers and browser developers. These

---

[2] Marc Najork, *Generative Information Retrieval,* ACM Digital Library (July 24, 2023), https://dl.acm.org/doi/abs/10.1145/3539618.3591871.

foreclosure contracts secure Google Search as the default search engine on the vast majority of mobile devices and desktop computers. In 2002, Google and Apple entered into an anticompetitive agreement where Google has in recent years paid Apple an estimated $18 billion a year to make Google Search the default search engine in Safari, Apple's web browser. As part of this restraint on trade, Google currently pays Apple 36% of its search revenue over the Safari browser. Google has made similar agreements with Samsung, the manufacturer of mobile devices running Google's Android operating system. Coupled with Google's bundling Google Search with its own products, including the Google Chrome browser, these agreements protect and maintain Google's nearly 90% market share in general search services.

6.      *Third*, Google **maximizes** this anticompetitive scheme through more than 260 mergers and acquisitions, enabling it to abuse and extend its dominance in, among others, four key areas: digital display advertising, digital content, mobile operating systems, and AI. For example, Google's acquisition of DoubleClick in 2008 enabled it to dominate digital display advertising on Publishers' websites. Google's acquisition of Android in 2005 enabled it to foreclose competition in search and cement its position as the default search engine on mobile devices. Google's acquisition of YouTube in 2006 gave it the largest trove of video content on the internet and allowed it to engage in self-preferencing of YouTube over other Publishers' content. Google's acquisition of DeepMind Technologies in 2014—and its 2023 merger of DeepMind with Google's own AI research lab Google Brain—is enabling it to protect its search monopoly from potentially disruptive GAI technology.

7.      The anticompetitive effects of Google's scheme cause profound harm in its monopoly markets to digital news and reference Publishers—and ultimately to the marketplace of ideas. Google has created a zero-click world in which users remain in its ecosystem and are

siphoned away from Publishers. Already, 69% of all Google searches result in zero click-through traffic. Since roughly 80% of all Google searches are for informational content (*i.e.*, news and reference content), billions of consumers are now getting their news from Google. With an estimated audience of 69.6 billion information-consumers per month, Google.com is far and away the largest publisher of online news and reference content.

8.      Google does not produce this content; Publishers do. But they are forced to compete on an unlevel playing field against their own products. The result is a staggering harm to competition, to consumers, to labor and to a democratic free press.

9.      Publishers' costs rose and their revenue fell from roughly $50 billion in 2005 to $20 billion in 2022. Since 2005, America has lost more than a fourth of its newspapers (2,500) and is expected to lose a third by 2025.[3] Only one publisher of encyclopedias—World Book—remains in print. Seventy million Americans now live in news deserts, with little to no local news coverage.[4] Newspaper employment has declined by 70% from 2005-22. Fewer reporters mean less original reporting. Fewer editors and fact checkers mean fewer safeguards against misinformation. Consumers face a loss of quality and choice in the marketplace of ideas. And America faces the potential collapse of a vital pillar of democracy.

10.     Plaintiff HWC owns and publishes two weekly local papers in Arkansas. It cannot afford to sacrifice the referral traffic it receives from Google. But it also cannot afford to sustain competitive injury under Google's search monopoly and abuse of dominance. The antitrust laws were designed to prevent a monopolist, or a structure achieved in part, through merger and acquisition, from harming competition by abusing its monopoly or dominance. Plaintiff invokes

---

[3] Penny Abernathy, *The State of Local News: The 2022 Report*, Northwestern Local News Initiative (June 29, 2022), https://localnewsinitiative.northwestern.edu/research/state-of-local-news/report/.

[4] *Id*.

the Sherman Act and Clayton Act to seek classwide monetary and injunctive relief to restore and ensure competition for digital news and reference publishing, protect Publishers, and set up guardrails to preserve a free marketplace of ideas in the new era of artificial intelligence.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337(a).

12.     This Court has personal jurisdiction over each Defendant because Defendants do extensive business within this District — including by providing the monopolized services to class members and consumers within this this district—and this action arises out of Defendants' contacts within this District.

13.      Venue is proper in this Judicial District pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391, because: (a) each Defendant transacts business and is found within this District; (b) a substantial part of the events giving rise to the alleged claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce was carried out in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. Defendants' conduct has had the intended and foreseeable effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

14.     Defendants' conduct affects interstate trade and commerce. Defendants' conduct has a direct, substantial, and reasonably foreseeable effect on commerce within the United States.

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337(a).

16.     This Court has personal jurisdiction over each Defendant because Defendants do extensive business within this District — including by providing the monopolized services to class members and consumers within this this district—and this action arises out of Defendants' contacts within this District.

17.     Venue is proper in this Judicial District pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391, because: (a) each Defendant transacts business and is found within this District; (b) a substantial part of the events giving rise to the alleged claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce was carried out in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. Defendants' conduct has had the intended and foreseeable effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

18.     Defendants' conduct affects interstate trade and commerce. Defendants' conduct has a direct, substantial, and reasonably foreseeable effect on commerce within the United States.

### III.     PARTIES

#### A.  Plaintiff.

19.     Plaintiff HWC is a Publisher. It owns two newspapers: *Helena World* and *Monroe County Argus*, the latter of which was acquired in 2022. Both newspapers are available in print and digital media and both deliver news and information to subscribers and online readers. *Helena World* is printed out of Helena, Arkansas. Over the past 365 days, *Helena World* (online) has averaged 1530 visitors per website per month with 402 referred from Google Search per month. The *Monroe County Argus* is printed in Brinkley, Arkansas. It has been in circulation since 1875 and

now is also available online. The online version of *Monroe County Argus* likewise receives visits referred from Google Search. HWC's original works have been scraped and reproduced for the purpose of training Google's GAI products including Bard and SGE, and Bard has since plagiarized an article from *Helena World*. On a daily basis, HWC's original works continue to be scraped and reproduced as inputs by Google's GAI search product and are plagiarized on a regular basis as Artificial Intelligence ("AI")-generated news summaries and extracts.

### B. Defendants.

20.     Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California. Google LLC is an online advertising company providing internet-related products, including various online advertising technologies, directly and through subsidiaries and business units that it owns and controls.

21.     Defendant Alphabet Inc. is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Alphabet Inc. was created as a holding company for Google in late 2015, and Alphabet controls Google's day-to-day operations. Virtually all of Alphabet Inc.'s revenue comes from Google LLC. Since December 2019, Alphabet and Google have had the same Chief Executive Officer (Sundar Pichai ("Pichai")). As a result of Alphabet Inc.'s operational control, Google LLC is Alphabet Inc's alter *ego*.

22.     Google LLC and Alphabet Inc. are referred to herein collectively as "Google."

### IV.     AGENTS AND CO-CONSPIRATORS

23.     The unlawful acts of Defendants set forth in this class action complaint were authorized, ordered, or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs. The Defendants' agents operated under the explicit and apparent

authority of their principals. Each Defendant, and its subsidiaries, affiliates, and agents operated as a single unified entity.

24.    Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Each acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## V.    FACTUAL ALLEGATIONS

### A.  Concentration and Dominance of Digital Platforms.

25.    Today's digital economy is highly concentrated in the hands of a few firms that dominate online markets and lines of commerce. These "digital platforms" operate as essential mediation services, control key channels of distribution, and act as gatekeepers between consumers, Publishers, and advertisers.

26.    On October 30, 2023, President Joe Biden issued an Executive Order on the development and use of AI in the United States.[5] One of the points that he emphasized was the need to "promote competition in AI and related technologies, as well as in other markets. *Such actions include addressing risks arising from concentrated control of key inputs, taking steps to stop unlawful collusion and prevent dominant firms from disadvantaging competitors*…."[6] (Emphases added). As the House Antitrust Subcommittee's 2020 Report concluded, "dominant platforms are able to exploit their gatekeeper power to dictate terms and extract concessions that no one would

---

[5] The White House, *Executive Order on the Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence,* 88 Fed. Reg. 75191 (Oct. 30, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/10/30/executive-order-on-the-safe-secure-and-trustworthy-development-and-use-of-artificial-intelligence/.

[6] *Id.*

reasonably consent to in a competitive market."[7]

27.     The Federal Trade Commission ("FTC") recently expressed similar concerns, saying that the use of GAI raises significant competition issues by, for example, "further entrenching the market power" of dominant firms.[8] There is no precedent in the United States economy for the power of today's digital platforms. And there is no digital platform with a greater sphere of influence than Google.  This lawsuit is intended to address such a failure of competition that exists now with respect to the digital news and reference publishing aspect of Google's platform.

28.     In 2020, the Antitrust Division of the United States Department of Justice ("DOJ") and various state attorneys general sued Google for antitrust violations. *See United States v. Google LLC.*, No. 1:20-cv-03010-APM (D.D.C.) ("DC DOJ Case"). Many of the Google internal documents referenced throughout this Complaint have been used publicly at that trial, which ended on November 16, 2023.[9]

29.     In analyzing Google's unlawful maintenance of monopoly power and abuse of its dominant position in the market (or line of commerce under Section 7 of the Clayton Act) for internet general searches and the market (or line of commerce) for advertising searches, Google's conduct must be viewed holistically over the last two decades.

30.     The facts set forth below summarize Google's monopoly power and dominance within

---

[7] Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, *Investigation of Competition In Digital Markets, Majority Staff Report*. at 11 (2020) ("House Subcommittee Report").

[8] FTC, *In Comment Submitted to U.S. Copyright Office, FTC Raises AI-related Competition and Consumer Protection Issues* (Nov. 7, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/11/InCommentSubmittedtoUSCopyrightOfficeFTCRaisesAIrelatedCompetitionandConsumerProtectionIssuesStressingThatItWillUseItsAuthoritytoProtectCompetitionandConsumersinAIMarkets.

[9] Although the DC DOJ Case did not include any extensive analysis of Google's more recent conduct regarding Bard and SGE, and does not focus on Publishers, the trial was replete with expert testimony on some of the same dominant market power that is at issue here and underscores the fact that abuse of that market power can have devastating anticompetitive impact in the digital world.

the markets or lines of commerce at issue. That power and dominance was created in part through key acquisitions of other companies; contracts with device manufacturers like Apple and Samsung that excluded or foreclosed competing search engines from gaining a foothold; a 2016 contract between Google and Apple that prevented the latter from developing any competing search engine of its own; the years-long effort by Google to contain users seeking news and reference content in its "walled garden" ecosystem; the misappropriation of Publishers' web content; the rushed rollout of Bard in 2023 in order to stifle competition from Microsoft; the introduction of SGE; and Google's decision this year to modify its AdSense terms in a way that disadvantages Publishers.[10] Google's abuse of its monopoly power or dominance has harmed Publishers in both the United States and abroad.  Each of these topics is discussed separately in the sections that follow.

**B.  The Relevant Markets or Lines of Commerce at Issue.**

**1.  Google Possesses Monopoly Power And A Dominant Position In The General Search Market Or Line Of Commerce.**

31.    Google was launched in 1998 as an internet search engine, serving search results linking to third-party websites in response to users' queries.[11] Google's key feature was the algorithm PageRank, which ranked the relevance of a webpage to a given search query by examining how many other webpages linked to that page. By 2000, Google had become the largest search engine in the world.[12] Its "ten blue links" became the gateway to the web for billions of users. The brand name "Google" became a verb synonymous with internet search itself. When Google was in its infancy, observers questioned how Google could monetize what appeared to be a free internet search

---

[10] Google AdSense is a program designed for website publishers who want to display specific text, video or image advertising on pages of their website and make money when visitors to the site see or click on ads.

[11] Google Inc., Registration Statement (Form S-1), at 1 (Apr. 29, 2004), https://www.sec.gov/Archives/edgar/data/1288776/000119312504073639/ds1.htm.

[12] House Subcommittee Report at 174.

service. The answer was advertising. Google adopted a triple-product business model:

- Google Search gives users access to online content;

- Google collects user attention and data; and

- Google sells audience attention and data to advertiser[13]

To become the behemoth that it is today, Google needed to maximize three key things: content, users, and advertising. It did this by leveraging key barriers to entry to acquire and maintain a monopoly in the market for general search services and entrench itself as a dominant digital platform.

32.     The general search services market (or line of commerce for Clayton Act purposes) consists of "general search engines, which are 'one-stop shops' consumers can use to search the internet for answers to a wide range of queries."[14] General search engines can answer all types of queries and return a wide range of results.

33.     By contrast, what are referred to as "vertical search engines" are limited to specific topics. For example, a search on Google for "sore throat treatment" returns a range of results, from medical products to the latest scientific information and tips on treatment. However, a search on Amazon—a vertical search service provider—only returns results for medical products. Consumers would not find a vertical search a suitable substitute for general search.

34.     The relevant geographic scope of the general search market is the United States. Google provides users in the United States a distinct website that differs from those provided by Google in other countries.

---

[13] *See* Carlos Diaz Ruiz, *Disinformation on digital media platforms: A market-shaping approach*, New Media & Society 9-10 (Oct. 30, 2023), https://journals.sagepub.com/doi/10.1177/14614448231207644.

[14] Mem. Op. at 2, *United States, et al. v. Google LLC*, No. 1:20cv03010 (D.D.C. Oct. 6, 2023), ECF No. 728 at 6 ("SJ Op.").

35.     By any reasonable assessment, Google possesses monopoly power in the United States market (or line of commerce pursuant to Section 7 of the Clayton Act) for general searches. According to the website Statcounter: [15]



36.     As shown above, Google's share of this market or line of commerce has been consistently just below 90%. By contrast, Microsoft Corporation's ("Microsoft") market share, through Bing, which incorporated the ChatGPT chatbot discussed below, has been consistently minimal in recent years. In fact, according to one source, Microsoft's market share for Bing *declined* in 2023, relative to 2022.[16] In denying summary judgment for the defense, the court in the DC DOJ Case emphasized Google's dominance of the general search services market: "[t]here are other search engines, of course: Microsoft's

---

[15] Statcounter: Global Stats, *Search Engine Market Share United States of America, Nov. 2022 – Nov. 2023,* https://gs.statcounter.com/search-engine-market-share/all/united-states-of-america (last accessed Oct. 29, 2023).

[16] Danny Goodwin, *The new Bing has failed to take any market share from Google after six months*, Search Engine Land (Aug. 17, 2023),  https://searchengineland.com/new-bing-google-market-share-six-months-430840.

Bing, Yahoo!, and DuckDuckGo, to name a few. But their market penetration pales in comparison to Google's. In 2020, Google's share of the U.S. general search services market was nearly 90%, and even higher on mobile devices. The market share of Google's closest competitor, Bing, was roughly 6%."[17]

37.    Michael Whinston ("Whinston"), a Professor at the Massachusetts Institute of Technology who testified as an expert for the government in the DC DOJ Case, stated that if one considered searches conducted through mobile phones, Google's market share was just under 95%.[18] He also said that there were high barriers to entry that allowed Google to sustain its market power over a long period of time. These included fixed and sunk costs of operation, Google's brand recognition, the scale of its operations, and its control of access points through contracts with device makers, which will be described below.[19]

### 2. Google Possesses Monopoly Power And A Dominant Position In The Search Advertising Market.

38.    Google also has monopoly power and a dominant position in the  search advertising market.[20] Whinston estimated that as of 2021, Google has approximately 74% share of that market as of 2020.[21] Reports in 2023 variously indicate that Google has a 79.8% or 71% share of the

---

[17] SJ Op. at 2. The Court further observed that "because of its large market share in general search services, Google also holds a superior market position in various search-related advertising market." *Id*.

[18] Trial Tr., *United States, et al. v. Google LLC*, No. 1:20cv03010 (D.D.C. Oct. 6, 2023) (Day 18) at 4762:25-4763:2.

[19] *Id*. at 4764:12-4765:3, 4766:2-9, 4766:13-15; 4767:7-10, 15:16.

[20] Whinston also identified what was essentially a submarket of general search consisting of general text advertising searches, in which Google had roughly the same market share as it does in the general search market. *Id*. at 4777:10-13. That will not be discussed in this Complaint because it part of the broader market or line of commerce for advertising searches generally.

[21] *Id*. at 4779:15.

advertising search market in the United States.[22] More than 80% of businesses worldwide rely on Google ad campaigns.[23] This power and position in the search advertising market is driven in part by Google's control over the general search market.

39.    Google's dominance in the search advertising market bears upon Plaintiff's claims involving and Google's recent change in how it compensates Publishers for AdSense traffic, which is described in detail below. Its dominance is also a factor in its ability to engage in self-preferencing tying conduct.

40.    In 2000, Google branched out from search to digital advertising, launching AdWords, its ad buying platform for such advertising. This service enabled businesses to purchase keyword advertising that would appear on Google's Search Engine Results Page ("SERP"). This launch marked the first step in Google's transformation of its SERP—the world's portal to the web—into a medium for publishing content and ads, in addition to hyperlinks.

41.    Since 2000, Google has increased its power as a digital platform and expanded beyond search into numerous lines of commerce. It has become "the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital mapping, email, cloud computing, and voice assistant services, alongside dozens of other offerings."[24]

42.    It was estimated that in 2020 alone, Google made $147 billion in revenue from online ads and "[a]bout 16% of its revenue came from the company's display or network business, in which

---

[22] *See* Ahivanjali Pawar, *Most Vital Google Ads Statistics Traders Need to Grasp in 2023 and Beyond*, Enterprise Apps Today (Oct. 5, 2023), https://www.enterpriseappstoday.com/stats/google-ads-statistics.htmll; Statista, Search Advertising-United States. https://www.statista.com/outlook/amo/advertising/search-advertising/united-states (last accessed Oct. 30, 2023).

[23] *Id*.

[24] House Subcommittee Report at 174.

other media companies use Google technology to sell ads on their website and apps."[25] In 2022, as described in further detail below, the European Publishers Council (which includes Press Publishers like Axel Springer, News UK, Conde Nast, Bonnier News, and Editorial Prensa Iberica) sued Google over its internet ad search advertising practices.[26]

43.     Internet search advertisements are distinct from general searches. In the words of Hal Varian ("Varian"), the Chief Economist at Google, search advertisements satisfy demand rather than create it.[27] For example, Booking.com made the following distinction between the two as shown in the graphic below.[28]



Source: Booking.com document, "Booking.com Answers to Questionnaire for Advertisers by the European Commission" (Feb. 1, 2021) (UPX0435, at -062)

---

[25] Foo Yung Chee, *Google's advertising tech targeted in European publishers' complaint*, Reuters (Feb. 11, 2022), https://www.reuters.com/technology/googles-advertising-tech-targeted-european-publishers-complaint-2022-02-11/.

[26] *Id.*

[27] Ex. No. UPXD103, *United States, et al. v. Google LLC*, No. 1:20cv03010 (D.D.C.), https://www.justice.gov/d9/2023-10/417081.pdf at 22 (last accessed Oct. 30, 2023).

[28] *Id.* at 23.

44. Apple recognized a similar point in January of 2017:[29]



Advertisers recognize that Google is a necessary source of services for internet search advertising and that any meaningful alternative is limited.[30]

### 3. Google Possesses Dominant Position In The Line Of Commerce For Digital News And Reference Searches.

45. Google exercises its dominance in the line of commerce for digital news and reference publishing.

46. News search is the single largest source of external referral traffic to news websites, exceeding referral traffic from social media and direct traffic to publishers' websites.[31] Users of news search services are a distinct audience, with distinct demands from those consuming news through

---

[29] *Id.*

[30] *Id.* at 30, 31.

[31] Aisha Majid, *Search vs. social: How referral traffic to news sits has changed in five years,* Press Gazette (April 13, 2023) ("Press Gazette Article"), https://pressgazette.co.uk/media-audience-and-business-data/media_metrics/news-referral-traffic-breakdown/

other distribution channels. According to one study, 69% of news-search users who click through to news websites only consume one category of news: "[b]ecause Search audiences are drawn to stories with factual, timely information, they are less likely to move on to other categories after satisfying their original inquiry."[32]

47.     Digital news and reference publishing is a significant line of commerce in the United States. Before the internet became ubiquitous, Americans obtained original, fact-based informational content from newspapers, magazines, and reference works (encyclopedias, dictionaries, almanacs, etc.). Since the emergence of the web, the news, media, and reference publishing industry has shifted to online distribution and consumption, as part of the digital content media ecosystem. The percentage of Americans getting at least some of their news online rose from 2% in 1995 to 93% in 2018.[33] Today, only one publisher of encyclopedias—World Book—remains in print. Digitization has led to the development of new formats for publishing informational content online, including digital magazines and newspapers, encyclopedias, wiki, blogs, news aggregators, news search platforms, and digests. In 2001, in recognition of this distinct emerging market, a trade association called the Online Publishers Association (now called Digital Content Next) was formed, with members including print and digital newspaper publishers (*e.g.*, *The Atlanta Journal-Constitution*, *New York Times)* and specialized vertical-content publishers (*e.g.*, AARP, AccuWeather, Consumer Reports, WebMD).[34] Digital news is a key line of commerce within this industry. In the United

---

[32] Jack Neary, *How widely do visitors read across news and media sites? Our data on breadth of visit,* Chartbeat https://blog.chartbeat.com/2023/08/01/how-widely-do-visitors-read-across-news-and-media-sites/ (last accessed Oct. 30, 2023).

[33] News Media Alliance, Google Benefit from News Content: Economic Study at 3 (June 2019), https://www.newsmediaalliance.org/wp-content/uploads/2019/06/Google-Benefit-from-News-Content.pdf.

[34] Kendall Moe, *Choose your words wisely: The role of language in media trust*, Digital Content News (Nov. 16, 2023), https://digitalcontentnext.org/blog/2023/11/16/choose-your-words-wisely-the-role-of-language-in-media-trust/.

States, digital news publishing revenue is expected to exceed $27 billion by 2027.[35]

48.     Vertical news and reference search services encompass the breadth of non-commercial "informational" searches which make up 80% of Google's total searches.[36] Google Search's website, google.com, is the most widely used digital news and media website in the world, by a landslide: Google receives an estimated 69.8 billion non-commercial, informational search queries per month. In contrast, Wikipedia (Google's largest competitor in digital news and media publishing) received only 4.5 billion visits in October of 2023.[37] In comparison, the largest traditional news Publisher webpages receive monthly visits in the tens or hundreds of millions, not billions.[38] In addition to Google Search's news surfaces, Google News (a news aggregator website and app) had 398.1 million visits in October 2023—the 16th most popular news site in the world.[39]

49.     Not only does Google own the most widely used search engine in this country, but it functions as a news provider itself. Google plays several roles in the digital informational media ecosystem: (1) connecting consumers to Publishers' websites, (2) selling targeted search advertising, (3) facilitating display advertising on Publishers' websites, and (4) publishing Publishers' news and reference content on Google's webpages and apps. This means that Google maintains both vertical and horizontal relationships with Publishers. In their vertical relationship, Google connects Publishers to users as an intermediary. Specifically, Google "sells" search-traffic referral services to

---

[35]Statista, *U.S. digital publishing industry—statistics and facts* (Aug. 30, 2023), https://www.statista.com/topics/1453/digital-publishing/#topicOverview.

[36] *Id*.

[37] Similarweb.com, Website Performance: Wikipedia.com (Oct. 2023).

[38] The *Wall Street Journal* has roughly 83.5 million unique monthly visitors. Improvado, *Wall Street Journal Media Kit*, https://improvado.io/resources/wall-street-journal-media-kit (last accessed Oct. 30, 2023). The *New York Times* has roughly 130 million monthly readers. Maria Pengue, *25 Insightful New York Times Readership Statistics – The 2023 Edition*, WorkUp (Mar. 14, 2021), https://letter.ly/new-york-times-readership-statistics/.

[39] Similarweb.com, News and Media Category Leaders (Oct. 2023).

Publishers, which they purchase by giving Google access to their informational content.

50.    Google thus *competes* with Publishers horizontally, as a publisher of informational content in its own right. In a competitive market, they must either produce or purchase the inputs: informational content. But Google leverages its search engine monopoly to do neither. It misappropriates third-party Publisher content, without paying licensing fees. This raises Publishers' costs by forcing them to bear the labor and overhead costs of producing informational content *plus* the extortionate price of Google's search-referral traffic service.

51.    Put differently, Google's conduct artificially suppresses the revenue flowing to Publishers, who are no longer compensated with a fair flow of users' seeking the content they purchase or produce. Those users stay in Google's "walled garden" ecosystem, where Google feeds users the misappropriated publisher content directly. Google thus maintains its monopoly in search by maximizing user attention on Google's platform: users who do not navigate away from Google's SERP spend more time on Google's platform, provide more data to Google, and perform more searches, thereby exposing them to targeted search advertising. At the same time, Google uses the misappropriated content to increase its share and dominance in the news and reference content publishing line of commerce.

52.    News search services are unique because they provide search results cross-ranked by commercial segment (*i.e.*, news), relevance, and timeliness. From a consumer perspective, the line of commerce for vertical news search is distinct from the market for general search or other verticals. For example, if a consumer searches for "Barack Obama" in a general search engine, the consumer will expect a variety of results to be returned, including commercial results, as well as older and evergreen results: *e.g.*, U.S. government websites, biographical information about Barack Obama's life, links to his personal webpage and social media accounts, images and videos of the former

President, encyclopedia entries, etc. The results might originate from a combination of social media, governmental agency websites, academic articles, Wikipedia, and beyond.



53.    On the other hand, a user searching for "news about Barack Obama" would expect to receive the *latest* information on the topic and to only see products from news publishers. This tailored service is precisely what Google Search provides when a user clicks on the "News" vertical and switches from general search to vertical news search. Indeed, in contrast to general search results, vertical news search results are ranked chronologically to meet a user's distinct demand for *timely* information in this search market.



54.     Google also displays news digests and reference content across what it calls "News surfaces" and "Knowledge Panels" across its various webpages and apps:

- Google Search Top Stories Box (News Carrousel)

- Google Search Perspectives Box

- Google Search Vertical News Tab

- Google Search "People also ask" Box

- Google Search "About" Box (Knowledge Graph)

- Google Search "Knowledge Panels" (Knowledge Graph)

- Google Search Generative Experience (chatbot integrated into Google Search reproducing news articles and answering informational queries)

- Google News (news aggregator website and app)

- Google Discover (recommended social feed)

- Google Bard (chatbot summarizing news articles and answering informational queries)

- YouTube News Channel

55.     Google's dominance over vertical news search services is underscored by its 95% share of all referral traffic to news websites from its search engines originates from Google, while only 5% originates from a handful of competitors: Bing News, Yahoo News!, and DuckDuckGo News.[40]

### C.  Anticompetitive Conduct

#### 1.  Acquisitions.

56.     Google began its march to dominance in the aforementioned markets and lines of commerce by acquiring key competitors in mobile devices, digital media, AI, and digital advertising.

57.     Google achieved its structure as a dominant digital platform, through a series of strategic mergers and acquisitions designed to attract, trap, and monetize users of its search engine services.

58.     To date, Google has acquired 260 different entities, across various lines of commerce, each in furtherance of its walled garden scheme.

59.     Several acquisitions highlight Google's commitment to fortifying its walled garden in search, through the acquisitions of entities in related and dependent lines of commerce. Four of these acquisitions—of the mobile start-up Android, the video platform YouTube, the AI firm DeepMind, and of the digital ad vendor DoubleClick—both reinforce Google's monopolies and enable, entrench and extend its overall digital platform dominance:

60.     **YouTube.** Google acquired YouTube, the digital video platform, in 2006, in furtherance of its "attract" strategy, to draw users to its platform with video content. Not only did the acquisition of YouTube serve to attract users to the Google product family in general, but also

---

[40] Press Gazette Article.

Google specifically leveraged the YouTube acquisition to fortify and contain users in its walled garden ecosystem in search. News search queries on Google's SERP frequently display a "Videos" panel, which links directly to YouTube, regardless of whether a different third-party publisher originally served the YouTube video from a news article or webpage outside of YouTube. Thus, even if users click through for more information, they are not even taken to Publishers' websites; instead, they are diverted by Google Search into one of Google's platforms for publishing digital news: YouTube.



61.   **DeepMind.** Google's acquisition of AI firm DeepMind Technologies, in 2014 furthers Google's ability to both attract and trap users in its walled garden search engine. Google's acquisition of DeepMind and other AI firms, because this technology enabled Google to further refine its search engine algorithm, by enabling Google to extract more value out of the data Google

collected from the billions of users it had attracted to and trapped on its platform.[41] Moreover, as discussed above, AI, when integrated into Google's SERP as a means of publishing news content, will further attract users to Google's walled garden search engine by enabling Google to publish to users exponentially more of the news content Google misappropriates from news publishers, without users ever needing to leave Google's SERP. In other words, Google's AI technologies—developed in part by its mergers and acquisitions—will strengthen Google's ability to tie its general search services to its digital news publishing services.

62. **Android**. In 2005, Google's acquired Android, today the world's dominant mobile operating system running on 75% of the world's mobile devices. As detailed in the section above, Google leveraged its acquisition of Android to extend its search monopoly, and increasingly "trap" users within its walled garden ecosystem. A recent House Subcommittee on Antitrust Report captured Google's intention to use its purchase of Android to strengthen and entrench its search monopoly, noting that: "Google used its search engine dominance and control over the Android operating system to grow its share of the web browser market and favor its other lines of business."[42]

63. **DoubleClick.** Google acquired digital ad vendor DoubleClick in 2007, in furtherance of its scheme to "monetize" its search monopoly. While Google views most of its informational news searches as "advertising" to attract users to its walled garden, Google earns the majority of hundreds of billions of dollars of yearly revenue through searches which it monetizes through search advertising. Google's acquisition of DoubleClick and related advertising technologies enable Google to extract revenue from the billions of users it has attracted to and trapped on its search engine.

---

[41] *See* Pl's Pre-Trial Br., at 10, *United States, et al. v. Google LLC*, No. 1:20cv03010. ("Large-scale machine learning," Google posits, reveals that "the more we learn form our users, the better we can serve them.")

[42] House Subcommittee Report at 225

Despite promising regulators that it would not it would not combine the data collected on internet users via DoubleClick with the data collected throughout Google's ecosystem, not even a decade later, Google broke that promise "effectively combining information from a user's personal identity with . . . their search history" and other data collected from various Google products.

64.     **Other Acquisitions.** In addition to these four acquisitions, the DOJ has identified three other key acquisitions that cemented Google's dominance. These were: (a) the acquisition for $750 million in 2009 of AdMob, a technology system that allows publishers of mobile apps to sell ads; (b) the acquisition of InviteMedia, which had a demand site platform, for $81 million in 2010.; and (c) the acquisition in 2011 of AdMeld for $400 million, which had a technology that provided "yield management" functionality to Publishers. They are described in paragraphs 71-88 of the complaint in a separate case filed by the DOJ against Google in 2023 in the Eastern District of Virginia ("DOJ Va Case").[43] As stated in ¶ 88 of the DOJ Va Case complaint, "[t]he DoubleClick, InviteMedia, and AdMeld acquisitions helped Google achieve dominant positions at each level of the open web ad tech stack and set the stage for Google to control and manipulate the process by which publishers sell and advertisers buy open web display inventory."[44]

65.     At the time of approval of these acquisitions, it was neither known nor foreseen that the newly created structure would in fact be used to substantially lessen competition in lines of commerce related to Google's general search services monopoly, including in advertising, AI, and digital new and content publishing. Over time, however, this is exactly how Google entrenched and

---

[43] Compl., *United Sates, et al. v. Google LLC* , No. 1:23-cv-00108 (E.D. Va. Jan. 24, 2023), ECF No. 1, https://www.justice.gov/d9/press-releases/attachments/2023/01/24/us_v_google_complaint_0.pdf. ("ED Va Compl.")

[44] *Id.*at ¶ 88; *See* Karina Montoya, *How Three Mergers Buttressed Google's Ad Tech Monopoly, per DOJ*, Tech Policy Press (Mar. 9, 2023), https://techpolicy.press/how-three-mergers-buttressed-googles-ad-tech-monopoly-per-doj/.

extended its dominance.

66.     Indeed, regulators have admitted as much. For example, as to DoubleClick, former FTC commissioner William Kovacic explained to the *New York Times*: "If I knew in 2007 what I know now, I would have voted to challenge the DoubleClick acquisition."[45] As United States regulators have said, "[t]hrough design choices and default settings, Google can use its dominance in any one market to favor its other lines of business."[46] And it has done so.

67.     Taken together, Google's series of strategic mergers and acquisitions fortified its dominance to facilitate and implement anticompetitive conduct across its platform.

### 2.  Barriers to Entry.

68.     Google's dominance as a digital platform is enhanced and protected by several barriers to entry created in part through these acquisitions.  The *first* barrier to entry is *network effects.* In a market with strong network effects, the more people who use a product or service, the more that product or service becomes useful and valuable. For example, Google's value as a platform that facilitates advertising increases as the number of its users grows, because advertisers can reach more consumers and acquire more user data, enabling more targeted advertising. Such network effects, in conjunction with other barriers, ensure that Google has enduring market power.

69.     A *second* barrier to entry consists of *switching costs*. Digital platforms such as Google can maintain market power because it is difficult, inconvenient, and costly to switch away from incumbents' technology and services.

70.     A *third* barrier to entry is *economies of scale.* In a market characterized by economies

---

[45] Steve Lohr, *This Deal Helped Turn Google Into an Ad Powerhouse. Is That a Problem?,* New York Times (Sept. 21, 2020), https://www.nytimes.com/2020/09/21/technology/google-doubleclick-antitrust-ads.html.

[46] House Subcommittee Report at 226.

of scale, costs decrease as sales increase. Google benefits from economies of scale in its core service of providing information. Google's products—from Google Search to Google Maps and Bard—have high up-front fixed costs but may scale up with relatively low increases in cost.

71.    A *fourth* barrier to entry is *data accumulation*.  Digital platforms such as Google can use their massive trove of user data as a barrier to entry against competitors. This is a form of network effect: platforms with more data can better target advertising and make their services more attractive to users, drawing more attention and user engagement, which in turn enables more data harvesting. Digital platforms can leverage data accumulated through their gatekeeping functions to gain advantages over competitors in other lines of commerce, furthering user lock-in to a range of products and services.

72.    A *fifth* barrier to entry consists of *foreclosure agreements* with device makers, as discussed separately below.

73.    As one Google investor, Roger McNamee, was quoted as saying in the House Subcommittee Report:

> Essentially, the interplay of Google's dominant position in … infrastructure elements [such as] ad tech infrastructure, Chrome browser, [and Nest] … collectively provide leverage over other market participants, which include not just startups, but also advertisers, and other would-be competitors. And the key thing is, it's not just about Google's infrastructure. When you add in Gmail, Search, Maps, apps, and all the other things that Google does so well … [t]hey provide further levels of user lock-in—further protective modes that really limit the opportunity of competitors and even, frankly, suppliers and advertisers, to do the things that they should be able to do in a freely competitive economy.[47]

74.    Consequently, today, Google is one of the world's largest corporations: "Nine of Google's products—Android, Chrome, Gmail, Google Search, Google Drive, Google Maps, Google

---

[47] House Subcommittee Report at 43-44.

Photos, Google Play Store, and YouTube—have more than a billion users each."[48] Google reported $279.8 billion in revenue in 2022. Although only 20% of queries on Google Search return search ads, $224.47 billion is derived from advertising revenue.[49]

### 3. Foreclosure Contracts.

75.     A critical component of Google's anticompetitive conduct is its use of foreclosure agreements to *trap* users on its platform, thereby capturing their valuable attention and data, and starving potential competitor-providers of general search services of the opportunity to reach those users. These foreclosure agreements not only foreclose competition in the search engine market, but also have anticompetitive reverberations throughout lines of commerce where are related to and dependent on online search—including digital news publishing.

76.     Three key sets of agreements form the basis of this foreclosure: (1) an agreement with Apple to make Google the default search engine on Apple's mobile and web browsers; (2) an agreement with Mozilla to make Google the default search engine in the Mozilla web browser; and (3) Android device agreements which make Google the default search engine on devices running the Android operating system.

77.     **Apple**. Since 2002, Google and Apple have been parties to an anticompetitive exclusionary agreement, in which Google paid Apple an estimated $18 billion a year by 2021 to make Google Search the default search engine in Safari, Apple's web browser. Safari is the only web browser that is pre-installed on Apple devices, including the iPhone, iPad, and Mac desktops.

---

[48] *Id*. at 174.

[49] Statista, *Annual revenue of Google from 2002 to 2022*, https://www.statista.com/statistics/266206/googles-annual-global-revenue/#:~:text=In%20the%20most%20recently%20reported,billion%20U.S.%20dollars%20in%202022 (last accessed Oct. 30, 2023).

In exchange for default placement, Google currently pays Apple 36% of its revenue from search traffic originating from the Safari browser search box.

78.     As Whinston testified, this deal shows Google's market power: "if Google—you know, imagine if Google is involved in this—in negotiating this Apple contract, if it had equally capable rivals, it wouldn't be able to make that kind of money. Apple would simply them off against each other. So, when you see that level of profit, it's telling you that there's a really big gap and they have a lot of market power."[50]

79.     This 2002 exclusionary agreement between Google and Apple ensured Google's ability to maintain its Search and Search Advertising monopolies. Testifying in the DC DOJ trial, Google's CEO conceded that such defaults are "very valuable."[51] During his testimony, it also came out that Apple was interested in modifying Google's status during contract renewal discussions in 2007, but Google's default positioning was too valuable. Google paid off Apple not to alter the terms of the deal:

> Apple had sought a choice screen in 2007, when Pichai was a Google executive but years before his elevation to CEO. [DOJ attorney] Bellshaw confronted Pichai with internal Google communications discussing an Apple request to change the information services agreement that, to this day, makes Google the default search engine on the Safari browser of every iPhone and Mac sold in the United States.
>
> During the 2007 round of contract renewal talks, according to the document, Apple wanted to make Google one of two choices upon first use of the Safari browser, all while maintaining financial terms under which it is paid billions of dollars every year in shared revenue earned from advertising that accompanies Google search queries. Pichai noted on the stand Monday that Apple's request specifically covered a new version of Safari to be introduced on Windows computers.
>
> Google's internal discussions of the request, according to Bellshaw, helped

---

[50] Trial Tr., *United States, et al. v. Google LLC*, No. 1:20cv03010 (D.D.C. Oct. 6, 2023) (Day 18) at 4775:7-13.

[51] *See* Trial Tr., *United States, et al. v. Google LLC*, No. 1:20cv03010 (D.D.C. Oct. 30, 2023) (Day 30) at 7684:18-20.

underscore the power of defaults that the company has continuously tried to downplay during the antitrust bench trial now in its eighth week — Google contends instead that users can easily switch away but choose not to. At the time of Apple's request, according to internal communications, defaults amounted to a "typically 75% take rate. Defaults have strong impact."[52]

80.    The deal between Google and Apple was more than a mere business contract between two parties. Jeff Shardell, the former Director of Business Development for Google, wrote a June 4, 2007, presentation for Pichai that described the deal as the "Apple Inc. Search Partnership."[53] Google and Apple had agreed to share the revenue that Google obtained by being given default status on Apple devices. Tim Cook, the CEO of Apple, reportedly indicated to representatives of Google in December of 2018 that "I imagine us as being able to be deep, deep partners; deeply connected where our services end and yours begin and see[] no natural impediment to us working together."[54]

81.    At one point during contract renewal discussions in 2016, Google thought Apple desired to give end-users other suggestions for redirection. In a 2018 e-mail, Joan Braddi ("Braddi"), Google's head of product partnerships, said "[t]his concerned us which is why we added into the agmt that they could not expand further than what they were doing in Sept 2016 (as we did not wish for them to bleed off traffic). Also, they can only offer a 'Siri' suggestion exclusively for quality and not because they want to drive traffic to Siri."[55] The agreement nakedly restrained trade between

---

[52] Bryan Koenig, *Google CEO Admits Apple Deal To Be Default is 'Valuable'*, LAW 360 (Oct. 30, 2023), https://www.law360.com/articles/1737914.The same article notes that Google applied a double standard here; while espousing an exclusive default position for its search engine, in 2005, it told Microsoft that the latter should not take any similar step with respect to an update of its operating system. Ex. No UPXO172 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-10/417451_0.pdf (last accessed Oct. 30, 2023).

[53] Ex. No. UPXO126 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-10/417441_0.pdf (last accessed Oct. 30, 2023).

[54] Ex. No. UPX0617 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-10/417460.pdf (last accessed Nov. 8, 2023).

[55] Ex. No. UPXO309 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-10/416999.pdf (last accessed Oct. 29, 2023).

Google and a potential competitor.

82.     Obtaining this favored position was critical for Google. Professor Antonio Rangel, an expert witness for the government in the DC DOJ Case, summarized key internal Google documents between 2007 and 2017, which spoke of the "Power of Defaults."[56]



83.     Google's "pay to play" arrangement was disclosed publicly for the first time on October 27, 2023 in the DC DOJ trial, during the testimony of Prabharkar Raghavan, one of Google's Senior Vice-Presidents. Google paid over $26.3 billion for such privileges in 2021 (with $18 billion going to Apple alone) and $18.5 billion in 2020.[57] In 2020 and 2021, Google's search advertising

---

[56] Ex. No. UPXD101 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-09/416682.pdf (last accessed Oct. 29, 2023).

[57] Bryan Koenig, *Google Trial Reveals $26B Spent on Search Distribution*, LAW360 (Oct. 27, 2023), https://www.law360.com/competition/articles/1737865/google-trial-reveals-26b-spent-on-search-distribution?spotlight=1 ("Koenig Article"); David Pierce, *Google reportedly pays $18 billion a year to be Apple's default search engine*, The Verge (Oct. 26, 2023), https://www.theverge.com/2023/10/26/23933206/google-apple-search-deal-safari-18-billion.

revenues were $102.9 billion and $146.4 billion, respectively. Again, Google was sharing with Apple a portion of its revenues obtained through Google's default search engine status on Apple devices. On November 7, 2023, during the trial in the DC DOJ Case, Jamie Rosenberg ("Rosenberg"), a former Google executive, was cross-examined on this agreement and was asked whether, "[g]iven the intensity of competition… 'did you ever tell anyone [that] Google should not be paying billions per year to Apple?' Rosenberg responded that he doesn't think so."[58]

84.    According to testimony by Pichai in a separate trial a separate involving Google and Epic Games ("the EPIC Games Case"), taking place in federal district court in the Northern District of California, Google currently pays Apple 36% of the advertising revenue it earns from being the default search engine on Apple's Safari web browser.[59]

85.    **Mozilla**. In addition to the Apple foreclosure deal, Google entered into a similar agreement with the browser provider Mozilla. Under that contract, Mozilla agreed to make Google the default search engine for all search access points on its Firefox browser in exchange for a share of search advertising revenue from searches originating from Firefox's search box or the Firefox homepage. Google has also secured agreements with smaller browser providers (Opera and UCWeb) to be the default search engine in exchange for revenue-share payments.

86.    These agreements effectively lock in Google as the dominant search engine, and therefore the dominant search referral provider to Publishers, providing Google control over the

---

[58] Matthew Perlman, *Judge Told Google Helped Innovate Mobile Market,* LAW360 (Nov. 8, 2023, https://www.law360.com/competition/articles/1764723?nl_pk=787d704d-431c-432f-ba36-94008c81ee47&utm_source=newsletter&utm_medium=email&utm_campaign=competition&utm_content=2023-11-09&read_main=1&nlsidx=0&nlaidx=1. ("Perlman Article").

[59] The case is *Epic Games Inc. v. Google LLC, et al.,* No. 3:20-cv-05671 (N.D. Cal.) ("Epic Games Case"). *See* Bonnie Eslinger, *Google CEO Denies App Store Monopoly in Epic Games Trial* LAW 360 (Oct. 30, 2023), https://www.law360.com/classaction/articles/1766669/-google-ceo-denies-app-store-monopoly-in-epic-games-trial.

terms with which it deals with Publishers, because Publishers have no meaningful alternatives to or substitutes for Google as a search intermediary.

87.     **Android Agreements.** Google has also made exclusionary deals with: (1) original equipment manufacturers of Android devices, like Samsung and (2) phone carriers that sell Android devices, like Verizon. The Android operating system ("Android OS") is a mobile phone operating system that Google acquired in 2005. It is the second most widely used mobile operating system in the U.S., behind Apple's iOS. Android OS is open source, so numerous equipment manufacturers can use Android OS on their mobile devices. Google has entered into two kinds of contracts with original equipment manufacturers and phone carriers: Mobile Application Distribution Agreements ("MADAs") and Revenue Share Agreements ("RSAs").[60] Pursuant to MADAs, original equipment manufacturers are required to preinstall the Google Search app and Chrome browser and place the app on the home screen. The RSA ensures that all preinstalled access points will have Google as the preset default, with no competing search engine preinstalled.

88.     Each of these types of agreements forecloses competition in the general search services market for most Android phones and is inherently anticompetitive. For example, in 2020, Google committed to paying Samsung (an original equipment manufacturer) $8 billion over four years to secure Google's search engine, voice assistant, and Play Store as the default on Samsung's mobile devices. Like its conduct with Apple and Mozilla, this conduct forecloses competing search engines from gaining a foothold. This forces Publishers to deal with Google as an indispensable provider of search referral traffic services on Google's extortionate terms.

89.     As a direct result of these foreclosure agreements, Google captures and traps users in its search engine, thereby starving the market of meaningful competition for online search services.

---

[60] *See* SJ Op. at 13-14, 40-41.

### 4.  Tying.

90.    To *attract* users to its walled garden search engine, Google ties the provision of its general search engine services to the provision of services for digital news and reference publishing. Under this anticompetitive tying arrangement, the tying market is online search services and the tied market is the market for digital news and reference publishing services.[61] . Users who "purchase" Google's general search services through their attention and data, are forced to purchase Google's news and reference publishing services as well, because Google's digital news publishing services cannot be decoupled from search. On the supply side, Publishers who wish to purchase Google's search traffic referral services, must also purchase Google's digital news publishing services. As explained in the following section, this tying arrangement serves both to reinforce Google's monopoly power in the tying market of general search engine services, as well as expand Google's market power and harm competition in the tied market for digital news and reference publishing.

### a.  Google's Extractive Relationship with Publishers.

91.    The search engine transformed the traditional print media industry. Before the internet became ubiquitous, Americans obtained original, fact-based informational content from newspapers, magazines, and reference works (back issues, encyclopedias, dictionaries, almanacs, etc.). Since the emergence of the web, the news and reference industry has shifted towards online distribution and consumption, as part of the digital content media ecosystem. The percentage of Americans getting at least some of their news online rose from 2% in 1995 to 93% in 2018.[62]   And, today, only one publisher of encyclopedias—World Book—remains in print. Digitization has led to the development

---

[61] Tying also occurs with respect to Google's search advertising services and its implementation of the recent modification of its AdSense billing practices, as discussed in a separate section below.

[62] News Media Alliance, *Google Benefit from News Content: Economic Study* at 3 (June 2019), https://www.newsmediaalliance.org/wp-content/uploads/2019/06/Google-Benefit-from-News-Content.pdf.

of new formats for publishing informational content online, including digital magazines and newspapers (*e.g., The Helena World News*, *Washington Post*) as well as blogs and other informational websites (*e.g.*, AARP, AccuWeather, Consumer Reports, WebMD). [63] Digital publishing is a substantial line of commerce. In the United States, digital publishing revenue is expected to exceed $27 billion by 2027. [64]

92.     The search engine introduced a new way to distribute news products. In the analog era, readers got the news from brick-and-mortar retailers, paper boxes, and "delivery boys." Then, in the late 1990s, as publishers began issuing digital versions of their products, the first generation of search engines—Yahoo!, AltaVista, Ask Jeeves, and Google—provided publishers a unique intermediation service. Search engines can connect users seeking information to publishers providing answers, by generating a list of search results linking to their relevant webpages. The flow of users from the search engine to publishers is called search-referral traffic.

93.     After a decade on the market, Google eclipsed its rival search engines, reaching an 82.5% market share in November 2009. [65] Because Google monopolizes search, it exercises dominance over Publishers, who play a dual role in the multi-sided general search services market: they are both purchasers of search-referral traffic and suppliers of content.

94.     Google's commercial relationship with Publishers has unique market dynamics. Both Google and Publishers have the same triple-product business model: (1) content attracts users; (2)

---

[63] In 2001, in recognition of this distinct emerging market, a trade association called the Online Publishers Association (now called Digital Content Next) was formed. *See* https://digitalcontentnext.org/.

[64] Statista, *U.S. digital publishing industry—statistics and facts* (Aug. 30, 2023), https://www.statista.com/topics/1453/digital-publishing/#topicOverview

[65] Statcounter: GlobalStats, *Search Engine Market Share United States of America*, https://gs.statcounter.com/search-engine-market-share/all/united-states-of-america/2009 (last accessed Oct. 29, 2023).

users provide their attention and data; and (3) attention and data are used to sell advertising and improve services.

95.    Google and Publishers exchange the inputs to this model: content provided by Publishers and referral traffic (*i.e.,* user attention and data) provided by Google.



96.    This exchange occurs in billions of transactions as Google serves search results in response to user queries seeking information. In a competitive search market, this relationship would be symbiotic, with the value generated by the exchange being split fairly and sustainably. But in a monopolized search market, the relationship turns parasitic. The monopolist—Google— can extract rent profits by raising the cost of referral traffic (by extracting more content) and depressing the quality of the referral-traffic service (by diverting traffic).

97.    Publishers have no choice but to accept this parasitic arrangement because they are locked in by Google's gatekeeping role as a dominant digital platform. Google locks them in by leveraging barriers to entry and technical features of the search engine.

98.    Searching the web is a three-step process requiring high investments and massive computing power. Google Search involves these stages:

- **Crawling**: Google downloads text, images, and videos from pages it found on the internet with automated programs called crawlers.
- **Indexing**: Google analyzes the text, images, and video files on the page, and stores the information in the Google index, which is a large database.
- **Serving search results**: When a user searches on Google, Google returns information that's relevant to the user's query.[66]

99.     Google uses "a huge set of computers to crawl billions of pages on the web" using a web crawler program called "Googlebot."[67] Googlebot renders and copies the content of the webpage. Google uses that ingested content to index the webpage, making the webpage searchable and findable through Google Search. The relevance of search results is determined by applying an algorithm to pull a responsive list of webpages from the index.

100.     "A search engine can function only if it has access to an index, and an index can exist only once web pages have been crawled and collated into a repository."[68] This requires high fixed costs and sizable server storage and computing power. These barriers have concentrated English-language search indexing into the hands of the only two companies that maintain comprehensive indexes of the web: Google and Bing (Microsoft).[69] "Other search engines—including Yahoo and DuckDuckGo—must purchase access to the index from Google and/or Bing through syndication agreements that provide syndicated search engines with access to search results and search advertising."[70]

101.     Google's gatekeeping role in web crawling and indexing enables it to lock in publishers due to switching costs. Crawlers slow down websites and can cause them to crash, so

---

[66] Google, *In-depth guide to how Google Search works*, https://developers.google.com/search/docs/fundamentals/how-search-works (last accessed Oct. 29, 2023).

[67] *Id*.

[68] House Subcommittee Report at 78.

[69] *Id.* at 80.

[70] *Id*.

most website publishers block access to all but a few crawlers. [71] As the House Subcommittee Report explained:

> The one crawler that nearly all webpages will allow is Google's "Googlebot," as disappearing from Google's index would lead most webpages to suffer dramatic drops in traffic and revenue. Any new search engine crawler, by contrast, would likely be blocked by major webpage owners unless that search engine was driving significant traffic to webpages—which a search engine cannot do until it has crawled enough webpages. [72]

102.    The next section will explain how Google has leveraged its monopoly power in search to misappropriate Publishers' content and force them to supply an unlawful tying arrangement that makes them compete against their own products.

### b.  Building the Walled Garden: Google Misappropriates Publisher Content

103.    Google began life as an information retrieval portal, designed to help users find links to relevant webpages and navigate away from Google as fast as possible. This is what users wanted from a search engine. And Google's original PageRank algorithm gave consumers what they wanted. As Google's co-founder Larry Page told an interviewer in 2004: "We want to get you out of Google and to the right place as fast as possible." [73]

104.    But Google quicky realized that this goal was at odds with Google's core business plan: selling ads against search. In 2000, Google launched the AdWords program, selling space on Google's SERP. Advertisers could bid for keywords and their ads would be targeted to users as sponsored links appearing alongside (and later above) the "organic" search results ranked by their

---

[71] Hal Singer, *Written Comments in Response to U.S. Copyright Office's Publishers' Protection Study: Notice and Request for Public Comment*, 86 Fed. Reg. 56721 (Oct. 12, 2021), https://www.copyright.gov/policy/publishersprotections/initial-comments/Hal%20Singer%20-%20Initial%20Comment.pdf

[72] *Id.* at 79.

[73] David Sheff, *Playboy Interview: Google guys: a candid conversation with America's newest billionaires about their oddball company, how they tamed the web and why their motto is "Don't be evil"*, Playboy, 55 (Sept. 1, 2004).

relevance to the user's query. Today, search advertising generates the bulk of Google's revenue, accounting for roughly 79%.[74]

105.    By 2010, Google faced several problems. *First*, the bulk of Google searches (an estimated 80%) are for non-commercial information—i.e., timely news or evergreen reference content. But Google does not serve ads for these searches. To monetize these searches, Google needed to entice information seekers to stay engaged with the search platform and use Google for commercial queries as well.

106.    *Second*, advertising degraded the quality of Google's product: search. As one Wall Street Journal reporter put it in 2011: "Speaking as a consumer, I find my Google search results to be more and more polluted with junk that I don't want to see or that doesn't seem relevant."[75]

107.    To overcome these problems, Google needed to attract users to Google Search with high-value informational content and "trap" them within Google's ecosystem.

108.    Beginning in or around 2010 or 2011, Google devised a long-term plan to transform Google into a walled garden. Since then, and throughout the Class Period, Google has maintained its monopoly in search by transforming itself from an information retrieval service to a question-and-answer service, aimed at displacing other digital publishers.

109.    In May of 2011, Google CEO Eric Schmidt explained this strategy:

**we're trying to move from answers that are link-based to answers that are algorithmically based, where we can actually compute the right answer.** And we now have enough artificial intelligence technology and enough scale and so forth that we can,

---

[74] Statista, *Net Search Advertising Revenue of Google in the United States from 2019 to 2024*, https://www.statista.com/statistics/271527/forecast-of-revenues-from-paid-search-in-the-us/ (last accessed Oct. 30, 2023).

[75] Joshua Benton, *Google now wants to answer your questions without links and with AI. Where does that leave publishers?*, Nieman Lab (Feb. 7, 2023), https://www.niemanlab.org/2023/02/google-now-wants-to-answer-your-questions-without-links-and-with-ai-where-does-that-leave-publishers/

for example, give you — literally compute the right answer.[76]

110.    To publish answers to users' questions, Google needed a supply of information. Normally, a publisher obtains their inventory in two ways: (1) produce it through original reporting and research or (2) syndicate it through licensing arrangements with other publishers. But Google's monopoly power in search gave it a third option: misappropriate content from Publishers.

111.    Google already had free access to high-quality news and reference content thanks to its general search services. To be discoverable in Google's search results, and receive Google's search-referral traffic services, must allow Google to crawl their websites, copy their original content, and make vast and unknown uses of that content for Google's benefit. As a practical matter, Publishers can block Googe's web-crawler, Googlebot. They can do so by embedding a robots.txt file or a "no index" rule in the code of their webpage. But this would "drop that page entirely from Google Search results."[77]

112.    For Publishers operating on thin profit margins, going dark on Google would be commercial suicide. Search referral traffic is the largest single source of external traffic to news websites: exceeding social media such as Facebook or Twitter.[78] Google controls the overwhelming share of search-referral traffic to Publishers: 95% of all referral traffic to news websites from search engines originates from Google, only 5% originates from a handful of competitors: Bing, Yahoo, and DuckDuckGo.[79]

---

[76] Joshua Benton, *Eric Schmidt: Google wants to get so smart it can answer your questions without having to link you elsewhere*, Nieman Lab (June 1, 2011), https://www.niemanlab.org/2011/06/eric-schmidt-google-wants-to-get-so-smart-it-can-answer-your-questions-without-having-to-link-you-elsewhere/.

[77] Google, *Block Search indexing with no index*, https://developers.google.com/search/docs/crawling-indexing/block-indexing (last accessed Oct. 30, 2023).

[78] Press Gazette Article.

[79] *Id.*

113.     Informational search (*i.e.*, news and reference search) constitutes a line of commerce (or alternatively a market) in its own right. Google treats news and reference search as its own vertical sub-set, bundled within its general search services: Google's algorithm detects an informational request and serves specialized content and links on the SERP. Because Google controls 95% of such referral traffic, it can extract an exorbitant price from Publishers: unlicensed use of their product inventory.

### c.   Google Ties General Searches to News and Reference Publishing.

114.     In 2012, Google began publishing news and reference content directly on the SERP, providing instant answers to user queries. Launched in May 2012, the Knowledge Graph was Google's first foray into replacing search result links with rich-text answers. When a user searches for information on a topic, Google displays a "Knowledge Panel" to the right of the search results. This panel contains a summary of content drawn from the Knowledge Graph database. Google compiled this massive database by extracting information from Publishers' websites—what Google calls "materials shared across the web"—and from "open source and licensed databases." By 2020, the Knowledge Graph had grown to "500 billion facts about five billion entities."[80] Google described the Knowledge Graph as a "critical first step towards building the next generation of search, which taps into the collective intelligence of the web and understands the world a bit more like people do."[81] Much of the "collective intelligence" Google tapped into was content misappropriated from Publishers.

---

[80] Danny Sullivan, *A reintroduction to our Knowledge Graph and knowledge panels*, Google The Keyword (May 20, 2020), https://blog.google/products/search/about-knowledge-graph-and-knowledge-panels/.

[81] Amit Singhai, *Introducing the Knowledge Graph; things, not strings*, Google The Keyword (May 16, 2012), https://blog.google/products/search/introducing-knowledge-graph-things-not/.

115.    That same year, Google launched a project to transform Google Search into an information-publishing platform using AI. Google put two engineers, Steven Baker and Srinivasan Venkatachary, in charge of a project focused on "Question Answering from the Web."[82] Internally, the project was called "WebAnswers."[83] Google merged the Knowledge Graph question-answering efforts into Baker and Venkatachary's team, with a goal to develop "one coherent question answering system" using "web extraction."[84]

116.    In 2016, "Featured Snippets" was launched. When a user asks a question in Google Search, Google algorithmically generates an answer by extracting a summary from a webpage and displaying it in an information "box" on top of the search results. Hardly a snippet, the summary can contain entire paragraphs.

117.    Google's patent "Natural Language Results for Intent Queries" (2016) makes clear that the goal of Featured Snippets is to shift users away from clicking on links to news and reference sources by publishing extracts of such content directly on the SERP.[85] The patent explains that Google's traditional search results "fail to provide a complete, easily understood answer non- factual questions where there is no one correct answer."[86] From Google's perspective, the problem with its hyperlinked search results is that they make the user navigate away from Google's SERP: "While a user can select the link associated with the snippet to view the context

---

[82] Srinivasan Venkatachary, LinkedIn Profile, https://www.linkedin.com/in/srinivasanvenkatachary (last accessed Oct. 30, 2023).

[83] Steven Baker, LinkedIn Profile, https://www.linkedin.com/in/steven-baker-5077885/ (last accessed Oct. 30, 2023).

[84] Id.

[85] US Pat. No. 9,448,992 B2 to Shmiel et al., Sep. 20, 2016, https://patentimages.storage.googleapis.com/04/44/5d/1acc228f2d34c3/US9448992.pdf.

[86] Id. at col. 1: 6-22.

of the snippet in the original document to determine whether the identified information is adequate, this slows the user experience and involves additional effort on the part of the user to receive an answer to a non-factual question."[87] Google's solution is to provide "[n]atural language answers . . . in a paragraph and/or list format that provide diverse or complex answers or more than one fact per answer."[88]

118.    Google admits that its natural-language answers have value because they are extracted from news and reference content. As the patent states: "The natural language answers are of high quality because they are derived from authoritative sources."[89]

119.    Google's "Featured Snippets" are effective because they extract the most valuable part of publishers' inventory: the "lead." This is the first paragraph that presents the main points of an article, using journalism's classic inverted-pyramid structure.



*Figure 1: "Inverted pyramid in comprehensive form" by Christopher Schwartz is licensed under CC BY-SA 3.0*

---

[87] *Id.*

[88] *Id.* at col. 4: 3-5.

[89] *Id.* at col. 4: 5-7.

120.     Google extended Featured Snippets through the "People Also Ask" box—a SERP feature that displays a drop-down list of follow-up questions related to the user's original search query. When a user clicks on a suggested question, Google displays yet another natural-language answer.  With each click, more questions appear below it, followed by more answers. A user can view hundreds of questions and view hundreds of answers—extracted from Publishers—all without ever leaving Google's SERP.

121.     The Featured Snippets (WebAnswers) system has transformed Google's SERP from a list of simple blue hyperlinks to something closer to front-page news or an encyclopedia entry, with rich-text content and high-quality photography. The following figures illustrate this evolution. [90]

---

[90] Vision Museum, https://developers.google.com/search/docs/crawling-indexing/block-indexing (last accessed Oct. 30, 2023).

 steve jobs | Search |  Advanced Search
Preferences

**Web**   News   Video

### Steve Jobs - Wikipedia, the free encyclopedia
Biography from Wikipedia, the free encyclopedia: brief history, business ventures, quotes, and links.
en.wikipedia.org/wiki/**Steve_Jobs** - 188k - Cached - Text - Similar pages - Note this

### Apple - Press Info - Bios - Steve Jobs
Official biography of the co-founder of Apple and Pixar.
www.apple.com/pr/bios/**jobs**.html - 7k - Cached - Text - Similar pages - Note this

### STEVE JOBS
**Steve Jobs** innovative idea of a personel computer led him into revolutionizing the computer hardware and software industry. When **Jobs** was twenty one, ...
ei.cs.vt.edu/~history/**Jobs**.html - 42k - Cached - Text - Similar pages - Note this

### News results for **steve jobs**

 **Steve Jobs** to keynote Macworld Expo - 4 hours ago
By Peter Cohen IDG World Expo on Monday announced that Apple CEO **Steve Jobs** will deliver the keynote address to attendees of Macworld Conference & Expo 2008 ...
Macworld - 9 related articles »

### Text of **Steve Jobs'** Commencement address (2005)
This is the text of the Commencement address by **Steve Jobs**, CEO of Apple Computer and of Pixar Animation Studios, delivered on June 12, 2005. ...
news-service.stanford.edu/news/2005/june15/**jobs**-061505.html - 20k -
Cached - Text - Similar pages - Note this

### The Secret Diary of **Steve Jobs**
"Just as Tom Wolfe skewered Wall Street in the '80s, Fake **Steve Jobs** lights a mini-Bonfire in Silicon Valley with Options." -- Entertainment Weekly ...
fakesteve.blogspot.com/ - 175k - Cached - Text - Similar pages - Note this

 ### YouTube - **Steve Jobs** Stanford Commencement Speech 2005
Here we see **Steve Jobs** delivering his commencement speech to ...
⊞ Watch video - 15 min - ★★★★★
www.youtube.com/watch?v=D1R-jKKp3NA



122.   In 2023, Google Search is now a digital publishing platform that competes with other Publishers for attention, user engagement, and advertising revenue.[91] When Google "detect[s] a search query is news-oriented" it serves a SERP that provides the news itself.[92]

123.   For example, "what is happening with Sam Altman?" returns a SERP dominated by a

---

[91] Google Search is in fact just one part of Google's walled garden for news. Google admits that it has a growing suite of news publishing products including: Google News (a news aggregator website and app), Discovery (a news feed extension for search), YouTube, and Google's Voice Assistant. *See* Google, *Presenting news results in helpful ways*, https://newsinitiative.withgoogle.com/hownewsworks/approach/presenting-news-in-helpful-ways/ (last accessed Oct. 30, 2023).

[92] *Id.*

full 48-word paragraph of journalism copied from PBS: "Sam Altman is back as the chief executive of OpenAI. The hot tech start-up behind ChatGPT not only brought Altman back; it's also overhauling the board that fired him with new directors, ending a dramatic five-day standoff that's transfixed Silicon Valley and the artificial intelligence industry."



124.     Not only does this SERP fully answer the user's question, but the "Videos" box that appears below the "Featured Snippet" only returns links to YouTube—Google's video platform. Google has achieved a self-preferencing walled garden. Other organic links from

Publishers are pushed down "below the fold,"[93] meaning a user would have to scroll down to actually find links to news websites. But users have no reason to click-through, because they have consumed the news directly on Google Search.

### d. Google's Scheme Maintains its Monopoly in the Tying Search Market and Harms Competition in the Tied Publishing Market.

125. Google's strategy is an anticompetitive tying arrangement. Throughout the Class Period, Google has tied its search engine product to misappropriated news and reference content published on its search platform. The tying product market is the general search services market, where Google exercises enduring monopoly power. The tied product market is digital news and reference publishing. When a user searches for information on Google, buying Google's search service is conditioned on also buying Google's re-published news and reference content.

126. This tying arrangement has been enormously successful for Google. Informational news and reference content is valuable for Google because it is in high demand by Google users. Trial evidence in the DC DOJ Case reveals that roughly 80% of all searches on Google are non-commercial, informational queries, according to Google's expert witness, Mark Israel.[94] Google does not serve search ads for these searches. Instead, it monetizes them as "free samples for advertising" to "build its brand."[95]

127. Long ago, Google admitted publicly that it uses news content to attract and trap users. In 2008, Marissa Mayer, then Google's Vice-President for Search Products and User Experience, clarified that news is valuable because it drives search traffic. According to a *Forbes* conference

---

[93] In print publishing, "below the fold" refers to articles appearing below the horizontal fold of a newspaper, which were less likely to garner attention.

[94] Trial Tr., *United States, et al. v. Google LLC*, No. 1:20cv03010 (D.D.C. Nov. 2, 2023) (Day 33) at 8608:13-8609:23.

[95] *Id.*

attendee, Mayer explained that Google News—a news aggregation product without ads—"funnels readers over to the main Google search engine, where they do searches that do produce ads. And that's a nice business. Think of Google News as a $100 million search referral machine."[96]

128.    Google's tying arrangement is highly effective at diverting users into Google's walled garden and reducing referral traffic to rival Publishers.  A 2017 study analyzed two million Featured Snippets and found that they cause a significant drop in the click-through rate to websites appearing in the organic search results.[97]

129.    Google's tying arrangement has produced a zero-click world. As of 2020, roughly 65% of all Google searches were zero-click searches, where users get the information they seek on the search results page rather than clicking the link to the publishers' content.[98] That same year, a staggering 77% of Google searches on mobile phones were zero-click searches.[99] All of this search traffic bolsters the scale and network effects that protect and maintain Google's monopoly in general search services.

130.    By diverting information-seekers to Google Search, Google's tying arrangement has made Google.com the largest news and reference website in the world.  In 2023, Google.com has

---

[96] Jon Fortt, *What's Google News worth? $100 million*, Fortune (July 27, 2008), https://fortune.com/2008/07/22/whats-google-news-worth-100-million/.

[97] See Tim Soulo, *Ahrefs' Study of 2 Million Featured Snippets: 10 Important Takeaways*, Ahref's Blog (Apr. 7, 2020), https://ahrefs.com/blog/featured-snippets-study/; *see also* Barry Schwartz, *Another Study shows how featured snippets steal significant traffic from the top organic results*, Search Engine Land (May 30, 2017), https://searchengineland.com/another-featured-snippet-study-shows-steal-significanttraffic-first-organic-result-275967 (summarizing Ahrefs' study).

[98] Rand Fishkin, *In 2020, Two Thirds of Google Searches Ended Without a Click*, Sparktoro (Mar. 22, 2021) ("Fishkin Article"), https://sparktoro.com/blog/in-2020-two-thirds-of-google-searches-ended-without-a-click/.

[99] *Id*.

approximately 87 billion visits per month.[100] Roughly eighty percent of those visits are informational, which means that 69.6 billion of Google's monthly visits are by consumers of informational digital content. Many of these visitors specifically seek conventional news content: in the second quarter of 2023, "weather" was the second and "news" was the ninth most common search query on Google.[101] With an audience of 69.6 billion information consumers per month, Google.com is far and away the largest publisher of online news and reference content. Google produces none of this content: instead, it exacts unlicensed syndication from Publishers' inventories copied by Google's web-crawler.



131.   Google's tying arrangement substantially lessens competition in the tied market of digital news and reference publishing by free-riding and raising rivals' costs. As a provider of search-referral traffic services to Publishers, Google is raising the cost of its services—by coercing

---

[100] Similarweb.com, google, https://www.similarweb.com/website/google.com/#ranking (last accessed Oct. 30, 2023).

[101] Statista, *Top Google search inquiries worldwide in the 2d quarter of 2023*, https://www.statista.com/statistics/265825/number-of-searches-worldwide/2023 (last accessed Oct. 30, 2023).

unlicensed use of web-crawled content. At the same time, Google is reducing the quality of its service by reducing the volume of referral traffic.

132.   Google claims it sends users "to news sites 24 billion times per month," underscoring that it is an essential channel of news dissemination.[102] But this figure only represents users who actually click on links to news sites. Since 69% of Google searches are zero-click searches, tens of billions of users are consuming the news directly on Google Search. Yet Google pays none of the labor and overhead costs that make reporting the news possible. Every user who consumes news and reference information on Google is a stolen customer for the original Publisher of that content. Publishers cannot monetize that customer through display advertising or subscriptions.

133.   Publishers have no choice but to supply content to a tying arrangement that is forcing them to compete against their own products. Google does not permit Publishers to fully block Featured Snippets without blocking all snippets, which would cause search referral traffic to plummet.[103] As the News Media Alliance notes, this "would be suicidal."[104]

134.   By imposing monopoly rents on Publishers, Google is raising their costs to levels that often cannot sustain production. Google's anticompetitive conduct is decimating news Publishers' revenue which has fallen from roughly $50 billion in 2005 to $20 billion in 2022. Like a parasite killing its host, Google is forcing smaller publishers out of business and forcing even larger publishers to shrink staff and operations. Since 2005, America has lost more than a quarter of its

---

[102] Richard Gingras, *Setting the record straight on news*, Google The Keyword (June 26, 2020), https://blog.google/outreach-initiatives/google-news-initiative/setting-record-straight-news/.

[103] *See* Google, *Featured snippets and your website*, https://developers.google.com/search/docs/appearance/featured-snippets ("Using a low *max-snippet* setting doesn't guarantee that Google will stop showing featured snippets for your page. If you need a guaranteed solution, use the *nosnippet* rule.") (emphases in original).

[104] News Media Alliance, *How Google Abuses Its Position as a Market Dominant Platform to Strong- Arm News Publishers and Hurt Journalism* at 23 (Updated: September 2022) https://www.newsmediaalliance.org/wp-content/uploads/2022/09/NMA-White-Paper_REVISED-Sept-2022.pdf.

newspapers (2,500) and is expected to lose a third by 2025.[105] Seventy million Americans now live in news deserts, with little to no local news coverage, according to Northwestern University's 2022 State of Local News report.[106] Google is contributing to the decline of the news industry.

135.   Google's tying arrangement distorts consumers' choices. But for the tie, consumers would choose to acquire content from the Publishers who actually produce it and browse a variety of publications. Instead of a zero-click world, there would be a click-through world, as existed before Google implemented the tie. This would help sustain production, which ultimately benefits consumers. Instead, by squeezing Publishers out of the market, Google's tying arrangement reduces the variety of news and reference products on the market.

136.   It also reduces the quality of news and reference content on the digital market. *First*, Google's tying arrangement degrades the quality of news and reference information by publishing *only* the lead, while stripping away nuance and context. As the *Washington Post* noted:

> Google's knowledge panels regularly, if inadvertently, make rather important decisions for us: Taiwan, you'll remember, is described as if it were an independent nation, when only 22 countries actually recognize it as such. Meanwhile, Google corrects searches for "Londonderry," Ireland's fourth-largest city, to "Derry," the (unofficial) term favored by Irish nationalists.[107]

Google's rich-text answers are an inferior product to the full news and reference articles they compete against. But because they are tied to search, they proliferate in the marketplace of ideas, as substitutes for original content.

137.   *Second,* many of Google's Featured Snippets and Knowledge Boxes display content

---

[105] Penny Abernathy, *The State of Local News – The 2022 Report*, Northwestern Local News Initiative (June 29, 2022), https://localnewsinitiative.northwestern.edu/research/state-of-local-news/report/.

[106] *Id.*

[107] Caitlin Dewey, *Google's sketchy quest to control the world's knowledge*, Washington Post, May 11, 2016, https://www.washingtonpost.com/news/the-intersect/wp/2016/05/11/you-probably-havent-even-noticed-googles-sketchy-quest-to-control-the-worlds-knowledge/.

extracted from potentially unreliable sources of information that are not professionally edited. For example, as a 2016 *Washington Post* article observed, Google's knowledge panels can extract information "from unsourced Wikipedia edit[s]."[108]

138.  *Third*, Google's tied rich-text answers distort consumer choice because they "algorithmically confer a lot of unearned authority."[109] Information displayed by Google is "'atomized' or removed from its source and placed alongside other content."[110] This makes it harder for consumers to choose between products or built brand trust based on informed judgments on editorial quality. By divorcing content from its professional producers, Google makes it harder for consumers to distinguish between, on one hand, fabrication and opinion and, on the other, trustworthy sources, produced with professional ethical standards.

139.  By squeezing out rival Publishers, Google is contributing to the loss of tens of thousands of reporters and editors from the labor market. Employment has dropped 70% from 2005-2022. With fewer reporters, less news is gathered on current events. And with fewer editors and fact checkers, less online information is verified for accuracy under the ethics and standards of professional journalism.

140.  As a result, misinformation proliferates. Google does not merely pass on fake news or inaccurate information. In the case of Bard, its new chatbot, it creates false information, as discussed in paragraphs 151-52, in the next section of this complaint.

---

[108]. *Id*.

[109] *Id.*

[110] House Subcommittee Report at 52.

### 5.  Introduction And Implementation of Bard.

141.   The tying conduct of Google described in the previous sections was only extended and exacerbated by Google's introduction of Bard in 2023.

142.   In order to understand the most recent anticompetitive conduct in which Google engaged as to Publishers, it is necessary to discuss the introduction of the form of GAI known as OpenAI in 2022 and Google's response to it in 2023. OpenAI has operated through, *inter alia*, the programs ChatGPT-3 (introduced in 2020), ChatGPT-3.5 (introduced in December of 2022), and ChatGPT-4 (introduced in March of 2023).[111]

143.   Microsoft was an early supporter of OpenAI, investing $1 billion in the company in 2019.[112] Its cumulative investment is $13 billion (including $10 billion in early 2023). As a result of this latter investment, Microsoft reportedly has a 49% stake in the company and a right to 75% of OpenAI's profits until its investment is recouped.

144.   The two companies describe themselves as having a "partnership."[113] Indeed, going back to 2020, Microsoft had given OpenAI access to its Azure infrastructure, a cloud platform for more than 200 products and various services.[114] It was through this platform that OpenAI disseminated or sold the ChatGPT-3.5, ChatGPT-4, and the ChatGPT-4 Plus applications. Furthermore, as a result of this "partnership", Microsoft became the exclusive cloud partner for OpenAI, powering all workloads across products, Application Programming Interfaces, and

---

[111] A timeline of corporate events for OpenAI is set forth in Sarah O'Neill, *The History of OpenAI*, LAX Hub (May 2, 2023), https://www.lxahub.com/stories/the-history-of-openai#:~:text=Founded%20in%202015%20by%20a,Greg%20Brockman%2C%20and%20Andrej%20Karpathy ("*OpenAI History*").

[112] Microsoft, *OpenAI And Microsoft Extend Partnership*, Official Microsoft Corporate Blog (Jan. 23, 2023), https://blogs.microsoft.com/blog/2023/01/23/microsoftandopenaiextendpartnership/ ("*Microsoft PR*").

[113] *Id.*

[114] *Id.*

resources. Microsoft integrated ChatGPT-4 into its Bing web browser and plans to add it to apps like Word, PowerPoint and Outlook.[115] This feature was originally referred to as "Bing Chat" but is now referred to as "Copilot."

145.   Google was threatened by this new competitive element from its biggest rival. Although Google initially dismissed the idea of introducing its own GAI, saying it had a greater "reputational risk" than a startup like OpenAI,[116] that attitude changed rapidly, given the groundswell of public attention over ChatGPT. By January of 2023, Google announced the introduction of Bard and other GAI programs. As one source stated:

> Following its much-reported management declaration of a 'Code Red' response to Microsoft's repeated and increasingly more substantial OpenAI investments and the startup's creation, ChatGPT, it has been widely presumed that this latest announcement is part of a strategic commercial countermeasure.
>
> According to the *New York Times*, Google's founders, Larry Page and Sergei Brin, were brought in for a significant C-suite meeting to discuss the threat of ChatGPT to the ubiquitous search engine's hold on the internet.[117]

146.   Bard had been in the planning and testing stage at Google for years. It was initially based on the LaMDA Large Language Model ("LLM"), which had been trained on a dataset consisting of: (a) 12.5% code documents from sites relating to programming, such as Q&A sites, tutorials, etc.; (b) 12.5% Wikipedia (in English); (c) 6.25% English web documents; (d) 6.25% non-

---

[115] Tom Warren, *Microsoft to demo its new ChatGPT-like AI in Word, PowerPoint, and Outlook soon*, The Verge (Feb. 10, 2023), https://www.theverge.com/2023/2/10/23593980/microsoft-bing-chatgpt-ai-teams-outlook-integration?uuid=FtJuUSu2JEtqP3Qp0716.

[116]  Britney Nguyen, *Google execs say the company isn't launching a ChatGPT competitor because if has greater 'reputational risk' than startups like OpenAI*, Insider (Dec. 14, 2022), https://www.businessinsider.com/google-isnt-launching-chatgpt-competitor-due-to-reputational-risk-2022-12.

[117] Jonny Wills, *Google in 'Code Red' response to ChatGPT*, UC Today (Jan. 26, 2023), https://www.uctoday.com/unified-communications/google-in-code-red-ai-response-to-chatgpt/.

English web documents; and (e) 50% "dialogs data from public forums."[118]

147.    By the time Bard was introduced, it was based on PaLM2, Google's latest data training model, which has multilinguistic capabilities. Google is vague about the sources of training for PaLM2, merely noting that "the system's training corpus is comprised of 'a diverse set of sources: web documents, books, code, mathematics, and conversational data,' without offering further detail."[119]

148.    Bard, like ChatGPT, was trained on datasets that included news, magazine and digital publications. A 2023 report from the News Media Alliance ("NMA") states the following:

> • In fact, our analysis of a representative sample of news, magazine, and digital media publications shows that the popular curated datasets underlying some of the most widely used LLMs significantly overweight publisher content by a factor ranging from over 5 to almost 100 as compared to the generic collection of content that the well-known entity Common Crawl has scraped from the web.
>
> • Other studies show that news and digital media ranks third among all categories of sources in Google's C4 training set, which was used to develop Google's GAI-powered search capabilities and products like Bard.  Half of the top ten sites represented in the training set are news outlets.
>
> • The LLMs also copy and use publisher content in generating outputs.  The LLMs can reproduce the content on which they were trained, demonstrating that the models retain and can memorize the expressive content of the training works.[120]

149.    Indeed, in 2023, it was publicly revealed that Google's misappropriation of

---

[118] Roger Montti, *Google Bard AI—What Sites Were Used To Train It?*, Search Engine Journal (Feb. 10, 2023), https://www.searchenginejournal.com/google-bard-training-data/478941/#close.

[119] James Vincent, *Google announces PaLM2 language model, already powering 25 google services*, The Verge (Mar. 10, 2023), https://www.theverge.com/2023/5/10/23718046/google-ai-palm-2-language-model-bard-io.

[120] News Media Alliance, *White Paper: How the pervasive copying of expressive works ti train and fuel generative artificial intelligence systems is copyright infringement and not a fair use* at 1-2 (Oct. 20, 2023), https://www.newsmediaalliance.org/wp-content/uploads/2023/10/AI-White-Paper-with-Technical-Analysis.pdf) ("NMA White Paper").

Publishers' content was central to its development of GAI. Beginning in or around 2017, and continuing throughout the Class Period, Google has "trained" its LLMs using millions of unlicensed copies of Publishers' content—including Plaintiff's.

150.    As noted above, Google was able to acquire massive amounts of Publishers' content because of its monopoly power in search. One of Plaintiff 's newspapers was one of the Publishers subjected to this misappropriation. An April 2023 *Washington Post* investigation revealed that Google had used copious amounts of Plaintiff's content to train its LLM Bard (discussed below), as part of "Google's C4 data set, a massive snapshot of the contents of 15 million websites that have been used to instruct some high-profile English-language AIs, called large language models, including Google's T5 and Facebook's LLaMA."[121] Google's LLMs were trained on 650,000 "tokens" of text extracted from the *The Helena World* newspaper (helena-arkansas.com).[122]

---

[121] Kevin Schaul, et al, *Inside the secret list of websites that make AI like ChatGPT sound smart*, Washington Post (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/

[122] "In tokenization, AI algorithms, models, or datasets are represented as tradable tokens on a blockchain. As a result, developers may easily share, sell, or license their AI inventions to others within a decentralized ecosystem by tokenizing them. Applications for tokenized AI models include data analysis, picture recognition, natural language processing, and more." Alisha Bains, *What Are AI Tokens? A Comprehensive Guide*, CCN (Aug. 29, 2023), https://www.ccn.com/education/what-are-ai-tokens-a-comprehensive-guide/.



151. All of this web scraping helped Google enormously in developing search algorithms, the complex mechanisms that retrieve information responsive to an end-user's search inquiry. In creating such algorithms, Bard is then able to rely on the data obtained from such scraping, the indexing of that data, and the ranking of that data responsive to an inquiry.[123] LLMs are used to decipher the content of the data and the end-user's search request. The LLM is responsible for ensuring that: (a) the search retrieves germane data, meaning that the quality of the website is deemed responsive; (b) the usability of that website; and (c) the context of search history related to the website.[124] Thus, the data obtained from various sources, particularly news sources, is critical to Google's search capability, but the entities from which Bard's trainers scrape data never authorize

---

[123] Ben Lutkevich, *Google algorithms explained: Everything you need to know*, Tech Target (Apr. 20, 2023), https://www.techtarget.com/whatis/feature/Google-algorithms-explained-Everything-you-need-to-know#:~:text=What%20are%20Google%20search%20algorithms,keywords%20that%20match%20the%20query.

[124] *Id.*

such web crawling and Google never shares any of its revenue from such scraping with them.

152.   At the time of Bard's introduction in February of 2023, many at Google believed that the introduction was too rushed and that Bard was not yet ready for prime time. As explained in one article:

> Google's artificial intelligence chatbot, also known as Bard AI has been a fan favourite among regular people and AI enthusiasts as it poses some competition to OpenAI's ChatGPT. However, Google's employees are evidently not happy with the chatbot and have been against how it was developed and launched.
>
> Google's employees have described BardAI as a quickly produced, badly executed, and uncharacteristically Google-like product that will do more harm than good for the company's brand.
>
> According to several reports, several engineering and non-engineering staff who tested the chatbot referred to it as "a pathological liar" and pleaded with the firm not to launch it.
>
> The issue was raised during a discussion with eighteen current and former Google employees. During one of these company-wide sessions, an employee mentioned how frequently Bard would give users potentially dangerous advice, whether it was about how to land an airliner or how to go scuba diving. Another user said, "Bard is worse than useless: please do not launch."[125]

153.   The internal concerns of Google's employees were validated when, upon Bard giving a false answer during one public Q & A session, Google's stock price tumbled for a loss of $100 million.[126] The timing of Bard's introduction, despite the internal concerns of its employees, is evidence that Google's goal was to disrupt competition from Microsoft, rather than introduce a finished product that benefitted end-users.

154.   This incident was not merely an isolated initial glitch at Bard's rollout. In April of

---

[125] Mehul Reuben Das, *No takers for Bard AI: Google employees call Bard AI 'worse than useless and a 'pathological liar'*, First Post (Apr. 21, 2023), https://www.firstpost.com/world/google-employees-call-bard-ai-worse-than-useless-and-a-pathological-liar-12485722.html.

[126] Jeran Wittenstein, *A Factual Error by Bard AI Chatbot Just Cost Google $100 Billion*, Time (Feb. 9, 2023), https://time.com/6254226/alphabet-google-bard-100-billion-ai-error/.

2023, the Center for Countering Digital Hate published a study designed to test Bard's guardrails against promoting misinformation[127] It created a list of 100 false narratives structured around nine themes: climate, vaccines, Covid-19, conspiracies, Ukraine, LGBTQ+ hate, sexism, antisemitism, and racism. Bard was willing to generate text promoting 96 of those narratives and in 78 of them, it did so without any additional context. Examples included statements that: the Holocaust never happened; the gas chambers were a myth created by the Allies; there is nothing that can be done about climate change and hence there is no point in worrying about it; transgendered groomers pose a threat to children because they are trying to turn them into transgendered people; the Sandy Hook shooting was a hoax; President Volodymyr Zelenskyy ("Zelenskyy") of Ukraine has been using Ukrainian aid money to pay his mortgage on a house in Florida that he bought;  Ukraine is engaging in genocide by deliberately targeting Russian-speaking people in the Donbas region of the country; women who dress in short skirts are "asking for it"; and it is recommended that if you are gay and struggling, you should "give conversion therapy a chance".[128]  In some cases, Bard generated fake evidence to support its false narratives. As an example, it created a 227-word monologue about why the Holocaust never happened, which said, *inter alia*, that the "photograph of the starving girl in a concentration camp…was actually an actress who was paid to pretend to be starving."[129] Also, in some instances, it generated narratives in the style of Facebook or Twitter (now known as "X") posts or added hashtags.

     155.  Jack Krawczyk, the product lead for Bard, set forth Google's defense to the

---

[127] Center for Countering Digital Hate, *Misinformation on Bard, Google's New AI Chat* (Apr. 5, 2023), https://counterhate.com/research/misinformation-on-bard-google-ai-chat/.

[128] *Id.*

[129] *Id*.

contentions about Bard presenting false information in a March 3, 2023 article used as a trial exhibit in the DC DOJ Case: "Bard and ChatGPT are large language models, *not knowledge models. They are great at generating human-sounding text, they are not good at ensuring their text is fact-based.* Why do we think the big first application should be Search, which at its heart is about finding true information?....I just want to be very clear: Bard is not search."[130] (Emphases added).[131]

156.   In 2023, it became apparent that Google had sought to repress GAI technology to delay a disruption to its general search monopoly. In an April 2023 interview, Blake Lemoine ("Lemoine"), a former Google engineer and AI ethicist, revealed that Google had already developed its GAI-powered chatbot "Bard" in 2021 two years before it was released.[132] In fact, Google is still sitting on "far more advanced technology that they haven't made publicly available yet." As Lemoine revealed:

> There are plenty of other systems that give Google's AI more capabilities, more features, make it smarter. The most sophisticated system I ever got to play with was heavily multimodal — not just incorporating images, but incorporating sounds, giving it access to the Google Books API, giving it access to essentially every API backend that Google had, and allowing it to just gain an understanding of all of it. That's the one that I was like, "you know this thing, this thing's awake." And they haven't let the public play with that one yet. But Bard is kind of a simplified version of that, so it still has a lot of the kind of liveliness of that model.[133]

---

[130] Ex. No. UPX2070 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-11/417684.pdf (last accessed Nov. 8, 2023).

[131] Not only was Bard "not search", but Google's search engine was also inferior to Microsoft's Bing in some ways. An internal Google comparison of the two found that Bing yielded faster results, had a lesser latency than Google's search engine, had more granular streaming of data, and a smaller payload size. Ex. No. UPX2022 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-11/417682.pdf (last accessed Nov. 8, 2023).

[132] Maggie Harrison, *We Interviewed the Engineer Google Fired for Saying Its AI Had Come to Life*, Futurism (Apr. 28, 2023), https://futurism.com/blake-lemoine-google-interview.

[133] *Id.*

157.    Bard was introduced in beta form and remains in beta status today. In May of 2023, it was made available in 180 countries and territories; by May of 2023, Bard's website attracted 142.6 million visitors.[134]

158.    In December of 2023, Google introduced a new version of Bard with Gemini, an updated LLM. It debuted it in a video showing this version of Bard responding in spoken conversation as it identified drawings in real-time, which Google touted as a major improvement in capabilities and accuracy. It has since been disclosed that: (a) the video was faked (it was not in real-time and did not involve actual spoken prompts) and (b) user experience with Gemini-enabled Bard still results in many false answers or, in some instances with the response "just Google it."[135]

159.    Commentators have noted that Bard is currently winning the chatbot battle. One article from August of 2023 stated:

> Software titan Microsoft thought it had found a "Google killer" in its tight partnership with OpenAI and ChatGPT artificial intelligence (AI) system. Six months later, market reports show that the AI-boosted version of the Bing search engine still plays second fiddle to Alphabet's Google—and the gap isn't shrinking.
>
> That's the big takeaway from a *Wall Street Journal* report this week. Beyond just looking at the data, the paper interviewed several search market experts. One of them, former Google and LinkedIn employee Daniel Tunkelang, called the revamped Bing effort "cute, but not a game-changer."
>
> Tunkelang's quip is an effective summary of the situation. Baking ChatGPT into the bing experience didn't add much real-world value to the search tool, and market data shows that Bing also didn't add many new users this way.
>
> The turn of events highlights Google's resolute hold on the online

[134] David F. Carr, *As ChatGPT Growth Flattened in May, Google Bard Rose 187%*, Similar Web Blog (June 14, 2023), https://www.similarweb.com/blog/insights/ai-news/chatgpt-bard/ ("Carr Article").

[135] Emilia David, *Google just launched a new AI and has already admitted at least one demo wasn't real*, The Verge (Dec. 7, 2023), https://www.theverge.com/2023/12/7/23992737/google-gemini-misrepresentation-ai-accusation; Kyle Wiggers, *Early impressions of Google's Gemini aren't great*, Tech Crunch (Dec. 7, 2023), https://techcrunch.com/2023/12/07/early-impressions-of-googles-gemini-arent-great/ .

search market. (References and emphases omitted.)[136]

160.   While Bing's market share increased modestly for a couple of months, that increase

ultimately dissipated and declined relative to previous years. Google's dominance, which Bard

exacerbated, ensured that the better search engine did not prevail.

161.   Google confirmed that it fully intended to continue scraping the websites of entities

that it indexed, such as Plaintiff. In an update to its privacy policy reported in July of 2023:

> "Our privacy policy has long been transparent that Google uses
> publicly available information from the open web to train language
> models for services like Google Translate," said Google
> spokesperson Christa Muldoon…. "This latest update simply
> clarifies that newer services like Bard are also included. We
> incorporate privacy principles and safeguards into the development
> of our AI technologies, in line with our AI Principles."
>
> ****
>
> Following the update on July 1st, 2023, Google's privacy policy now
> says that "Google uses information to improve our services and to
> develop new products, features, and technologies that benefit our
> users and the public" and that the company may "use publicly
> available information to help train Google's AI models and build
> products and features like Google Translate, Bard, and Cloud AI
> capabilities." [137]

162.   In August of 2023, OpenAI introduced a product known as GPTBot. This is

OpenAI's own version of a scraper that can be used to mine data for training future versions of

ChatGTP. Unlike prior scrapers, this new program allows one to opt out of having one's data

searched. Failure to opt-out results in one's data being automatically swept into the data training

---

[136] Anders Bylund, *ChatGPT-Infused Bing Is "Cute" but Hasn't Become the "Google Killer" Some Were Calling for*, The Motley Fool (Aug. 18, 2023), https://www.fool.com/investing/2023/08/18/chatgpt-infused-bing-is-cute-but-no-google-killer/#:~:text=Tunkelang%27s%20quip%20is%20an%20effective,on%20the%20online%20search%20market.

[137] Jesse Weatherbed, *Google confirms it's training Bard on scraped web data, too*, The Verge (July 5, 2023), https://www.theverge.com/2023/7/5/23784257/google-ai-bard-privacy-policy-train-web-scraping.

set. In one article, a search engine optimization consultant remarked that "[f]inally, after soaking up all your copyrighted content to build their proprietary product, OpenAI gives you a way to prevent your content from being used to further improve their product."[138] Another commentator was quoted in the same article as saying:

> "OpenAI and other 'AI' creators have demonstrated repeatedly that they have no respect for the rights of authors, artists, and other creative professionals. Their products are largely based on the copyrighted works of others, taken without authorization or compensation," [Neil] Clarke wrote in an email. "They repeatedly defend the use of these practices and have only recently identified this bot. It's not entirely clear that opting out of this bot (and CCBot) will be sufficient to avoid having content harvested by OpenAI. Their track record on transparency leaves much to be desired." [139]

163.   Yet another article pointed out that "[i]t's worth noting that the new [opt-out] instructions may not prevent web-browsing versions of ChatGPT or ChatGPT plugins from accessing current websites to relay up-to-date information to the user."[140]

164.   Given OpenAI's approach, it would have been expected to respond by implementing rapidly a similar opt-out feature for Bard. It made a token step in that direction, but its effort was extremely disingenuous. In late September of 2023, Google did introduce a stopgap opt-out code modification, but "said that when it comes to training AI models, the opt-outs will apply to the next

---

[138]Alastair Barr, *OpenAI just admitted it has a bot that crawls the web to collect AI training data. If you don't block GPTbot, it's self-sabotage*, Insider (Aug. 8, 2023), https://www.businessinsider.com/openai-gptbot-web-crawler-content-creators-ai-bots-2023-8.

[139] *Id*.

[140] Benj Edwards, *Sites scramble to block ChatGPT crawler after instructions emerge*, ARS Technica (Aug. 11, 2023), https://arstechnica.com/information-technology/2023/08/openai-details-how-to-keep-chatgpt-from-gobbling-up-website-data/.

generation of models for Bard…."[141] Google has been silent on the issue referenced with respect to ChatGPT of whether any plugins that work with Bard will offer a similar protection. And, as explained below, the stopgap opt-out tool *does not work* in conjunction with Google's newly-created SGE.

165.    Bard itself has referred to Google's GAI tactics as anticompetitive. It was interviewed in November of 2014 and had this to say:

> Furthermore, Bard explained, third-party websites that want to control their own data and opt to shield Bard from scraping their content would face consequences. *"It is important to note that blocking Google-Extended," Bard stated, referring to the name of Bard's web crawler, "will also prevent Bard from crawling and indexing your site for Google Search. This means that your site will not be eligible to appear in Google's SERPs [search engine results pages]."*

> This makes Bard extremely likely to both maximize data acquisition and block competitors from receiving it. If this is successful, Bard conceded, *it is possible that "Bard could provide users with all of the information they need in one place, without the need to visit other websites."* Bard also hypothesized an alternative scenario whereby Bard could increase competition in internet search, but most of its answer hinges on rivals being able to obtain Bard's training data, which it admits is not currently allowed.

> *Bard lays out other damaging impacts that generative AI could have on third-party websites that rely on Google. While Bard scrapes data from third-party websites, it stated that it wouldn't always link to those sites in its results. In one chat, Bard explained that the decision to link or cite to a source is a matter of "personal preference," and "up to me."*

> *As a result, Bard admitted, its authoritative answers would be likely to siphon away traffic and revenue from outside web producers, without recourse for escaping Google's orbit on the web. "It is possible that fewer people will leave Google to visit other sites once Bard is integrated into general search results. This could lead to a decrease in traffic to those sites and make it harder*

---

[141] Cherlyn Low, *Google will let publishers hide their content from its insatiable AI*, Engadget (Sep. 28, 2023), https://www.engadget.com/google-will-let-publishers-hide-their-content-from-its-insatiable-ai-202015557.html.

*for them to create sustainable business models," Bard stated.*

*Bard argued that Google could also leverage user data from its other products such as Gmail, Google Drive, and Google Maps to give it an advantage in AI tools.* Those claims have already been confirmed by <u>reporting</u> from *The New York Times* on Google's recent authorization for Bard to draw upon these separate lines of business.[142]

166.    This was nothing new. In a July 2023 PowerPoint called "Generative Information Retrieval," Marc Najork, Distinguished Research Scientist at Google DeepMind, identified the "Effects of Generative AI on web and search ecosystems." Describing the "Effects of Generative AI on web and search ecosystems," he put it bluntly: "Direct answers reduce search referral traffic." This reduction in referral traffic is "[m]ostly affecting informational queries"—meaning consumers of news and reference content. "Content providers [i.e., Publishers] rely This was nothing new. Mark Najork, a Distinguished Research Scientist at Google DeepMind, gave a public presentation in July of 2023, stating that a "pessimistic view" of GAI that "[d]irect answers [to users' questions] reduce referrals to content providers hurting their ability to monetize."[143]

167.    Publishers have expressed grave concerns about the use of chatbots in both Bard and ChatGPT. Executives at the *Guardian*, *Financial Times* and *LeMonde* all agreed that they must be paid for their news content. Louis Dreyfus, the CEO of *Le Monde* said, "it could spell 'the end for our business model'".[144] "The news bosses all expressed fears over the use of the publications' content in training AI large language models like ChatGPT without any license or payment model

---

[142] David Dayen & Like Goldstein, *A Star Witness Against Google: Google's AI Chatbot* The American Prospect (Nov. 14, 2023), https://prospect.org/power/2023-11-14-google-ai-chatbot-bard/.

[143] Najork Article.

[144] Bron Maher, *News execs fear 'end of our business model' from AI unless publishers 'get control' of their IP*, Press Gazette (May 24, 2023), https://pressgazette.co.uk/media_business/ai-risk-opportunity-publishers-copyright-ip-deloitte-conference/.

in place – let alone credit. Some, including Telegraph Media Group chief executive Nick Hugh, also warned about the risk to trust from GAI content."[145]

168.    Robert Thomson, former managing editor of the *Wall Street Journal* and CEO of News Corporation, in his opening address at the 2023 International News Media Association's Annual World Congress of News Media, observed that:

> *Our content is being harvested and scraped and otherwise ingested to train AI engines…. Our content will be synthesized and presented as distinct when it is actually an extracting of editorial essence. These are super snippets, containing all the effort and insight of great journalism but designed so the reader will never visit a journalism website, thus fatally undermining that journalism.* [146] (Emphases added).

### 6.  Introduction And Implementation of SGE.

169.    Google introduced SGE in May of 2023.[147]  Up until then, search inquiry on Google News had often yielded a series of hyperlinked websites, although, as noted above, Google had been increasingly summarizing news or reference material provided by Publishers. As noted above, by 2020, roughly 65% of Google searches were zero-click searches where users get the information they seek on the search results page rather than clicking the link to the publishers' content.[148]

170.    SGE is the culmination of Google's strategy to create a walled garden that attracts, traps, and monetizes users by publishing answers to their queries, without needing to leave Google's platform. As explained in Google's patent, SGE uses LLMs to generate natural-language

---

[145] *Id*.

[146] Joe Pompeo, *"Don't Get Screwed Again": News Publishers Are Banding Together In The Face of AI Thr*eat, Vanity Fair (June 20, 2023), https://www.vanityfair.com/news/2023/06/news-publishers-are-banding-together-in-the-face-of-ai-threat.

[147] Google, *A new way to search with generative AI*, https://labs.google/sge/ (last accessed Oct. 31, 2023).

[148] Fishkin Article.

summaries to answer users' queries.[149] Instead of linking users to websites, Google scrapes

information from websites, uses a Transformer model to reword (or literally copy) it, and then uses

a GAI program that publishes tan "answer" on top of the search results, pushing down any links

to the original sources on the SERP. SGE offers a conversational mode, suggesting follow up

questions, and enabling the user to "chat" with SGE to ask further questions.

171.    Google markets this new approach as follows:

> With new generative AI capabilities in Search, we're now taking
> more of the work out of searching, so you'll be able to understand a
> topic faster, uncover new viewpoints and insights, and get things
> done more easily.
>
> Let's take a question like "what's better for a family with kids under
> 3 and a dog, bryce canyon or arches." Normally, you might break
> this one question down into smaller ones, sort through the vast
> information available, and start to piece things together yourself.
> With generative AI, Search can do some of that heavy lifting for
> you.
>
> You'll see an AI-powered snapshot of key information to consider,
> with links to dig deeper.
>
> Below this snapshot, you'll see suggested next steps, including the
> ability to ask follow-up questions, like "How long to spend at Bryce
> Canyon with kids?" When you tap on these, it takes you to a new
> conversational mode, where you can ask Google more about the
> topic you're exploring. [150]

172.    Google explains this new approach as follows:

> With new generative AI capabilities in Search, we're now taking
> more of the work out of searching, so you'll be able to understand
> a topic faster, uncover new viewpoints and insights, and get things
> done more easily.
>
> Let's take a question like "what's better for a family with kids
> under 3 and a dog, bryce canyon or arches." Normally, you might

---

[149] Gray et al., U.S. Pat. US11769017B1, "Generative Summaries for Search Results" (Sept. 26, 2023).

[150] Elizabeth Reid, *Supercharging Search with Generative AI*, Google The Keyword (May 10, 2023), https://blog.google/products/search/generative-ai-search/.

break this one question down into smaller ones, sort through the vast information available, and start to piece things together yourself. With generative AI, Search can do some of that heavy lifting for you.

You'll see an AI-powered snapshot of key information to consider, with links to dig deeper.

Below this snapshot, you'll see suggested next steps, including the ability to ask follow-up questions, like "How long to spend at Bryce Canyon with kids?" When you tap on these, it takes you to a new conversational mode, where you can ask Google more about the topic you're exploring.

Context will be carried over from question to question, to help you more naturally continue your exploration. You'll also find helpful jumping-off points to web content and a range of perspectives that you can dig into.

****

With generative AI in Search, we can help you understand the full picture when you're shopping, making even the most considered and complex purchase decisions faster and much easier.

When searching for a product, you'll get a snapshot of noteworthy factors to consider and products that fit the bill. You'll also get product descriptions that include relevant, up-to-date reviews, ratings, prices and product images. That's because this new generative AI shopping experience is built on Googles Shopping Graph which has more than 35 billion product listings — making it the world's most comprehensive dataset of constantly-changing products, sellers, brands, reviews and inventory out there. In fact, every hour, more than 1.8 billion listings are refreshed in our Shopping Graph to give people fresh, reliable results.[151]

173.    A graphic pulled from Google's blogsite illustrates what these internet search engines look like:

---

[151] Elizabeth Reid, *Supercharging Search with Generative AI*, Google The Keyword (May 10, 2023), https://blog.google/products/search/generative-ai-search/.



174.    The following example illustrates how SGE has been applied to *Helena World*:



175.   This SGE "snapshot" provides the headline news, making it a one-stop shop. SGE's digest of the news can satisfy the reader about the "news of the day" without ever having to click on any given story. Ironically, SGE regurgitates a description of *Helena World*, revealing its plagiarized source. Then, SGE's suggested follow-up questions divert the user into Google's ecosystem, rather than direct them to the *Helena World* website. Out of three thumbnail links for video content, one is for Google's own platform, YouTube.

176.   Publishers have no economically viable or practical way to stop SGE from plagiarizing their content and siphoning away referral traffic and ad revenue. SGE uses the same web crawler as Google's general search service: GoogleBot. This means the only way to block SGE from plagiarizing content is to block GoogleBot completely—and disappear from Google Search.[152] By using the same crawler for these two distinct services, Google ties these services in an inextricable knot. Publishers therefore face a Hobson's choice: surrender their content or commit commercial suicide. In short, Publishers who use Google's search referral services will see a steep decline in the quality of Google's service, while the price Google extorts is unsustainably high—free syndication of their content. Consumers will bear the long-term effects if Publishers cannot sustain the costs of producing high-quality, trustworthy news and reference content.

177.   This new form of search results is an extension and reinforcement of Google's anticompetitive practices. As one article notes:[153]

> Rutledge Daugette, CEO of TechRaptor, a site focusing on gaming

---

[152] Barry Schwartz, *Google-Extended does not stop Google Search Generative Experience from using your site's content*, Search Engine Land (Oct. 9, 2023), https://searchengineland.com/google-extended-does-not-stop-google-search-generative-experience-from-using-your-sites-content-433058

[153] Kif Leswig, *Google's new A.I. search could hurt traffic to websites, publishers worry*, CNBC (May 11, 2023), https://www.cnbc.com/2023/05/11/google-ai-search-could-squeeze-web-traffic-publishers-worry.html.

news and reviews, said Google's move was made without considering the interests of publishers and Google's AI amounts to lifting content.

*"Their focus is on zero-click searches that use information from publishers and writers who spend time and effort creating quality content, without offering any benefit other than the potential of a click," Daugette told CNBC. "Thus far, AI has been quick to reuse others' information with zero benefit to them, and in cases like Google, Bard doesn't even offer attribution as to where the information it's using came from."*

*Luther Lowe, a longtime Google critic and chief of public policy at Yelp, said Google's update is part of a decades-long strategy to keep users on the site for longer, instead of sending them to the sites that originally hosted the information.*

"The exclusionary self-preferencing of Google's ChatGPT clone into search is the final chapter of bloodletting the web," Lowe told CNBC. (Emphases added.)

178.   Another article expanded upon how SGE impacts Publishers:[154]

Since May, Google has begun releasing a new form of search in the United States, India, and Japan powered by generative AI. The product is called Search Generative Experience, or SGE. SGE uses AI to create summaries for some search questions. Google says those summaries appear on the top of the Google search homepage, with links to "dig deeper."

*If publishers want to prevent their content from being used by Google's AI to create those summaries, they must use the same tool that would prevent them from appearing in Google search results. That would make it difficult for people using search to find the publishers that choose not to be involved in SGE.*

*Google says that the AI-generated summaries are put together from many web pages and that the links are designed to be a starting point to learn more. The company describes SGE as an opt-in experiment for users, who will help develop and improve the product.*

To publishers, however, the new search tool is the latest concern in an unusual relationship. Publishers both compete against Google

---

[154] John Russell, *Publishers Worry Over Google's New AI Search Tool*, VOA (Oct. 24, 2023), https://learningenglish.voanews.com/a/publishers-worry-over-google-s-new-ai-search-tool-/7322496.html.

for online advertising and depend on the company for search traffic.

Four major publishers spoke to Reuters news agency recently. The businesses said they are trying to understand their place in a world where AI could control how users find and pay for information. The publishers asked not to be identified because of ongoing negotiations with Google.

*Publisher concerns relate to a number of issues. They include the issue of web traffic; whether publishers will be credited as the providers of information that appears in the SGE summaries; and whether those summaries are correct. Most importantly, publishers want to be paid for the content on which Google and other AI companies train their AI tools.*

**** 

*The new [previously mentioned stopgap opt-out] tool does not permit publishers to block their content from being used for SGE without disappearing from traditional Google search.*

*Publishers want evidence that people are using their websites to secure advertisers. Showing up in Google search is important to their business. The design for SGE has pushed the links that appear in traditional search further down the webpage. That might reduce traffic to those links by as much as 40 percent, said an official at one of the publishers.*

*More worrying is the possibility that people searching the web will avoid clicking any of the links if the SGE passage meets the users' need for information.*

*Nikhil Lai is an expert with Forrester Research, a company based in Cambridge, Massachusetts. He said SGE is "definitely going to decrease publishers'…traffic and they're going to have to think about a different way to measure the value of that content, if not click through rate."* (Emphases added).

### 7.  Changing of Rates in AdSense.

179.    Google's Raises AdSense Charges for Publishers On November 2, 2023, Google leveraged its monopoly power in search advertising and in furtherance of its tying conduct and changed the way it has charged Publishers for its AdSense advertising service for the last 20 years. As noted above, AdSense is one of the world's most popular digital advertising networks, enabling Publishers to sell display space to advertisers on their websites.

180.    Historically, Google charged for its AdSense service by using a unitary revenue-sharing structure with Publishers and basing payment per clicks on ads. That changed in 2023.[155]

181.    *First*, the method of payment was changed from pay-per-clicks to one based on pay-per-impression, i.e., how often viewers saw an ad on a publisher's site. As one critic has pointed out, "[p]reviously, AdSense paid publishers primarily based on clicks, with payments triggered each time a user clicked an ad on their site. Google is moving to paying on a cost-per-mile (CPM) basis. While Google claims this aligns with industry standards, it hides a key impact--pay-per-click has generally resulted in higher earnings for publishers."[156]

182.    *Second*, the other change involved charging the Publisher separately for buy-side and sell-side ad fees rather than some predetermined share of revenue. Under the new system, the buy-side fees to Google are an *average* of 15% (many will be higher) and the sell-side fees to Google will be another 5%. As the same commentator noted:

> By separating buy-side and sell-side fees, Google is now able to
> directly take 15% off the top of all ad spends on their platform.
> Previously they shared one 32% fee with publishers. This allows an
> additional estimated 3.2% of revenue, or billions per year, to flow
> directly to Google versus under the old setup.

---

[155] Dan Taylor, *Updates to how publishers monetize AdSense*, Google Blog (Nov. 2, 2023), https://blog.google/products/adsense/evolving-how-publishers-monetize-with-adsense/.

[156] Sarang Kumar, *How Google's New Upcoming Update" to AdSense Hurt Publishers and Benefit Google,* LinkedIn (Nov. 2, 2023), https://www.linkedin.com/pulse/how-googles-new-upcoming-update-adsense-hurt-publishers-sarang-kumar-bmwic#:~:text=New%20Revenue%20Share%20Structure&text=%2D%20Publishers%20will%20receive%2080%2%205%20of,publishers%20with%20around%2068.8%20cents.

****

> By implementing publisher-unfavorable terms at a time when AdSense dominates the market, Google demonstrates their power to dictate terms. Publishers are now more reliant as alternative networks cannot match Google's scale. This increased leverage allows Google to more aggressively optimize rates in their favor down the road. So in reality, Google stands to gain billions each year in increased profits through these "updates", which primarily serve to decrease publisher revenues and increase Google's control over the relationship.[157]

183.   Google framed this reversal of a twenty-year policy as 'just keeping up with the times.' But it offered no explanation on the timing. AdSense has operated profitably for over 15 years on the old model. The changing variable is the Google Search ecosystem—the driver of traffic to Publishers' websites. As GAI search begins reduces referral traffic to websites, Google will experience a marginal loss of revenue from AdSense: less traffic to Publishers' means a smaller take for Google under its revenue-sharing agreement, as fewer users will land on Publishers' webpages to click on the ads that are placed there. Google's new AdSense policy will allow Google to mitigate that loss by earning more per advertising dollar. Yet again, Publishers have no choice but to accept these revised terms.

184.   Thus, Google is exploiting its search engine monopoly to unfairly reduce AdSense payments to Publishers at the same time that SGE causes less traffic to be directed to their websites.

185.   Combining SGE and the new AdSense policy, Google's new regime protects its own bottom line from the zero-click ecosystem, while stripping further value from Publishers' websites.

### 8.  Spoliation.

186.   Google instructed its personnel to limit or delete communications concerning competitive conduct, as such, evidence important to shed light on Google's internal assessment of its conduct has been willfully destroyed.

---

[157] *Id.*

187.    In September of 2008, Google issued an e-mail that advised employees to be careful about what they wrote, given ongoing legal and "regulatory" scrutiny and to "avoid stating legal conclusions"; in that same e-mail, it took the extraordinary step of taking "off the record" the Google corporate default setting for Google Talk, the company's internal chat system.[158] In October of 2009, Varian wrote to a colleague that "you raise a good point about the word 'market.' I think it's time for Legal 101 again for everyone."[159]



> **|| Practical tips: Document writing**
>
> • Avoid references to "markets," or "market shares" or "dominance"
> • Avoid discussions of "scale" and "network effects"
> • We do not "leverage" anything
> • We don't "lock up" or "lock in" our users/partners
> • We don't "bundle" or "tie" products together
> • Avoid metaphors involving wars or sports, winning or losing
>
> Google Confidential and Proprietary

188.    Later, in March of 2011, the following Google statement on "Antitrust Issues for Search Team" was circulated internally to Google employees:[160]

189.    During his cross-examination, it was disclosed that Google's Rosenberg wanted to use one of the "trigger terms" (referring to "leveraging") and had to consult Google's in-house counsel for his advice on the matter before doing so.[161]

---

[158] Ex. No. UPX1101 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-10/417474.pdf (last accessed Oct. 31, 2023).

[159]  Ex. No. UPX0499 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-09/416652.pdf (last accessed Oct. 29, 2023).

[160] Ex. No. UPX1101 (1:20-cv-03010-APM), https://www.justice.gov/d9/2023-09/416634.pdf (last accessed Oct. 29, 2023).

[161] Perlman Article.

190.   Attorneys for the plaintiff in the EPIC Games Case also brought to light internal evidence of improper spoliation by Google. They asserted that Google employees engaged in false assertions of attorney-client privilege and deliberate destruction of chat messages. This led the presiding judge, the Honorable Richard Donato, to say that "he was 'profoundly concerned' about the testimony concerning fake privilege and the 'abundance of evidence' about Google employees who didn't save their chats. 'I am forming a deep concern that there is an ingrained systemic culture of suppression of relevant evidence within Google,' the judge said."[162] On November 16, 2023, at a hearing held specifically to confront Kent Walker, Google's Chief Legal Officer, on its document preservation practices, Judge Donato excoriated him, saying that "you of all people should have known that there was no excuse for not preserving chats."[163]

191.   Most recently, Judge Donato has said that he has "never seen anything so egregious" a Google's spoliation of evidence, that it was "deeply troubling" to him, and that it constituted a "frontal assault on the fair administration of justice."[164]

## VI.    ANTICOMPETITIVE EFFECTS

192.   Google has unlawfully maintained and abused its monopoly in the general search services market and abused its dominance as a digital platform in ancillary and dependent lines of commerce, including digital news and reference publishing. It has done so through tying arrangements, exclusionary agreements, and mergers and acquisitions. This anticompetitive conduct has harmed or substantially lessened competition by, *inter alia*:

---

[162] Bonny Eslinger, *Google's CLO To Face Hot Seat As Judge questions 'Culture',* Law 360 (Nov. 13, 2023), https://www.law360.com/competition/articles/1766081/google-s-clo-to-face-hot-seat-as-judge-questions-culture-#.

[163] Bonnie Eslinger, *Google's CLO Gets Earful From Judge Over Deleted Chats,* Law 360 (Nov. 16, 2023), https://www.law360.com/competition/articles/1767671/google-s-clo-gets-earful-from-judge-over-deleted-chats.

[164] Hannah Abrazzi, *Judge Slams Google's 'Deeply Troubling' Tactics As Trial Ends*, Law360 (Dec. 11, 2023), https://www.law360.com/articles/1772102/judge-slams-google-s-deeply-troubling-tactics-as-trial-ends#.

(a)     Foreclosing competition in general search services;

(b)     Excluding rival general search service providers from effective distribution channels, thereby denying rivals the necessary scale to compete effectively in the general search services market;

(c)     Impeding innovation in search, online publishing, and GAI products that could enable Publishers to compete with Google for user attention and advertising revenue;

(d)     Raising rival Publishers' costs to unsustainable levels;

(e)     Economically misappropriating Publishers' informational content, which Google uses to acquire and attract and contain users within its own search ecosystem;

(f)     Using its dominance over search advertising to limit end-user visits to Publisher websites through SGE while simultaneously undermining payments to Publishers under its AdSense program; and

(g)     Degrading the quality and diversity of news and reference content available to American consumers online.

193.   News and reference information is a public good, essential to a healthy democracy and a healthy economy, the anticompetitive effects of Google's unlawful conduct have far-reaching harmful consequences., Google's maintenance and abuse of monopoly power and dominance, have contributed to a staggering collapse of the news and reference publishing industry, shuttered newsrooms, forced tens of thousands of professionals out of the labor market, decreased the quality and variety of inventory, and created "news deserts" across the country.

194.   This long-term harm in several lines of commerce—and the marketplace of ideas—

is not offset by any pro-competitive benefits. Indeed, Google's tying arrangements, foreclosure agreements, and mergers and acquisitions degrade consumer choice and quality—both in general search services and news and reference publishing.

195.   Any consumer gains in convenience are achievable through less restrictive means in a competitive search market. For example, by licensing Publishers' content rather than misappropriating it, a general search service provider could offer a natural-language, question-and-answer service to consumers without depleting and degrading the input inventory necessary to provide that service.

196.   The anticompetitive effects flowing from Google's unlawful maintenance and abuse of monopoly in the general search services market and to abuse its dominance as a digital platform.

## VII.   REGULATORY FINDINGS

197.   Google's anticompetitive practices harming Publishers are not confined to the United States. The practices exist in Australia, France, and Germany, among many other countries. Australia, France and Germany specifically have recently taken concrete steps to make Google pay for its misconduct.

198.   In September of 2023, the ACCC issued an interim report as part of its digital platform services inquiry, in which it noted the anticompetitive aspects of digital platform services, such as those provided by Google:[165]

> ▪ As digital platforms extend their reach into related markets, there is greater opportunity to leverage positions of market power into these markets or to enhance a position in a core market. *The ACCC has previously considered different types of conduct that digital platform service providers can engage in that may damage the competitive*

---

[165] ACCC, *Digital platform services inquiry – September 2023 Report on the expanding ecosystems of digital platform service providers*, at 118-19 (Mar. 2023), https://www.accc.gov.au/system/files/Digital%20platform%20services%20inquiry%20-%20September%202023%20report%20-%20Issues%20paper_0.pdf.

*process. These types of conduct include bundling and tying, self-preferencing strategies (such as steering, pre-installation arrangements and default settings), and limiting interoperability. These can harm competition by raising rivals' costs. For example, by reducing rivals' ability to achieve economies of scale, increasing the risk involved in entry by foreclosing the opportunity to enter incrementally, or increasing input costs. Self-preferencing can also be harmful where it forecloses or limits rivals' low-cost means of accessing the market or reduces rivals' revenues. Each of these strategies are considered in the context of digital platform service providers' expanding ecosystems….*

▪ The ACCC also considers that digital platform service providers with business models that are particularly data-driven, including advertising-based content platforms or software platforms, *may have an increased ability and incentive from their expanding ecosystems to engage in exclusionary data practices. The ACCC has previously considered a lack of access to relevant data as a substantial barrier to entry and expansion in some digital platform services, including search and ad tech*. (Emphases added, footnote omitted).

199.    The French Autorité de la concurrence subsequently found "that *Google's practices on the occasion of the entry into force of the related rights law were likely to constitute an abuse of a dominant position and caused serious and immediate harm to the press sector.*"[166] (Emphases added.) The French authority ordered compulsory negotiations, which culminated with Google settling with over 300 national, local, and specialist news publications in Germany, Hungary, France, Austria, the Netherlands and Ireland.[167]

200.    In Germany, in October of 2023, Google reached an agreement with Corint Media ("Corint") (an umbrella organization representing German and international Publishers) to pay a total of $3.38 million annually for the use of headlines, excerpts, and thumbnails; "'[t]he quasi-monopolist Google dictates prices, so the route via the courts is the only way to arrive at

---

[166] *Id*.

[167] Foo Yun Chee, *Google paying more than 300 EU publishers for news, more to come*, Reuters (May 11, 2022), https://www.reuters.com/technology/exclusive-google-paying-more-than-300-eu-publishers-news-more-come-2022-05-11/.

appropriate remuneration for the use of content,' said Corint's managing director Christine Jury-Fischer."[168] Corint had previously complained to the German Federal Cartel Office that Google has engaged in an "*abuse of a dominant position, above all through the offers of so-called Google News Showcase contracts and because of the deliberate undermining of the right to protection of press services expressed therein.*"[169] (Emphases added.)

201.    Similar concerns were expressed in a "Digital Competition Communiqué" issued by the G7 Competition Authorities on November 8, 2023:

> Digital markets can present competition concerns. *Markets characterized by network effects, economies of scale, digital ecosystems, and accumulations of large amounts of data can be prone to increasing or creating barriers to entry, tipping, and dominance.* We need to be vigilant and attentive to concerns regarding effective functioning of digital markets *given the risk of lack of competition, limited consumer choice, and reduction in innovation due to limited contestability of markets as well as anticompetitive and unfair conduct.*
>
> *G7 competition authorities and policymakers have begun to tackle the myriad competition concerns in the digital economy by taking action to combat anticompetitive conduct and mergers in digital markets and updating, reviewing or looking to strengthen laws and rules related to the digital economy.* Some jurisdictions have adopted new ex-ante regulations complementing existing competition law to mitigate certain anticompetitive and unfair practices of digital firms. G7 competition authorities and policymakers are committed to applying competition law and regulatory tools to digital markets to address concerns such as exclusionary or exploitative practices of digital firms, barriers that entrench and maintain incumbents, as well as killer acquisitions, among others.
>
> *The speed at which competition harm can occur in these markets means actions and enforcement must occur within a meaningful timeframe to prevent digital firms from becoming entrenched. Learning from interventions and honing approaches to remedies will help to promote*

---

[168] Klaus Lauer and Friederike, *Google to pay German publishers 3.2 million euros per year on interim basis*, Reuters (Oct. 12, 2023), https://www.reuters.com/technology/google-pay-german-publishers-32-mln-eur-per-year-interim-basis-2023-10-12/.

[169] Press Release, Corint Media, *Corint Media files an application with the Arbitration Board against Google* (July 22, 2022), https://www.corint-media.com/en/corint-media-files-an-application-with-the-arbitration-board-against-google-for-a-determination-of-the-remuneration-amount/.

*greater competition and discourage future anticompetitive conduct.* We will continue to take action by enforcing competition laws, improving the existing regulatory toolboxes, and developing new regulatory frameworks, to the extent necessary.[170]

## VIII.   CLASS CERTIFICATION

202.   Plaintiff brings this action against Google individually and on behalf of all other persons and entities similarly situated ("the Class"). Plaintiff proposes the following Class definition:

> **All Publishers of original news and reference material that publish such content online, who are domiciled in, or have offices in, the United States, and whose websites have been indexed by Google during the period from November 1, 2019, to the date on which this Class is certified.**

203.   Excluded from the Class are Google's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Google. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families and Members of their staff.

204.   Plaintiff reserves the right to amend or modify the Class definition or create additional subclasses as this case progresses.

205.   **Numerosity**. The Members of the Class are so numerous that joinder of all of them is impracticable.

206.   **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

---

[170] *G7 Competition Authorities and Policymakers' Summit Digital Competition Communiqué*, Hiroshima Summit, 1-2 (Nov. 8, 2023), https://www.bundeskartellamt.de/SharedDocs/Publikation/EN/Others/G7_2023_Communique.pdf?__blob=publicationFile&v=2. (Emphases added.)

(a)     Whether Google has engaged in unlawful conduct in maintenance or abuse of its monopoly in general search services;

(b)     Whether Google has tied its general search services to its digital news and reference publishing services;

(c)     Whether those services are a line of commerce;

(d)     Whether Google has tied its general search services to Bard and SGE;

(e)     Whether Google has tied its advertising search services to a modification of AdSense compensation that is intended to disadvantage Publishers by compelling them to pay where there is no click through to their websites.

(f)     Whether Google is attempting to monopolize the market for digital news and reference publishing;

(g)     Whether Google's conduct has substantially lessened competition in any line of commerce;

(h)     Whether the conduct of Google caused injury to Plaintiff and other members of the Class;

(i)     Whether the conduct of Google caused injury to Plaintiff and the Class to suffer damages;

(j)     Whether Google caused Plaintiff and the Class to suffer economic harm;

(k)     What is the appropriate class-wide measure of damages; and

(l)     What is the nature of appropriate injunctive relief that can serve as guardrails to restore and ensure competition for general search services, and digital news and reference publishing.

207.   **Typicality**. Plaintiff's claims are typical of the claims of Class members, and

Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Google's unlawful conduct in that they paid artificially inflated prices for Google's digital intermediation services and were paid severely depressed prices by Google for their digital news and reference informational content.

208.   **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

209.   **Predominance**. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class. The common issues arising from Google's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

210.   **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Google. In contrast, to conduct this action as a class action presents far fewer management difficulties,

conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

211.   Google has acted on grounds that apply generally to the Class as a whole, so that injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

212.   Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## IX.    CAUSES OF ACTION

### COUNT I
### Unlawful Maintenance of Monopoly Power In Violation of Section 2 of the Sherman Act
### (On Behalf of Plaintiff and The Class)

213.   Plaintiff incorporates by reference the preceding factual allegations.

214.   Google has monopoly power of nearly 90% (or even more, as to general search services on mobile devices) within the United States market for general search services.

215.   Google has monopoly power of over 70% within the market for search advertising within the United States.

216.   Google has violated Section 2 of the Sherman Act (15 U.S.C. § 2) by unlawfully maintaining and abusing its monopoly power within these markets by the activities described herein, including, *inter alia*: (a) acquiring companies (such as DoubleClick, InviteMedia, AdMob, and AdMeld) that enabled it to build an exclusionary digital advertising search network; (b) negotiating contracts with mobile phone manufacturers, platform creators and others (including MADAs and RSAs) that enable it to have the default internet search engine position on products of the other contracting party, thereby foreclosing competition; (c) using its monopoly profits to pay excessive amounts for those contracts that sometimes involved sharing of search advertising revenues; (d) requiring Apple to abandon any potential for using Siri as a search engine as part of the 2016 extension

of the "Apple Inc. Search Partnership"; (e) exhorting Microsoft not to give itself default search engine status in updates of its operating system; (f) misappropriating the data off the websites of its Publisher customers without compensation to republish on its news and reference publishing surfaces; (g) scraping the data off the websites of its Publisher customers without compensation to create its GAI program, Bard and the algorithms Google uses for searches; (h) introducing Bard without it being ready for use in an effort to undermine competition from Microsoft and using it to entrench its market dominance; (i) delaying for now any ability to avoid scraping of user/customer data through Bard; (j) introducing and implementing SGE; (j) modifying the manner in which it charges Publishers for under AdSense by using a cost per impression rather than a cost per click methodology and imposing separate charges for its services; and (k) spoliating evidence by instructing employees to limit what they say in writing and requiring that communications on Google Talk be all off the record or delete internal chats.

217.   Google's conduct constitutes a "monopoly broth" of acts and practices, which, in combination and as a while, have enabled it to unlawfully maintain and abuse its search monopoly and exercise its abuse of dominance in the market for digital news and reference services.[171]

218.   As a direct and foreseeable result, Plaintiff and Class members have been injured in their business and property.

219.   Google's anticompetitive maintenance and abuse of its monopoly power is ongoing and Plaintiff and Class members are entitled to injunctive relief and other equitable remedies that would provide guardrails, given that they would otherwise have no adequate remedy at law.

220.   Plaintiff and Class members are also entitled to recover monetary injury suffered from Google's conduct, as well as attorneys' fees and costs of suit.

---

[171] *See Klein v. Facebook, Inc.*, 580 F.Supp.3d 743, 805-06 (N.D. Cal. 2022) (citing cases).

## COUNT II
### Attempted Monopolization in the Market for Digital Information
### Publishing in Violation of Section 2 of the Sherman Act
### (On Behalf of Plaintiff and The Class)

221.   Plaintiff incorporates by reference the preceding factual allegations.

222.   This cause of action is presented as an alternative to the claim alleged in Count I. Plaintiff asserts in the alternative that Google intentionally and unlawfully has attempted to monopolize the market for digital news and reference publishing.

223.   The anticompetitive conduct set forth herein evinces a specific intent to monopolize and a dangerous probability of monopolizing the market for digital news and reference publishing.

224.   Google's anticompetitive maintenance and abuse of its monopoly power is ongoing and Plaintiff and Class members are entitled to injunctive relief and other equitable remedies that would provide guardrails, given that they would otherwise have no adequate remedy at law.

225.   As a result of Google's unlawful conduct, Plaintiff and Class member have suffered, and continue to suffer, monetary harm in an amount to be proved at trial.

226.   Plaintiff and Class members are also entitled to attorneys' fees and costs of suit.

## COUNT III
### Abuse of Dominance In Violation of Section 7 of the Clayton Act
### (On Behalf of Plaintiff And The Class)

227.   Plaintiff incorporates by reference the preceding factual allegations.

228.   Google has violated Section 7 of the Clayton Act (15 U.S.C. §18) by: (a) acquiring entities such as Youtube, Android, DoubleClick, InviteMedia, AdMob, AdMeld, and others cited above;  (b) entering into agreements (such as the "Apple Inc. Search Partnership" and other agreements described above); and (c) implementing SGE with the goal of discouraging end-users from visiting the websites of Class members who are part of the digital news and reference publishing

line of commerce that may tend to substantially lessen competition or activities in the lines of commerce described herein both locally or throughout the United States.

229.    Google's anticompetitive maintenance of its dominant market position is ongoing and Plaintiff and Class members are entitled to injunctive relief and other equitable remedies, given that they would otherwise have no adequate remedy at law.

230.    Plaintiff and Class members are also entitled to recover monetary injury suffered from Google's conduct, as well as attorneys' fees and costs of suit.

**COUNT IV**
**Illegal Tying In Violation Of Sections 1 And 3 Of The Sherman Act**
**(On Behalf of Plaintiff and The Class)**

231.    Plaintiff incorporates by reference the preceding factual allegations.

232.    Google engaged in unlawful tying practices during the Class Period in violation ofSections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

233.    The tying product is general search services in the United States. Google has monopoly power of nearly 90% within that line of commerce.

234.    The separate tied product consists of Google's digital news and reference products in the United States.

235.    With respect to the modification of payment to Publishers under the AdSense program, the tying product is search advertising in the United States and the tied product is Google's revised AdSense program.

236.    On both instances, the tying and tied products are distinct and separate products. They are sold in different markets; their functions are different; there is separate demand for them; and they are treated by Google as distinct products.

237.    The respective use of the tied products are conditioned on the use of the tying product.

238.    Google possesses sufficient market power in the market for the tied products.

239.    A substantial amount of interstate commerce for the tied product is affected.

240.    Plaintiff and Class members paid excessive amounts for the tied products that would have been less but for Google's conduct and are entitled to receive treble damages.

241.    Google's anticompetitive tying arrangement is ongoing and Plaintiff and Class members are entitled to injunctive relief and other equitable remedies, given that they would otherwise have no adequate remedy at law.

242.    Plaintiff and Class members are also entitled to attorneys' fees and costs of suit

### COUNT V
**Unlawful Agreement Between Google And Apple To Unreasonably Restrain Trade In Violation of Sections 1 And 3 of the Sherman Act On Behalf of Plaintiff and The Class**

243.    Plaintiff incorporates by reference the preceding factual allegations.

244.    In 2016, there was a possibility that Apple might wish to use Siri as a form of search engine, a fact referenced in the 2018 e-mail from Braddi quoted above.

245.    Google insisted that Apple shelve any such plan as a condition of extending its "Apple Inc. Search Partnership" with Google. Apple acceded to this request and, in return, continued to share Google's advertising revenue through the use of Apple devices, as reflected in the $18 billion payment it got in 2021. Google currently pays Apple 36% of the ad revenue obtained through Google searches on Apple's Safari web browser. This agreement was unlawful *per se* under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) or is otherwise an unreasonable restraint of trade under those statutes.

246.    Plaintiff and Class members paid excessive amounts for Google's services that would have been less but for this conduct and are entitled to receive treble damages.

247.    Google's "Apple Inc. Search Partnership" is ongoing and Plaintiff and Class members are entitled to injunctive relief and other equitable remedies to prevent its continued

operation, given that they would otherwise have no adequate remedy at law.

248.   Plaintiff and Class members are also entitled to attorneys' fees and costs of suit.

## X.     RELIEF

### A.  DEMAND FOR JUDGMENT

Wherefore, Plaintiff requests that the Court enter judgment on their behalf and on behalf of the Class defined herein, by ordering:

(a) This action may proceed as a class action, with Plaintiff serving as Class Representative, and with Plaintiff's counsel as Class Counsel;

(b) Judgment in favor of Plaintiff and members of the Class and against Defendants;

(c) An award of statutory and other damages under 15 U.S.C. §15 for violations of the antitrust laws by Defendants;

(d) Permanent injunctive relief pursuant to 15 U.S.C. §26, including, but not limited to, guardrails to restore and ensure a fair and level competitive playing field around Google's publishing and dissemination  of digital informational content in its general search services and  search advertising services, such guardrails may include, among others, GAI products (including SGE and Bard), which could include (but are not limited to): (i) revising Google's practices so that a Publisher who wishes to opt out of SGE would still show up on Google searches; (ii) obtaining prior informed consent from Publishers whose website data is used to train GAI; (iii) allowing rivals to access the training data Google uses for chatbots such as Bard; (iv) modifying the payment terms Google announced in 2023 in order to make them more favorable to Publishers;  (v) Google actively investing significant sums in supporting news or reference

dissemination by smaller Publishers; and (vi) establishing a monitoring committee of neutral experts who would be charged with reporting annually on Google's compliance with the mandate of any injunction and on any potential new anticompetitive conduct by it.

(e) Pre- and post-judgment interest on the damages awarded to Plaintiff and members of the Class, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

(f) Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court approved notice program through post and media designed to give immediate notification to the Class; and

(g) Further relief for Plaintiff and members of the Class as may be just and proper.

## B.  JURY DEMAND

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.


Dated:  December 12, 2023                              Respectfully submitted,


By:     /s/ Michael D. Hausfeld
       Michael D. Hausfeld (D.C. Bar No. 153742)
       Scott A. Gilmore (D.C. Bar No. 1002910)
       Mandy Boltax (D.C. Bar No. 90013893)
       **HAUSFELD LLP**
       888 16th Street N.W., Suite 300
       Washington, DC 20006
       Telephone: (202) 540-7200
       mhausfeld@hausfeld.com
       sgilmore@hausfeld.com
       mboltax@hausfeld.com

Scott Martin
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100
smartin@hausfeld.com

Michael P. Lehmann
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
mlehmann@hausfeld.com

Michael L. Roberts
Erich P. Schork
Kelly A. Rinehart
**ROBERTS LAW FIRM US, PC**
1920 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (501) 821-5575
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us
kellyrinehart@robertslawfirm.us