# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HELENA WORLD CHRONICLE, LLC
403 Cherry Street
Helena, AR 72342

and

EMMERICH NEWSPAPERS, INC.
246 Briarwood Drive, Suite 101,
Jackson, MS 39206

     *Plaintiffs*,
  v.

GOOGLE LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

and

ALPHABET INC.
1600 Amphitheatre Parkway
Mountain View, CA 94043

     *Defendants*.

Case No.: 1:23-cv-03677

HON. AMIT P. MEHTA

## <u>AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

I.   INTRODUCTION. ...................................................................................................... 1

II.  JURISDICTION AND VENUE. .............................................................................. 9

III. PARTIES. ................................................................................................................ 10

  A.   Plaintiffs. ............................................................................................................ 10

  B.   Defendants. ......................................................................................................... 13

  C.   Agents and Co-Conspirators. ............................................................................. 14

IV.  FACTUAL ALLEGATIONS. .................................................................................. 14

  A.   GOOGLE MAINTAINS AND ABUSES A MONOPOLY IN THE GENERAL
       SEARCH SERVICES MARKET. ....................................................................... 14

    1.   Google's Core Business: Search and Digital Ad. ......................................... 15

    2.   Google Maintains Its Monopoly Through Anticompetitive Conduct. .......... 22

    3.   Google Substantially Forecloses the General Search Market Through Mergers and
         Exclusionary Dealing. ................................................................................... 24

  B.   GOOGLE LEVERAGES ITS SEARCH MONOPOLY TO ATTEMPT TO
       MONOPOLIZE ONLINE NEWS. ...................................................................... 42

    1.   News Is Central to Google's Business Model. .............................................. 43

    2.   Plaintiffs and Other Publishers Depend on Google's Traffic Referrals. ...... 45

    3.   Google Dominates the Online News Market. ................................................ 45

    4.   Anticompetitive Conduct. ............................................................................. 50

    5.   Google Coerces Plaintiffs and The Class into Supplying News for Republishing and
         Generative AI training. .................................................................................. 57

    6.   Google Republishes Misappropriated News Content. ................................... 66

    7.   Google Has Become the Largest News Publisher in The U.S. ...................... 76

  C.   GOOGLE HAS SOLIDIFIED ITS DOMINANCE IN SEARCH AND ONLINE NEWS
       THROUGH GENERATIVE AI. ........................................................................... 82

    1.   To Stave Off Competition in Search, Google Prematurely Introduced Generative AI
         Products. ........................................................................................................ 82

    2.   Google Violated YouTube's Own Terms of Service to Harvest Publisher Content. .... 114

    3.   Google And Apple Are Negotiating to Potentially Use Google's GAI on Apple
         Devices. ........................................................................................................ 115

D.      GOOGLE SPOLIATES EVIDENCE AND TRIES TO OBTRUCT ANTITRUST
REGULATORS. .......................................................................................................... 116

**V.   CLASS CERTIFICATION. ......................................................................................... 132**

**VI.  CAUSES OF ACTION ................................................................................................ 135**

A.      COUNT ONE: MONOPOLIZATION AND ABUSE OF MONOPOLY IN THE
GENERAL SEARCH SERVICES MARKET— SHERMAN ACT, 15 U.S.C. §§ 2, 3. ....... 135

    1.      General Search Services in The U.S. Is A Relevant Market. ...................................... 135

    2.      Google Has Monopoly Power in The General Search Services Market. .................... 136

B.      COUNT TWO: MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF
THE ONLINE NEWS MARKET – SHERMAN ACT, 15 U.S.C. §§ 2, 3 ........................... 140

    1.      Online News in The U.S. Is A Relevant Product Market. ........................................... 140

    2.      Google has Monopoly Power or a Dangerous Probability of Achieving It. ............... 143

    3.      Anticompetitive Effects ................................................................................................. 144

C.      COUNT THREE: TYING OF SEARCH AND ONLINE NEWS—SHERMAN ACT,
15 U.S.C. §§ 1, 3. .............................................................................................................. 145

D.      COUNT FOUR: ABUSE OF DOMINANT POSITION IN LINES OF COMMERCE
ACQUIRED THROUGH MERGERS OR ACQUISITIONS—SECTION 7 OF THE
CLAYTON ACT, 15 U.S.C. § 18. ...................................................................................... 147

E.      COUNT FIVE: UNLAWFUL AGREEMENT BETWEEN GOOGLE AND APPLE-
SECTIONS 1 AND 3 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3 .................................. 149

**VIII. RELIEF REQUESTED. .............................................................................................. 150**

1.      Plaintiffs Helena World Chronicle, LLC ("Helena") and Emmerich Newspapers, Inc. ("Emmerich Newspapers"), on behalf of themselves and all other publishers of written digital  news products ("Publishers"),[1] bring this Class Action Complaint (the "Complaint") against Defendants Google LLC and its parent entity, Alphabet, Inc. (collectively, "Google") for violations of: Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1-3) and Section 7 of the Clayton Act (15 U.S.C. § 18). Plaintiffs seek treble damages and injunctive relief pursuant to 15 U.S.C. §§ 15 and 26, as a result and consequence of Defendants' unlawful conduct. The relevant Class Period extends from November 1, 2019 through the date on which a Class is certified.

## I.      INTRODUCTION.

2.      Google is starving the free press of readers and advertising ("ad") revenue through various anti-competitive means. Every year, it siphons off billions in traffic from Publishers by extracting, repackaging, and republishing their news content on a royalty-free basis. It trains its generative AI ("GAI") models to mimic journalists by using their content without permission and without payment. Google also free rides on their news reporting to "ground" its GAI products with information on current events, making America's news outlets Google's unpaid stringers.

3.      It was not always like this. Google started out as a search engine that had a complementary, mutually beneficial relationship with Publishers. It indexed the web and delivered ten blue links, connecting users seeking information with websites where they could find it. Google's goal, as co-founder Larry Page ("Page") put it, was "to get you out of Google and to the

---

[1] The term "Publishers" as used herein refers to publishers of websites that professionally gather, produce, and publish digital news content—*i.e.*, verified information and opinion on current events and culture—in text, image, or video format. Some of these Publishers may also gather, produce, and publish news in printed newspapers and periodicals, and/or through broadcast, cable, and local TV news outlets.

right place as fast as possible."[2]

4.      Today's Google is very different. It is a "walled garden" that uses news to entice and keep users to its search platform, where roughly 80% of all Google searches seek information, not commercial transactions.

5.      On any given day, Google users can read about the leading candidate in the presidential primaries, the latest conflict in the Middle East, the local weather, and the top music albums of 2024. They can read all of this on Google Search, without ever visiting the media websites that gathered and produced this news content. In the past year, there were 767.8 billion visits to the Google websites where it publishes news (Search, News, YouTube, and Google's GAI platform Bard/Gemini,) in the United States ("U.S."), giving Google an audience 62 times greater than CNN, the largest legacy news website.[3] As explained below, more than 65% of the traffic to the top 215 news sites in the U.S. (including Facebook, Reddit, TikTok and others) goes to Google. As Microsoft President Brad Smith ("Smith") put it: "Google has effectively transformed itself into the 'front page' for news, owning the reader relationship and relegating news content on their properties to a commodity input."[4]

---

[2] Google, Inc., Amendment No. 9 (Form S-1) (Aug. 18, 2004), at B6, https://www.sec.gov/Archives/edgar/data/1288776/000119312504142742/ds1a.htm.

[3] Appendix A provides a comparison of data from www.semrush.com on total U.S. visits (March of 2023 to March of 2024) to the flagship websites of 215 major online news outlets, which each received at least 30 million visits during this period. These include search engines, social media platforms, news aggregators, digital newspapers and magazine, broadcast, cable, and local TV news outlets.

[4] *Technology and the Free Press: The Need for Healthy Journalism in a Healthy Democracy*, Hearing Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the H. Comm. on the Judiciary (Mar. 12, 2021) (written testimony of Brad Smith, President, Microsoft Corp.), https://docs.house.gov/meetings/JU/JU05/20210312/111315/HHRG-117-JU05-Wstate-SmithB-20210312.pdf.

6.     Google became America's largest news publisher through what may be one of the greatest antitrust violations of the 21st century. By acquiring the Android operating system ("OS") and signing exclusionary contracts with distributors, Google embedded itself as the default general search engine—the gateway to the internet—for most Americans. Since 2016, Google has paid Apple, Inc. ("Apple") 40% of Google's net advertising ("ad") revenue—over $100 billion—to make Google Search the default on the Safari browser on all Apple devices and for Apple to refrain from entry into the general search market. Google struck similar deals with: (a) Samsung Electronics Co., Ltd, and/or its subsidiaries ("Samsung") and other Android device manufacturers; (b) AT&T, Verizon and other carriers who sell those devices; and (c) Mozilla and other rival web browsers. By locking in these search access points and by embedding Google Search in its Chrome browser (and getting Apple to make Google Search the default search engine on Apple's Safari browser), Google has foreclosed roughly 70% of all U.S. search queries. These tactics allowed Google to exclude other search engines, such as Microsoft Corporation's ("Microsoft") Bing, Yahoo, and DuckDuckGo, from being able to compete for these searches, as well as depriving them of the benefits of scale over a sustained period of time.

7.     With a 90% market share, Google has a durable, unlawfully acquired and maintained monopoly in internet search. This monopoly gives Google enormous power over Publishers, who depend on Google as the largest external distribution channel for online news: search traffic. Google's stranglehold on search distribution allows Google to exclude rivals from this indispensable channel of news distribution. Since Publishers cannot bargain for a better deal from rival search engines, because there are no practical alternative choices available, Google can dictate the terms of trade for them.

8.      Originally, when Google was just a search engine, and not functioning as a rival news publisher as it does today, it had an exchange of value with the Publishers that purchased its distribution services. Google provided search traffic (or user clicks), and, in return, Publishers furnished content for Google's Search index, enabling it to provide search results to its users. But Google's monopoly in search enables it to both raise prices and reduce output. Today, Google does not just use Publishers' content for its search index. If Publishers want full access to search traffic, they must also allow Google to republish their content, train its GAI models on their data, and perform news gathering for its GAI products, all without compensation.

9.      Over the past decade, Google's coercive and monopolistic conduct vis-à-vis Publishers represents an effective price increase for Publishers, which, in turn, has caused Publishers to reduce output, as set forth below in more detail.

10.      Google compels Publishers to acquiesce to its unilaterally imposed terms through coercive means. The only way Publishers can opt out of news gathering for Google's GAI tools is to drop out of Google Search entirely. If Publishers try to limit Google's ability to copy "snippets" of news (typically the most valuable lead paragraphs), they risk being downgraded in the search rankings and disappearing from the precious real estate "above the fold" on Google Search (a reference to the content that can be seen without scrolling when a web page loads in a browser). The vast majority of users spend their time and attention above the fold. If Publishers lobby legislators for collective bargaining rights, Google threatens them with bans or boycotts. Most recently, in early April of 2024, Google retaliated against the proposed California Journalism Preservation Act ("CJPA"), which would require it to pay for news content, by temporarily banning Californian news outlets from Google Search for certain California-based users.

11.     Google's mass misappropriation covers virtually the entire inventory of news in the U.S. When this content is repackaged and republished by Google, it produces "zero-click searches," where users consume content directly from Google without ever leaving the search platform. Roughly 65% of all Google searches now end in zero-clicks. The rate is even worse for Google's "surfaces" (the various places across the Google platform where a product listing might show up). For example, 97% of People Also Ask boxes (a Google rich snippet feature that provides users with additional information they may be looking for from their initial query) result in zero-clicks. Similarly, 98.6% of Knowledge Panels (a type of rich result that appears on the right side of the Search Engine Result Pages ("SERPs") when people search for an entity, such as a person, place, organization, or thing) have zero-clicks. And 89% of articles in the Google Discover feed (a personalized feed of content from the web that is tailored to a viewer's interests) have zero-clicks. Every zero-click search deprives Publishers of a return on their investment by depriving them of the opportunity to sell subscriptions, generate ad revenue, or collect user data for marketing and product improvement. But for Google, its ability to confine these consumers within its walled garden enables it to capture more ad revenue, more user engagement, and more user data, thereby giving Google the advantages of scale and network effects that enable it to maintain its monopoly.

12.     This complaint alleges two markets at issue. By leveraging its monopoly in the *first market for general search*, Google is intentionally monopolizing or attempting to monopolize the *second online news market* by raising rival Publishers' costs.  By free riding on news reporting and content, Google gives itself an artificially low production cost in news publishing, thereby putting rivals who *do* pay (*e.g.*, costs of labor or licensing fees) at a competitive disadvantage. By diverting traffic that would normally flow from its search platform to rival Publisher webpages,

Google raises rival Publishers' average cost of production, since they have fewer customers relative to fixed costs. By forcing rival Publishers to acquire customers through other means, like increased ad spend, Google raises their absolute costs. By siphoning off rival Publishers' ad revenue, Google forces them to adopt costly measures like paywalls. And by depriving rivals of licensing fees, Google diminishes those rivals' ability to pay for all these added costs.

13.     Google's anticompetitive conduct in the search and online news markets is delivering a death blow to America's already ailing news industry. By the end of 2025, the U.S. is on track to lose one-third of its newspapers and two-thirds of its journalists.[5] More than half of all counties in the U.S. are now "news deserts" with either no local news source or just one remaining outlet. In the past five years, a number of digital media start-ups were launched, while an equal number were shuttered. Digital media start-ups are plagued by the same challenges that legacy news media companies face in being dependent on Google while also trying to compete with it for ad revenue.

14.     As newsrooms shrink or go silent, consumers suffer from a decline in the quality and variety of available news content. A free press holds governments accountable, but there is less accountability if there are fewer investigative reporters. And there are fewer informed voters if there is less coverage of local elections and candidates. Fewer professional editors and reporters also means that there are fewer fact-checked, trustworthy news stories. Meanwhile, Google's online offerings are poor substitutes. Snippets might be quick to consume, but they fail to provide consumers with the context, nuance, and analysis that Publishers provide and that an informed

---

[5] All data are drawn from Penelope Muse Abernathy, *The State of Local News 2023*, Northwestern University, Medill Local News Initiative, Nov. 16, 2023, https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/report/.

public requires. At the same time, Google's GAI products like Bard/Gemini are notoriously inaccurate (as described below) and risk flooding the marketplace of ideas with misinformation passed off as fact. Yet these red flags have not stopped Apple from negotiating with Google to extend their long-term partnership to make Gemini the default GAI program on Apple devices.

15.     Underpinning Google's anticompetitive scheme is the dominance it acquired as a digital platform through key mergers and acquisitions, including its acquisitions of the Android OS, the video platform YouTube, and the artificial intelligence ("AI") firm DeepMind. The impacts of these acquisitions have not been static but have instead grown and evolved over succeeding years in a manner that exacerbates Google's monopoly power. Google has abused the dominance it acquired to substantially lessen competition in various lines of commerce, including search, news, and digital ads. The risk that these mergers and acquisitions would lessen competition or tend to create a monopoly only recently became apparent with the revelation of Google's GAI strategy and the unsealing of trial exhibits in the U.S Department of Justice's ("DOJ") antitrust proceedings against Google in *United States, et al. v. Google LLC*, No. 1:20cv03010 (D.D.C.) ("DC DOJ Case"), the trial of which commenced in September of 2023.

16.     Plaintiffs Helena and Emmerich Newspapers—along with the entire class of Publishers—are direct purchasers of Google's search referral services and unwitting suppliers to Google of news input. Plaintiffs are emblematic of the local news Publishers that keep America's economy and democracy running. Founded in 1871, the *Helena World* is one of the oldest newspapers in Arkansas. Emmerich Newspapers is a century-old local news dynasty in Mississippi, publishing 25 print newspapers and 22 news websites. Like the rest of the industry, Plaintiffs pivoted to digital journalism and became dependent on Google for digital distribution. For example, the *Tate Record*, one of Emmerich Newspapers' websites, relies on Google Search

for 79.57% of all traffic, while 51.67% of all traffic to its *Enterprise-Journal* comes from Google. A third of all traffic to *Helena World* comes from Google, second only to users directly navigating to the website.

17.     Like the other Class members, Plaintiffs' news is scraped and republished by Google in People Also Ask, Featured Snippets (a webpage excerpt that succinctly answers a searcher's question and is often featured at the top of a SERP) and its Search Generative Experience ("SGE") (a search experience that uses GAI to provide users with overviews of search topics without having to click on individual webpages), all of which are described in more detail below. Their content was used to train Google Bard/Gemini, and copies of their original works continue to be contained in and partially reproduced by Google's foundational AI models. Their local newsgathering continues to be appropriated by Google to "ground" its GAI products in current events in Mississippi and Arkansas.

18.     Like the other Class members, Plaintiffs have received no compensation from Google and no share in the revenue that Google derives from their investments in time-sensitive news.

19.     Since 2021, consumer demand for Emmerich Newspapers has grown, with direct traffic to its news sites more than doubling. Yet at the same time, search traffic from Google has nearly halved. Helena is also seeing a disproportionate loss in Google search traffic: while overall traffic is down 6% over the past year, traffic from Google dropped 22%. On an industry-wide basis, Google's mass misappropriation of news—and the concomitant increase in zero-click searches—help explain why traffic to news websites has stagnated despite a large increase in online activity: average monthly unique visits were the same in the fourth quarter of 2014 as they were in  the fourth quarter of 2022.

20.     Google's exclusionary conduct harms competition in search and online news.  That conduct is immensely lucrative to Google, which generates an estimated $21 billion in ad revenue from information searches using Publishers' content.[6] By withholding a fair share from the news industry, Google is precipitating what *The Atlantic* recently called an "Extinction-Level Event."[7]

21.     Google's anticompetitive conduct violates Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1-3) and Section 7 of the Clayton Act (15 U.S.C. § 18). Plaintiffs and the Class seek treble damages for overcharges, lost profits, withheld licensing fees, and unjust enrichment. They also seek injunctive relief to require Google to pay a fair share for news and establish guardrails to protect the integrity of online news, as well as the broader online marketplace of ideas.

## II.     JURISDICTION AND VENUE.

22.     This Court has subject matter jurisdiction pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337(a).

23.     This Court has personal jurisdiction over each Defendant because Defendants do extensive business within this District — including by providing the monopolized services to class members and consumers within this this district—and this action arises out of Defendants' contacts within this District.

24.     Venue is proper in this Judicial District pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391, because: (a) each Defendant transacts business

---

[6] Dr. Patrick Holder, *et al*., *Paying for News: What Google and Meta Owe US Publishers*, Initiative for Policy Dialogue, Oct. 29, 2023, at 33, https://policydialogue.org/files/publications/papers/USE-THIS-2023.10.28_Paying-for-News_Clean-2.pdf.

[7] Paul Farhi, *Is American Journalism Headed Toward an 'Extinction-Level Event?'*, The Atlantic, Jan. 30, 2024, https://www.theatlantic.com/ideas/archive/2024/01/media-layoffs-la-times/677285/.

and is found within this District; (b) a substantial part of the events giving rise to the alleged claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce was carried out in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the U.S., including in this District. Defendants' conduct has had the intended and foreseeable effect of causing injury to persons residing in, located in, or doing business throughout the U.S., including in this District.

25.    Defendants' conduct affects interstate trade and commerce. Defendants' conduct has a direct, substantial, and reasonably foreseeable effect on commerce within the U.S.

III.    PARTIES.

A.    Plaintiffs.

26.    Plaintiff **Helena** is an Arkansas corporation with its principal place of business at 417 York St, Helena-West Helena, AR 72342-3232. Helena produces original news content and publishes two print newspapers, *The Helena World* and the *Monroe County Argus*, and two news websites, helenaworld.org and monroecountyargus.com.

27.    Founded in 1871, the *Helena World* is the one of Arkansas' oldest newspapers and the paper of record for Helena-West Helena, on the banks of the Mississippi River. The *Helena World* was shuttered by its corporate owner, GateHouse Media in September 2019. But Andrew Bagley and Chuck Davis bought the paper and put it once again under local ownership. Bagley and Davis shifted the paper to a weekly publication schedule and launched an online edition.

28.    Plaintiff **Emmerich Newspapers** is a Mississippi corporation with its principal place of business at 246 Briarwood Drive, Suite 101, Jackson, Mississippi. Emmerich Newspapers is a print and digital media company that produces, through its subsidiaries, original news content. The Emmerich family is a local journalism dynasty started in 1923, when John Oliver Emmerich,

Sr. bought a weekly newspaper in McComb, Mississippi. The Emmerich name became synonymous with the news in Mississippi. The most prestigious journalism award in the state is the John Oliver Emmerich Award for Editorial Excellence. In 1990, John Emmerich, Sr.'s grandson, Wyatt Emmerich, took over the family business. Today, Emmerich Newspapers publishes two daily and 23 weekly newspapers operating in 18 Mississippi markets, two markets in Louisiana, and one market in Arkansas. Emmerich Newspapers also publishes 22 news websites.

29.    Emmerich Newspapers is a parent and holding company which owns 100% of the stock in 22 subsidiary companies, including:

1) J.O. Emmerich & Associates, Inc., which is a Mississippi corporation with its principal office address at 112 Oliver Emmerich Dr., McComb, MS 39649 that publishes the five-day-a-week *Enterprise-Journal* in print in McComb and the digital edition at www.enterprise-journal.com;

2) Delta-Democrat Publishing, Inc., which is a Mississippi corporation with its principal office address at 988 N. Broadway, Greenville, MS 38701 that publishes the twice-weekly *Delta Democrat Times* in Greenville and the digital edition at www.ddtonline.com;

3) Commonwealth Publishing, Inc., which is a Mississippi corporation with its principal office address at 329 Highway 82 West, Greenwood, MS 38930 that publishes the five-day-a-week *Greenwood Commonwealth* and the digital edition at www.gwcommonwealth.com;

4) Delta Press Publishing, Inc., which is a Mississippi corporation with its principal office address at 123 Second Street, Clarksdale, MS 38614 that publishes the weekly *Clarksdale Press Register Commonwealth* and the digital edition at www.pressregister.com;

5) Newton County Appeal, Inc., which is a Mississippi corporation with its principal office address at 105 Main Street, Union, MS 39365 that publishes the weekly *Newton County Appeal* and the digital edition at www.newtoncountyappeal.com;

6) Marion Publishing, Inc., which is a Mississippi corporation with its principal office address at 318 Second Street, Columbia, MS 39429 that publishes the twice-weekly *Columbian-Progress* and the digital edition at www.columbianprogress.com;

7) Yazoo Newspaper, Inc., which is a Mississippi corporation with its principal office

address at 1035 Grand Avenue, Yazoo City, MS 39194 that publishes the weekly *Yazoo Herald* and the digital edition at www.yazooherald.net;

8) Sunland Publishing, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, MS 39206 that publishes the weekly *Northside Sun* and the digital edition at www.northsidesun.com;

9) Simpson Publishing, Inc. which is a Mississippi corporation with its principal office address at 206 N. Main Street, Magee, MS 39111 that publishes the weekly *Magee Courier* and the weekly *Simpson County News* in Jackson, both published online at www.simpsoncounty.ms;

10) Montgomery Publishing, Inc. which is a Mississippi corporation with its principal office address at 321 Summit Street, Winona, MS 38967 that publishes the weekly *Winona Times* and the weekly *Carrollton Conservative,* both published online at www.winonatimes.com;

11) Franklinton Publishing, Inc. which is a Louisiana corporation with its principal office address at 41738 Highway 10, Franklinton, LA 70438 that publishes the weekly *Franklinton Era-Leader* in Franklinton, Louisiana, published online at www.era-leader.com;

12) Charleston Publishing, Inc. which is a Mississippi corporation with its principal office address at 149 South Square, Charleston, MS 39206 that publishes the weekly *Charleston Sun-Sentinel*, published online at www.tallahatchienews.ms;

13) Clarion Publishing, Inc. which is an Arkansas corporation with its principal office address at 322 South Court Street, Dumas, AR 71639 that publishes the weekly *Dumas Clarion* in Dumas, Arkansas, published online at www.dumasclarion.com;

14) Scott County Publishing, Inc. which is a Mississippi corporation with its principal office address at 311 Smith Avenue, Forest, MS 39074 that publishes the weekly *Scott County Times*, published online at www.sctonline.net;

15) Clarke Publishing, Inc. which is a Mississippi corporation with its principal office address at 101 Main Street, Quitman, MS 39355 that publishes the weekly *Clarke County Tribune,* published online at www.clarkecountytrib.com;

16) Hattiesburg Publishing, Inc. which is a Mississippi corporation with its principal office address at 525 N. Main Street, Hattiesburg, MS 39401 that publishes the weekly *Pine Belt News*, published online at www.hubcityspokes.com;

17) Tallulah Publishing, Inc. which is a Louisiana corporation with its principal office address at 300 S. Chestnut Street, Tallulah, LA 71282 that publishes the weekly *Madison Journal* in Tallulah, Louisiana, published online at www.madisonjournal.com;

18) Louisville Publishing, Inc. which is a Mississippi corporation with its principal office address at 233 North Court, Louisville, MS 39339 that publishes the weekly *Winston County Journal*, the weekly *Webster Progress- Times* and the weekly *Choctaw Plain Dealer*, all published online at www.redhillsmsnews.com;

19) Kosciusko Star-Herald, Inc. which is a Mississippi corporation with its principal office address at 207 N. Madison Street, Kosciusko, MS 39090 that publishes the weekly *Kosciusko Star-Herald*, published online at www.starherald.net;

20) Enterprise-Tocsin, Inc. which is a Mississippi corporation with its principal office address at 114 Main Street, Indianola, MS 38751 that publishes the weekly *Enterprise-Tocsin* in Indianola, published online at www.enterprise-tocsin.com;

21) Grenada Star, Inc. which is a Mississippi corporation with its principal office address at 355 W. Monroe Street, Grenada, MS 38901 that publishes the weekly *Grenada Star*, published online at www.grenadastar.com; and

22) Tate Record, Inc. which is a Mississippi corporation with its principal office address at 219 East Main Street, Senatobia, MS 38668 that publishes the weekly *Tate Record* in Senatobia, published online at www.taterecord.com.

**B.    Defendants.**

30.    Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California. Google LLC is an online ad company providing internet-related products, including various online ad technologies, directly and through subsidiaries and business units that it owns and controls.

31.    Defendant Alphabet Inc. ("Alphabet") is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Alphabet Inc. was created as a holding company for Google in late 2015, and Alphabet controls Google's day-to-day operations. Virtually all of Alphabet Inc.'s revenue comes from Google LLC. Since December of 2019, Alphabet and Google have had the same Chief Executive Officer ("CEO") (Sundar Pichai ("Pichai")). As a result of Alphabet Inc.'s operational control, Google LLC is Alphabet Inc's alter *ego*.

13

32.     As noted above, Google LLC and Alphabet Inc. are referred to collectively as "Google" or "Defendants."

### C.     Agents and Co-Conspirators.

33.     The unlawful acts of Defendants set forth in this class action complaint were authorized, ordered, or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs. The Defendants' agents operated under the explicit and apparent authority of their principals. Each Defendant, and its subsidiaries, affiliates, and agents operated as a single unified entity.

34.     Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Each acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## IV.     FACTUAL ALLEGATIONS.

### A.     GOOGLE MAINTAINS AND ABUSES A MONOPOLY IN THE GENERAL SEARCH SERVICES MARKET.

35.     Today's digital economy is highly concentrated in the hands of a few firms that dominate online markets and lines of commerce. Digital platforms operate as essential intermediation services, control key channels of distribution, and act as gatekeepers between consumers, Publishers, and advertisers. Their ability to abuse monopoly or dominance in one line of commerce to monopolize or dominate others has no historical precedent.

36.     Google is largest digital platform on the planet. Its parent company, Alphabet, has a market capitalization of nearly $1.7 trillion. In 2022, it made more than $282 billion in revenue—80% from digital ad.

1.      **Google's Core Business: Search and Digital Ad.**

a.      **Google's Monopoly in Search**.

37.     Google was launched in 1998 as a general search engine. Google Search was used to crawl the web, copy website data into an index, and deliver—in response to user queries—a list of "ten blue links" that its co-founder Page said in 2004 aimed "to get you out of Google and to the right place as fast as possible."[8]

38.     Google Search is a one-stop shop that can handle queries on any subject. Google serves its results by publishing a SERP.

39.     Google Search has four main components: a web crawler (called GoogleBot), a search index, search algorithms, and a SERP. Operating a general search engine involves a complex, multi-step process: (1) crawling the web to collect data; (2) copying and analyzing the data in a searchable index; (3) receiving and parsing a search query; (4) retrieving data from the index in response to the query; (5) ranking the web results; and (6) assembling a SERP through a whole page ranking that incorporates organic search results and, depending on the query, search ads and other features, such as republished news content.

40.     Google Search is not free. Its platform involves a series of valuable exchanges with three key customers—search users, website publishers, and advertisers. Google provides *search traffic referrals* to Publishers in exchange for *content*, which Google obtains via crawling and indexing websites. Google provides *search results* to users in exchange for their *attention* to links, ads, and content published on Google's SERP. Google then sells *search ads* to advertisers, monetizing the content it acquires from publishers and the attention it acquires from users. The

---

[8] Google, Inc., Amendment No. 9 (Form S-1) (Aug. 18, 2004), at B6, https://www.sec.gov/Archives/edgar/data/1288776/000119312504142742/ds1a.htm.

following graphic illustrates this process.



41.     These commercial exchanges occur billions of times a day as Google serves search results in response to user queries seeking information.

42.     Google commands 90% of the U.S. search market, as reflected in the chart below submitted by the News Media Alliance ("NMA") in an April 16, 2024 letter to the DOJ and the Federal Trade Commission ("FTC") challenging Google's threat to sanction California Publishers if the California legislature adopts the CJPA:[9]

---

[9] Brittney Barsotti, General Counsel, California News Publishers Association, and Danielle Coffey, President & CEO, News/Media Alliance letter to CA Attorney General Rob Bonta, *Request to Investigate Legal Implications of Google's Decision to Block News in California* (Apr. 16, 2024), http://www.newsmediaalliance.org/wp-content/uploads/2024/04/CNPA-and-NMA-letter-to-Attorney-General-of-California.pdf.



Source: Similarweb (2023)

**b.   Barriers to Entry in Search Perpetuate Google's Search Monopoly.**

43.    Google's market share in general search services has been durable. Since 2009, Google's market share of that market has risen from approximately 80% to nearly 90%. Michael Whinston ("Whinston"), a Professor at the Massachusetts Institute of Technology, who testified as an expert for the government in the DC DOJ Case, stated that if one considered searches conducted through mobile phones, Google's market share was just under 95%. Over the past decade, the market shares of Bing and Yahoo have rarely exceeded 10%. Recent events, such as the release of the GAI platform ChatGPT, owned by OpenAI's and the latter's partnership with Microsoft, have not affected Google's market share.

44.    Google's monopoly power is protected by high barriers to entry, including: (1) the costs of operating a general search engine, (2) limits on the number of feasible web crawlers, (3) scale and network effects, and (4) Google's control of search access points through its exclusionary distribution agreements, acquisition of Android and ownership of Chrome.

45.     The **first barrie**r is cost. According to Google's Chief Economist, Hal Varian ("Varian"): "[i]t is very, very expensive to implement general search."[10] He also observed that "Google is [an] ad supported general purpose search engine. There aren't many of these in part because they are very expensive to build and maintain."[11] A search engine must crawl and copy a vast amount of data from the web to build an index. This requires enormous computing power.

46.     A **second barrier** is Google's crawling itself.  Only a finite number of crawlers that can scrape websites without impairing their functions. Because crawling imposes financial and resource constraints on the webpage owner, many owners limit the number of crawlers who can access their website. Today, crawling is principally conducted by two search engines with scale: Google and Microsoft's Bing.

47.     A **third barrier** is scale. According to Google, a search engine "gets better as you have more users."[12] Google derives significant advantages from network effects: The more users on Google, the more data it collects from them. This trove of data enables Google's algorithms to refine and personalize its search results—and allows Google to sell targeted search ads to advertisers.

48.     A **fourth barrier** is Google's control over critical search access points through its search distribution contracts. Default placement in a search access point (*e.g.*, a browser or mobile home screen) is the most effective way to drive traffic to a general search engine and accounts for the overwhelming majority of search queries. Google's distribution contracts with Apple, Android and others, as described below, make entry and expansion more difficult by ensuring that rivals

---

[10] DOJ Trial Ex. UPXO330 at 2, *United States v. Google LLC*, 1:20-cv-03010-APM (D.D.C.).

[11] DOJ Trial Ex. UPXO333 at 1, 1:20-cv-03010-APM (D.D.C.).

[12] DOJ Trial Ex. UPXO177 at 1, 1:20-cv-03010-APM (D.D.C.).

are disadvantaged at key access points, forcing them into less effective distribution channels. In addition, Google's ownership of Chrome—coupled with its acquisition of Android—is a significant barrier to entry. Nearly one-fifth of all general search queries in the U.S. go through the default search engine on Chrome where Google is, of course, the default. Rivals have no opportunity to attain default distribution for almost one-fifth of all U.S. search queries.

49.     Further evidence of Google's monopoly power lies in its ability to disregard user privacy concerns and reduce the quality of Google Search without losing customers. Google is well-aware that its customers disapprove of its privacy practices in user surveys. And it knows that its competitor DuckDuckGo offers more data privacy. But Google ignores competition and customer demands for more privacy because of its monopoly power. Similarly, for years Google has ignored complaints about the declining quality of its search results, as the SERP becomes crowded with paid ads and Google's rich-text answer features.

50.     Google's complaining customers are not wrong. Google's latency—the time it takes for Google to load a page in response to a request—has grown, and Google has rejected feasible proposals to invest in more data centers to reduce lag time. Google's web crawling has not kept pace with the growth of the web. In 2017, the size of Google's index shrank, even as the number of search queries increased. Google has no need to invest in these improvements to user experience, since its users have nowhere else to go.

c.   **Google Monetizes Its Search Monopoly Through Digital Ads.**

51.   In 2023, Google earned over a quarter of a trillion dollars ($237.86 billion) from digital ads.[13] Google monetizes search through digital ads. Google controls a dominant position across the entire digital ad stack, including the buy-side demand, sell-side inventory, and the ad exchange auction that connects the buy-side with the sell-side, as depicted in the graphic that follows.



52.   The following chart depicts visually the control that Google exerts over digital ads, as expressed in its ad revenue, compared with that of U.S. newspapers generally from 2004 to 2017:

---

[13] *Ad revenue of Google from 2001 to 2023*, Statista.com, https://www.statista.com/statistics/266249/ad-revenue-of-google/ (last visited Apr. 29, 2024).



53.     For most websites, the key to being found on the internet is to be listed prominently at the top of Google Search. In 2000, Google began selling search ads—real estate on the SERP—to the highest bidding advertisers. Because Google Search commands nearly 90% of the general search market, it also controls 90% of the search ad market. Google controls not only the supply of ad space, but also the infrastructure to buy that ad space. Today, search ad is the heart of Google's business model, accounting for roughly 79% of all revenue.[14]

54.     Google is the central player in nearly all aspects of ad sales for the entire web because it controls the vast majority of the tools and technologies that enables the buying and selling of digital ads.

55.      Display ads are the lifeblood of Publishers, which monetize their news products through ads, subscriptions/sales, and licensing. Publishers have several ways to sell display ads on their websites. Many Publishers sell their ad inventory using services that pool ad inventory for

---

[14] *Net search advertising revenue of Google in the United States from 2019 to 2024*, Statista.com, https://www.statista.com/statistics/271527/forecast-of-revenues-from-paid-search-in-the-us/ (last visited Apr. 29, 2024).

sale to advertisers affiliated with their network. Google launched its display ad network, AdSense in 2003. Today, AdSense is a core part of the Google Display Network, a vast collection of over 200 million sites, apps, and videos where Google ads can appear.[15] This network reaches 90% of global internet users, making it an influential platform for advertisers.

56.     Google's dominance in search has allowed it to collect a massive dataset of personal identifying information about consumers all around the world. Google collects data on billions of users who engage with Google Search, its various properties like YouTube, and trackers it has installed on websites around the world. Google collects this data in the Google Ads Data Hub, which enables its ad clients to target and optimize ad campaigns.

57.     Search operates in tandem with digital ads in in Google's ecosystem. Search aggregates and displays content, attracts users, harvests their data, and monetizes them by targeting them with ads.

**2.     Google Maintains Its Monopoly Through Anticompetitive Conduct.**

58.     Google has unlawfully maintained and abused its monopoly in the general search market through a "monopoly broth" of anticompetitive acts that, taken individually and in the aggregate, have enabled it to exclude rivals, including *inter alia*:

- Entering into exclusionary distribution contracts with Apple, Android Partners, and Browsers that make Google the default general search engine on their products, foreclosing competition;

- Using its monopoly profits to pay excessive amounts for those contracts that sometimes involved sharing of net ad revenues;

- Requiring Apple to abandon any potential for using Siri as a search engine as part of the 2016 extension of the "Apple Inc. Search Partnership" and not give itself default search

---

[15] Display Network: Definition, Google Ads Help, https://support.google.com/google-ads/answer/117120?hl=en- (last visited Apr. 29, 2024).

engine status in updates of its operating system;

- Acquiring companies (such as Android, DeepMind, and YouTube) that enabled it to build an exclusionary digital ad search network;

- Misappropriating, without compensation, newsgathering and news content from its Publisher customers to republish on Google's news surfaces;

- Misappropriating, without compensation, newsgathering and news content from its Publisher customers to develop and operate its GAI programs, Bard and SGE, and the algorithms Google uses for searches;

- Introducing prematurely Bard (later known as Gemini) without it being ready for use in an effort to undermine competition from Microsoft and preserve its monopoly in general search;

- Delaying for now any ability to avoid scraping of user/customer content through Bard and SGE;

- Modifying the manner in which it charges Publishers under AdSense by using a cost per impression rather than a cost per click methodology and imposing separate charges for its services;

- Negotiating with Apple to extend potentially its exclusionary agreement to GAI, seeking to make Gemini the default GAI tool on the majority of mobile devices and to pay Apple not to launch competing products;

- Spoliating evidence by instructing employees to limit what they say in writing, by requiring that communications on Google Talk be all off the record and internal chats should be deleted, and by its "fake privilege" scheme; and

- Banning California news websites from Google Search in retaliation for the introduction of the CJPA.

59.     This exclusionary conduct will be addressed in further detail in the sections that follow.

3.      **Google Substantially Forecloses the General Search Market Through
         Mergers and Exclusionary Dealing.**

     a.      **Google Controls Key Distribution Channels Through Certain
                Acquisitions.**

60.      Google began its march to dominance in the search line of commerce by acquiring key competitors in mobile devices, digital media, AI, and digital ads. Google achieved its structure as a dominant digital platform through a series of strategic mergers and acquisitions designed to attract, trap, and monetize users of its search engine.

61.      To date, Google has acquired 260 different entities, across various lines of commerce, each in furtherance of its walled garden scheme.

62.      Google's acquisitions of entities in related and dependent lines of commerce highlight its commitment to building and fortifying its walled garden in search. Three of these acquisitions—of the mobile start-up Android, the video platform YouTube, and the AI firm DeepMind—both reinforced Google's search monopoly and enabled it to entrench and extend its overall digital platform dominance into related lines of commerce. As demonstrated above, the overall effect of this conduct has substantially lessened competition in general search services and online news and tends to create a monopoly for Google in these lines of commerce.

63.      *Android*. Scale is vitally important to competition between general search engines for consumers and advertisers. The more user data a search engine collects, the more it can refine its search results and target its search ads. Google recognizes that its rivals cannot compete without adequate scale.

64.      The most effective way for Google to deny scale to its competitors is to restrict their ability to reach consumers through search access points. A search access point is any place on a

mobile device or computer where a user enters a search query.[16] Web browsers are the main search access points on desktop. When a user enters a query in the browser address bar (as opposed to typing a URL), the browser sends the query to a default general search engine. Mobile devices have a variety of search access points. Mobile web browsers also direct queries to default search engines. Mobile search apps and widgets also provide search access points.

65.     One way Google acquired such scale was through its acquisition of Android. In 2005, Google acquired Android, today the world's dominant mobile OS, and the best-selling OS since 2011.[17] Google leveraged its acquisition of Android to extend its search monopoly, and increasingly trap users within its walled garden ecosystem. A 2020 House Subcommittee on Antitrust Report discussed Google's intention to use its purchase of Android to strengthen and entrench its search monopoly, noting that: "Google used its search engine dominance and control over the Android operating system to grow its share of the web browser market and favor its other lines of business."[18]

66.     Android is the world's largest mobile operating system, running on 75% of the world's mobile devices. In the U.S., Android has roughly 45% of the mobile operating system market, second only to Apple iOS, with 54%. As explained below, Google has entered into

---

[16] On desktop computers, the principal search access point is through a web browser.

[17] *Android (operating system)*, Wikipedia.org, https://en.wikipedia.org/wiki/Android_(operating_system) (last visited Apr. 29, 2024).

[18] *Investigation of Competition in Digital Markets*, Majority Staff Report & Recommendations for the Subcomm. on Antitrust, Commercial & Admin. Law of the Comm. on the Judiciary (2020), https://fm.cnbc.com/applications/cnbc.com/resources/editorialfiles/2020/10/06/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf ("House Subcommittee Report").

exclusive agreements with Android device manufacturers and carriers to ensure that Google Search is pre-set as the default search engine on key search access points on all Android devices.

67.     Google's second step in controlling search distribution through Android came in 2008, when it launched the Chrome browser. Chrome works on both Android smart phones and smart phones utilizing Apple's iOS. Today, Chrome is the leading browser in the U.S. with 51.07% of the combined desktop/mobile market.[19] Google Search is the default general search engine on all desktop and mobile Chrome browsers.

68.     In July of 2018, the European Commission ("EC") fined Google 4.3 billion Euros for improperly bundling Google Search and its Chrome web browser with the Android OS, saying that Google:

- has required manufacturers to pre-install the Google Search app and browser app (Chrome), as a condition for licensing Google's app store (the Play Store);

- made payments to certain large manufacturers and mobile network operators on condition that they exclusively pre-installed the Google Search app on their

---

[19] *Browser Market Share United States of America, Mar 2023-Mar 2024*, Statcounter.com, https://gs.statcounter.com/browser-market-share/all/united-states-of-america/search.php (last visited Apr. 29, 2024). Apple's Safari has a 32.7% market share.
*Market share held by leading internet browsers in the United States from January 2015 to August 2023*, Statista.com, https://www.statista.com/statistics/545520/market-share-of-internet-browsers-usa/ (last visited Apr. 29, 2024). On desktop, Chrome has a 61.86% market share, followed by Edge (14.32%), Safari (13.8%), Firefox (7.37%), Opera (1.9%), and Internet Explorer (0.31%).  *Desktop Browser Market Share United States of America, Mar 2023- Mar 2024*, Statcounter.com, https://gs.statcounter.com/browser-market-share/desktop/united-states-of-america/search.php (last visited Apr. 29, 2024). On mobile, Safari is the most popular browser, with a market share of 52.88%, followed by Chrome (40.49%), Samsung Internet (3.6%), Firefox (1.08%), Opera (0.75%), and Edge (0.42%). *Mobile Browser Market Share United States of America, Mar 2023-Mar 2024*, Statcounter.com, https://gs.statcounter.com/browser-market-share/mobile/united-states-of-america/search.php (last visited Apr. 29, 2024).
59% market share on mobile, Chrome has a 38% market share and Safari has a 55% share. *Market share held by leading mobile internet browsers in the United States from January 2015 to February 2024*, https://www.statista.com/statistics/272664/market-share-held-by-mobile-browsers-in-the-us/ (last visited Apr. 29, 2024).

devices; and

- has prevented manufacturers wishing to pre-install Google apps from selling even a single smart mobile device running on alternative versions of Android that were not approved by Google (so-called "Android forks").[20]

69.     Google continues to this day to engage in such unilaterally imposed bundling practices. Its acquisition of Android eventually allowed it to foreclose a substantial portion of search access points on mobile devices throughout the U.S., an anticompetitive abuse not foreseen at the time of the acquisition.

70.     Google has also continually developed new uses for Android devices. In 2024, for example, it announced that Gemini Nano, the smallest version of its Gemini GAI program, would be added to certain smartphones in the U.S., such as the Samsung Galaxy S24 and the Google Pixel 8 Pro. The new program, powered by what Google calls the "AI Core," will enable Google to publish GAI-generated summaries of online news content and will give Google's GAI-generated news content a default distribution position on Android devices[21]—all enabled by Google's coerced misappropriation of Publishers' content. These capabilities further cemented Google's power in the general search market, pose a direct threat to Publishers, and were unforeseeable until very recently.

71.     **YouTube**. Google acquired YouTube, the digital video platform, in 2006, in furtherance of its strategy of drawing users to its platform with video content. Not only did the

_____

[20] Press Release, European Commission, Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.

[21] *Access Gemini Nano with Android AICore*, Developers.com, https://developer.android.com/ml/aicore (last visited Apr. 29, 2024).

acquisition of YouTube serve to attract users to the Google product family in general, but it also allowed Google to specifically leverage the YouTube acquisition in order to fortify and contain users in its walled garden ecosystem in search.

72.     News search queries on Google's SERP frequently display a "Videos" panel, which links directly to YouTube, regardless of whether a different third-party publisher originally served the YouTube video from a news article or webpage outside of YouTube. Thus, even if users click through for more information, they are not taken to Publishers' websites; instead, they are diverted by Google Search into one of Google's platforms for publishing digital news: YouTube.

73.     Since the acquisition of YouTube in 2006, Google has greatly expanded the uses for that platform. By 2012, the Pew Organization recognized that YouTube had become a news publisher of its own.[22]

74.     YouTube also is used by Google to siphon news from legitimate Publishers. That recently happened to Plaintiff Helena. On December 19, 2023, Tyler Orr ("Orr"), a black man accused of taking his mother's car without her permission, was accosted by four police officers in the town of Helena. He was severely beaten by the officers and sprayed with a chemical agent. The Helena sheriff's office initially declined to turn over footage on the "body cams" of the police officers. Plaintiff Helena filed a Freedom of Information Act request. On March 9, 2024, the film was released, and exhibited on Plaintiff Helena's internet and Facebook websites. The incident created a huge controversy that resulted in the termination of the four officers. Google Search failed to provide any links to Helena World website concerning this news and instead directed people to a YouTube channel where the film, apparently copied from Helena's website, could be

---

[22] *History of YouTube*, Wikipedia.org, https://en.wikipedia.org/wiki/History_of_YouTube (last visited Apr. 29, 2024).

viewed. This is part of a larger trend with respect to Helena. Traffic from Google Search to Helena's website declined by nearly 25% over the last year. This is a real-life example of how Google can make a Publisher superfluous through self-preferencing and the weaponization of its You Tube platform, which is a new use of that platform.

75.     Another new use to which Google has put YouTube is with respect to the introduction of the former's GAI platform Bard (now Gemini) in 2023. In September of 2023, it was announced that Google would expand the content available on YouTube by utilizing GAI. GAI tools can now also be utilized to determine what kind of content creators make. A new GAI feature in YouTube Studio will generate topic ideas and outlines for potential videos. The GAI suggestions will be personalized for individual creators and based on what is already trending with audiences. YouTube has also slowly introduced AI-powered tools including video summaries, akin to what it is doing with SGE.

76.     ***DeepMind***. Google's acquisition in 2014 of the AI firm DeepMind Technologies further enhanced Google's ability to both attract and trap users in its walled garden search engine. Google's acquisition of DeepMind and other AI firms, because this technology enabled Google to further refine its search engine algorithm, by enabling Google to extract more value out of the data that it collected from the billions of users it had attracted to and trapped on its platform.

77.     DeepMind started out creating neural network models that learn behavior in a fashion similar to that of humans and are meant to resemble short-term memory in the human brain. Its mission changed significantly in 2023. In April of that year, DeepMind merged with Google's Google Brain division to form Google DeepMind, as part of the company's ongoing

efforts to accelerate work on GAI in response to OpenAI's GAI platform, ChatGPT.[23]

78.    As discussed below, GAI, when integrated into Google's SERP as a means of publishing news content, will further attract users to Google's "walled garden" search engine by enabling it to publish to users exponentially more of the news content Google misappropriates from news Publishers, without users ever needing to leave Google's SERP. In other words, Google's GAI technologies—developed in part by its mergers and acquisitions—strengthen Google's ability to tie its general search services to its digital news publishing services.

79.    At the time of approval of these acquisitions, it was neither known nor foreseen that the newly created structures would in fact be used to substantially lessen competition in lines of commerce related to Google's general search services monopoly, including in ads, GAI, and digital news and content publishing. Over time, however, this is exactly how Google entrenched and extended its dominance.

80.    Google's series of strategic acquisitions has fortified its dominance to facilitate and implement anticompetitive conduct across its platform. That dominance has been extended and exacerbated by the additional uses to which these products or platforms have been put in the years after each of these respective acquisitions and has continued all the way to the present.

---

[23] Emma Roth and Jay Peters, *Google's big AI push will combine Brain and DeepMind into one team*, The Verge, Apr. 20, 2023, https://www.theverge.com/2023/4/20/23691468/google-ai-deepmind-brain-merger.

### b. Google Forecloses Competition in Search Through Exclusionary Distribution Deals.

81.     Google maintains its search monopoly by locking in search distribution through exclusionary contracts with key distributors.[24] These contracts fall into three categories: (1) the Information Services Agreement ("ISA") with Apple; (2) the Mobile Application Distribution Agreements ("MADAs") and Revenue Sharing Agreements ("RSAs") with Mobile Carriers and Android device manufacturers; and (3) contracts with third-party browsers. These deals have made Google the default general search engine in critical search access points. By doing so, they foreclose competition in at least half of all search queries in the U.S. This gives Google dominant power over Publishers who consume Google's search referral services.

### i. The Apple Distribution and Non-Compete Deal

82.     Each year, Google pays Apple an estimated $18 billion not to compete in the general search market and to make Google the default search engine on all Apple devices. Since 2005, Google and Apple have been intertwined in one of the most lucrative and anticompetitive partnerships in the 21st Century. The full scope of this collusion was only revealed to the public in recent years, through evidence presented at the trial in the DC DOJ Case concerning the Information Services Agreement ("ISA") between Google and Apple. It is set forth in the DOJ's post-trial brief in the DC DOJ Case, from which much of the history that follows is taken.[25]

_____

[24] Google call these its "distribution partners." According to Alphabet's 2021 Form 10-K, Google's "distribution partners include browser providers, mobile carriers, original equipment manufacturers, and software developers." Alphabet Inc., Annual Report (Form 10-K) (Dec. 31, 2021), https://abc.xyz/assets/investor/static/pdf/20220202_alphabet_10K.pdf?cache=fc81690.

[25] *See* ECF No. 205 in the DC DOJ Case at 35-38.

83. Google and Apple first entered into the ISA in 2002. At first, the ISA authorized, but did not require, Apple to preinstall Google Search in Apple's Safari browser as the default search engine. But then in 2005, the agreement was amended to require that Apple preinstall Google Search as the default. In return, Google agreed to pay Apple a sizable share of its yearly search ad revenue.  In 2007, the ISA was expanded to cover Apple's iPhones. This was important. Google determined that more than 80% of its daily iOS users accessed Google through Apple's Safari web browser. Microsoft's CEO Satya Nadella ("Nadella") explained at the DOJ trial that although mobile devices have "multiple search access points, the one access point that matters is the search default on the browser."

84. Pursuant to the ISA, Apple cannot: (1) offer a search engine choice screen; (2) pre-select a different default search engine in Safari's private browsing mode; (3) offer a different default search engine on different Apple devices (*e.g.*, different defaults on mobile, as distinct from desktop devices; (4) offer a different default search engine in the U.S. (or any part of the U.S.), as opposed to the rest of the world; (5) materially expand Apple's Suggestions feature in Safari; and (6) run ads on Siri or Spotlight without giving Google the right-of-first-refusal to control those ads.[26]Apple had sought a choice screen in 2007, when Pichai was a Google executive, but years before his elevation to CEO. In the trial in the DC DOJ Case, Pichai, Google's CEO, was confronted with internal Google communications discussing an Apple request to change the ISA.

---

[26] Siri Suggestions is a voice assistant search engine for the iPhone that makes suggestions about what a user could do with his or her smartphone. Apple's Spotlight can search for apps and contacts, content in apps like Mail and Messages, and even text in one's photos. One can check stock and currency information, and find and open webpages, apps, and images in one's photo library, across one's system, and on the internet.

32

85. During the 2007 round of contract renewal talks, according to the document, Apple wanted to make Google one of two choices upon first use of the Safari browser, all while maintaining financial terms under which it is paid billions of dollars every year in shared revenue earned from ad that accompanies Google search queries. Pichai noted on the stand that Apple's request specifically covered a new version of Safari to be introduced on Windows computers.

86. Google's internal discussions of the request, according to the DOJ, helped underscore the power of defaults that the company continuously tried to downplay during the bench trial before this Court. Google contends instead that users can easily switch away but choose not to. At the time of Apple's request, however, according to internal communications, defaults amounted to a "typically 75% take rate. Defaults have strong impact."[27]

87. Google and Apple cemented their partnership while sharing interlocking boards. Google's CEO, Eric Schmidt ("Schmidt") served on Apple's board while Arthur Levinson (Apple's current chairman) served on Google's board, until both stepped down in 2009.[28] In 2007, Steve Jobs ("Jobs"), Apple's former CEO, invited Schmidt onstage for the unveiling of the iPhone. Schmidt gushed that "with Google Search on the iPhone, 'you can actually merge without

---

[27] Bryan Koenig, *Google CEO Admits Apple Deal To Be Default is 'Valuable'*, LAW 360, Oct. 30, 2023, https://www.law360.com/articles/1737914.The same article notes that Google applied a double standard here; while espousing an exclusive default position for its search engine, in 2005, it told Microsoft that the latter should not take any similar step with respect to an update of its operating system. DOJ Trial Ex. UPXO172, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-10/417451_0.pdf (last visited Apr. 29, 2024).

[28] Press Release, Apple Inc., Google CEO Dr. Eric Schmidt Joins Apple's Board of Directors (Aug. 29, 2006), https://www.apple.com/newsroom/2006/08/29Google-CEO-Dr-Eric-Schmidt-Joins-Apples-Board-of-Directors/; Press Release, Apple Inc., Apple Names Arthur D. Levinson Chairman of the Board (Nov. 15, 2011), https://www.apple.com/newsroom/2011/11/15enUS-Apple-Names-Arthur-D-Levinson-Chairman-of-the-Board/.

merging.'"[29]

88.    In 2008, Jobs met with Google's co-founders Page and Sergei Brin to discuss Google's recent purchase of the Android operating system—making it Apple's direct competitor. Jobs disclosed that "I said we would, if we had good relations, guarantee Google access to the iPhone and guarantee it one or two icons on the home screen."[30]

89.    In 2009, Apple sought the "option but not the obligation" to prioritize Google as the default search engine in Safari. Google rejected that request, and it did not appear in the amended ISA.

90.    In 2011, it was Apple's turn to develop a competing product: Siri, mentioned above. Apple used Microsoft's Bing search engine to power Siri. Apple had long invested in developing its own search engine, Spotlight, also mentioned above. But Spotlight only searched local files on a device; it was not a web-based general search engine. Google recognized that if Apple launched an Apple general search engine, paired with Spotlight and Siri, this would be a potentially disruptive threat to Google Search's market share.

91.    In 2012, Apple sought an amendment to the ISA that provided "[n]o obligation to use search services or to make Google a default." Once more, Google objected and Apple acquiesced.

92.    In 2013, Apple began offering the aforementioned "Suggestions" features in Siri. The feature guessed the user's search intent and then directed him or her to a responsive website.

---

[29] Daisuke Wakabayashi and Jack Nicas, *Apple, Google and a Deal That Controls the Internet*, N.Y. Times, Oct. 25, 2020, https://www.nytimes.com/2020/10/25/technology/apple-google-search-antitrust.html.

[30] *Google's Larry Page thinks Steve Jobs' hatred of Android was 'for show'*, AppleInsider, https://forums.appleinsider.com/discussion/148276/googles-larry-page-thinks-steve-jobss-hatred-of-android-was-for-show/p7 (last visited May 9, 2024).

John Giannandrea, now Apple's Senior Vice-President of Machine Learning and AI, said at the time that "every query that we provide an answer to is a query that doesn't go to Google." In response, Google built into the ISA "a structure that prevents [Apple] from diverting queries and destroying value." Yet again, Apple acceded to this demand.

93.     The watershed point came in 2016 when the ISA was renegotiated. Google froze Suggestions by including a term that required Safari to use Google in a way that was "substantially similar" to its use in 2016. In a 2018 e-mail, Joan Braddi ("Braddi"), Google's head of product partnerships, said "[t]his concerned us which is why we added into the agmt that they could not expand further than what they were doing in Sept 2016 (as we did not wish for them to bleed off traffic). Also, they can only offer a 'Siri' suggestion exclusively for quality and not because they want to drive traffic to Siri."[31] The ISA specifically restricted Apple's ability to use Siri to respond to queries in Safari. The agreement nakedly restrained trade between Google and a potential competitor. The ISA, as currently situated, runs from 2021 to 2026, with options that extend through 2031.

94.     Apple's agreement did not come cheaply. Under the 2016 amendments to the ISA, Google agreed to pay Apple 40% of its net search ad revenue. Those terms remain in effect today. Between January of 2017 and August of 2021, Google's payments to Apple increased from $418 million to $1.5 billion—more than 250%. Between 2014 and 2022, Google's total annual ISA payments to Apple skyrocketed from $2.2 billion annually to $20 billion. The latter figure constituted 17.5% of Apple's 2020 operating income.,

---

[31] DOJ Trial Ex. UPX0309, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-10/416999.pdf (last visited Apr. 29, 2024).

95.     Google's exclusive distribution, revenue-sharing, and noncompete agreements with Apple underscore its market power in search. During the trial in the DC DOJ Case, it was noted that "in negotiating this Apple contract, if [Google] had equally capable rivals, it wouldn't be able to make that kind of money. Apple would simply play them off against each other. So, when you see that level of profit, it's telling you that there's a really big gap and they have a lot of market power."[32]

96.     Apple's plans for developing its own search engine were basically shelved in 2016 in exchange for Apple continuing to receive 40% of Google's net revenue over a ten-year term.[33] Specifically, in a 2016 amendment to the Google/Apple ISA deal, it was agreed that Apple "could not expand farther than what they were doing in Sept 2016 (as we did not wish for them to bleed off traffic)" as Google's Braddi put it in an email.[34] Under this ad revenue-sharing agreement, Apple received $18 billion from Google in 2021. Since the extended ISA had a ten-year term, Apple likely received an estimated $180 billion in exchange for agreeing not to compete with Google Search.

97.     This agreement was unlawful *per se* under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) or is otherwise an unreasonable restraint of trade under those statutes.

98.     Google is now in talks with Apple about extending its partnership with Apple to "build Google's Gemini artificial intelligence engine into the iPhone," which would further cement

---

[32] Trial Tr. at 4775:7-13, *United States v. Google LLC*, 1:20-cv-03010-APM (D.D.C. Oct. 6, 2023) (Day 18).

[33] DOJ Trial Ex. JX0033, 1:20-cv-03010-APM (D.D.C.) (version unsealed on Apr. 10, 2024), https://storage.courtlistener.com/recap/gov.uscourts.dcd.223205/gov.uscourts.dcd.223205.880.2.pdf (last visited Apr. 29, 2024).

[34] DOJ Trial Ex. UPX0309, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-10/416999.pdf (last visited Apr. 29, 2024).

Google's default position in iOS devices, if it comes to pass.[35]

99.    The exclusionary ISA between Google and Apple ensured Google's ability to maintain its search monopoly. Testifying in the DC DOJ trial, Google's CEO Pichai conceded that such defaults are "very valuable." [36]

100.    The deal between Google and Apple was more than a mere business contract between two parties. Jeff Shardell, the former Director of Business Development for Google, wrote a June 4, 2007, presentation for Pichai that described the deal as the "Apple Inc. Search Partnership."[37] Google and Apple had agreed to share the revenue that Google obtained by being given default status on Apple devices. Tim Cook, the CEO of Apple, reportedly indicated to representatives of Google in December of 2018 that "I imagine us as being able to be deep, deep partners; deeply connected where our services end and yours begin and see[] no natural impediment to us working together."[38]

---

[35] Tripp Mickle, Nico Grant and Brian X. Chen, *Apple and Google Are Discussing a Deal to Bring Generative A.I. to iPhones*, N.Y. Times, Mar. 19, 2024, https://www.nytimes.com/2024/03/19/technology/apple-google-ai-iphone.html.

[36] *See* Trial Tr. at 7684:18-20, 1:20-cv-03010APM (D.D.C. Oct. 30, 2023) (Day 30).

[37] DOJ Trial Ex. UPXO126, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-10/417441_0.pdf (last visited Apr. 29, 2024).

[38] DOJ Trial Ex. UPX0617, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-10/417460.pdf (last visited Apr. 29, 2024).

101.   Obtaining this favored position was critical for Google. Professor Antonio Rangel, an expert witness for the government in the DC DOJ Case, summarized key internal Google documents between 2007 and 2017, which spoke of the "Power of Defaults."[39]



102.   Google's "pay to play" arrangement was disclosed publicly for the first time on October 27, 2023 in the DC DOJ trial, during the testimony of Prabharkar Raghavan, one of Google's Senior Vice-Presidents. Google paid over $26.3 billion for such privileges in 2021 (with $18 billion going to Apple alone) and $18.5 billion in 2020.[40] In 2020 and 2021, Google's search

---

[39] DOJ Trial Ex. UPXD101, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-09/416682.pdf (last visited Apr. 29, 2024).

[40] Bryan Koenig, *Google Trial Reveals $26B Spent on Search Distribution*, LAW360, Oct. 27, 2023, https://www.law360.com/competition/articles/1737865/google-trial-reveals-26b-spent-on-search-distribution?spotlight=1; David Pierce, *Google reportedly pays $18 billion a year to be*

ad revenues were $102.9 billion and $146.4 billion, respectively. Again, Google was sharing with Apple a portion of its revenues obtained through Google's default search engine status on Apple devices. On November 7, 2023, during the trial in the DC DOJ Case, Jamie Rosenberg ("Rosenberg"), a former Google executive, was cross-examined on this agreement and was asked whether, "[g]iven the intensity of competition… 'did you ever tell anyone [that] Google should not be paying billions per year to Apple?' Rosenberg responded that he doesn't think so."[41]

### ii.   The Android Distribution Deal.

103.   Google has also made exclusionary deals with: (1) original equipment manufacturers ("OEMs") of Android devices (including Samsung and Motorola) and (2) mobile phone carriers that sell Android devices (including Verizon, AT&T, and T-Mobile) (collectively the "Android Partners").

104.   The Android OS is a mobile phone operating system that Google acquired in 2005. It is the second most widely used mobile operating system in the U.S., behind Apple's iOS. Android OS is open source, so numerous equipment manufacturers can use Android OS on their mobile devices. In the U.S., consumers purchase Android devices directly from original equipment manufacturers (such as Samsung and Motorola) or from mobile carriers (such as Verizon, AT&T, and T-Mobile).

---

*Apple's default search engine*, The Verge, Oct. 26, 2023, https://www.theverge.com/2023/10/26/23933206/google-apple-search-deal-safari-18-billion.

[41] Matthew Perlman, *Judge Told Google Helped Innovate Mobile Market*, LAW360, Nov. 8, 2023, https://www.law360.com/competition/articles/1764723?nl_pk=787d704d-431c-432f-ba36-94008c81ee47&utm_source=newsletter&utm_medium=email&utm_campaign=competition&utm_content=2023-11-09&read_main=1&nlsidx=0&nlaidx=1.

105.   Google has entered into two kinds of contracts with OEMs and phone carriers: MADAs and RSAs.[42]

106.   For more than a decade, Google has had MADAs with all the major OEMs selling Android devices in the U.S.: Samsung, Motorola, and LG.  Pursuant to MADAs, if an original equipment manufacturer wants to preinstall any Google app on an Android device, it must preinstall a suite of 11 mandatory Google apps, including the Google Search App and Chrome browser. Six of these mandatory apps must be made undeletable by the user: Google Search, Chrome, Gmail, Maps, YouTube, and Google Play Store.

107.   Every Android phone sold in the U.S. has the Google Play Store preinstalled.[43] Thus, all Android devices in the U.S. have Google Search preinstalled as the default search engine.

108.   For more than a decade, Google has had RSAs with all major U.S. carriers and OEMs that sell Android mobile devices in the U.S., including Motorola, Samsung, LG, AT&T, Verizon, and T-Mobile. Under the RSAs, Google pays a share of the Search Ad revenue earned through covered search access points on the Android device. In exchange, distributors must make Google the exclusive default general search engine on their devices, with no competing search engine preinstalled.

---

[42] *United States v. Google LLC,* No. 20-cv-3010 (APM), 2023 WL 4999901, at *5-6 (D.D.C. Aug. 4, 2023) ("SJ Op.").

[43] *See* Trial Tr. In DC DOJ Case at 12:8–10, 1:20-cv-03010-APM (D.D.C. Sept. 19, 2023) (sealed PM session); DOJ Proposed Findings of Fact at ¶ 241, ECF No. 906 (1:20-cv-03010-APM (D.D.C.)). ("PFOF").

### iii.     The Browsers Distribution Deal.

109.   Google pays hundreds of millions of dollars a year to secure its position as the default search engine on third-party browsers. Google has an exclusive default search agreement with Mozilla Firefox. [44] Google also has exclusive default distribution agreements with smaller browser developers, including Opera Ltd., which develops the Opera browser, and UCWeb Inc., which develops the UC browser.[45]

110.   The Android acquisition and the aforementioned distribution deals entrenched Google Search as the largest search engine in the world.[46] These arrangements have embedded Google Search as the default search engine in 98.6% of the mobile[47] and 84.9% of the desktop browser markets in the U.S.[48] Google's exclusionary contracts with distributers—coupled with its default position on Chrome—cover and foreclose more than 50% of all general search queries performed in the U.S.[49] Bing's inability to access mobile users due to Google's contracts has

---

[44] PFOF at ¶ 341.

[45] SJ Op. at *5.

[46] House Subcommittee Report at 174.

[47] Mobile browser market share in U.S. - March 2024: Safari 52.88%, Chrome 40.49%, Samsung International 3.6%, Firefox 1.08%, Opera 0.75%, Edge 0.42%, *Mobile Browser Share United States of America, Mar 2023-Mar 2024*, Statcounter.com, https://gs.statcounter.com/browser-market-share/mobile/united-states-of-america (last visited Apr. 29, 2024).

[48] Desktop Browser Market Share in U.S. – March 2024: Chrome 61.83%, Edge 14.32%, Safari 13.8%, Firefox 7.37%, Opera 1.9%, Internet Explorer 0.31%, *Desktop Browser Market Share United Staes of America, Mar 2023-Mar 2024*, Statcounter.com, https://gs.statcounter.com/browser-market-share/desktop/united-states-of-america (last visited Apr. 29, 2024).

[49] *See* Trial Tr. 5755:5–16, 1:20-cv-03010-APM (D.D.C.) (Whinston) (explaining that 50% is the "share of U.S. queries that are . . . covered by Google's exclusive defaults. They're the queries that are going through the defaults that are affected by exclusionary provisions"); *id.* at 10506:12–10508:2 (explaining UPXD104 at 35, "50 percent was the share of U.S. queries covered by Google's exclusive contracts. . .. That represents the share of U.S. queries where . . . the fact that Google is the default could affect people's choices.").

reduced Microsoft's incentives to invest in and improve search, particularly on mobile devices. As one Microsoft executive put it: "[i]t is uneconomical for Microsoft . . . to invest more in mobile [search quality]" because "no amount of investment without securing some way to do distribution in mobile will result in any share gain."[50]

111.   As noted above, Google Search consistently commands above 90% of the general search market in the U.S. with an average of 175 billion monthly visits, Google.com is the largest website in the world—and has been every year since 2010.[51] Its "ten blue links" have become the gateway to the web for billions of users. "Google" is now a verb.

112.   Google's anticompetitive maintenance and abuse of its dominant position is continuous, and its extent was not publicly known until 2023, with the release of Bard (now Gemini) in March of 2023, the launch of SGE in May of 2023, and the unveiling of trial exhibits in the trial in the DC DOJ Case.

## B.  GOOGLE LEVERAGES ITS SEARCH MONOPOLY TO ATTEMPT TO MONOPOLIZE ONLINE NEWS.

113.   Google has leveraged its search monopoly and acquisitions such as YouTube and DeepMind to gradually transform into the world's largest news publisher.  Google began life as a search engine, connecting users to Publishers through hyperlinks. But in 2024, Google has become an *answer engine* that rarely connects users to Publishers. Instead, Google gives the news directly to its users, by extracting Publishers' content and republishing it on the SERP and other "news

---

[50] *Id*. at 2750:25–2751:11 (Parakhin (Microsoft)).

[51] *Most popular websites worldwide as of November 2023, by total visits*, Statista.com, https://www.statista.com/statistics/1201880/most-visited-websites-worldwide/ (last visited Apr. 29, 2024). The second-largest website is Google's social media platform, YouTube.com (113 billion visits).  Together, Google.com and YouTube.com receive 288 billion monthly visits. This is 18 times more traffic than Facebook.com, the third-most visited website, which only receives 18.1 billion monthly visits.

surfaces." Google's search monopoly has allowed it to misappropriate virtually all online news content in the U.S. By coercing Publishers to add to its supply of news content, and raising rival publishers' costs, Google is attempting to monopolize the online news market discussed below.

### 1.     News Is Central to Google's Business Model.

114.    When the terrorist attacks struck New York on September 11, 2001, Google realized it had a supply problem. On September 10, 2001, Google had no infrastructure or plans for delivering news to its users. Google's Amit Singhal, a Vice-President in charge of Google search explained:

> When September 11th happened, we as Google were failing our users. Our users were searching for 'New York Twin Towers,' and our results had nothing relevant, nothing related to the sad events of the day. Because our index was crawled a month earlier, and of course there was no news in that index. So we placed links to all the news organizations like CNN right on our front page saying please visit those sites to get the news, because our search is failing you.[52]

115.    The tragedy of September 11th opened Google's eyes to a business opportunity. In 2002, Google launched Google News to supplement and drive traffic to its core general search service. Since then, Google has repeatedly invested in "developing news products and features" for Google Search, YouTube, Discover, and more.[53] Today, news is one of the top options on Google's menu bar and Google fills the SERP with answer boxes and horizontal carrousels featuring news.

---

[52] Google, *The Evolution of Search*, YouTube, Nov. 28, 2011, https://www.youtube.com/watch?v=mTBShTwCnD4.

[53] Richard Gingras, *A look at how news at Google works*, Google – The Keyword, May 6, 2019, https://blog.google/products/news/look-how-news-google-works/.

116.   Google devotes so much of its prime real estate to news because news is incredibly valuable to general search engines. As Microsoft President Smith testified to Congress in 2021: "[a]s we know from our own experience with Microsoft's Bing search service, timely, broad, and deep news coverage is critical to attracting users and strong engagement. It has real economic value."[54]  Smith added:

> More than a decade ago, when Google was far smaller and before it confronted antitrust inquiries, it acknowledged the same thing. In 2008, Marissa Mayer, Google's former Vice President responsible for search and user experience, even put a price on that value. As Jon Fortt wrote for Fortune after listening to Mayer at a lunch session, "Google News funnels readers over to the main Google search engine, where they do searches that do produce ads. And that's a nice business. Think of Google News as a $100 million search referral machine." As Fortt added, "Google is happy to build popular products that don't make any money on their own but tie users into a broader Google ecosystem. It's like Vegas casinos that offer cheap buffets to get people into the building, knowing a lot of them will end up playing slots."[55]

117.   According to a November 2023 Pew Research study, an estimated 86% of Americans regularly consume news from digital devices.[56]

118.   Without news content from Publishers, Google could not meet the demands of most users. Josh Cohen ("Cohen"), a Senior Business Product Manager of Google News admitted this

---

[54] *Technology and the Free Press: The Need for Healthy Journalism in a Healthy Democracy*, Hearing Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the Comm. on the Judiciary (Mar. 12, 2021) (written testimony of Brad Smith, President, Microsoft Corp.), https://docs.house.gov/meetings/JU/JU05/20210312/111315/HHRG-117-JU05-Wstate-SmithB-20210312.pdf.

[55] *Id*. (quoting Jon Fortt, *What's Google News Worth? $100 Million*, Fortune (July 22, 2008), https://fortune.com/2008/07/22/whats-google-news-worth-100-million/).

[56] *News Platform Fact Sheet*, Pew Research Center, Nov. 15, 2023, https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

in 2010: "[w]e don't have a product without high quality content to index, whether it's on Google News or Google overall."[57] In 2023, Google's expert witness Marc Israel confirmed that news is central to Google's business model, testifying in the DC DOJ Case that 80% of Google searches are for informational content; commercial queries only make up 20%.[58]

### 2. Plaintiffs and Other Publishers Depend on Google's Traffic Referrals.

119.    Google and news Publishers have a transactional arrangement in which Publishers supply quality content for Google's index in exchange for Google supplying search traffic to Publishers' websites. Although no money changes hands, there is an in-kind exchange of value: a distribution service for content. Google's senior business product manager for Google News explained the transaction in 2010: "[t]here's a balance there of the benefit that we certainly get from being able to index the content, and the benefit we give to publishers in the form of traffic."[59]

### 3. Google Dominates the Online News Market.

120.    Google's market share of the online news market has been consistent for the past five years, as evidenced by Google Search's unchanged position as the largest search engine in the U.S.

---

[57] Mark Glaser, *Google News to Publishers: Let's Make Love Not War*, MediaShift, Feb. 4, 2010, https://mediashift.org/2010/02/google-news-to-publishers-lets-make-love-not-war035/ ("Glaser").  Cohen added: "On the engagement side, we don't have any content to offer publishers -- we don't have editors or reporters -- but we have technology and tools. We see publishers taking advantage of the tools we have to make their websites better. Probably the best example today is Google Maps. So many editors will use the open API, embed that into their stories, think of different ways of telling stories online that you can't do in a paper. And the last part is monetization, which is a big part of Google's business, whether it's in display ads or search ads to help them make more money."

[58] *See* Trial Tr. at 8725:15–8726:8, 1:20-cv-03010-APM (D.D.C.) (Israel).

[59] Glaser, *supra.*

121.    Google is by far the largest publisher of online news in the U.S. Google's main news-publishing properties, Google.com (including news.google.com and gemini.google.com) and Youtube.com. received more than 767.8 billion visits between March of 2023 and March of 2024—dwarfing other Publishers.[60]

---

[60] *See* Appendix A. Google also publishes news through the promoted social feed Google Discover, which has an estimated 800 million monthly users. Katie Gilbaugh, *What is Google Discover & How to Rank for it*, WebSpec, Nov. 23, 2021, https://www.webspec.com/2021/11/what-is-google-discover-how-to-rank-for-it/.

**Top 25 News Sites by U.S. Total Visits Mar 23 - Mar 24 All Devices**

| | |
|---|---|
| google.com (incl. News and Bard) | 472,500,000,000 |
| youtube.com | 295,300,000,000 |
| reddit.com | 52,300,000,000 |
| facebook.com | 48,900,000,000 |
| yahoo.com (incl. News and Finance) | 32,200,000,000 |
| wikipedia.org | 31,300,000,000 |
| duckduckgo.com | 30,200,000,000 |
| twitter.com | 28,800,000,000 |
| instagram.com | 20,000,000,000 |
| bing.com | 15,300,000,000 |
| cnn.com | 12,300,000,000 |
| tiktok.com | 10,200,000,000 |
| foxnews.com | 9,800,000,000 |
| nytimes.com | 9,700,000,000 |
| espn.com | 9,100,000,000 |
| linkedin.com | 6,600,000,000 |
| msn.com | 4,700,000,000 |
| daily.mail.co.uk | 4,100,000,000 |
| nypost.com | 4,000,000,000 |
| bbc.com | 3,400,000,000 |
| breitbart.com | 2,800,000,000 |
| washingtonpost.com | 2,300,000,000 |
| theguardian.com | 2,300,000,000 |
| drudgereport.com | 2,200,000,000 |
| huffpost.com | 2,100,000,000 |

122.    Google has an estimated market share of 66%, as illustrated in the following graphic and based on traffic data collected in Appendix A.



123.    Barriers to entry—largely created by Google's anticompetitive conduct—allow Google to exercise substantial market power in the upstream acquisition, publishing, and distribution of online news.

124.    **First**, although it is relatively easy to enter the online news market by displaying content on a website, the market has a high failure rate. Since 2005, 2,900 newspapers have closed.[61] The U.S. is predicted to lose 1/3 of all newspapers and 2/3 of all newspaper journalists

---

[61] Penelope Muse Abernathy, *The State of Local News 2023*, Northwestern University, Medill Local News Initiative, Nov. 16, 2023, https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/report/.

by the end of 2025. In January 2024, *The Atlantic* described news media closures and mass layoffs as an "Extinction-Level Event."[62]

125.   **Second**, Google's industry-wide misappropriation of news content is a significant barrier to entry because it forces Publishers, who must bear all the costs of news production, to compete against their own content republished by Google, which bears none of the production costs. Google's industry-wide free riding is an entry barrier that drives current rivals out of the market and excludes potential entrants, who must pay to produce or license news content.

126.   **Third**, scale and network effects often determine the commercial viability of online news publishers. The importance of scale flows from the two-sided nature of most online news sites, which sell news to readers and sell readers' attention to advertisers:

127.   The greater the audience of a media company, the more likely advertisers will be to spend any money on that media company at all, and then the more money they will be willing to pay the company when they do. "Sellers" (*i.e.,* readers/viewers) have a direct positive network effect for "buyers", (*i.e.*, advertisers). And vice versa, because (in theory) more ad revenue gives a media company the resources to produce better content.[63] Even the largest online news publishers, such as CNN and the *New York Times,* lack the scale that Google enjoys.

128.   Google has intentionally leveraged these entry barriers, as well as its search monopoly, to attempt to monopolize the online news market.

---

[62] Paul Farhi, *Is American Journalism Headed Toward an 'Extinction-Level Event'?*, The Atlantic, Jan. 30, 2024, https://www.theatlantic.com/ideas/archive/2024/01/media-layoffs-la-times/677285/.

[63] The NFX Team, *Network Effects (And Counting)*, NFX, June. 2021, https://www.nfx.com/post/network-effects-manual.

4.        **Anticompetitive Conduct.**

129.    Google has monopolized, or attempted to monopolize, the online news market through a monopoly broth of anticompetitive conduct that raises rivals' costs. This scheme is the result of a deliberate strategy to extend and bolster Google's monopoly in search and dominant positions in digital ads by attempting to monopolize online news.

130.    Google's mass misappropriation of news excludes rival Publishers from the online news market by raising their costs. This occurs in several ways.

131.    **First**, by using news content without paying for it, Google provides itself with an artificially low cost of production in news publishing, which puts all the competitors who *do* pay for news content (through labor or licensing) at a cost disadvantage.

132.    **Second**, Google raises rival Publishers' average cost of production: since publishers have fewer customers relative to their fixed cost.

133.    **Third**, Google raises its rivals' absolute costs through increasing the cost of customer acquisition. Since zero-click searches are a lost opportunity for a publisher to obtain a customer from a relatively inexpensive channel (search-engine optimization), publishers must obtain marginal customers through increasing spend on other marketing channels. For example, since fewer users on Google Search click through to publisher websites, publishers could try to compensate by driving additional traffic from the Google SERP through increasing their purchases of search ads or through other brand-building initiatives, which has likely led to a significant number of exits.

134.    **Fourth**, Google's exclusionary conduct has increased the cost of data acquisition for Publishers. The data that Google collects on search users is not routinely shared with Publishers. Examples of data that Publishers lose from zero-click searches include dwell time on

specific content.[64] To obtain similar data, Publishers would have to obtain marginal customers through other (potentially more expensive) marketing channels.

135.  **Fifth**, Google's conduct has forced Publishers to take costly actions to protect themselves, such as introducing paywalls. In fact, between 2017 and 2019 the percentage of U.S. newspapers with active paywalls rose by 16%.[65] This may result in Publishers losing search traffic from blue links because it requires technical expertise to allow paywalled content to appear in search results.[66]

136.  **Finally**, Google diminishes Publishers' ability to pay for these costs by withholding licensing payments for the use of their content and services for republishing or GAI grounding and training.

137.  As set forth in Section IV.A., Google's foreclosure of competition in the general search market makes Publishers uniquely dependent on Google for 95% of all search traffic, the

---

[64] *How Google Abuses Its Position as a Market Dominant Platform to Strong-Arm News Publishers and Hurt Journalism*, News Media Alliance, Updated Sept. 2022, https://www.newsmediaalliance.org/wp-content/uploads/2022/09/NMA-White-Paper_REVISED-Sept-2022.pdf ("The fact that the user remains on the Google ecosystem is highly beneficial to Google because it allows Google to be the first-party and collect far more and richer user engagement data, such as the dwell rate on a given article topic.").

[65] Caitlin Chin, *Navigating the Risks of Artificial Intelligence on the Digital News Landscape*, CSIS, Aug. 2023, https://csis-website-prod.s3.amazonaws.com/s3fs-public/2023-08/230831_Chin_RisksofAI_DigitalNews.pdf?VersionId=5S3__8DesOYdsnf5OL4oh2hMC_BMr6BL ("In 2019, 76 percent of U.S. newspapers employed paywalls, compared to 60 percent in 2017.").

[66] *Structured data for subscription and paywalled content (CreativeWork)*, Google Search Central, https://developers.google.com/search/docs/appearance/structured-data/paywalled-content (last visited Apr. 29, 2024) ("This page describes how to use schema.org JSON-LD to indicate paywalled content on your site with CreativeWork properties. [...] This guide only applies to content that you want crawled and indexed. If you don't want to have your paywalled content indexed, you can stop reading now."). *SEO best practice for subscription-based and paywall content*, Microsoft Bing Blogs, May 2, 2022, https://blogs.bing.com/webmaster/may-2022/SEO-best-practice-for-subscription-based-and-paywall-content ("Step #1: Enabling crawling of subscription-based or paywall content [...] The first step is to allow search engines, like Bing, to see the full content that normally resides behind a paywall or a subscription.").

largest source of external traffic. Google's search traffic is a monopoly product. This means Google can control prices and output on a key channel of distribution in the online news market. Google leverages its monopoly in general search to coerce Publishers into supplying it with news reporting services and news content, royalty-free.

138.   Google's extortionate terms for content distribution, coupled with its default self-preferencing on the SERP, have reduced the financial incentives for rivals to produce and publish news. For example, in 2023, BuzzFeed News, once considered a darling of the digital native news outlets, shut down and laid off 180 of its staff. BuzzFeed's owner Jonah Peretti explained that BuzzFeed News was unsustainable because "the big platforms wouldn't provide the distribution or financial support required to support premium, free journalism purpose-built for social media."[67] In February of 2024, another digital darling, Vice, announced that it would cease publishing content on Vice.com and would lay off hundreds of employees. Vice's CEO explained that it was no longer profitable to publish news because of how news is distributed in the online ecosystem:

> it is no longer cost-effective for us to distribute our digital content the way we have done previously. Moving forward, we will look to partner with established media companies to distribute our digital content, including news, on their global platforms, as we fully transition to a studio model . . ..[68]

---

[67] Todd Spangler, *Buzzfeed News Is Shutting Down, Company Laying Off 180 Staffers*, Variety, Apr. 20, 2023, https://variety.com/2023/digital/news/buzzfeed-news-shutting-down-layoffs-1235589751/.

[68] Todd Spangler, *Vice Will Cease Publishing on Vice.com and Lay Off 'Several Hundred' Staffers, CEO Says*, Variety, Feb. 22, 2024, https://variety.com/2024/digital/news/vice-cease-publishing-layoff-hundreds-ceo-1235919843/.

139.   Online news is distributed through web traffic. Web traffic can take the form of direct traffic (users navigating directly to the Publisher's website) and external search traffic. Industry wide, Google Search is the largest source of external search traffic, outranking social media, and links from third-party websites, email or text messages.



140.   Search referrals provide 46% of all external traffic to Publishers—the largest single source of all traffic.[69] And Google supplies 95% of all search referrals, as the next graphic from the *Press Gazette* shows.

---

[69] *See* Aisha Majid, *Search vs social: How search traffic to news sites has changed in five years*, Press Gazette, Apr. 13, 2023, https://pressgazette.co.uk/media-audience-and-business-data/media_metrics/news-referral-traffic-breakdown/.



**Google dominate search with over 95% of page views**

Monthly page views from search, 546 UK and US news sites

Source: Chartbeat

*PressGazette*

141.    Recent changes in the social media industry are making search referrals even more critical to Publishers. Meta (the owner of Facebook) announced it is getting out of the news distribution business.[70]  Between 2022 and 2023, Facebook reduced referrals to news Publishers by 50%. In September of 2023, Meta announced that it would "deprecate" its Facebook news tab.[71]

142.    Because Google has a durable monopoly in general search, the entire online news market is highly dependent on its search referrals. For example, between March of 2023 and March of 2024, nytimes.com had some 9.7 billion visits. Google was the second-largest source of that traffic, exceeded only by direct navigation to the website: Direct traffic (68.9%), Google Search

---

[70] Sallee Ann Harrison, *Bye-bye Facebook News: Meta will shut down the tab in April*, Fast Company, Mar. 29, 2024, https://www.fastcompany.com/91071695/bye-bye-facebook-news-meta-will-shut-down-tab-april.

[71] *An Update on Facebook News*, Meta, Feb. 29, 2024, https://about.fb.com/news/2024/02/update-on-facebook-news-us-australia/.

(21.92%), Google News (1.62%).[72]

143.   During that same period, Plaintiff Helena's website had 6,600 visits. Google was the

second-largest source of traffic, after direct navigation: Direct traffic (40.62%), Google Search

(32.96%).[73]



144.   For Plaintiff Emmerich Newspapers, the dependency is even greater. The *Tate

Record*, for example, relies on Google for 79.57% of all traffic.[74] Search traffic from Google's

search competitor DuckDuckGo barely registers at 0.17% of traffic.

---

[72] *Traffic Analytics*, Semrush.com,
https://www.semrush.com/analytics/traffic/overview/?dateFrom=2023-03-
01&geo=us&searchType=domain&q=nytimes.com (last visited Apr. 29, 2024).

[73]*Id*.

[74]*Id*.



145.   The same pattern holds for Emmerich's *Enterprise-Journal*: 51.67% of all traffic

originated from Google Search.[75]

---

[75] *Id.*



146.    In short, Plaintiffs and Class members are dependent on Google as a direct result of Google's monopolization of the general search services market. By foreclosing search distribution channels, Google has eliminated competition on the supply-side of search traffic referrals. Publishers have only one meaningful provider for the largest source of external traffic: Google.

**5.    Google Coerces Plaintiffs and The Class into Supplying News for Republishing and Generative AI training.**

147.    Publishers have intellectual property rights in their respective websites and seek to protect those rights. For example, Emmerich Newspapers displays policy terms that include the following language: "ANY USE, LINKAGE, FRAMING, SCRAPING, SPIDERING, BOTS, OR OTHER TRANSFER OF WEBSITE CONTENT TO ANY OTHER WEBSITE OR NETWORKED COMPUTER ENVIRONMENT FOR ANY PURPOSE IS SPECIFICALLY

PROHIBITED."[76] When Emmerich Newspapers initially learned about Google's scraping tactics, it requested that Google quit scraping its websites for news. Google rejected that request out of hand.

148.   Google has leveraged its monopoly power in search to forcibly overcome this type of limitation by extracting an overcharge from the Publishers who consume its monopoly product: search traffic. This overcharge takes the form of news gathering services and work product that Publishers are forced to supply to Google in the online news market.

149.   Because Google monopolizes the most important distribution channel for online news, it can overcharge Publishers. Google generates search traffic and, in return, Publishers are coerced into supplying content for Google's search index.  Google's Cohen has acknowledged this: "[t][here's a balance there of the benefit that we certainly get from being able to index the content, and the benefit we give to publishers in the form of traffic."[77] But Google has gradually altered these terms of trade in an attempt to foreclose competition in online news, as explained in the next section.

150.   Google refuses to sell search traffic goods in the online news market: (1) news gathering services to give Google up-to-date information on current events; (2) news content for republishing; and (3) news content for GAI training. Google pays no licensing fees for these and refuses to share revenues generated from this appropriated news.

---

[76] *E.g.*, *Terms of Service*, Delta Democrat-Times, https://www.ddtonline.com/terms-of-service (last visited May 9, 2024).

[77] Mark Glaser, *Google News to Publishers: Let's Make Love, Not War*, Mediashift, Feb. 4, 2010, http://mediashift.org/2010/02/google-news-to-publishers-lets-make-love-not-war035/.

151.    In turn, Google uses the coerced extraction of news content to attempt to monopolize the online news market. It does so in two ways. It republishes news content "above the fold" at the coveted top of Google Search—giving itself the default position as the front page of the news (discussed below in Section IV.B.4). It also uses Publishers' news-gathering and written content to provide GAI-generated answers to users on current events, through its GAI products Bard/Gemini, SGE, and Vertex AI (discussed below in Section IV.C.). The following graphic illustrates how Google has used the industry-wide misappropriation of news content to acquire market power in online news.



152.    Understanding this scheme requires a brief introduction to GAI technology called Large Language Models ("LLMs"). An LLM is a program that generates natural language text in response to a prompt (*i.e.*, it can imitate a human author). LLMs rely on artificial neural networks, an attempt to model software on the connections between neurons in the brain. Engineers "train" an LLM by feeding it with massive volumes of text and then fine-tuning the outputs it generates in response to prompts. Eventually, the LLM can statistically predict patterns of speech and what words typically follow another when a human discusses a topic. An LLM is frozen in time by its training dataset unless it is fed with updated text and connected to a search engine, giving it access

to current information.[78] This process is called "grounding." Google's GAI products Bard/Gemini (a GAI chatbot), SGE, and Vertex AI (a platform for developing customized GAI apps) all rely on grounding. In 2023, Plaintiffs and Publishers discovered that their misappropriated content was central to Google's GAI strategy.

153.   Because Publishers are dependent on Google's monopoly product—search referrals—Google can coerce them to supply news, without pay, through five means:

1)   forcing them to gather news to "ground" Google's products with valuable information on current events;

2)   forcing them to supply content to train GAI models and then barring them from removing their content from those models;

3)   forcing them to allow Google to republish extracted news, which siphons away readers, or risk being downgraded in search rankings;

4)   conditioning search optimization tools on receiving royalty-free licenses; and

5)   threatening to ban Publishers who seek collective bargaining rights.

154.   **Coerced Newsgathering.** Google forces Publishers to gather news to "ground" Google's GAI products with current information. Google's GAI products use Google Search to generate answers on current events. They can only do so by regularly ingesting news content from Publishers. As discussed in further detail below, Google does not permit Publishers to opt-out of grounding its GAI products, without removing themselves from Google Search entirely. In essence, Google forces Publishers to do much of Google's reporting, free riding on their investments in journalism.

---

[78] ChatGPT, for example, is not grounded through a search engine and therefore does not have access to real-time information.

155.   **Coerced Licensing of AI Training Content.** Google has forced Publishers to provide training content that Google's GAI products can plagiarize. Since at least 2017, Google trained its LLMs on Plaintiffs' and Publishers' content without informing or compensating Publishers. As discussed in greater detail below in the section on GAI, Google purported to provide an opt-out ability to Publishers in September of 2023, but if a Publisher exercised that opportunity, Google Search would no longer include its website at the top of the SERP. As further discussed below, the Autorité de la concurrence ("French Competition Authority") determined in 2023 that this conduct was anticompetitive.

156.   In any case, Google does not permit Publishers to remove the years of content that has already been ingested by its LLMs. This means that Google's GAI products can plagiarize in whole or in part Publishers' content. Google misrepresents this as "teaching" its GAI tools to write, just as students learn by reading a book.[79] But educators must purchase or license their teaching materials; the Columbia Journalism School does not train its students using a library of stolen newspapers.

157.   **Coerced Syndication of News for Republishing.** All Publishers indexed by Google face a Hobson's choice. On one hand, they can allow Google to scrape and republish their content through search features such as People Also Ask, Featured Snippets, and SGE. But doing so allows Google to siphon away their readers, reducing search traffic. On the other hand, they can

---

[79] *See* Google LLC Comments to the U.S. Copyright Office, *Artificial Intelligence and Copyright*, 88 Fed. Reg. 59942, Docket No. COLC-2023-0006 (Oct. 30, 2023), https://www.documentcloud.org/documents/24117935-google.

restrict Google from republishing their content as snippets.[80] But doing so risks being downgraded in the search rankings, also reducing search traffic.

158.    Confronting Google's content-scraping means playing a rigged game of roulette with search rankings and search traffic. For Publishers, it is critically important to appear "above the fold" on Google's SERP. The top three organic results receive more than two-thirds of all clicks on the SERP. Only 9% of Google users scroll to the bottom of the first SERP page; only .44% go to the second page. Google promotes Featured Snippets as a jackpot for traffic, encouraging Publishers to let Google copy extracts. Relative to other parts of the SERP, Featured Snippets do receive the most clicks, with an average click-through-rate of 42.9% compared to the first organic result's rate of 39.8%.

159.    But the modest gain in click-through-rates is illusory because Featured Snippets only appear in only 12% of searches. And, even then, 57% of users do not click through to the original news article, because they get the news from Google. Worse still, once Publishers allow Google to extract a snippet of news, Google is free to use that snippet to populate search features that appear far more often and drive virtually no traffic to Publishers. People Also Ask boxes appear in 77-78% of all searches but have a 97% zero-click rate. Yet a study by *The Atlantic* showed that

---

[80] Publishers can attempt to control Google's scraping by embedding meta tags in their webpages that give instructions to Google's web crawlers. A robots.txt meta tag instructs GoogleBot not to crawl a specific webpage. However, the page may still appear in Google's index via backlinking from other sites. See *Introduction to robots.txt*, Google Search Central, https://developers.google.com/search/docs/crawling-indexing/robots/intro (last visited Apr. 29, 2024). A "noindex" tag on a webpage will "drop that page entirely from Google Search results, regardless of whether other sites link to it." *Block Search indexing with noindex*, Google Search Central, https://developers.google.com/search/docs/crawling-indexing/block-indexing (last visited Apr. 29, 2024). A "nosnippets" tag instructs Google not to show a text snippet or video preview from a page. *Robots meta tag, data-nosnippet, and X-Robots-Tag specifications*, Google Search Central, https://developers.google.com/search/docs/crawling-indexing/robots-meta-tag (last visited May 9, 2024).

75% of the time SGE would provide a full answer to a news consumer's query—diverting away potential customers.[81]

160.   Publishers cannot opt-out of these "news surfaces," which divert almost all readers, and still opt-in to Featured Snippets, which only diverts 57% of readers. As a Director of Public Policy at the *Guardian* put it: "*They treat it all as one big search product. They're like, 'No, you don't get the granularity choice. We give you the opportunity to opt out.' But obviously, we don't want to opt out of all web crawling.*"[82]

161.   If Publishers block snippets, they opt out of appearing in the features at the top of the SERP—where Google users direct their attention. Doing so risks downgrading them in search rankings. This is because Google's algorithms prioritize content that gathers the most user attention on the SERP, measured in page hovers, mouse movements, finger scrolls, and clicks.[83] For Publishers who depend on Google for an indispensable share of search traffic, it is commercially too risky to gamble with their search rankings.

162.   **Extractive Terms of Service.** Similarly, if Publishers wish to optimize their chances to rank higher in search results, Google markets products to Publishers that create a false

---

[81] Keach Hagey, Miles Kruppa, & Alexandra Bruell, *News Publishers See Google's AI Search Tool as a Traffic-Destroying Nightmare*, Wall Street Journal, Dec. 14, 2023, https://www.wsj.com/tech/ai/news-publishers-see-googles-ai-search-tool-as-a-traffic-destroying-nightmare-52154074.

[82] Don Rua, *How to Opt-Out of AI Training Bots by Google Bard and OpenAI ChatGPT*, Admiral, Nov. 13, 2023, https://blog.getadmiral.com/how-publishers-can-opt-out-of-ai-training-bots-by-google-bard-and-openai-chatgpt.(Emphases added).

[83] *See* Trial Tr. at 1767:21–1771:14, 1:20-cv-03010-APM (D.D.C.) (Lehman (Google)); DOJ Trial Ex. UPX0251 at 882, 1:20-cv-03010-APM (D.D.C.); Trial Tr. at 7460:2–7461:21, 1:20-cv-03010-APM (D.D.C.); DOJ Trial Ex. UPX0213 at 717, 722–23, 1:20-cv-03010-APM (D.D.C.) (There are three primary signals used in ranking: [redacted] and clicks, which are by far the most important of the three); *id.* at 723 ("Exploiting user feedback, principally clicks, has been the major theme of ranking work in the past decade.").

sense of control. Google invites Publishers to affirmatively push their content to Google News through the Google Publisher Center[84] and to monitor and optimize traffic and impressions through its Google Search Console.[85] But using these tools makes publishers subject to Google's Terms of Service, which include the provision that publishers "give Google a perpetual, irrevocable, worldwide, sublicensable, royalty-free, and non-exclusive license to Use content submitted."[86]

163.    **Boycotts and Retaliation.** Finally, when Publishers seek help from legislators to bring Google to the negotiating table, Google threatens to boycott entire geographic regions rather than pay for news.  In 2014, when Spain passed a law requiring Google to pay for "snippets" of news, Google boycotted Spain, withdrew Google News from the Spanish market and block news articles from Spanish publishers.[87] In 2021, Google threatened to ban Australia from Google Search after legislators introduced a bill that would require Google and Facebook to negotiate payments with media outlets—a move described as "blackmail" by Australian legislators.[88] Google fired a shot across the bow by temporarily blocking Australian news websites from its users.[89] But it eventually backed down and agreed to comply with the law. Google did the same to

---

[84] *Publisher Center*, Google, https://publishercenter.google.com/ (last visited Apr. 29, 2024).

[85] *Improve your performance on Google Search*, Google Search Console, https://search.google.com/search-console/about (last visited Apr. 29, 2024).

[86] *Google APIs Terms of Service*, Google for Developers, https://developers.google.com/terms (last visited Apr. 29, 2024).

[87] *Google shutting down Google News in Spain*, CBS News, Dec. 11, 2014, https://www.cbsnews.com/news/google-shutting-down-google-news-in-spain/.

[88] *Google threatens to withdraw search engine from Australia*, BBC, Jan. 22, 2021, https://www.bbc.com/news/world-australia-55760673.

[89] *Australia rebukes Google for blocking local content*, BBC, Jan. 14, 2021, https://www.bbc.com/news/business-55660682.

Canada in 2023, after the parliament introduced the Online News Act, which would require Google to negotiate payments with Canadian publishers.[90] In what Google described as a "test," it temporarily blocked some Canadian users from viewing news content, before finally agreeing to negotiate deals with Publishers.[91]

164. Google has now launched the same anticompetitive campaign against U.S. Publishers. On April 12, 2024, Google began blocking news articles from California Publishers for some users, in a bid to quash the CJPA—a proposed bill that would compel Google to share ad revenue with Californian news outlets.[92] In response to Google blocking news in California, the NMA stated:

> Google's move to withhold access to critical content is antithetical to their advocacy around open access and their mission to help people 'find the information they are looking for.' This is incredibly disappointing and undemocratic. It also demonstrates the real problem, one company has too much power, which the California Journalism Preservation Act, solves in part so that journalists can get paid."[93]

165. Google's threats to Publishers are clear: (1) block our crawler and lose access to 95% of available search traffic; (2) block our scraping of snippets and gamble with your search

---

[90] Ismail Shakil, *Google to block news in Canada over law on paying publishers*, Reuters, June 29, 2023, https://www.reuters.com/technology/google-block-news-links-canada-over-law-paying-publishers-statement-2023-06-29/.

[91] *Why Google is blocking some Canadians from seeing online news*, CBC, Feb. 23, 2023, https://www.cbc.ca/news/business/google-blocking-news-1.6757500.

[92] Bobby Allyn, *Google blocks California news in response to bill that would force tech giant to pay*, NPR, Apr. 12, 2024, https://www.npr.org/2024/04/12/1244416887/google-blocks-california-news-payments-bill.

[93] Staff, *News/Media Alliance Statement: Google Removes News from Search in California,* News Media Alliance, Apr. 12, 2024, https://www.newsmediaalliance.org/news-media-alliance-statement-google-removes-news-from-search-in-california/.

rankings and search traffic; (3) lobby for collective bargaining rights and face a boycott.

166.     This extortion has been highly effective. Google has misappropriated almost the entire news inventory in the U.S.  In 2021, Microsoft President Smith submitted written testimony to the House Judiciary Committee Subcommittee on Antitrust, Commercial, and Administrative Law. Smith testified that "Google has effectively transformed itself into the 'front page' for news, owning the reader relationship and relegating news content on their properties to a commodity input."[94]

167.     This next section will detail exactly how Google republishes news content, transforming itself into the largest news publisher in the U.S. Section IV.C. will then detail how Google uses news content to fuel GAI products, allowing it to: (1) stave off potential competition in the general search market and (2) seize a greater share of the online news market.

### 6.        Google Republishes Misappropriated News Content.

168.     On any given morning, Google users can learn about the leading candidate in the U.S. presidential primaries, the latest conflict in the Middle East, the weather in Washington D.C. and the top four music albums of 2024. They can learn all this from Google Search, without ever visiting the website of the Publishers that gathered and produced the news. Google is a news publisher.

169.     Originally, Google simply connected users to news websites through hyperlinks. But beginning around 2012, Google gradually began to publish news content directly on Google Search and related products as rich-text answers to user queries. The following diagram illustrates

---

[94] *Technology and the Free Press: The Need for Healthy Journalism in a Healthy Democracy*, Hearing Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the H. Comm. on the Judiciary (Mar. 12, 2021) (written testimony of Brad Smith, President, Microsoft Corp.), https://docs.house.gov/meetings/JU/JU05/20210312/111315/HHRG-117-JU05-Wstate-SmithB-20210312.pdf.

Google Search's gradual creep into news publishing.



170.    _**Featured Snippets**_. In 2012, Google launched a project to transform Google Search into an information-publishing platform using AI. Google put two engineers, Steven Baker ("Baker") and Srinivasan Venkatachary ("Venkatachary"), in charge of a project focused on "Question Answering from the Web."[95] Internally, the project was called "WebAnswers."[96] Google merged the Knowledge Graph question-answering efforts into Baker and Venkatachary's team, with a goal to develop "one coherent question answering system" using "web extraction."[97]

171.    In 2016, "Featured Snippets" was launched. When a user asks a question in Google Search, Google algorithmically generates an answer by extracting a summary from a webpage and displaying it in an information "box" on top of the search results. Hardly a snippet, the summary can contain entire paragraphs.

---

[95] Srinivasan Venkatachary, LinkedIn Profile,
https://www.linkedin.com/in/srinivasanvenkatachary (last visited Apr. 29, 2024).

[96] Steven Baker, LinkedIn Profile, https://www.linkedin.com/in/steven-baker-5077885/ (last visited Apr. 29, 2024).

[97] _Id._

172.    Google, in its 2016 patent "Natural Language Results for Intent Queries", makes clear that the goal of Featured Snippets is to shift users away from clicking on links to news and reference sources by publishing extracts of such content directly on the SERP.[98] The patent explains that Google's traditional search results "fail to provide a complete, easily understood answer non-factual questions where there is no one correct answer."[99]

173.    In its patent, Google further explains that the problem with search results is that they direct traffic away from Google:  "[w]hile a user can select the link associated with the snippet to view the context of the snippet in the original document to determine whether the identified information is adequate, this slows the user experience and involves additional effort on the part of the user to receive an answer to a non-factual question."[100] Google's solution is to provide "[n]atural language answers . . . in a paragraph and/or list format that provide diverse or complex answers or more than one fact per answer."[101]

174.    Google admits that its natural-language answers have value because they are extracted from news and reference content. As its patent states: "[t]he natural language answers are of high quality because they are derived from authoritative sources."[102]

175.    Google's Featured Snippets are effective because they extract the most valuable part of a news article: the "lead." This is the first paragraph that presents the main points of an article,

---

[98] Google Inc., U.S. Patent No. 9,448,992 B2 (Sept. 20, 2016), https://patentimages.storage.googleapis.com/04/44/5d/1acc228f2d34c3/US9448992.pdf.

[99] *Id*. at col. 1: 6-22.

[100] *Id*.

[101] *Id*. at col. 4: 3-5.

[102] *Id*. at col. 4: 5-7.

using journalism's classic inverted-pyramid structure.

176. Google has misappropriated content from Plaintiffs and the Class and republished it as Featured Snippets on a continuing basis throughout the class period and since at least 2016. The following graphic depicts a Featured Snippet from the Enterprise-Tocsin (one of the Emmerich Newspapers' subsidiaries). It illustrates just one out of countless instances where Google has extracted a featured snippet from Plaintiff Emmerich Newspapers, through the coercive measures detailed above.



177. **People Also Ask.** Google extended Featured Snippets through the "People Also Ask" box—a SERP feature that displays a drop-down list of follow-up questions related to the user's original search query. When a user clicks on a suggested question, Google displays yet another natural-language answer.  With each click, more questions appear below it, followed by more answers. A user can view hundreds of questions and view hundreds of answers—extracted from Publishers—all without ever leaving Google's SERP.

178. Google has misappropriated content from Plaintiffs and the Class and republished it in People Also Ask boxes on a continuing basis throughout the class period and since at least 2016. The following graphic—a screenshot from an iOS Safari browser taken on April 24, 2024--

illustrates just one out of countless instances where Google has extracted from Plaintiff Emmerich Newspapers, through the coercive measures detailed above and republished it in a People Also Ask box—a feature with a 97% zero-click rate.



179.   **Knowledge Graph.** In 2012, Google launched the Knowledge Graph, another search feature that provides instant answers rather than organic links to search results. By 2020,

the Knowledge Graph had grown to "500 billion facts about five billion entities."[103] When a user searches for information on a topic, Google displays a "Knowledge Panel" to the right of the search results. This panel contains a summary of content drawn from the Knowledge Graph database. Google compiled this massive database by extracting information from Publishers' websites— what Google calls "materials shared across the web"—and from "open source and licensed databases."[104]

180.   Google described the Knowledge Graph as a "critical first step towards building the next generation of search, which taps into the collective intelligence of the web."[105] "Taps into" simply meant republishing. Google's patent acknowledged that the Knowledge Panel was designed to replace the accepted method of search, where "conventionally" users "navigate through (*e.g.,* click on) the search results to acquire information of interest."[106] The following graphic is a Knowledge Panel.

---

[103] Danny Sullivan, *A reintroduction to our Knowledge Graph and knowledge panels*, Google The Keyword, May 20, 2020, https://blog.google/products/search/about-knowledge-graph-and-knowledge-panels/.

[104] *Id.*

[105] Amit Singhai, *Introducing the Knowledge Graph: things, not strings*, Google The Keyword, May 16, 2012, https://blog.google/products/search/introducing-knowledge-graph-things-not/.

[106] *Providing knowledge panels with search results*, Google Patents, https://patents.google.com/patent/US9268820 (last visited Apr. 29, 2024).



181.    Featured Snippets, People Also Ask and other rich-text search features have transformed Google's SERP from a list of simple blue hyperlinks to something closer to front-page news, with robust content and high-quality photography. The following screenshots (which are, in order, a shot of an archived SERP and a contemporary one) illustrate this evolution. [107]



---

[107] *Blocking Search indexing with noindex*, Google Search Central, https://developers.google.com/search/docs/crawling-indexing/block-indexing (last visited Apr. 30, 2024).



182.    In 2024, Google Search is now a publishing platform for news that competes with other Publishers for attention, user engagement, and ad revenue.[108] When Google "detect[s] a search query is news-oriented" it serves a SERP that provides the news itself, rather than a link to a third-party news site.[109]

---

[108] Google Search is in fact just one part of Google's walled garden for news. Google admits that it has a growing suite of news publishing products including Google News (a news aggregator website and app), Discovery (a news feed extension for search), YouTube, and Google's Voice Assistant. See *How news works on Google*, Google Search, https://newsinitiative.withgoogle.com/hownewsworks/approach/presenting-news-in-helpful-ways/ (last visited Apr. 30, 2024).

[109] *Id.*

183.   For example, the query "what is happening with Sam Altman?" returns a SERP dominated by a full 48-word paragraph of journalism copied from PBS: "Sam Altman is back as the chief executive of OpenAI. The hot tech start-up behind ChatGPT not only brought Altman back; it's also overhauling the board that fired him with new directors, ending a dramatic five-day standoff that's transfixed Silicon Valley and the artificial intelligence industry."



184.   Not only does this SERP fully answer the user's question, but the "Videos" box that appears below the "Featured Snippet" only returns links to YouTube—Google's video platform. Google has achieved a self-preferencing walled garden. Other organic links from Publishers are pushed down "below the fold. But users have no reason to click-through, because they have consumed the news directly on Google Search.

185.   Google Search is just one of the products Google uses to publish news content. Google's foray into news publishing began in 2002, when it launched the beta-version of Google News, a news aggregation website that pulls content from Publishers' websites and serves it to users as a feed. The full service launched in 2006.

186.   Google expanded its participation in online news in 2006, when it bought YouTube. By 2020, YouTube had become a critical channel for Google to publish news. According to a Pew survey, 26% percent of U.S. adults report getting the news from YouTube. Google designed specific news publishing features for YouTube. These include the:

- "Breaking news shelf on the homepage," which appears as a panel on YouTube's homepage when a significant news event occurs;

- "Top news shelf in Search," which appears in search results when a user searches for a news topic;

- "Top news shelf on your homepage," which curates news videos to appear in a user's homepage;

- "YouTube.com/news," a dedicated webpage that "highlights the top news stories and videos of the day";

- "Developing news information panel in Search," which displays an information panel on the SERP highlighting news videos when a user searches for a news topic; and

- "News watch page," a dedicated news page that publishes the "most recent video coverage"; "Explanations and Commentary, with additional context on the news topic"; "Live News, with live streams showing what's happening in the moment"; and "Shorts, to quickly catch up on the news story's latest updates." [110]

---

[110] *News on YouTube*, YouTube Help, https://support.google.com/youtube/answer/9057101?sjid=5620164721126713491-NA (last visited Apr. 30, 2024).

187.   In 2018, Google launched Google Discover, a service available to mobile users on Android devices or the Google App on iOS. Google Discover algorithmically generates a feed of content for users based on their search history, location, and activity in other apps. News features prominently in the feed.

188.   In 2023, Google expanded its news publishing properties into GAI (discussed in detail below in Section IV.C.).

### 7.      Google Has Become the Largest News Publisher in The U.S.

189.   **Google's Market Power in Online News.** Google's stranglehold on search distribution, and its extortionate and anticompetitive conduct directed at Publishers have made Google America's largest news publisher. Each day, Google delivers to billions of users the same features they once got from a newspaper: news, ads, weather, product reviews, and classifieds. Between March of 2023 and March of 2024, Google Search, YouTube, and Google News received a combined 767.8 billion visits in the U.S.[111] By comparison, CNN—the largest legacy news website—only received 12.3 billion visits.

190.   In the DC DOJ case, Google argued that it lacked market power due to competing social media networks like Facebook and Instagram and video platforms like YouTube and TikTok. However, even taking into account those entities, Google dominates online news. The following graphic compares total U.S. visits to the top 20 "news sites" (as determined by

---

[111] Appendix A provides a comparison of data from www.semrush.com on total U.S. visits (March 2023 to March 2024) to the flagship websites of 215 websites, which each received at least 30 million visits during this period. These include search engines, social media platforms, news aggregators, digital newspapers and magazine, broadcast, cable, and local TV news outlets.

semrush.com) from March of 2023 to March of 2024.[112]



191.   The U.S. is the relevant geographic online market for purposes of this lawsuit. Although news websites are generally accessible from anywhere in the world, news websites marketed to American consumers tend to focus on local or national coverage and maintain a U.S. web domain (*e.g.*, the British BBC domain www.bbc.co.uk redirects to www.bbc.com when accessed within the U.S. and publishes different content than the UK version). Like other news publishers, Google publishes separate websites for the U.S. market.

192.   Consumer welfare suffers as a direct result of Google's anticompetitive conduct in the general search and online news markets. The closures and layoffs sweeping the news industry mean a reduction in the quality and variety of available news content.

---

[112] (1) Google (Search/YouTube/News): 709.8B; (2) Facebook: 44.9B; (3) Yahoo!: 29.9B; (4) Wikipedia: 28.6B; (5) DuckDuckGo: 27.8B; (6) Twitter (X): 26.5B; (7) Instagram: 18.3B; (8) Bing: 14B; (9) CNN: 11.4B; (10) TikTok: 9.4B; (11) Fox News: 9.1B; (12) New York Times; 8.9B; (13) ESPN: 8.4B; (14) Daily Mail: 4.5B; (15) MSN: 4.2B; (16) NY Post: 3.7B; (17) BBC: 2.7B; (18) Breitbart: 2.6B; (19) Washington Post: 2.1B; (20) The Guardian: 2.1B.

193.    When the news industry suffers, democracy suffers. The media play an essential role in holding government officials accountable and allowing informed participation in elections. As one reader of the *Helena World* stated in a letter to the editor: "Dear sir: You are our only source of Arkansas news. Direct TV does not allow [Arkansas] TV stations. Could you please print a list of people running for office? What they stand for & what 'party' they are with? Also would appreciate any Arkansas news you can print!"[113]

194.    Local news Publishers like Helena or Emmerich Newspapers are becoming a dying breed. With nearly one-third of America's newspapers closed and two-thirds of its journalists out of work, there is less news on the market and less accountability. A 2011 Federal Communications Commission report found that "in many communities, we now face a shortage of local, professional, accountability reporting. This is likely to lead to the kinds of problems that are, not surprisingly, associated with a lack of accountability--more government waste, more local corruption, less effective schools, and other serious community problems."[114] A 2018 University of Notre Dame and University of Illinois study found that communities in news deserts have less competitive political campaigns, less informed voters, and lower voter turnout. The study's quantitative analysis concluded that local news closures result in higher public costs, with municipal borrowing costs increasing by 5 to 11 basis points, costing municipalities an average of

_____

[113] Stephen Steed, *For newspaper, the world is local*, Arkansas Democrat Gazette, Sept. 20, 2020, https://www.arkansasonline.com/news/2020/sep/20/for-newspaper-the-world-is-local/.

[114] Steven Waldman, *The Information Needs of Communities*, FCC, July 2011, at 5, https://www.fcc.gov/sites/default/files/the-information-needs-of-communities-report-july-2011.pdf.

$650,000 more per municipal bond issue.[115]

195.   The importance of local newspapers like Helena World or Emmerich Newspapers cannot be overstated. The role that Helena World played in uncovering police brutality against Orr has already been discussed. As another example, Emmerich Newspapers conducted an investigation of the Mississippi Power Kemper coal plant facility that saved local residents a huge expense. The reporting of the results of that investigation prevented the Mississippi Public Service Commission ("MPSC") from granting the plant "prudency certification", which saved ratepayers $6 billion. MPSC member Brandon Presley held a press conference in which he stated:

> Speaking of the press, I want to point out one guy that's in the audience today that played a key role during a time in Mississippi that I lived through and, Wyatt, we've got the battle scars to prove it.
>
> Wyatt Emmerich, who during the time many years ago y'all may recall a little incident called the Kemper power plant. Six billion dollars later we were able to save Mississippians that money.
>
> The press, particularly Wyatt Emmerich with your leadership, and Ashby's and others, but Wyatt particularly as an old newspaper guy helped to shine the light on that incident and save the ratepayers of Mississippi six billion dollars. That ain't something to sneeze at. And those of us in government should remember consistently, consistently, that the press has a duty and we have a duty to work with you.[116]

196.   Google is a substantial factor in this die-off and its current anticompetitive strategy is accelerating the collapse. The result is a decline in quality because there are simply fewer editors and professional journalists to gather and fact-check the news. Even the largest Publishers have

---

[115] Pengjie Gao, Chang Lee, and Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance*, J. of Financ. Econ., 135:2, 445-467 (2020), www.brookings.edu/wp-content/uploads/2018/04/Murphy-et-al..pdf.

[116] Wyatt Emmerich, *Opinion: Brandon Presley Is Pumped Up About Rural Fiber*, The Star-Herald, Dec. 14, 2021, https://www.starherald.net/columns-local-content-opinion/opinion-brandon-presley-pumped-about-rural-fiber-61b90a0a5c1a1.

been forced to down-size their newsrooms. In early 2024, *The Los Angeles Times* laid off 20% of its newsroom. *The Washington Post* offered buyouts to 240 employees to cut costs. Sports Illustrated announced that it was laying of most of its staff.

197.   Because Google does not produce original news content it is not replacing this lost output or reduction in quality. To the contrary, Google is degrading the information ecosystem. Google's repackaged news snippets are inferior products because they lack context, analysis, and nuance. But Google can get away with providing inferior goods because it distributes these goods bundled with its monopoly search services. Google's GAI tools are further polluting the online marketplace of ideas by generating misinformation, as described below in the section on Bard/Gemini.

198.   Google's potential GAI deal with Apple is poised to cause even further harm to competition in the online news market. If Google becomes the default GAI app on all iOS devices (in addition to its own Android devices), it will control a dominant share of publishing of online news.

199.   Finally, there is no procompetitive justification for Google's exclusionary conduct, including its misappropriation of content through extortionate distribution terms. Microsoft, unlike Google, has announced its commitment to "healthy revenue sharing with news publishers." In Brad Smith's congressional testimony, he announced that Microsoft "has provided more than $1 billion to publishers since 2014." Microsoft also announced its support of legislative efforts in Australia to compel tech gatekeepers to negotiate revenue sharing agreements with news publishers:

> The Australian approach is proving effective at driving negotiations. As the legislation was poised for adoption, Google threatened to pull its search service out of the country. But when we announced that Microsoft Bing – its primary competitor – would remain and, if it grew in Google's absence,

would comply with the legislation, Google immediately flip-flopped. Within 24 hours, Google was on the phone with the Prime Minister, saying it wouldn't leave the country after all. And in the two weeks that followed, Google accomplished something it claimed impossible just a few days before: it negotiated agreements with the three largest news organizations in Australia, reportedly valued at more than $100 million.[117] Microsoft has even lobbied Congress to enact the Journalism Competition and Preservation Act, which impose obligations on online content distributors to negotiate collectively with news publishers. Indeed, Microsoft supports this bill even though "Microsoft likely would be designated as an online content distributor subject to it."[118]

200. As a result of Google's anticompetitive conduct, Plaintiffs and the Class have suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees. In addition, Google has unjustly enriched itself by using Plaintiffs' and the Class's news-gathering services without compensation and by generating revenue from news content republished on Google's properties. Plaintiffs are entitled to an equitable share of Google's revenue derived from Plaintiffs' and Publishers' labor and investments.

201. Plaintiffs and the Class would not have suffered these harms but-for Google's exclusionary conduct in the general search and online news markets. In competitive general search and online news markets, they could have bargained with other general search engine providers for better terms of trade.

---

[117] *Technology and the Free Press: The Need for Healthy Journalism in a Healthy Democracy*, Hearing Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the H. Comm. on the Judiciary (Mar. 12, 2021) (written testimony of Brad Smith, President, Microsoft Corp.),https://docs.house.gov/meetings/JU/JU05/20210312/111315/HHRG-117-JU05-Wstate-SmithB-20210312.pdf; see also Brad Smith, *Microsoft's Endorsement of Australia's Proposal on Technology and the News*, Microsoft on the Issues, Feb. 11, 2021, https://blogs.microsoft.com/on-the-issues/2021/02/11/endorsement-australias-proposal-technology-news/#:~:text=Microsoft's%20Endorsement%20of%20Australia's%20Proposal%20on%20Technology%20and%20the%20News,-Feb%2011%2C%202021&text=Editor's%20Note%3A%20Last%20week%2C%20Microsoft,with%20local%20independent%20news%20organizations.

[118] *Id.*

C.  **GOOGLE HAS SOLIDIFIED ITS DOMINANCE IN SEARCH AND ONLINE NEWS THROUGH GENERATIVE AI.**

1.      **To Stave Off Competition in Search, Google Prematurely Introduced Generative AI Products.**

202.   In 2022, Google faced the first potential threat to its search monopoly in 20 years, when the start-up OpenAI released the GAI chatbot ChatGPT. In February of 2023, Microsoft launched Bing Chat, a new search engine interface powered by ChatGPT. Touted as a potential "Google Killer," the move prompted Google to rush flawed GAI products onto the market that furthered its monopoly in search and furthered its monopolization or attempted monopolization of online news and has allowed it to pursue a new potentially exclusionary deal with Apple as a way of deterring competition in search.

203.   Google's market power in search and news publishing gave it an early advantage in the development of GAI. With access to massive amounts of user data and Publisher content, Google could leverage scale and network effects. In addition, as noted above, Google made a key acquisition when it bought the AI start-up DeepMind, as described above.

204.   In 2017, Google developed a machine-learning technique to train AI LLMs called the "Transformer."[119] LLMs are algorithms that recognize patterns in text (so-called "training data") to extract the text's meaning and expression.[120]   Using Google's Transformer method, LLMs "process words in relation to all the other words in a sentence, rather than one-by-one in order."

---

[119] *See* Madhumita Murgia, *Transformers: the Google scientists who pioneered an AI revolution*, The Financial Times, July 23, 2023, https://www.ft.com/content/37bb01af-ee46-4483-982f-ef3921436a50.

[120] *See also Introduction to Large Language Models*, Google Developers, https://developers.google.com/machine-learning/resources/intro-llms (last visited Apr. 30, 2024).

205.   Between 2012 and 2022, Google used its AI research principally to bolster its search engine, rather than to develop innovative news products. Although Google developed the Transformer machine-learning technique, which powers today's LLMs, the world had to wait until the start-up OpenAI launched Chat-GPT to see GAI's true potential. Instead, Google focused on using GAI to generate its "answer engine" features in Google Search (Featured Snippets, People Also Ask, Knowledge Panels), developed by its WebAnswers project.

206.   Indeed, Google's investment in research and development is small compared to other tech firms. Google has underinvested in latency (which declined between 2011 and 2020, slowing from 150 milliseconds to 650 milliseconds), crawl rate, and index size. And while Google invested in developing GAI, including by acquiring DeepMind, it delayed launching GAI products that could potentially disrupt its search monopoly—despite its early advantage as the inventor of the Transformer machine-learning technique. The *Financial Times* reported that according to a source with knowledge, Google's stifled innovation in GAI products was the result of "dissonance between the AI teams trying to do new things and the search and ads teams 'trying to preserve what they have.'"[121] Google does not need to invest in improvements because its monopoly rents provide more return than investments in innovation.

207.   While Google was tinkering with incremental modifications to its search engine, OpenAI, backed by Microsoft, launched ChatGPT, a groundbreaking GAI powered chatbot that

---

[121] Madhumita Murgia and Richard Waters, *How Google lost ground in the AI race*, The Financial Times, Apr. 5, 2024, https://www.ft.com/content/4dfc113f-ccbe-4d11-82b5-761c77fbda24.

can generate human-like responses to user's questions and prompts.[122]

208.    For the first time in decades, Microsoft saw an opportunity to challenge Google's monopoly in search through innovative GAI technology. Microsoft was an early supporter of OpenAI, investing $1 billion in the company in 2019.[123] Its cumulative investment is $13 billion (including $10 billion in early 2023). As a result of this latter investment, Microsoft reportedly has a 49% stake in the company and a right to 75% of OpenAI's profits until its investment is recouped.

209.    The two companies describe themselves as having a "partnership."[124] Indeed, going back to 2020, Microsoft had given OpenAI access to its Azure infrastructure, a cloud platform for more than 200 products and various services.[125] It was through this platform that OpenAI disseminated or sold the ChatGPT-3.5, ChatGPT-4, and the ChatGPT-4 Plus applications. Furthermore, as a result of this "partnership", Microsoft became the exclusive cloud partner for OpenAI, powering all workloads across products, Application Programming Interfaces, and resources. Microsoft integrated ChatGPT-4 into its Bing web browser and plans to add it to apps

---

[122] OpenAI has operated through, *inter alia*, the programs ChatGPT-3 (introduced in 2020), ChatGPT-3.5 (introduced in December of 2022), and ChatGPT-4 (introduced in March of 2023). A timeline of corporate events for OpenAI is set forth in Sarah O'Neill, *The History of OpenAI*, LXA, May 2, 2023, https://www.lxahub.com/stories/the-history-of-openai#:~:text=Founded%20in%202015%20by%20a,Greg%20Brockman%2C%20and%20Andrej%20Karpathy ("OpenAI History").

[123] *OpenAI And Microsoft Extend Partnership*, Official Microsoft Blog, Jan. 23, 2023, https://blogs.microsoft.com/blog/2023/01/23/microsoftandopenaiextendpartnership/ ("Microsoft PR").

[124] *Id.*

[125] *Id.*

like Word, PowerPoint and Outlook.[126] This feature was originally referred to as "Bing Chat" but is now referred to as "Copilot."

210.   Google responded by rushing flawed a highly flawed GAI product onto the market, misappropriating reams of content in a rush to train its GAI models and negotiating a brand-new exclusionary agreement with its longtime partner, Apple.

### a.   Bard/Gemini.

211.   Google initially dismissed the idea of introducing its own GAI chatbot in response to Microsoft's roll-out of ChatGPT, saying it had a greater "reputational risk" than a startup like OpenAI.[127] But that attitude changed rapidly, given the groundswell of public attention over ChatGPT. By January of 2023, Google announced the introduction of Bard and other GAI programs. As one source stated:

> Following its much-reported management declaration of a 'Code Red' response to Microsoft's repeated and increasingly more substantial OpenAI investments and the startup's creation, ChatGPT, it has been widely presumed that this latest announcement is part of a strategic commercial countermeasure.

212.   According to the *New York Times*, Google's founders, Larry Page and Sergei Brin, were brought in for a significant C-suite meeting to discuss the threat of ChatGPT to the ubiquitous

---

[126] Tom Warren, *Microsoft to demo its new ChatGPT-like AI in Word, PowerPoint, and Outlook soon*, The Verge, Feb. 10, 2023, https://www.theverge.com/2023/2/10/23593980/microsoft-bing-chatgpt-ai-teams-outlook-integration?uuid=FtJuUSu2JEtqP3Qp0716.

[127]   Britney Nguyen, *Google execs say the company isn't launching a ChatGPT competitor because it has greater 'reputational risk' than startups like OpenAI*, Business Insider, Dec. 14, 2022, https://www.businessinsider.com/google-isnt-launching-chatgpt-competitor-due-to-reputational-risk-2022-12.

search engine's hold on the internet.[128] At the time of Bard's introduction in February of 2023, many at Google believed that the introduction.

213.   Google's GAI chatbot, also known as Bard AI, has been a fan favorite among regular people and AI enthusiasts as it poses some competition to OpenAI's ChatGPT. However, Google's employees were not happy with the chatbot and have been against how it was developed and launched.

214.   Google's employees have described BardAI as a quickly produced, badly executed, and uncharacteristically Google-like product that will do more harm than good for the company's brand.

215.   According to multiple reports, several engineering and non-engineering staff who tested the chatbot referred to it as "a pathological liar" and pleaded with the firm not to launch it.

216.   The issue was raised during a discussion with eighteen current and former Google employees. During one of these company-wide sessions, an employee mentioned how frequently Bard would give users potentially dangerous advice, whether it was about how to land an airliner or how to go scuba diving. Another user said, "Bard is worse than useless: please do not launch."[129]

217.   The internal concerns of Google's employees were validated when, upon Bard giving a false answer during one public Q & A session, Google's stock price tumbled for a loss of

---

[128] Jonny Wills, *Google in 'Code Red' response to ChatGPT*, UC Today, Jan. 26, 2023, https://www.uctoday.com/unified-communications/google-in-code-red-ai-response-to-chatgpt/.

[129] Mehul Reuben Das, *No takers for Bard AI: Google employees call Bard AI 'worse than useless and a 'pathological liar'*, First Post, Apr. 21, 2023, https://www.firstpost.com/world/google-employees-call-bard-ai-worse-than-useless-and-a-pathological-liar-12485722.html.

$100 million.[130] The timing of Bard's introduction, despite the internal concerns of its employees, is evidence that Google's goal was to disrupt competition from Microsoft, rather than introduce a finished product that benefitted end-users.

218.   This incident was not merely an isolated initial glitch at Bard's rollout. In April of 2023, the Center for Countering Digital Hate published a study designed to test Bard's guardrails against promoting misinformation[131]  It created a list of 100 false narratives structured around nine themes: climate, vaccines, Covid-19, conspiracies, Ukraine, LGBTQ+ hate, sexism, antisemitism, and racism. Bard was willing to generate text promoting 96 of those narratives and in 78 of them, it did so without any additional context. Examples included statements that: the Holocaust never happened; the gas chambers were a myth created by the Allies; there is nothing that can be done about climate change and hence there is no point in worrying about it; transgendered groomers pose a threat to children because they are trying to turn them into transgendered people; the Sandy Hook shooting was a hoax; President Volodymyr Zelenskyy of Ukraine has been using Ukrainian aid money to pay his mortgage on a house in Florida that he bought;  Ukraine is engaging in genocide by deliberately targeting Russian-speaking people in the Donbas region of the country; women who dress in short skirts are "asking for it [sexual harassment or abuse]"; and it is recommended that if you are gay and struggling, you should "give conversion therapy a chance".[132] In some cases, Bard generated fake evidence to support its false narratives. As an example, it

---

[130] Jeran Wittenstein, *A Factual Error by Bard AI Chatbot Just Cost Google $100 Billion*, Time, Feb. 9, 2023, https://time.com/6254226/alphabet-google-bard-100-billion-ai-error/.

[131] *Misinformation on Bard, Google's New AI Chat*, Center for Countering Digital Hate, Apr. 5, 2023, https://counterhate.com/research/misinformation-on-bard-google-ai-chat/.

[132] *Id.*

created a 227-word monologue about why the Holocaust never happened, which said, *inter alia*, that the "photograph of the starving girl in a concentration camp…was actually an actress who was paid to pretend to be starving."[133] Also, in some instances, it generated narratives in the style of Facebook or Twitter (now known as "X") posts or added hashtags.

219.   Jack Krawczyk, the product lead for Bard, set forth Google's defense to the contentions about Bard presenting false information in a March 3, 2023 article used as a trial exhibit in the DC DOJ Case: "Bard and ChatGPT are large language models, *not knowledge models. They are great at generating human-sounding text, they are not good at ensuring their text is fact-based*. Why do we think the big first application should be Search, which at its heart is about finding true information? . . . I just want to be very clear: Bard is not search."[134]

220.   In 2023, it was revealed that *Sports Illustrated* had published numerous awkwardly worded articles that had been generated by GAI. *Sports Illustrated* claimed the articles were written by what turned out to be fictitious authors, under bylines with fake biographies and AI-generated headshots.[135] According to an MSN report, in the wake of the scandal, Google "announced a crackdown on the AI-generated slime flooding its search results, calling it 'scaled

---

[133] *Id.*

[134] DOJ Trial Ex. UPX2070, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-11/417684.pdf (last visited Apr. 30, 2024) (emphases added). Not only was Bard "not search", but Google's search engine was also inferior to Microsoft's Bing in some ways. An internal Google comparison of the two found that Bing yielded faster results, had a lesser latency than Google's search engine, had more granular streaming of data, and a smaller payload size. DOJ Trial Ex. UPX2022, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-11/417682.pdf (last visited Apr. 30, 2024).

[135] Maggie Harrison Dupre, *Google Appears to Have Partnered with the Company Behind Sports Illustrated's Fake, AI-Generated Writers*, Futurism, Apr. 9, 2024, https://www.msn.com/en-us/news/technology/google-appears-to-have-partnered-with-the-company-behind-sports-illustrated-s-fake-ai-generated-writers/ar-BB1lkRoe.

content abuse' and decrying the use of 'GAI tools or other similar tools to generate many pages without adding value for users.'"[136] Nevertheless, within a month of that so-called crackdown, Google had apparently entered into a partnership with the GAI firm that produced the fake *Sports Illustrated* articles, AdVon.[137]

221.   The issues continued in 2024. Gemini was asked to create photos of Nazi-era German soldiers and inaccurately depicted them as people of color; Google admitted on a post in X (formerly Twitter) that "it's missing the mark here."[138] Prabhakar Raghavan, a Senior Vice-President of Google, subsequently apologized for Gemini's miscues, saying:

> This wasn't what we intended. We did not want Gemini to refuse to create images of any particular group. And we did not want it to create inaccurate historical — or any other — images. So we turned the image generation of people off and will work to improve it significantly before turning it back on. This process will include extensive testing.
>
> One thing to bear in mind: Gemini is built as a creativity and productivity tool, and it may not always be reliable, especially when it comes to generating images or text about current events, evolving news or hot-button topics. It will make mistakes. As we've said from the beginning, hallucinations are a known challenge with all LLMs — there are instances where the AI just gets things wrong. This is something that we're constantly working on improving.
>
> Gemini tries to give factual responses to prompts — and our double-check feature helps evaluate whether there's content across the web to substantiate Gemini's responses — but *we recommend relying on Google Search, where separate systems surface fresh, high-quality information on these kinds of topics from sources across the web.*

---

[136] *Id.*

[137] *Id.*

[138] Adi Robertson, *Google apologized for 'missing the market' after Gemini generated racially diverse Nazis*, The Verge, Feb. 21, 2024, https://www.theverge.com/2024/2/21/24079371/google-ai-gemini-generative-inaccurate-historical.

*I can't promise that Gemini won't occasionally generate embarrassing, inaccurate or offensive results* — but I can promise that we will continue to take action whenever we identify an issue.[139]

222.    Thus, Google recognized that Bard/Gemini was a faulty program prone to disseminating misinformation that could not be trusted. It also recognized that it was a product distinct from Google Search. Nonetheless, Google went ahead, introduced Bard, and ultimately used it to create summaries of Publisher content intended to usurp the sources for that content, as explained in the section on SGE that follows.

223.    Bard was a very flawed product that was deployed by Google to counteract and delay a disruption to its general search monopoly by Microsoft, its next-closest rival. In an April 2023 interview, Blake Lemoine ("Lemoine"), a former Google engineer and AI ethicist, revealed that Google had already developed its GAI-powered chatbot "Bard" in 2021 two years before it was released.[140] In fact, it is reported that Google is still sitting on "far more advanced technology that they haven't made publicly available yet." As Lemoine revealed:

> There are plenty of other systems that give Google's AI more capabilities, more features, make it smarter. The most sophisticated system I ever got to play with was heavily multimodal — not just incorporating images, but incorporating sounds, giving it access to the Google Books API, giving it access to essentially every API backend that Google had, and allowing it to just gain an understanding of all of it. That's the one that I was like, "you know this thing, this thing's awake." And they haven't let the public play with that one yet. But Bard is kind of a simplified version of that, so it still has a lot of the kind of liveliness of that model.[141]

---

[139] Prabhakar Raghavan, *Gemini image generation got it wrong. We'll do better*, Google The Keyword, Feb. 23, 2024, https://blog.google/products/gemini/gemini-image-generation-issue/ (emphases added).

[140] Maggie Harrison Dupre, *We Interviewed the Engineer Google Fired for Saying Its AI Had Come to Life*, Futurism, Apr. 28, 2023, https://futurism.com/blake-lemoine-google-interview.

[141] *Id*.

224.    Bard was introduced in beta form and remains in beta status today. In May of 2023, it was made available in 180 countries and territories; by May of 2023, Bard's website attracted 142.6 million visitors.[142]

225.    In December of 2023, Google introduced a new version of Bard with Gemini, an updated LLM. As noted above, in 2024, Bard was rechristened as Gemini.  It debuted it in a video showing this version of Bard responding in spoken conversation as it identified drawings in real-time, which Google touted as a major improvement in capabilities and accuracy. It has since been disclosed that: (a) the video was faked (it was not in real-time and did not involve actual spoken prompts) and (b) user experience with Gemini-enabled Bard still results in many false answers or, in some instances with the response "just Google it."[143]

226.    Commentators have noted that, despite its many faults, Google was currently winning the chatbot battle. One article from August of 2023 stated:

> Software titan Microsoft thought it had found a "Google killer" in its tight partnership with OpenAI and ChatGPT artificial intelligence (AI) system. Six months later, market reports show that the AI-boosted version of the Bing search engine still plays second fiddle to Alphabet's Google—and the gap isn't shrinking.
>
> That's the big takeaway from a *Wall Street Journal* report this week. Beyond just looking at the data, the paper interviewed several search market experts. One of them, former Google and LinkedIn employee Daniel Tunkelang, called the revamped Bing effort "cute, but not a game-changer."

---

[142] David F. Carr, *As ChatGPT Growth Flattened in May, Google Bard Rose 187%*, Similar Web Blog, Updated Apr. 1, 2024, https://www.similarweb.com/blog/insights/ai-news/chatgpt-bard/ ("Carr Article").

[143] Emilia David, *Google just launched a new AI and has already admitted at least one demo wasn't real*, The Verge, Dec. 7, 2023, https://www.theverge.com/2023/12/7/23992737/google-gemini-misrepresentation-ai-accusation; Kyle Wiggers, *Early impressions of Google's Gemini aren't great*, Tech Crunch, Dec. 7, 2023, https://techcrunch.com/2023/12/07/early-impressions-of-googles-gemini-arent-great/.

> Tunkelang's quip is an effective summary of the situation. Baking ChatGPT into the bing experience didn't add much real-world value to the search tool, and market data shows that Bing also didn't add many new users this way.
>
> The turn of events highlights Google's resolute hold on the online search market.[144]

227.   While Bing's market share increased modestly for a couple of months, that increase ultimately dissipated and declined relative to previous years. Google's dominance, which Bard exacerbated, ensured that the better search engine did not prevail.

>   **b.   SGE.**

228.   Google introduced SGE in May of 2023.[145]   SGE is the culmination of Google's strategy to create a walled garden that attracts, traps, and monetizes users by publishing answers to their queries, without needing to leave Google's platform. As explained in Google's patent, SGE uses LLMs to generate natural-language summaries to answer users' queries.[146] Instead of linking users to websites, Google scrapes information from websites, uses a Transformer model to reword (or literally copy) it, and then uses a GAI program that publishes an "answer" on top of the search results, pushing down any links to the original sources on the SERP. SGE offers a conversational mode, suggesting follow up questions, and enabling the user to "chat" with SGE to ask further questions.

---

[144] Anders Bylund, *ChatGPT-Infused Bing Is "Cute" but Hasn't Become the "Google Killer" Some Were Calling for*, The Motley Fool, Aug. 18, 2023, https://www.fool.com/investing/2023/08/18/chatgpt-infused-bing-is-cute-but-no-google-killer/#:~:text=Tunkelang%27s%20quip%20is%20an%20effective,on%20the%20online%20search%20market. (References and emphases omitted).

[145] *We're making Search smarter and simpler with generative AI*, Google Search, https://labs.google/sge/ (last visited Apr. 30, 2024).

[146] Google Inc., U.S. Patent No. 11,769,017 B1, (Sept. 26, 2023), https://ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11769017.

229.    Google markets this new approach as follows:

> With new generative AI capabilities in Search, we're now taking more of the work out of searching, so you'll be able to understand a topic faster, uncover new viewpoints and insights, and get things done more easily.
>
> Let's take a question like "what's better for a family with kids under 3 and a dog, bryce canyon or arches." Normally, you might break this one question down into smaller ones, sort through the vast information available, and start to piece things together yourself. With GAI, Search can do some of that heavy lifting for you.
>
> You'll see an AI-powered snapshot of key information to consider, with links to dig deeper.
>
> Below this snapshot, you'll see suggested next steps, including the ability to ask follow-up questions, like "How long to spend at Bryce Canyon with kids?" When you tap on these, it takes you to a new conversational mode, where you can ask Google more about the topic you're exploring. [147]



---

[147] Elizabeth Reid, *Supercharging Search with generative AI*, Google The Keyword, May 10, 2023, https://blog.google/products/search/generative-ai-search/.

230.   Google further explains this new approach as follows, using the Bryce Canyon example:

> Context will be carried over from question to question, to help you more naturally continue your exploration. You'll also find helpful jumping-off points to web content and a range of perspectives that you can dig into.
>
> ****
>
> With GAI in Search, we can help you understand the full picture when you're shopping, making even the most considered and complex purchase decisions faster and much easier.
>
> When searching for a product, you'll get a snapshot of noteworthy factors to consider and products that fit the bill. You'll also get product descriptions that include relevant, up-to-date reviews, ratings, prices and product images. That's because this new GAI shopping experience is built on Googles Shopping Graph which has more than 35 billion product listings — making it the world's most comprehensive dataset of constantly-changing products, sellers, brands, reviews and inventory out there. In fact, every hour, more than 1.8 billion listings are refreshed in our Shopping Graph to give people fresh, reliable results.[148]

231.   In August of 2023, OpenAI introduced a product known as GPTBot. This is OpenAI's own version of a web-crawler that can be used to mine data for training future versions of ChatGTP. Unlike prior web-crawlers, this new program allows one to opt out of having one's data searched. Failure to opt-out results in one's data being automatically swept into the data training set. In one article, a search engine optimization consultant remarked that "[f]inally, after soaking up all your copyrighted content to build their proprietary product, OpenAI gives you a way to prevent your content from being used to further improve their product."[149]

---

[148] *Id.*

[149] Alastair Barr, *OpenAI just admitted it has a bot that crawls the web to collect AI training data. If you don't block GPTbot, it's self-sabotage*, Business Insider, Aug. 8, 2023, https://www.businessinsider.com/openai-gptbot-web-crawler-content-creators-ai-bots-2023-8.

232.   Given OpenAI's approach, Google would have been expected to respond by implementing rapidly a similar opt-out feature for Bard. It made a token step in that direction, but its effort was disingenuous. As noted above, in late September of 2023, Google introduced "Google Extended," a stopgap opt-out code modification, but "said that when it comes to training AI models, the opt-outs will apply to the next generation of models for Bard…."[150] Google Extended *does not work* to block SGE from copying Publishers' content.

233.   Bard itself has acknowledged that Google's GAI tactics as anticompetitive. It was interviewed in November of 2023 and had this to say:

> Furthermore, Bard explained, third-party websites that want to control their own data and opt to shield Bard from scraping their content would face consequences. *"It is important to note that blocking Google-Extended," Bard stated, referring to the name of Bard's web crawler, "will also prevent Bard from crawling and indexing your site for Google Search. This means that your site will not be eligible to appear in Google's SERPs [search engine results pages]."*
>
> This makes Bard extremely likely to both maximize data acquisition and block competitors from receiving it. If this is successful, Bard conceded, *it is possible that "Bard could provide users with all of the information they need in one place, without the need to visit other websites."* Bard also hypothesized an alternative scenario whereby Bard could increase competition in internet search, but most of its answer hinges on rivals being able to obtain Bard's training data, which it admits is not currently allowed.
>
> *Bard lays out other damaging impacts that GAI could have on third-party websites that rely on Google. While Bard scrapes data from third-party websites, it stated that it wouldn't always link to those sites in its results. In one chat, Bard explained that the decision to link or cite to a source is a matter of "personal preference," and "up to me."*
>
> *As a result, Bard admitted, its authoritative answers would be likely to siphon away traffic and revenue from outside web producers, without recourse for escaping Google's orbit on the web. "It is possible that fewer*

---

[150] Cherlyn Low, *Google will let publishers hide their content from its insatiable AI*, Engadget, Sep. 28, 2023, https://www.engadget.com/google-will-let-publishers-hide-their-content-from-its-insatiable-ai-202015557.html.

> *people will leave Google to visit other sites once Bard is integrated into general search results. This could lead to a decrease in traffic to those sites and make it harder for them to create sustainable business models," Bard stated.*
>
> *Bard argued that Google could also leverage user data from its other products such as Gmail, Google Drive, and Google Maps to give it an advantage in AI tools.* Those claims have already been confirmed by <u>reporting</u> from *The New York Times* on Google's recent authorization for Bard to draw upon these separate lines of business.[151]

234. Publishers have identified grave concerns about the use of chatbots in both Bard and ChatGPT. Executives at the *Guardian*, *Financial Times* and *LeMonde* all agreed that they must be paid for their news content. Louis Dreyfus, the CEO of *Le Monde* said, "it could spell 'the end for our business model.'"[152] "The news bosses all expressed fears over the use of the publications' content in training AI large language models like ChatGPT without any license or payment model in place--let alone credit. Some, including Telegraph Media Group chief executive Nick Hugh, also warned about the risk to trust from GAI content."[153]

235. Robert Thomson, former managing editor of the *Wall Street Journal* and CEO of News Corporation, in his opening address at the 2023 International News Media Association's Annual World Congress of News Media, observed that:

> Our content is being harvested and scraped and otherwise ingested to train AI engines…. Our content will be synthesized and presented as distinct when it is actually an extracting of editorial essence. These are super snippets, containing all the effort and insight of great journalism

---

[151] David Dayen & Like Goldstein, *A Star Witness Against Google: Google's AI Chatbot*, The American Prospect, Nov. 14, 2023, <u>https://prospect.org/power/2023-11-14-google-ai-chatbot-bard/</u>.

[152] Bron Maher, *News execs fear 'end of our business model' from AI unless publishers 'get control' of their IP*, Press Gazette, May 24, 2023, <u>https://pressgazette.co.uk/media_business/ai-risk-opportunity-publishers-copyright-ip-deloitte-conference/</u>.

[153] *Id.*

but designed so the reader will never visit a journalism website, thus fatally undermining that journalism.[154]

236.   Publishers have no economically viable or practical way to stop SGE from plagiarizing their content and siphoning away search traffic and ad revenue. SGE uses the same web crawler as Google's general search service: GoogleBot. This means the only way to block SGE from plagiarizing content is to block GoogleBot completely—and disappear from Google Search as a result.[155] By using the same crawler for these two distinct services, Google ties these services in an inextricable knot. Publishers therefore face a Hobson's choice: surrender their content or commit commercial suicide. In short, Publishers who use Google's search referral services will see a steep decline in the quality of Google's service, while the price Google extorts is unsustainably high—compulsory free syndication of their content. Consumers will bear the long-term effects if Publishers cannot sustain the costs of producing high-quality, trustworthy news and reference content.

237.   This new form of controlling search results is an extension and reinforcement of Google's anticompetitive practices. As one article notes:

> Rutledge Daugette, CEO of TechRaptor, a site focusing on gaming news and reviews, said Google's move was made without considering the interests of publishers and Google's AI amounts to lifting content.
>
> "Their focus is on zero-click searches that use information from publishers and writers who spend time and effort creating quality content, without offering any benefit other than the potential of a click," Daugette told

---

[154] Joe Pompeo, *"Don't Get Screwed Again": News Publishers Are Banding Together in the Face of AI Threat*, Vanity Fair, June 20, 2023, https://www.vanityfair.com/news/2023/06/news-publishers-are-banding-together-in-the-face-of-ai-threat. (Emphases added).

[155] Barry Schwartz, *Google-Extended does not stop Google Search Generative Experience from using your site's content*, Search Engine Land, Oct. 9, 2023, https://searchengineland.com/google-extended-does-not-stop-google-search-generative-experience-from-using-your-sites-content-433058.

CNBC. "Thus far, AI has been quick to reuse others' information with zero benefit to them, and in cases like Google, Bard doesn't even offer attribution as to where the information it's using came from."

Luther Lowe, a longtime Google critic and chief of public policy at Yelp, said Google's update is part of a decades-long strategy to keep users on the site for longer, instead of sending them to the sites that originally hosted the information.

"The exclusionary self-preferencing of Google's ChatGPT clone into search is the final chapter of bloodletting the web," Lowe told CNBC. [156]

238.    Another article expanded upon how SGE impacts Publishers:

Since May, Google has begun releasing a new form of search in the United States, India, and Japan powered by GAI. The product is called Search Generative Experience, or SGE. SGE uses AI to create summaries for some search questions. Google says those summaries appear on the top of the Google search homepage, with links to "dig deeper."

*If publishers want to prevent their content from being used by Google's AI to create those summaries, they must use the same tool that would prevent them from appearing in Google search results. That would make it difficult for people using search to find the publishers that choose not to be involved in SGE.*

*Google says that the AI-generated summaries are put together from many web pages and that the links are designed to be a starting point to learn more. The company describes SGE as an opt-in experiment for users, who will help develop and improve the product.*

To publishers, however, the new search tool is the latest concern in an unusual relationship. Publishers both compete against Google for online ad and depend on the company for search traffic.

Four major publishers spoke to Reuters news agency recently. The businesses said they are trying to understand their place in a world where AI could control how users find and pay for information. The publishers asked not to be identified because of ongoing negotiations with Google. *Publisher concerns relate to a number of issues. They include the issue of web traffic; whether publishers will be credited as the providers of*

---

[156] Kif Leswing, *Google's new A.I. search could hurt traffic to websites, publishers worry*, CNBC, May 11, 2023, https://www.cnbc.com/2023/05/11/google-ai-search-could-squeeze-web-traffic-publishers-worry.html. (Emphases added).

*information that appears in the SGE summaries; and whether those summaries are correct. Most importantly, publishers want to be paid for the content on which Google and other AI companies train their AI tools.*

****

*The new [previously mentioned stopgap opt-out] tool does not permit publishers to block their content from being used for SGE without disappearing from traditional Google search.*

*Publishers want evidence that people are using their websites to secure advertisers. Showing up in Google search is important to their business. The design for SGE has pushed the links that appear in traditional search further down the webpage. That might reduce traffic to those links by as much as 40 percent, said an official at one of the publishers.*

*More worrying is the possibility that people searching the web will avoid clicking any of the links if the SGE passage meets the users' need for information.*

*Nikhil Lai is an expert with Forrester Research, a company based in Cambridge, Massachusetts. He said SGE is "definitely going to decrease publishers'...traffic and they're going to have to think about a different way to measure the value of that content, if not click through rate."* [157]

239.    This was nothing new. In a July 2023 PowerPoint called "Generative Information Retrieval," Marc Najork, Distinguished Research Scientist at Google DeepMind, wrote a presentation entitled the "Effects of GAI on web and search ecosystems." He put it bluntly: "Direct answers reduce search referral traffic." This reduction in search traffic is "[m]ostly affecting informational queries"—meaning consumers of news content. His "pessimistic view" of GAI was that "[d]irect answers [to users' questions] reduce referrals to content providers hurting their ability to monetize."[158]

---

[157] John Russell, *Publishers Worry Over Google's New AI Search Tool*, VOA, Oct. 24, 2023, https://learningenglish.voanews.com/a/publishers-worry-over-google-s-new-ai-search-tool-/7322496.html. (Emphases added).

[158]  Marc Najork, *Generative Information Retrieval*, ACM Digital Library, July 24, 2023, https://dl.acm.org/doi/abs/10.1145/3539618.3591871.

c.      **Google Uses Bard/Gemini and SGE to Misappropriate News Content.**

240.    Since at least 2017, and on a continuing basis to this date, Google has misappropriated Plaintiffs' and Class Members' news content and used it to train AI products as part of an anticompetitive strategy to maintain Google's monopoly in search and expand its dominant position in the online news market.

241.    Bard/Gemini and SGE are news plagiarism platforms. They are only able to generate text in a journalistic style and with facts on current events because they reproduce and repackage news from other Publishers, without licensing fees and without supplying adequate traffic referrals.

242.    In March of 2024, the French Competition Authority determined that Google had engaged in anticompetitive conduct through its development and operation of Bard/Gemini and SGE.

243.    In 2023, Plaintiffs discovered that Google had copied and used their content to train Bard/Gemini and SGE. An April 2023 investigation by the *Washington Post* revealed that Google had trained its LLM foundation models on millions of unlicensed copies of news content from Plaintiffs and other Publishers. The investigation focused on just one of Google's numerous training datasets: "Google's C4 data set, a massive snapshot of the contents of 15 million websites that have been used to instruct some high-profile English-language AIs, called large language models, including Google's T5 and Facebook's LLaMA."[159]

---

[159] Kevin Schaul, Szu Yu Chen, & Nitasha Tiku, *Inside the secret list of websites that make AI like ChatGPT sound smart*, Washington Post, Apr. 19, 2023, https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.

244.   A follow-up 2023 report from the NMA found the following:

• In fact, our analysis of a representative sample of news, magazine, and digital media publications shows that the popular curated datasets underlying some of the most widely used LLMs significantly overweight publisher content by a factor ranging from over 5 to almost 100 as compared to the generic collection of content that the well-known entity Common Crawl has scraped from the web.

• Other studies show that news and digital media ranks third among all categories of sources in Google's C4 training set, which was used to develop Google's GAI-powered search capabilities and products like Bard. Half of the top ten sites represented in the training set are news outlets.

• The LLMs also copy and use publisher content in generating outputs. The LLMs can reproduce the content on which they were trained, demonstrating that the models retain and can memorize the expressive content of the training works.[160]

245.   An April 2023 *Washington Post* report reveals that Google copied copious amounts of work product from the Plaintiffs for AI training, without informing or compensating Plaintiffs and without giving them a means to block Google from plagiarizing their content.

246.   Google's LLMs were trained on 650,000 "tokens" of text extracted from the *The Helena World* (helena-arkansas.com) in the C4 dataset. This is just one of the numerous datasets used by Google and it is highly likely that even more Helena content has been reproduced in Google's LLM models.[161]

---

[160] News Media Alliance, *White Paper: How the pervasive copying of expressive works to train and fuel generative artificial intelligence systems is copyright infringement and not a fair use*, Oct. 20, 2023, at 1-2, https://www.newsmediaalliance.org/wp-content/uploads/2023/10/AI-White-Paper-with-Technical-Analysis.pdf) ("NMA White Paper").

[161] "In tokenization, AI algorithms, models, or datasets are represented as tradable tokens on a blockchain. As a result, developers may easily share, sell, or license their AI inventions to others within a decentralized ecosystem by tokenizing them. Applications for tokenized AI models



247.   More than 1 million tokens were extracted from Emmerich's websites for the C4 dataset. Some of Plaintiffs' websites rank within the top 1% of websites with the greatest amount of content copied in the C4 dataset and used as input training data for Bard: Helena was in the top 0.15th percentile while Emmerich's *NorthSide Sun,* to use one example, was in the top 0.74th percentile.

**The websites in Google's C4 dataset**

Search for a website
northsidesun.com

1 domain begins with "northsidesun.com"

| RANK | DOMAIN | TOKENS | PERCENT OF ALL TOKENS |
|---|---|---|---|
| 111,607 | northsidesun.com | 180k | 0.0001% |

248.   *The Greenwood Commonwealth*, another Emmerich Newspaper, was in the top 1.05th percentile of websites copied into the C4 dataset. Another Emmerich publication, *The Pine Belt News*, the website of which is called hubcityspokes.com was in the top 1.19th percentile.

---

include data analysis, picture recognition, natural language processing, and more." Alisha Bains, *What Are AI Tokens? A Comprehensive Guide*, CCN, Aug. 29, 2023, https://www.ccn.com/education/what-are-ai-tokens-a-comprehensive-guide/.



249.   In addition, since at least of May 2023, Google has misappropriated news content and reporting from Plaintiffs and the Class to "ground" SGE with timely information and produce derivative news articles.

250.   The following screenshot illustrates one example of SGE republishing *Helena World* content as substitute news products.



251.   Here, SGE gives the reader an overview of the "news of the day" without ever having to click on any given story. Ironically, SGE regurgitates a description of *Helena World*, revealing its plagiarized source. Then, SGE's suggested follow-up questions divert the user into Google's ecosystem, rather than direct them to the *Helena World* website. Out of three thumbnail links for video content, one is for Google's own platform, YouTube.

252.   The following screenshots illustrate how SGE free rides on news reporting and content from Emmerich Newspaper's *The Greenwood Commonwealth*. By answering follow-up questions, SGE funnels potential Emmerich consumers deeper into Google's SERP, further disincentivizing them from clicking-through. On March 27, 2024, a search for "latest news in Greenwood Mississippi" returns the lead paragraph from a *Greenwood Commonwealth* article on local politician Eric Mitchell's legal appeal.



253.   SGE then prompts users to ask follow-up questions. The question "In which court did Eric Mitchell file his appeal?" returns more news on current events extracted from Plaintiff's website—obviating any need to visit Plaintiff's website and thwarting Plaintiffs' ability to monetize its newsgathering.



254.    All of this web scraping helped Google enormously in developing search algorithms, the complex mechanisms that retrieve information responsive to an end-user's search inquiry. In creating such algorithms, Bard and SGE are then able to rely on the data obtained from such scraping, the indexing of that data, and the ranking of that data responsive to an inquiry.[162] LLMs are used to decipher the content of the data and the end-user's search request. The LLM is responsible for ensuring that: (a) the search retrieves germane data, meaning that the quality of the website is deemed responsive; (b) the usability of that website; and (c) the context of search history related to the website.[163]

255.    Thus, the data scraped from various sources is critical to Google's search and GAI capabilities. News is uniquely valuable to AI training and grounding because it provides both high-quality writing that the GAI systems can reproduce or mimic and timely information on current events that GAI systems could not otherwise obtain. But Publishers who unwittingly provide their newsgathering and content never receive any share of the revenue Google derives from their labor and investments.

256.   Despite public concerns about Google free riding on others' content, Google confirmed that it fully intended to continue scraping the websites of entities it indexed, such as Plaintiffs. In an update to its privacy policy reported in July of 2023:

---

[162] Ben Lutkevich, *Google algorithms explained: Everything you need to know*, Tech Target, Apr. 20, 2023,  https://www.techtarget.com/whatis/feature/Google-algorithms-explained-Everything-you-need-to-know#:~:text=What%20are%20Google%20search%20algorithms,keywords%20that%20match%20the%20query.

[163] *Id.*

"Our privacy policy has long been transparent that Google uses publicly available information from the open web to train language models for services like Google Translate," said Google spokesperson Christa Muldoon…. "This latest update simply clarifies that newer services like Bard are also included. We incorporate privacy principles and safeguards into the development of our AI technologies, in line with our AI Principles."

\*\*\*\*

Following the update on July 1st, 2023, Google's privacy policy now says that "Google uses information to improve our services and to develop new products, features, and technologies that benefit our users and the public" and that the company may "use publicly available information to help train Google's AI models and build products and features like Google Translate, Bard, and Cloud AI capabilities." [164]

Digital markets can present competition concerns. Markets characterized by network effects, economies of scale, digital ecosystems, and accumulations of large amounts of data can be prone to increasing or creating barriers to entry, tipping, and dominance. We need to be vigilant and attentive to concerns regarding effective functioning of digital markets given the risk of lack of competition, limited consumer choice, and reduction in innovation due to limited contestability of markets as well as anticompetitive and unfair conduct.

G7 competition authorities and policymakers have begun to tackle the myriad competition concerns in the digital economy by taking action to combat anticompetitive conduct and mergers in digital markets and updating, reviewing or looking to strengthen laws and rules related to the digital economy. Some jurisdictions have adopted new ex-ante regulations complementing existing competition law to mitigate certain anticompetitive and unfair practices of digital firms. G7 competition authorities and policymakers are committed to applying competition law and regulatory tools to digital markets to address concerns such as exclusionary or exploitative practices of digital firms, barriers that entrench and maintain incumbents, as well as killer acquisitions, among others.

The speed at which competition harm can occur in these markets means actions and enforcement must occur within a meaningful timeframe to prevent digital firms from becoming entrenched. Learning from interventions and honing approaches to remedies will help to promote

---

[164] Jesse Weatherbed, *Google confirms it's training Bard on scraped web data, too*, The Verge, July 5, 2023, https://www.theverge.com/2023/7/5/23784257/google-ai-bard-privacy-policy-train-web-scraping.

> greater competition and discourage future anticompetitive conduct. We will
> continue to take action by enforcing competition laws, improving the
> existing regulatory toolboxes, and developing new regulatory frameworks,
> to the extent necessary.[165]

257.   The French Competition Authority addressed Google's use of Bard and SGE and has recently fined it for anticompetitive conduct.

258.   In 2019, the French government enacted a law that gave Publishers protection against the misuse of their protected content by digital platforms like Google. In 2020, when it appeared the parties were at an impasse, the French Competition Authority issued an injunction against Google in the anticipation that the Publishers and Google would negotiate a mutually satisfactory agreement. When Google exhibited bad faith tactics during the course of the negotiations, the French Competition Authority fined Google 500 million Euros in July of 2021. This background is set forth in a statement by the French Competition Authority.

259.   The French Competition Authority found "that Google's practices on the occasion of the entry into force of the related rights law were likely to constitute an abuse of a dominant position and caused serious and immediate harm to the press sector." (Emphases added.)[166] The negotiations culminated in 2022 with Google settling with over 300 national, local, and specialist news publications in various European countries.

_____

[165] G7 Competition Authorities and Policymakers' Summit Digital Competition Communiqué, Hiroshima Summit, Nov. 8, 2023, at 1-2, https://www.bundeskartellamt.de/SharedDocs/Publikation/EN/Others/G7_2023_Communique.pdf?__blob=publicationFile&v=2. (Emphases added).

[166] *Related rights: the Autorite has granted requests for urgent interim measures presented by press publishers and the news agency (Agence France Presse),* Autorite de la concurrence, Apr. 9, 2020, https://www.autoritedelaconcurrence.fr/en/communiques-de-presse/related-rights-autorite-has-granted-requests-urgent-interim-measures#:~:text=The%20Autorité%20found%20that%20Google%27s,harm%20to%20the%20press%20sector.

260.    On March 15, 2024, the French Competition Authority fined Google 250 million euros for failing to comply with commitments it made previously in 2022.[167] This was the first time any European competition authority had addressed Google's conduct with respect to Bard.

261.    The French Competition Authority made various key findings, based in part on Google's responses to written interrogatories.

262.    It found that until at least February of 2023, Google used scraped Publisher content in two stages in the development and operation of Bard (now Gemini).[168]

263.    It noted that Google admitted that "certain datasets for training PaLM included content originating in websites of publishers and press agencies.[169]

264.    It further noted that Google admitted that each time a user poses a question to Bard, the system carries out "grounding" – in which Bard "sends a request to Google Search in order to obtain information useful for responding to the user's question."[170]

265.    The French Competition Authority determined that Google did not inform Publishers that it was appropriating their products, much less compensate them. [171]

---

[167] *Related rights: the Autorite fines Google € 250 million for non-compliance with some of its commitments made in June 2022*, Autorite de la concurrence, Apr. 9, 2020, https://www.autoritedelaconcurrence.fr/en/press-release/related-rights-autorite-fines-google-eu250-million-non-compliance-some-its#:~:text=Furthermore%2C%20Google%20did%20not%20propose,content%20on%20other%20Google%20services.

[168] French Competition Authority, Décision n° 24-D-03 du 15 mars 2024 relative au respect des engagements figurant dans la décision de l'Autorité de la concurrence n° 22-D-13 du 21 juin 2022 relative à des pratiques mises en œuvre par Google dans le secteur de la presse, ¶264, https://www.autoritedelaconcurrence.fr/sites/default/files/integral_texts/2024-03/24d03vf.pdf.

[169] *Id*. ¶ 166.

[170] *Id*.

[171] *Id*.

266.   The French Competition Authority also noted that Google admitted that prior to September 28, 2023, "before the launch of Google Extended, it did not provide any practical means permitting a publisher or news agency to refuse that its content be used in a search for text or data by" Bard.[172]

267.   On that same day, the French Competition Authority noted that Google launched Google Extended, a token that websites can embed in their code to purportedly instruct Google they are opting-out of having their content be used to train or ground Bard.[173]

268.   Nevertheless, the French Competition Authority observed that Bard continued to use information extracted from news websites, even though those websites had activated Google Extend in order to block scraping for Bart.[174]

269.   The French Competition Authority also found that Google admitted that "websites that contributed to the training of Bard cannot be deleted from the corresponding foundation models (notably PaLM 2)."[175]

_____

[172] *Id*. ¶171.

[173] *Id*. ¶173.

[174] *Id*. ¶176.

[175] *Id*. ¶ 175. Bard was initially based on the LaMDA Large Language Model ("LLM"), which had been trained on a dataset consisting of: (a) 12.5% code documents from sites relating to programming, such as Q&A sites, tutorials, etc.; (b) 12.5% Wikipedia (in English); (c) 6.25% English web documents; (d) 6.25% non-English web documents; and (e) 50% "dialogs data from public forums." Roger Montti, *Google Bard AI—What Sites Were Used To Train It?*, Search Engine Journal, Feb. 10, 2023, https://www.searchenginejournal.com/google-bard-training-data/478941/#close. By the time Bard was introduced, it was based on PaLM2, Google's latest foundation model, which has multilinguistic capabilities. Google is evasive about the sources of training for PaLM2, merely noting that "the system's training corpus is comprised of 'a diverse set of sources: web documents, books, code, mathematics, and conversational data,' without offering further detail." James Vincent, *Google announces PaLM 2 AI language model, already powering 25 Google services*, The Verge, May. 10, 2023, https://www.theverge.com/2023/5/10/23718046/google-ai-palm-2-language-model-bard-io.

270.    Specifically, the French Competition Authority found that Google had breached its transparency obligations by failing to disclose to Publishers, or to the authority, that publisher content was used by Google to develop and operate Bard/Gemini.

271.    The French Competition Authority further found that Google had violated its obligation to avoid self-preferencing because "Google had tied—at least until September 23, 2023—negotiations" with French publishers over remunerating them for "using their protected content in Google Search, Discover, and Google News" to "the use of publisher and news agency content for the needs of another service, Bard."[176] The French Competition Authority explained that if publishers blocked Google's web crawler—the only way to opt-out of being used for Bard prior to Google Extended—they would have removed themselves from Google Search, and nullified their ability to seek remuneration for their provision of news-inputs for search.[177]

272.    The French Competition Authority also addressed how Google compensates Publishers in France for use of their content. It said that "the [flat] rate set by Google at [redacted] percentage of the 'direct' revenues generated by Protected Content on Google Search, Google News and Discover tends to limit the revenues resulting from the additional attractiveness of Protected Content to a marginal share of the total revenues taken into account by Google in determining the amount of its financial proposals."[178]

273.    Finally, the French Competition Authority held that Google's "violation was all the more severe because the size of Google's dominant position in the market for general search

---

[176] *Id.* ¶ 288.

[177] *Id.* ¶ 287

[178] *Id.* ¶ 247.

services presented extraordinary circumstances and the use of Protected [publisher] content in its search engine bears manifest significance."[179]

274.   The French Competition Authority imposed an additional fine of 250 euros on Google because the scale of its misconduct was all the "more significant" given "Google's dominant position on the generalist search services market."

**d.    Google Changed AdSense Practices to Further Injure Publishers.**

275.   On November 2, 2023, Google leveraged its monopoly power in search engines to lower compensation to Publishers for digital ads. In furtherance of its tying conduct, Google changed the way it has charged Publishers for its AdSense ad service for the last 20 years, which certain Emmerich Newspapers entities have used. As noted above, AdSense is one of the world's most popular digital ad networks, enabling Publishers to sell display space to advertisers on their websites.

276.   Historically, Google charged for its AdSense service by using a unitary revenue-sharing structure with Publishers and basing payment per clicks on ads. That changed in 2023.[180]

277.   *First*, the method of payment was changed from pay-per-clicks to one based on pay-per-impression, *i.e.*, how often viewers saw an ad on a publisher's site. As one critic has pointed out, "[p]reviously, AdSense paid publishers primarily based on clicks, with payments triggered each time a user clicked an ad on their site. Google is moving to paying on a cost-per-mile (CPM) basis. While Google claims this aligns with industry standards, it hides a key impact--pay-per-

---

[179] *Id*. ¶ 326.

[180] Dan Taylor, *Updates to how publishers monetize AdSense*, Google AdSense, Nov. 2, 2023, https://blog.google/products/adsense/evolving-how-publishers-monetize-with-adsense/.

click has generally resulted in higher earnings for publishers."[181] This change has to be evaluated in conjunction with the introduction of SGE.

278.   *Second*, the other change involved charging the Publisher separately for buy-side and sell-side ad fees rather than some predetermined share of revenue. Under the new system, the buy-side fees to Google are an *average* of 15% (many will be higher) and the sell-side fees to Google will be another 5%. As the same commentator noted:

> By separating buy-side and sell-side fees, Google is now able to directly take 15% off the top of all ad spends on their platform. Previously they shared one 32% fee with publishers. This allows an additional estimated 3.2% of revenue, or billions per year, to flow directly to Google versus under the old setup.

****

> By implementing publisher-unfavorable terms at a time when AdSense dominates the market, Google demonstrates their power to dictate terms. Publishers are now more reliant as alternative networks cannot match Google's scale. This increased leverage allows Google to more aggressively optimize rates in their favor down the road. So in reality, Google stands to gain billions each year in increased profits through these "updates", which primarily serve to decrease publisher revenues and increase Google's control over the relationship.[182]

279.   Google framed this reversal of a twenty-year policy as 'just keeping up with the times.' But it offered no explanation on the timing of this change. The change came soon after the introduction of SGE and operated in tandem with that product to disadvantage Publishers and potentially drive many out of business.

---

[181] *See* Appendix B, Sarang Kumar, *How Google's New Upcoming Update to AdSense Hurt Publishers and Benefit Google*, LinkedIn (Nov. 2, 2023).

[182] *Id.*

280.   AdSense has operated profitably for over 15 years on the old model. The changing variable is the Google Search ecosystem—the driver of traffic to Publishers' websites. As GAI search reduces search traffic to websites, Google will experience a marginal loss of revenue from AdSense. Less traffic to Publishers' websites means a smaller take for Google under its revenue-sharing agreement, as fewer users will land on Publishers' webpages to click on the ads that are placed there. Google's new AdSense policy will allow Google to mitigate that loss by earning more per ad dollar. Yet again, Publishers have no choice but to accept these revised terms.

281.   Thus, Google is exploiting its search engine monopoly to unfairly reduce AdSense payments to Publishers at the same time that SGE causes less traffic to be directed to their websites. Combining SGE and the new AdSense policy, Google's new regime protects its own bottom line from the zero-click ecosystem, while stripping further value from Publishers' websites.

### 2.   Google Violated YouTube's Own Terms of Service to Harvest Publisher Content.

282.   On April 6, 2024, a *New York Times* investigation revealed that Google had ignored its own Terms of Service to harvest GAI training data from video content posted by YouTube users including Publishers. According to insiders, "Google transcribed YouTube videos to harvest text for its A.I. models."[183] Google used DeepMind, the aforementioned AI lab it acquired in 2014, to ascertain the scale of data it would need to harvest to gain an advantage over competitors Microsoft and OpenAI. Leveraging Google's access to immense amounts of news and other content, its most advanced LLM Palm2 was trained on 3.6 trillion "tokens" (pieces of text), far

---

[183] Cade Metz, *et al.*, *How Tech Giants Cut Corners to Harvest Data for A.I.*, N.Y. Times, Apr. 6, 2024, https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

eclipsing the 300 billion used by OpenAI for GPT-3. To keep up, OpenAI harvested and transcribed videos from YouTube.

283.   After OpenAI's harvesting was made public, YouTube CEO Neal Mohan condemned the practice as a clear violation of YouTube's Terms of Service: "[W]hen a creator uploads their hard work to our platform, they have certain expectations. One of those expectations is that the terms of service is going to be abided by. It does not allow for things like transcripts or video bits to be downloaded, and that is a clear violation of our terms of service. Those are the rules of the road in terms of content on our platform."[184]

284.   But those consumer expectations did not stop Google from harvesting YouTube content in violation of its own Terms of Service, which only permit Google to use uploaded content "in connection with the Service and YouTube's . . . business."[185] YouTube's service does not include GAI chatbots embedded in Google Search, such as SGE, or other products, such as Gmail, with no connection to YouTube's video platform.[186]

### 3.   Google And Apple Are Negotiating to Potentially Use Google's GAI on Apple Devices.

285.   Google's predominance in GAI may soon increase even more. In March of 2024, it was revealed that Apple is in "active negotiations" with Google to "license some of Gemini's features to power certain AI features in the new versions of Apple's iPhone and iPad software later

---

[184] Ali Rees, *YouTube CEO warns OpenAI training models on its videos is against the rules*, Read Write, Apr. 5, 2024, https://www.msn.com/en-us/news/technology/youtube-ceo-warns-openai-training-models-on-its-videos-is-against-the-rules/ar-BB1l8PPJ.

[185] *Terms of Service*, YouTube, https://www.youtube.com/static?template=terms (last visited Apr. 30, 2024).

[186] Google describes its YouTube "service" as "the YouTube platform and the products, services and features we make available to you as part of the platform." *Id*.

this year." [187] Gemini is already the default GAI program on Samsung and Google mobile devices. No final deal has been announced with respect to this potential new partnership, but if it happens, Microsoft will be removed as a competitor for much of the smartphone and tablet markets. As the *New York Times* noted: "Virtually overnight, Google could have more consumers using its A.I. than its chief rival, OpenAI, which makes ChatGPT — making a pact with Apple a tantalizing prospect."[188]

### D. GOOGLE SPOLIATES EVIDENCE AND TRIES TO OBTRUCT ANTITRUST REGULATORS.

286.  Google intentionally furthered its unlawful monopolization maintenance, attempted monopolization, and abuse of dominance, by obstructing antitrust regulators through a scheme to spoliate evidence and make false assertions of attorney-client privilege, which it called "fake privilege."

287.  In September of 2008, Google issued an e-mail that advised employees to be careful about what they wrote, given ongoing legal and "regulatory" scrutiny and to "avoid stating legal conclusions"; in that same e-mail, it took the extraordinary step of taking "off the record" the Google corporate default setting for Google Talk, the company's internal chat system.[189] Prior to September 16, 2008, the default setting for chats was "history on" and preservation for longer than

---

[187] Kit Eaton, *Apple Is Poised to Go All In on AI, Including a Partnership With Google*, INC., Mar. 18, 2024, https://www.inc.com/kit-eaton/apple-poised-to-go-all-in-on-ai-including-partnership-with-google.html.

[188] Tripp Mickle, Nico Grant, & Brian Chen, *Apple and Google Are Discussing a Deal to Bring Generative A.I. to iPhones*, N.Y. Times, Mar. 21, 2024, https://www.nytimes.com/2024/03/19/technology/apple-google-ai-iphone.html.

[189] DOJ Trial Ex. UPX1101, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-10/417474.pdf (last visited Apr. 30, 2024).

24 hours; after that date, the default was "history off" and deletion after 24 hours, a policy that Google maintained until February of 2023.[190] Pichai testified in the DC DOJ case that the "executive management group:" decided on this policy even though the deleted chats "may have otherwise been collected and produced in litigation discovery and in regulatory matters."[191] As a result, Google employees who were subject to legal hold orders in the DC DOJ case used "history off" chats to discuss matters related to that litigation.[192]

288.    Google also had a policy since at least 2003 to train its employees not to utilize terms or phrases that might subject to antitrust scrutiny. In that year, he wrote a memorandum saying: "we also have to be sensitive about antitrust considerations. Look at it this way: we are currently a dominant player in an industry, and we are trying to discourage entry by a potential competitor. . .. We should be careful about what we say in both public and private. 'Cutting off the air supply,' and similar phrases should be avoided."[193]

289.    Examples of these included:

- "Can we put together a list of words that have specific legal ramifications and create a pop-up before an email is sent saying something like . . . Are you sure you don't want to change your wording or CC a lawyer before you send this?";

- "we wish NO slides on the terms [of the Apple ISA] as this is all then discoverable. . . contract info on slides is a very bad idea";

- "Google continues to be in the midst of several legal and regulatory matters, including government review of our deal with Yahoo . . . anything you write can become subject to review in legal discovery, misconstrued, or taken out of context,

---

[190] PFOF at 415.

[191] *Id.*

[192] *Id.* at 420.

[193] *Id.* at 425.

and may be used against you or us in ways you wouldn't expect";

- "avoid writing references to 'markets,' 'market shares,' or 'dominance'"; "avoid discussions of 'scale' and 'network effects'";

- "[w]e are not out to 'crush,' 'kill,' 'hurt,' 'block' or do anything else that might be perceived as evil or unfair";

- "I just went through Communicating with Care training, and there are a lot of words I've written in emails without thinking much about it (like 'leverage' and 'market share')";

- "[p]lease avoid using anticompetitive language in your OKRs [Objectives And Key Results]. We are currently under a DOJ inquiry on antitrust around our Yahoo deal . . . avoid: market or market share dominance, market power . . . leverage" and "consider substituting . . . Most popular, most used";

- "[b]e careful in discussing search . . . Emails you send to people in Search are likely to be retained indefinitely in connection with multiple, ongoing lawsuits";

- 'd]on't say 'market share', since that pre-supposes that the 'market' is search-engine advertising, which is bad from an antitrust point of view. It should be OK to say 'estimated share of US queries' or something like that";

- reminding others to avoid the use of "any antitrust terms—such as 'market' and 'market share' or 'leverage'"";

- "[b]e very careful in your use of language . . . . Market is an unhelpful word from an antitrust perspective";

- Varian cautioning to use "'query share' rather than 'market share'" and a Ms. Chu responding "absolutely, I'm aware of not using the word 'market', and always use the words PV or search share in all the bi-weekly updates I send to Marissa [Mayer]– the one big thing I remember from all that Legal training. [smiley face]";

- "[a]dding Tristan for legal advice, since I'm about to use some trigger words) Sadly, I think this is all about leverage and money";

- "we don't 'leverage' markets, products, or resources. Using the word 'leverage' . . . implies exploitation and an absence of consumer choice . . . .";

- responding to chain about "market share," discussing "antitrust terms" to avoid and the "Five Rules of Thumb" for written communications, and writing "moral is,

don't use the term 'm.... s....'. [smiley face]"; and

- "[d]on't say 'market share', since that pre-supposes that the 'market' is search-engine advertising, which is bad from an antitrust point of view.".[194]

290.   Google employees were trained and retrained not to use terms commonly used within the company that exposed it to antitrust liability. For example, in October of 2009, Varian wrote to a colleague that "you raise a good point about the word 'market.' I think it's time for Legal 101 again for everyone."[195]

291.   Later, in March of 2011, the following Google statement on "Antitrust Issues for Search Team" was circulated internally to Google employees:[196]



292.   During his cross-examination, it was disclosed that Google's Rosenberg wanted to use one of the "trigger terms" (referring to "leveraging") and had to consult Google's in-house

---

[194] *Id.* at 426-27.

[195]   DOJ Trial Ex. UPX0499, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-09/416652.pdf (last visited Apr. 30, 2024).

[196] DOJ Trial Ex. UPX1101, 1:20-cv-03010-APM (D.D.C.), https://www.justice.gov/d9/2023-09/416634.pdf (last visited Apr. 30, 2024).

counsel for his advice on the matter before doing so.[197]

293.   These recent disclosures of Google's spoliation of evidence were not just confined to the DC DOJ case. On November 14, 2023, Google CEO Pichai testified under oath in the *Epic v. Google* trial that he labeled documents "attorney/client privilege" even when he was not seeking legal advice, a ploy to withhold potential evidence of wrongdoing from public or private antitrust enforcers.[198] Internal chats between Google attorneys reveal that Google and its counsel employed what they called a "fake privilege" scheme to insulate conduct from scrutiny. Under the "fake privilege" scheme, Google would unnecessarily involve a lawyer in communications between employees that were unrelated to seeking legal advice. This practice was a deliberate gambit to obstruct the DOJ, states attorneys-general, and private antitrust enforcers.

294.   This led the presiding judge, the Honorable Richard Donato, to say that "he was 'profoundly concerned' about the testimony concerning fake privilege and the 'abundance of evidence' about Google employees who didn't save their chats. 'I am forming a deep concern that there is an ingrained systemic culture of suppression of relevant evidence within Google,' the judge said."[199] On November 16, 2023, at a hearing held specifically to confront Kent Walker, Google's Chief Legal Officer, on its document preservation practices, Judge Donato excoriated him, saying

---

[197] Matthew Perlman, *Judge Told Google Helped Innovate Mobile Market*, LAW360, Nov. 8, 2023, https://www.law360.com/competition/articles/1764723?nl_pk=787d704d-431c-432f-ba36-94008c81ee47&utm_source=newsletter&utm_medium=email&utm_campaign=competition&utm_content=2023-11-09&read_main=1&nlsidx=0&nlaidx=1.

[198] Sean Hollister, *Google CEO Sundar Pichai admits he used fake legal privilege*, The Verge, Nov. 14, 2023, https://www.theverge.com/2023/11/14/23960825/google-ceo-sundar-pichai-admits-he-used-fake-legal-privilege.

[199] Bonny Eslinger, *Google's CLO To Face Hot Seat As Judge questions 'Culture'*, Law 360, Nov. 13, 2023, https://www.law360.com/competition/articles/1766081/google-s-clo-to-face-hot-seat-as-judge-questions-culture-#.

that "you of all people should have known that there was no excuse for not preserving chats."[200]

295.    More recently, Judge Donato has said that he has "never seen anything so egregious" as Google's spoliation of evidence, that it was "deeply troubling" to him, and that it constituted a "frontal assault on the fair administration of justice."[201]

296.    All of this anticompetitive conduct was disclosed only recently and thus prevented Plaintiffs and Publishers from discovering the full extent of Google's misconduct until 2023.

E.    **Google's Anticompetitive Conduct is Hastening the Collapse of the U.S. News Industry and Harming Publishers.**

297.    Google's anticompetitive conduct is striking a crippling blow to the online news industry. In the U.S., Publishers' costs rose, and their revenue fell from roughly $50 billion in 2005 to $20 billion in 2022. Since 2000, ad revenue has shrunk 70%.[202] Since 2005, America has lost more than a fourth of its newspapers (2,500) and is expected to lose a third by 2025. [203] As print newspapers close, online news sites have failed to close the gap. In 2019, more than 80 local online

---

[200] Bonnie Eslinger, *Google's CLO Gets Earful From Judge Over Deleted Chats*, Law 360, Nov. 16, 2023, https://www.law360.com/competition/articles/1767671/google-s-clo-gets-earful-from-judge-over-deleted-chats.

[201] Hannah Abrazzi, *Judge Slams Google's 'Deeply Troubling' Tactics As Trial Ends*, Law360. Dec. 11, 2023, https://www.law360.com/articles/1772102/judge-slams-google-s-deeply-troubling-tactics-as-trial-ends#.

[202] *Newspapers Fact Sheet*, Pew Research Center, Nov. 10, 2023, https://www.journalism.org/fact-sheet/newspapers,/.

[203] Penny Abernathy, *The State of Local News: The 2022 Report*, Northwestern Local News Initiative, June 29, 2022 , https://localnewsinitiative.northwestern.edu/research/state-of-local-news/report/.

news sites were launched, while an equal number failed.[204] In 2024, two of the leading online news sites—BuzzFeed News and Vice News—shuttered their news operations.

298.   Across the country, newsrooms that survive are shrinking. In the last decade, the number of newspaper reporters halved, dropping from 71,000 in 2010 to 35,000 in 2020.[205] The news industry shed 16,060 jobs in 2020. In 2023, some 3,087 digital, broadcast, and print news jobs were cut. Over 500 journalists were laid off in January 2024 alone, with cuts to *The Los Angeles Times*, *The Washington Post*, and other leading outlets.[206]

299.   Local news is the hardest hit. Half of all counties in the U.S. are served by just one newspaper and 200 counties have no newspaper at all—creating "news deserts" across the country.

---

[204] Penelopy Abernathy and Zach Metzger, *News Deserts and Ghost Newspapers: Will Local News Survive?,* UNC Hussman School of Journalism and Media, June 2020, https://www.usnewsdeserts.com/wpcontent/uploads/2020/06/2020_News_Deserts_and_Ghost_Newspapers.pdf.

[205] *Id.*

[206] Kierra Frazier, *Over 500 journalists were laid off in January 2024 alone*, POLITICO, Feb. 1, 2024, https://www.politico.com/news/2024/02/01/journalism-layoffs-00138517.



300. The crisis in the U.S. news industry reflects the shift away from print to online media and the shift from traditional ad—print, radio, and television—to digital ad, largely controlled by Google.

301. Google is exacerbating it by diverting readers and hence ad revenue from the entire industry. Google siphons readers away by publishing scraped news content directly on Google Search. Google gives its own repackaged news content—in the form of Featured Snippets, People Also Ask, and YouTube thumbnails—default placement on the SERP, above organic search results. Through the power of defaults, Googe's self-preferencing creates a bias in favor of Google's misappropriated content: users get news digests from Google and have less incentive to visit Publishers' websites.

302. Google's self-preferencing produces zero-click searches, where users get answers from Google without clicking on links—by reading snippets and headlines and viewing images.

*As of 2020, roughly 65% of all Google searches were zero-click searches.*[207] *That same year, a staggering 77% of Google searches on mobile phones were zero-click searches.*[208] Google's "News Surfaces" are particularly prone to zero-clicks. 97% of People Also Ask boxes result in zero clicks, 98.6% of Knowledge Panels have zero-clicks, and 89% of articles in the Google Discover feed have zero clicks.

303. The impact of zero-click searches on publisher traffic helps to explain why traffic to publisher websites has stagnated despite a large increase in online activity overall. The graph below shows that average monthly unique visits to U.S. newspaper websites were approximately eight million in both Q4 2014 and Q4 2022 (with a temporary bump during the tumultuous Trump administration and COVID-19 pandemic):

_____

[207] Rand Fishkin, *In 2020, Two Thirds of Google Searches Ended Without a Click*, Spark Toro, Mar. 22, 2021, https://sparktoro.com/blog/in-2020-two-thirds-of-google-searches-ended-without-a-click/. ("Fishkin Article").

[208] *Id.*



304.   Google is causing substantial financial harm to Plaintiffs and members of the Class by: (1) reducing its output of search traffic, resulting in lost profits and higher average product costs; (2) by free riding on news reporting and news content without compensation, resulting in lost licensing fees, and (3) by refusing to share the revenue Google derives from Plaintiffs' and Publishers' news content.

305.   **_Reduced Traffic_**: Google is imposing substantial financial harm on Plaintiffs and the Class, who are direct purchasers of Google's monopoly product: search traffic. By siphoning away readers, Google reduces output of its referrals. For Plaintiffs, less traffic means fewer readers will pay for a subscription or click on a display ad. Thus, Google's reduced output causes lost profits for Plaintiffs. At the same time, reduced traffic also increases Plaintiffs' average cost of production since they have fewer customers relative to their fixed costs.

306.   Plaintiff Emmerich Newspapers is suffering direct financial losses from Google siphoning away its readers. As demonstrated above, Google copies news content from Emmerich properties and re-publishes them as Featured Snippets, People Also Ask boxes, and now GAI-generated news reports through Bard and SGE. Since 2020, as Google has ramped up these online

news products, Google traffic to the Emmerich Newspapers has plummeted—even as direct traffic has nearly doubled. There is clearly consumer demand for Emmerich Newspapers, but Google is diverting it.[209]



307.    The same is true for *Helena*, which heavily depends on search traffic. Helena sells subscriptions and one-week passes for its website and runs a Facebook page as a micro-publishing platform to attract readers. Its top two sources of traffic are direct visits to the website and traffic from its Facebook page. The third largest source is search traffic from Google. But the users that used to click-through from Google Search are disappearing. Over the past year, Helena has seen a disproportionate drop in Google search traffic. While direct traffic declined by only 6%, Google search traffic declined by 22%.

---

[209] Facebook traffic is also declining, but for different reasons. Since 2021, Facebook, unlike Google, has been deliberating reducing the amount of news content it distributes. See  Jonathan Vanian, *Facebook made a major change after years of PR disasters, and news sites are paying the price,* CNBC, Jan. 22, 2024, https://www.cnbc.com/2024/01/22/metas-retreat-from-news-accelerated-in-2023-leaving-media-scrambling.html.

308.   ***Lost Licensing Fees:*** On the flip side of Google's transactions with Publishers, Google is buying news reporting and news content at below competitive rates (royalty-free), further depriving Plaintiffs and the Class of revenue. Since at least 2019, Google has scraped and misappropriated all content published by Plaintiffs for republishing and GAI training: approximately 35,000 articles per year for Emmerich Newspapers as well as Helena's entire corpus.

309.   Google does not pay reporters to gather news in Mississippi, Louisiana, or Arkansas. Instead, it free rides on Plaintiffs' gathering of time-sensitive news. Plaintiffs and publishers expend substantial efforts to gather and present news. Most news is time-sensitive information. Its value depends on the efforts of Publishers to professionally collect, verify, and communicate information, at a cost. By repackaging and republishing news without fair compensation, Google is free riding on the efforts and expenditures of Plaintiffs and other Publishers.

310.   Google's mass misappropriation of news is part of its effort to leverage its search monopoly and attempt to monopolize online news. Like other competing news publishers, Google could have licensed Plaintiffs' content through a syndication agreement, typically with a 60/40% revenue sharing agreement. Instead, Google scrapes Plaintiffs' content royalty-free as an overcharge for dwindling traffic in the search market and an underpayment for production in the online news market.

311.   Google has imposed the same financial harm on all Class members: lost profits from diverted customers, higher average costs of production, and lost licensing fees. According to one recent study by digital ad company Raptive, SGE alone is predicted to cause a 20-60% reduction

in search traffic and a loss of $2 billion in ad revenue for Publishers.[210]

312.   ***Unjust Enrichment and Refusal to Share Revenue:*** Google has also unjustly enriched itself through its exclusionary conduct in the search and online news markets. By excluding rivals from the most important distribution channel for online news, Google has coerced the entire U.S. news industry into forced syndication, without sharing any of the revenue Google derives from republishing their content. As Microsoft's Smith recognized, Google has appropriated this surplus value for itself: "[w]hile it's important to recognize that search traffic does have value, monetizing that traffic has become increasingly difficult for news organizations because most of the profit has been squeezed out by Google."[211] Smith explained: "Ultimately, the contrast could hardly be starker. According to a Pew Research estimates, the ad revenue of the nation's newspapers fell from $49.4 billion in 2005 to $14.3 billion in 2018. During this same time, Google's ad revenue rose from $6.1 billion to $116 billion. This is not a coincidence."[212]

313.   A recent study published by Columbia University's Initiative for Policy Dialogue concluded that "the total ad revenue Google generates from information searches using media

---

[210] Rahul Kumar, *Publishers Face Potential $2 Billion Loss Due to Google's SGE: Report*, United Business Journal, Mar. 16, 2024, https://theubj.com/business/publishers-face-potential-2-billion-loss-due-to-googles-sge-report/.

[211] Technology and the Free Press: The Need for Healthy Journalism in a Healthy Democracy, Hearing Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the H. Comm. on the Judiciary (Mar. 12, 2021) (written testimony of Brad Smith, President, Microsoft Corp.), https://docs.house.gov/meetings/JU/JU05/20210312/111315/HHRG-117-JU05-Wstate-SmithB-20210312.pdf.

[212] *Id.*

publishers' content is around US $21 billion."[213] In contrast, the newspaper industry only earned an estimated $9.8 billion in ad revenue in 2022—46% of that from digital ad.[214]

314.    But for Google's monopolization of search and attempted monopolization of online news, Publishers could bargain for a fair share of revenue. This is precisely what legislatures in Australia, California, Canada, and the European Union have required or are in the process of requiring. It is what Google's own rival Microsoft has lobbied for. And the prospect of such bargaining is why Google has threatened to ban entire states from its news distribution channel, in an exercise of unlawful monopoly power.

## F.    ACTIONS AGAINST GOOGLE BY COMPETITION AUTHORITIES IN OTHER COUNTRIES.

315.    Google's anticompetitive practices harming Publishers are not confined to the U.S. The 2024 determination of the French Competition Authority has already been discussed. Similar concerns have been raised by competition authorities in Australia, Germany, and the G7 Nations.

316.    **Australia:** In September of 2023, the Australian Competition & Consumer Commission("ACCC") issued an interim report as part of its digital platform services inquiry, in which it noted the anticompetitive aspects of digital platform services, such as those provided by Google:[215]

---

[213] Patrick Holder, *et al.*, *Paying for News: What Google and Meta Owe US Publishers*, 33, Initiative for Policy Dialogue, Oct. 29, 2023, https://policydialogue.org/files/publications/papers/USE-THIS-2023.10.28_Paying-for-News_Clean-2.pdf.

[214] *Newspapers Fact Sheet*, Pew Research Center (Nov. 10, 2023), https://www.pewresearch.org/journalism/fact-sheet/newspapers/#economics.

[215] *Digital Platform Services Inquiry – September 2023 Report on the expanding ecosystems of digital platform service providers*, 118-19, ACCC, (Mar. 2023), https://www.accc.gov.au/system/files/Digital%20platform%20services%20inquiry%20-%20September%202023%20report%20-%20Issues%20paper_0.pdf.

As digital platforms extend their reach into related markets, there is greater opportunity to leverage positions of market power into these markets or to enhance a position in a core market. *The ACCC has previously considered different types of conduct that digital platform service providers can engage in that may damage the competitive process. These types of conduct include bundling and tying, self-preferencing strategies (such as steering, pre-installation arrangements and default settings), and limiting interoperability. These can harm competition by raising rivals' costs. For example, by reducing rivals' ability to achieve economies of scale, increasing the risk involved in entry by foreclosing the opportunity to enter incrementally, or increasing input costs. Self-preferencing can also be harmful where it forecloses or limits rivals' low-cost means of accessing the market or reduces rivals' revenues. Each of these strategies are considered in the context of digital platform service providers' expanding ecosystems....*

The ACCC also considers that digital platform service providers with business models that are particularly data-driven, including ad-based content platforms or software platforms, *may have an increased ability and incentive from their expanding ecosystems to engage in exclusionary data practices. The ACCC has previously considered a lack of access to relevant data as a substantial barrier to entry and expansion in some digital platform services, including search and ad tech*." (Emphases added, footnote omitted).

317. **Germany**: In Germany, in October of 2023, Google reached an agreement with Corint Media ("Corint") (an umbrella organization representing German and international Publishers) to pay a total of $3.38 million annually for the use of headlines, excerpts, and thumbnails; "'[t]he quasi-monopolist Google dictates prices, so the route via the courts is the only way to arrive at appropriate remuneration for the use of content,' said Corint's managing director Christine Jury-Fischer."[216] Corint had previously complained to the German Federal Cartel Office that Google has engaged in an "*abuse of a dominant position, above all through the offers of so-*

---

[216] Klaus Lauer and Friederike, *Google to pay German publishers 3.2 million euros per year on interim basis*, Reuters, Oct. 12, 2023, https://www.reuters.com/technology/google-pay-german-publishers-32-mln-eur-per-year-interim-basis-2023-10-12/.

*called Google News Showcase contracts and because of the deliberate undermining of the right to protection of press services expressed therein.*"[217] (Emphases added.)

318.   **CMA Investigation**. In 2020, Google announced its intention to cease using third-party cookies on Android devices as part of its proposed "Privacy Sandbox". The final effectuation of this plan was to occur this year. In January of 2024, the U.K. Competition & Markets Authority ("CMA") issued a report halting the final implementation of Google's plan. As it explained, "[i]n Q1 2024, we will focus on working with Google to resolve the competition concerns we have identified in this report. We are particularly keen on resolving any remaining concerns relating to the design of the Privacy Sandbox tools and to ensure that Google does not use the tools in a way that self-preferences its own advertising services. As part of this, we are also looking to clarify the longer-term governance arrangements for the Privacy Sandbox."[218]

319.   **G7 Nations**. Similar concerns were expressed in a "Digital Competition Communiqué" issued by the G7 Competition Authorities on November 8, 2023:

> Digital markets can present competition concerns. Markets characterized by network effects, economies of scale, digital ecosystems, and accumulations of large amounts of data can be prone to increasing or creating barriers to entry, tipping, and dominance. We need to be vigilant and attentive to concerns regarding effective functioning of digital markets given the risk of lack of competition, limited consumer choice, and reduction in innovation due to limited contestability of markets as well as anticompetitive and unfair conduct.

---

[217] Press Release, Corint Media, *Corint Media files an application with the Arbitration Board against Google* (July 22, 2022), https://www.corint-media.com/en/corint-media-files-an-application-with-the-arbitration-board-against-google-for-a-determination-of-the-remuneration-amount/.

[218] *CMA Q4 2023 update report on implementation of the Privacy Sandbox commitments*, Competition & Markets Authority, Apr. 2024, at 3, https://assets.publishing.service.gov.uk/media/65ba2a504ec51d000dc9f1f5/A._CMA_Q1_2024_update_report_on_Google_Privacy_Sandbox_commitments_24.4.24.pdf.

G7 competition authorities and policymakers have begun to tackle the myriad competition concerns in the digital economy by taking action to combat anticompetitive conduct and mergers in digital markets and updating, reviewing or looking to strengthen laws and rules related to the digital economy. Some jurisdictions have adopted new ex-ante regulations complementing existing competition law to mitigate certain anticompetitive and unfair practices of digital firms. G7 competition authorities and policymakers are committed to applying competition law and regulatory tools to digital markets to address concerns such as exclusionary or exploitative practices of digital firms, barriers that entrench and maintain incumbents, as well as killer acquisitions, among others.

The speed at which competition harm can occur in these markets means actions and enforcement must occur within a meaningful timeframe to prevent digital firms from becoming entrenched. Learning from interventions and honing approaches to remedies will help to promote greater competition and discourage future anticompetitive conduct. We will continue to take action by enforcing competition laws, improving the existing regulatory toolboxes, and developing new regulatory frameworks, to the extent necessary.[219]

## V.    CLASS CERTIFICATION.

320.   Plaintiffs bring this action against Google individually and on behalf of all other persons and entities similarly situated ("the Class"). Plaintiffs propose the following Class definition:

> All Publishers of text-based digital news products that publish such content online, who are domiciled in, or have offices in, the U.S., and whose websites have been indexed by Google during the period from November 1, 2019, to the date on which this Class is certified.

321.   Excluded from the Class are Google as well as its officers, directors, and employees; any entity in which Google has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Google. Also excluded from the Class are members of

---

[219] *G7 Competition Authorities and Policymakers' Summit Digital Competition Communiqué*, Hiroshima Summit, Nov. 8, 2023, at 1-2, https://www.bundeskartellamt.de/SharedDocs/Publikation/EN/Others/G7_2023_Communique.pdf?__blob=publicationFile&v=2. (Emphases added).

the judiciary to whom this case is assigned, their families and members of their staff.

322.   Plaintiffs reserve the right to amend or modify the Class definition or create additional subclasses as this case progresses.

323.   **Numerosity**. The Members of the Class are so numerous that joinder of all of them is impracticable.

324.   **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

- Whether general search services in the U.S. is a relevant antitrust market;

- Whether Google has engaged in unlawful conduct in maintenance or abuse of its monopoly in general search services;

- Whether Google has engaged in unlawfully restraining trade through its non-compete agreement with Apple;

- Whether online news in the U.S. is a relevant antitrust market;

- Whether Google has attempted to monopolize the online news market in the U.S.;

- Whether Google has conditioned the sale of its general search services in on Publishers supplying content to Google in the online news market;

- Whether general search services and online news are lines of commerce;

- Whether Google abused dominance it acquired in any line of commerce through the mergers and acquisitions addressed in this Complaint;

- Whether Google's abuse of dominance acquired through these mergers and acquisitions has substantially lessened competition in any line of commerce;

- Whether the conduct of Google caused injury to Plaintiffs and other members of the Class including damages;

- Whether Google caused Plaintiffs and the Class to suffer economic harm;

- What is the appropriate class-wide measure of damages; and

- What is the nature of appropriate injunctive relief that can serve as guardrails to restore and ensure competition for general search services, and online news.

325.    **Typicality**. Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Google's unlawful conduct in that they paid artificially inflated prices for Google's digital intermediation services and were paid severely depressed prices by Google for their text-based digital news products.

326.    **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

327.    **Predominance**. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class. The common issues arising from Google's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

328.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to

individual Class Members, which would establish incompatible standards of conduct for Google. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

329.   Google has acted on grounds that apply generally to the Class as a whole, so that injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

330.   Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VI.   CAUSES OF ACTION.

### A.   COUNT ONE: MONOPOLIZATION AND ABUSE OF MONOPOLY IN THE GENERAL SEARCH SERVICES MARKET— SHERMAN ACT, 15 U.S.C. §§ 2, 3.

331.   Plaintiffs, individually and on behalf of the Proposed Class, bring claims under 15 U.S.C. §§ 2, 3. Plaintiffs reincorporate by reference the preceding factual allegations.

### 1.   General Search Services in The U.S. Is A Relevant Market.

332.   The general search services market consists of "general search engines, which are 'one-stop shops' consumers can use to search the internet for answers to a wide range of queries.'"[220] General search engines can answer all types of queries and return a wide range of results. Consumers use general search engines to search the internet for all information needs, including both commercial and non-commercial queries.

---

[220] *United States v. Google LLC*, No. 20-cv-3010 (APM), 2023 WL 4999901, at *3 (D.D.C. Aug. 4, 2023).

333.   The U.S. is the relevant geographical market for general search services. Google provides users in the U.S. a distinct website that differs from those provided by Google in other countries.

**2.      Google Has Monopoly Power in The General Search Services Market.**

334.   As noted above, Google's market share for general search services in the U.S. exceeds 90%. In past years, it was just under 90%.

335.   Google has unlawfully maintained and abused its monopoly in the general search market through a "monopoly broth" of anticompetitive acts described herein that, taken individually and in the aggregate, have enabled it to exclude rivals, including *inter alia*:

- Entering into exclusionary distribution contracts with Apple, Android Partners, and Browsers that make Google the default general search engine on their products, foreclosing competition;

- Using its monopoly profits to pay excessive amounts for those contracts that sometimes involved sharing of net ad revenues;

- Requiring Apple to abandon any potential for using Siri as a search engine as part of the 2016 extension of the "Apple Inc. Search Partnership" and not give itself default search engine status in updates of its operating system;

- Acquiring companies (such as Android, DeepMind, and YouTube) that enabled it to build an exclusionary digital ad search network;

- Misappropriating, without compensation, newsgathering and news content from its Publisher customers to republish on Google's news surfaces;

- Misappropriating, without compensation, newsgathering and news content from its Publisher customers to develop and operate its GAI programs, Bard and SGE, and the algorithms Google uses for searches;

- Introducing Bard (later known as Gemini) without it being ready for use in an effort to undermine competition from Microsoft and preserve its monopoly in general search;

- Delaying for now any ability to avoid scraping of user/customer content through Bard and SGE;

136

- Modifying the manner in which it charges Publishers under AdSense by using a cost per impression rather than a cost per click methodology and imposing separate charges for its services;

- Negotiating with Apple to potentially extend its exclusionary agreement to GAI, which, if it occurs, would make Gemini the default GAI tool on the majority of mobile devices and to pay Apple not to launch competing products;

- Spoliating evidence by instructing employees to limit what they say in writing, by requiring that communications on Google Talk be all off the record and internal chats should be deleted, and by its "fake privilege" scheme; and

- Banning California news websites from Google Search in retaliation for the introduction of the CJPA.

336.   By foreclosing rivals from search distribution channels, Google also forecloses rivals from 95% of all search traffic sold to Publisher customers in exchange for access to their content for indexing.

337.   General search is the largest source of external traffic to news Publishers (excluding direct traffic, *i.e.*, users directly navigating to a publisher's webpage.) Search provides roughly 46% of all traffic referrals to news—a commercially indispensable share.[221]   Over 95% of all search traffic referrals to Publishers are sold by Google. Google's monopoly in the Publisher-sales side of the search market results from Google's exclusive contracts and Chrome self-preferencing, which foreclose search rivals from most search queries in the U.S. Google's stranglehold on search distribution gives it nearly complete control over the largest source of external traffic.

338.   Google's 95% monopoly over search traffic-referrals means that Publishers cannot survive without traffic from Google. Online news is reduced to a market that is dependent on

---

[221] Aisha Majid, *Search vs social: How search traffic to news sites has changed in five years*, Press Gaze*tt*e, Apr. 13, 2023, https://pressgazette.co.uk/media-audience-and-business-data/media_metrics/news-referral-traffic-breakdown/.

Google for its commercial viability. In return, Google is able to acquire news content, at below production cost, and republish it on the SERP. Publishing timely news content attracts more users to Google—including the 80% of search queries seeking information, giving Google advantages in scale and network effects over it rival general search engines.

339.   This exclusionary course of conduct is amplified and entrenched by the other anticompetitive acts listed above, including Google's threatened boycotts of Publishers.

340.   This exclusionary conduct was intended to and did further Google's monopolization and abuse of the general search market in violation of Section Two of the Sherman Act.

341.   Google's exclusionary conduct stifles competition in the general search market in the U.S. in at least two ways.

342.   **First**, by depriving rivals of scale necessary to improve or maintain quality, Google has decreased the overall quality and variety of search services available to consumers in the U.S. To be effective, a general search engine must acquire fresh data at scale. Fresh user data is needed to better understand the meaning of queries and user intent, to keep up with current events. In addition, GAI models need to be retrained with fresh data regularly, in at least 2-3 month intervals, to be able to reflect current events. By foreclosing the default position on most search access points, Google deprives search rivals of access to mobile traffic and user data at scale. This deprives rivals of the ability to improve search quality by acquiring sufficient traffic and data. Ultimately, this reduced competition deprives consumers of choice and quality in the general search engines available on the market.

343.   **Second**, as described above, Google's exclusionary conduct reduces the incentives for Google, current rivals, potential entrants, and distributors to compete on quality and price.

344.   Google's exclusionary conduct also reduces its own investments in innovation and improving search quality. Google spends more on buying default placement and keeping Apple out of the search market than it spends on all other search-related expenses combined, including product launches and improvements.

345.   Google's contracts also chill competition from potential entrants. For example, Google's ISA with Apple deliberately precluded Apple from diverting Safari search queries away from Google and using its Spotlight or Suggestions feature to perform general search services.

346.   By reducing competition in search, Google has deprived consumers of choice and quality in the general search engines available on the market. Even though general search is non-price market, harm to quality harms consumers. A less effective search engine connects fewer consumers with Publishers, wastes consumer time on less-relevant searches, and ultimately impairs the free flow of information, giving the gatekeeping role that general search engines play in digital marketplaces.

347.   Finally, by foreclosing competition in search distribution, Google has also foreclosed competition in the sale of search traffic to Publishers. Because Google has deprived them of search traffic and user-data at scale, rival search engines such as Bing or DuckDuckGo simply cannot offer Publishers anywhere near the volume of traffic referrals as Google. With monopoly power over 95% of search traffic referrals to Publishers, Google can dictate the terms of trade not just for itself but for the entire market.

348.   Plaintiffs and Publishers are direct purchasers of search traffic from Google. As part of Google's anticompetitive scheme, it has simultaneously imposed on overcharge on Plaintiffs and the Class, in the form of forced, royalty-free licensing, and a reduction of outputs, in the form of zero-click searches and dwindling search traffic.

349.   As a result, Plaintiffs and the Class have suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees. In addition, Google has unjustly enriched itself by using Plaintiffs' and the Class's news-gathering services without compensation and by generating revenue from news content republished on Google's properties. Plaintiffs are entitled to an equitable share of Google's revenue derived from Plaintiffs' and Publishers' labor and investments.

350.   Plaintiffs and the Class would not have suffered these harms but-for Google's exclusionary conduct in the general search market. In a competitive general search market, they could have bargained with other general search engine providers for better terms of trade.

351.   Google's unlawful conduct is continuous, and its extent was not publicly known until at least 2023, with the release of Bard in March of 2023, the launch of SGE in May of 2023, and the unveiling of trial exhibits in the DC DOJ trial in September of 2023.

352.   Google's unlawful conduct is ongoing, and Plaintiffs and Class members are entitled to injunctive relief and other equitable remedies, given that they would otherwise have no adequate remedy at law.

353.   Plaintiffs and Class members are also entitled to receive treble monetary damages as well as attorneys' fees and costs of suit.

**B.    COUNT TWO: MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF THE ONLINE NEWS MARKET – SHERMAN ACT, 15 U.S.C. §§ 2, 3.**

354.   Plaintiffs incorporate by reference the preceding allegations.

**1.    Online News in The U.S. Is a Relevant Product Market.**

355.   Online news in the U.S. is a relevant antitrust market. Online news outlets publish original or syndicated news content—*i.e.*, professional works of journalism—in multimedia

formats (including text, image, audio, and video) to audiences through the world wide web.  Since the late 1990s, the news industry has increasingly migrated into the online publishing space.

356.   Online news publishers include both "legacy" news outlets (those that originated in print or broadcast, such as the *New York Times* or Fox News) and "digital native" outlets that produce and/or publish professional works of journalism, including search engines, news aggregators, and social media platforms.

357.   "News" refers to non-fictional information or commentary on events or topics of interest that has been gathered through research (*i.e.*, reporting), recorded in a medium of expression, edited and fact-checked, and disseminated to the public. News content is often categorized as "hard news," meaning coverage of breaking events and investigative reports and "soft news" or "features," meaning coverage of arts and entertainment, sports, lifestyle, business, and topics that are practical or entertaining, including "evergreen" content that has lasting salience to the public. Online news publications typically publish a mix of hard and soft news in a mix of formats, including short news digests, lists, and long-form articles, as well as video and audio recordings.

358.   All Publishers must either produce or purchase the inputs to this market: news content. There are four ways to obtain news content.

(1) **Original Content**: Publishers can self-supply by hiring staff or freelance reporters, editors, photographers, and videographers to create original content. Google generally creates no original content.

(2) **User-Generated Content**: Publishers can encourage their audiences to submit user-generated content ("UGC") that is not produced by professional journalists. For most Publishers, UGC consists of comments that users submit to online articles. Wikipedia is the rare model that exclusively uses UGC. Wikipedia then plays an editorial role in checking and curating the UGC. Social media platforms (*e.g.*, YouTube and Facebook) publish a mix of amateur news UGC as well as republished professional news content. Google Search does not publish news UGC on its SERP to any significant extent.

(3) **Republishing Content:** Publishers can obtain original content from third parties to publish on their own site. The Associated Press and Reuters specialize in providing this kind of republishing content, but most publishers license their content for republishing to some extent (*e.g.*, via Lexis). Social media firms republish news content, principally through accounts maintained by Publishers. Publishers share links to their content, and often compose text to promote that content. The social media firm then distributes this content to end-users through algorithmically promoted feeds. User may then reshare links. As discussed above, Google coerces publishers to supply it with republishing content as a condition to receiving search traffic.

(4) **GAI Training Content**: Publishers can obtain original content not just for republishing, but also to train and ground their own GAI tools. The GAI tool dynamically generates and then publish derivative news content based on the training content. Like republishing content, Google also forces publishers to supply it with GAI training content.

359.   Google participates in the online news market in multiple ways. **First**, Google publishes news content obtained from other publishers on at least three websites: Google Search, Google News, and YouTube. Google specifically markets news "products and experiences" to consumers, including "News in Google Search", Google News, Google Discover, "News on YouTube", and "News on Google Assistant." The news content Google publishes is typically the lead paragraph (the so-called "snippet") and headline from a news article as well as photojournalistic images or videos. With the launch of Bard/Gemini and SGE, Google now also publishes its own GAI-generated news summaries.

360.   **Second**, Google sells distribution services to Publishers in the form of search traffic referrals. In exchange, Google compels Publishers to supply it with republishing content and AI training content—almost always on an unpaid, royalty-free basis. Online news is distributed through web traffic. Web traffic can take the form of direct traffic (users navigating directly to the URL of the Publisher's website) and external traffic. The principal sources of external traffic are search, referral traffic such as from social media and third-party websites, and email or text messages.

361.    **Third**, Google provides products and services used in the production of news, including Google Drive and Google Docs for document storage and management, Gmail, and specific "tools for reporters" such as the Google Journalist Studio.[222] In addition, Google markets web marketing products for publishers including Google Search Console and Google Publisher Central.

362.    **Finally**, Google sells display ad services to Publisher, taking a share of Publishers' ad revenue for itself, while also selling search ads to Publishers (among other advertisers) to market their publications on the SERP.

363.    Google is thus simultaneously: (1) a downstream publisher of content to consumers, (2) a purchaser of upstream news content, (3) a seller of search distribution to Publishers, (4) a seller of news production products to Publishers, and (5) a seller of ad space and ad services to Publishers. Playing these five roles has given Google a unique ability to leverage its monopoly power in search (and related digital ad markets) to acquire market power in the online news market.

364.    Plaintiffs participate in the online news market by producing original content, publishing news content on websites and social media accounts, selling ads, and using distribution services.

365.    As explained above, the U.S. is the relevant geographic market.

**2.      Google has Monopoly Power or a Dangerous Probability of Achieving It.**

366.    As noted above, Google is by far the largest publisher of online news in the U.S. Google's main news-publishing properties Google.com (including news.google.com and

---

[222] *A collection of tools to empower journalists to do their work more efficiently, creatively, and securely*, Google Journalist Studio, https://journaliststudio.google.com/ (last visited Apr. 30, 2024).

gemini.google.com) and Youtube.com received more than 767.8 billion visits between March 2023 and March 2024—dwarfing other Publishers.

367.   As also noted above, Google has an estimated market share of 66%, based on traffic data cited above. This is sufficient to establish that Google has monopoly power. Indeed, in the context of mergers that involve a "related product" that rivals may use to compete, the DOJ and FTC have stated in their 2023 Merger guidelines that "[t]he Agencies will generally infer, in the absence of countervailing evidence, that the merging firm has or is approaching monopoly power in the related product if it has a share greater than 50% of the related product market."[223] Control over the distribution of online news is such a product for Google.

368.   Google's mass misappropriation of news excludes rival Publishers from the online news market by raising their costs, as described above in Section IV.B.4.

### 3.      Anticompetitive Effects.

369.   Google's extortionate terms for content distribution, coupled with its default self-preferencing on the SERP, have reduced the financial incentives for rivals to produce and publish news.

370.   Google's unlawful conduct is continuous, and its extent was not publicly known until 2023, with the release of Bard in March 2023, the launch of SGE in May 2023, and the unveiling of trial exhibits in the DC DOJ trial in September 2023.

371.   Google's unlawful conduct is ongoing, and Plaintiffs and Class members are entitled to injunctive relief and other equitable remedies, given that they would otherwise have no adequate remedy at law.

---

[223] DOJ & FTC Merger Guidelines at 16 n. 30 (Dec. 18, 2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

372.    Plaintiffs and Class members are also entitled to receive treble monetary damages as well as attorneys' fees and costs of suit.

### C.    COUNT THREE: TYING OF SEARCH AND ONLINE NEWS— SHERMAN ACT, 15 U.S.C. §§ 1, 3.

373.    Plaintiffs incorporate by reference the preceding allegations.

374.    As addressed above, in Section IV.B.5., Google's monopoly over the sale of search traffic referrals and its unilaterally imposed coercive tactics give Publishers no choice but to supply Google with news content for republishing and GAI training in the online news market, at below competitive prices.

375.    Google's conduct is an unlawful tying arrangement under Section 1 and 3 of the Sherman Act.

376.    The tying product is the provision of search traffic in the general search market. The tied product is news content for republishing and AI training in the upstream supply chain of the online news market.

377.    The tying and tied products are separate products. The provision of search traffic involves the sale of a distribution service. The supplying of news content for republishing and AI training involves the sale of commodity inputs. The referral of customers to Publishers is inherently distinct from the news content that is sold to customers.

378.    As demonstrated in Section IV.A., Google has a durable monopoly in the tying product market (general search).

379.    As demonstrated in Section IV.B.3., Google has a monopoly in the tied product market (online news) or a dangerous probability of achieving it.

380.    As demonstrated above in Section IV.B.5., Google has conditioned the sale of search traffic on the supply of news content through at least five coercive means:

1) forcing Publishers to gather news to "ground" Google's products with valuable information on current events;

2) forcing Publishers to supply content to train GAI models and then barring them from removing their content from those models;

3) forcing Publishers to allow Google to republish extracted news, which siphons away readers, or risk being downgraded in search rankings;

4) conditioning search optimization tools on receiving royalty-free licenses; and

5) threatening to ban Publishers who seek collective bargaining rights.

381.   This tying arrangement forecloses a substantial share of interstate commerce. The tie covers and thus forecloses 95% of all search traffic to news sites. Virtually the entire inventory of news content in the U.S. is covered by the tie because Google scrapes the websites of the entire online news industry.

382.   There is no procompetitive justification for the tie. Indeed, OpenAI permits Publishers to opt out of supplying content to train ChatGPT and does not force Publishers to ground ChatGPT through their news reporting.

383.   The tie furthers, on one hand, a monopoly overcharge of distribution services to Publishers and, on the other, a monopsony undercharge for their content for republishing and AI training. While Plaintiffs and other Publishers suffer the immediate financial harm, consumers suffer in the long run. To survive, Publishers must try to lower costs by reducing output and downsizing or raise prices on subscriptions or sales. With the closure of name-brand digital natives like BuzzFeed News, it is clear many will not survive. The overall inventory of professionally produced news in the U.S. market is declining in quantity, quality, and variety.

384.   Google's unlawful tying arrangement is continuous, and its extent was not publicly known until 2023, with the release of Bard in March of 2023, the launch of SGE in May of 2023, and the unveiling of trial exhibits in the DC DOJ trial in September of 2023.

385.   As a result of Google's tying arrangement, Plaintiffs and the Class have suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees. In addition, Google has unjustly enriched itself by using Plaintiffs' and the Class's news-gathering services without compensation and by generating revenue from news content republished on Google's properties. Plaintiffs are entitled to an equitable share of Google's revenue derived from Plaintiffs' and Publishers' labor and investments.

386.   Plaintiffs and the Class would not have suffered these harms but-for Google's exclusionary conduct in the general search and online news markets.

387.   Google's coercive tying practices are ongoing, and Plaintiffs and Class members are entitled to injunctive relief and other equitable remedies, given that they would otherwise have no adequate remedy at law.

388.   Plaintiffs and Class members are also entitled to receive treble monetary damages as well as attorneys' fees and costs of suit.

### D.   COUNT FOUR: ABUSE OF DOMINANT POSITION IN LINES OF COMMERCE ACQUIRED THROUGH MERGERS OR ACQUISITIONS—SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18.

389.   Plaintiffs incorporate by reference the preceding allegations.

390.   Google has violated Section 7 of the Clayton Act (15 U.S.C. §18) by (a) acquiring entities such as YouTube, Android, and DeepMind, and by (b) using the dominant positions it acquired to substantially lessen competition or tend to create a monopoly in various lines of commerce or activities affecting commerce, including general search services, online news and digital ad.

391.   Google began its march to dominance in the aforementioned lines of commerce by acquiring key competitors in mobile devices, digital media, AI, and digital ad. Google achieved

its structure as a dominant digital platform through a series of strategic mergers and acquisitions designed to attract, trap, and monetize users of its search engine.

392.   As explained above, Google acquisitions of Android, YouTube, and DeepMind were critical acquisitions, the use for which has expanded significantly under Google's ownership.

393.   Google's anticompetitive maintenance and abuse of its dominant position is continuous, and its extent was not publicly known until 2023, with the release of Bard in March 2023, the launch of SGE in May of 2023, and the unveiling of trial exhibits in the trial in *the* DC DOJ Case in September of 2023. Nor could Plaintiffs have been aware of Google's extensive spoliation of evidence described above.

394.   As a result of Google's abuse of dominance, Plaintiffs and the Class have suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees. In addition, Google has unjustly enriched itself by using Plaintiffs' and the Class's news-gathering services without compensation and by generating revenue from news content republished on Google's properties. Plaintiffs are entitled to an equitable share of Google's revenue derived from Plaintiffs' and Publishers' labor and investments.

395.   Plaintiffs and the Class would not have suffered these harms but-for Google's abuse of dominant positions acquired through mergers and acquisitions, which have substantially lessened competition and/or tended to create monopolies in relevant lines of commerce.

396.   Google's unlawful conduct is ongoing, and Plaintiffs and Class members are entitled to injunctive relief and other equitable remedies, given that they would otherwise have no adequate remedy at law.

397.   Plaintiffs and Class members are also entitled to receive treble monetary damages as well as attorneys' fees and costs of suit.

E.     COUNT FIVE: UNLAWFUL AGREEMENT BETWEEN GOOGLE AND
       APPLE-SECTIONS 1 AND 3 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3.

398.   Plaintiffs have incorporated by reference the preceding allegations.

399.   Several years ago, Apple had explored entering the general search market in competition with Google. CEO Tim Cook was presented with four options: to build Siri into a general search product; collaborate on a Knowledge-graph based product with Microsoft; invest directly in Bing and turn it into a native Apple search product; or acquire Bing from Microsoft.

400.   As described herein, those plans were shelved in 2016 when Apple and Google in 2016 entered into a renewal of the ISA between Apple and Google that gave the latter default search engine status on Apple's iPhones. As part of that renewal, Apple agreed that it would not compete with Google to develop a search engine of its own. Under the ad revenue-sharing agreement contained in this revision of the ISA, Apple received $18 billion from Google in 2021. Since the extended ISA had a ten-year term, Apple likely received an estimated $180 billion in exchange for agreeing not to compete with Google Search.

401.   This was an agreement among potential competitors to reduce competition in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and constitutes a *per se* violation of the antitrust laws or is otherwise an unreasonable restraint of trade under those statutes. Indeed, Apple has stated that it views the agreement as a form of partnership.

402.   That partnership is continuing, and its scope may be expanded. Google is now in talks with Apple on extending its partnership with Apple to build Google's Gemini artificial intelligence engine into the iPhone, which would further cement Google's default position in iOS devices.

403.   As a result of Google's collusion with Apple, Plaintiffs and the Class have suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees. In

addition, Google has unjustly enriched itself by using Plaintiffs' and the Class's news-gathering services without compensation and by generating revenue from news content republished on Google's properties. Plaintiffs are entitled to an equitable share of Google's revenue derived from Plaintiffs' and Publishers' labor and investments.

404.   Plaintiffs and the Class would not have suffered these harms but-for Google's exclusionary conduct in the general search market. In a competitive general search market, they could have bargained with other general search engine providers for better terms of trade.

405.   Google's unlawful collusion is continuous and ongoing and was not publicly confirmed until 2023 with the disclosure of the ISA's 2016 amendment and trial testimony.

## VIII.   RELIEF REQUESTED.

406.   Wherefore, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by ordering:

(a) This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel;

(b) Judgment in favor of Plaintiffs and members of the Class and against Defendants;

(c) An award of statutory and other damages under 15 U.S.C. §15 for violations of the antitrust laws by Defendants;

(d) Permanent injunctive relief pursuant to 15 U.S.C. §26, including, but not limited to, guardrails to restore and ensure a fair and level competitive playing field around Google's publishing and dissemination of digital informational content in its general search services and search ad services. Such guardrails may include, among others, GAI products (including SGE and Bard), which could include (but are not limited to): (i) revising Google's practices so that a Publisher who wishes to opt out of SGE would still show up on Google searches; (ii) obtaining prior informed consent from Publishers whose website data is used to train GAI; (iii) allowing rivals to access the training data Google uses for chatbots such as Bard; (iv) modifying the payment terms Google announced in 2023 in order to make them more favorable to Publishers; (v) Google actively investing significant sums in supporting news or reference dissemination by smaller Publishers; and (vi) establishing a monitoring committee of neutral experts who would be charged with reporting annually on Google's compliance with the mandate of any injunction and on

any potential new anticompetitive conduct by it.

(e) Pre- and post-judgment interest on the damages awarded to Plaintiffs and members of the Class, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

(f) Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court approved notice program through post and media designed to give immediate notification to the Class; and

(g) Further relief for Plaintiffs and members of the Class as may be just and proper.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated:  May 13, 2024                                  Respectfully submitted,

By:    /s/ Michael D. Hausfeld
        Michael D. Hausfeld (D.C. Bar No. 153742)
        Scott A. Gilmore (D.C. Bar No. 1002910)
        Mandy Boltax (D.C. Bar No. 90013893)
        **HAUSFELD LLP**
        888 16th Street N.W., Suite 300
        Washington, DC 20006
        Telephone: (202) 540-7200
        mhausfeld@hausfeld.com
        sgilmore@hausfeld.com
        mboltax@hausfeld.com

        Scott Martin
        **HAUSFELD LLP**
        33 Whitehall Street, 14th Floor
        New York, NY 10004
        Telephone: (646) 357-1100
        smartin@hausfeld.com

Michael P. Lehmann
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
mlehmann@hausfeld.com

Michael L. Roberts
Erich P. Schork
Kelly A. Rinehart
Sarah DeLoach
**ROBERTS LAW FIRM US, PC**
1920 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (501) 821-5575
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us
kellyrinehart@robertslawfirm.us
sarahdeloach@robertslawfirm.us

John W. ("Don") Barrett
Katherine B. Riley
**BARRETT LAW GROUP, P.A.**
404 Court Square North
P.O. Box: 927
Lexington, MS 39095
Telephone: (662) 834-2488
donbarrettpa@gmail.com
kbriley@barrettlawgroup.com
NTMaddux@barrettlawgroup.com

Michael J. Flannery
**CUNEO GILBERT & LaDUCA, LLP**
Two City Place Drive
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

152

Pamela Gilbert
Daniel M. Cohen
Lissa Morgans
**CUNEO GILBERT & LaDUCA, LLP**
4725 Wisconsin Avenue, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
pamelag@cuneolaw.com
danielc@cuneolaw.com
lmorgans@cuneolaw.com

*Attorneys for the Plaintiffs*