**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HELENA WORLD CHRONICLE, LLC and EMMERICH NEWSPAPERS, INC. | |
| *Plaintiffs*, | Case No. 1:23-cv-03677 |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC and ALPHABET INC., | |
| *Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD............................................................................................................3

I.     COUNT ONE FAILS TO STATE A CLAIM FOR MONOPOLIZATION IN THE ALLEGED GENERAL SEARCH SERVICES MARKET. .......................................4

     A.    Plaintiffs Lack Antitrust Standing to Assert Count One.......................................4

     B.    Plaintiffs Have Not Adequately Alleged That Google Engaged in Exclusionary Conduct. .............................................................................................9

          1.    Allegations Relating to Search Distribution Agreements. .........................10

          2.    Additional Allegations Relating to Apple..................................................11

          3.    Allegations Relating to Acquisitions. ........................................................12

          4.    Allegations Relating to Misappropriating Content. ...................................13

          5.    Allegations Relating to the Readiness of Bard. .........................................15

          6.    Allegations Relating to Changes to AdSense. ...........................................15

          7.    Allegations Relating to Spoliation. ............................................................16

          8.    Allegations Relating to California News Sites. ..........................................17

II.    COUNT TWO FAILS TO STATE A CLAIM FOR MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF A MARKET FOR ONLINE NEWS..............17

     A.    Plaintiffs Have Not Adequately Pleaded a Relevant Market.................................18

     B.    Plaintiffs Have Not Adequately Pleaded the Possession of Monopoly Power or a Dangerous Probability of Achieving It.................................................21

     C.    Plaintiffs Have Not Adequately Alleged That Google Engaged in Exclusionary Conduct. ...........................................................................................23

III.   COUNT THREE FAILS TO PLEAD AN UNLAWFUL TYING ARRANGEMENT...............................................................................................................27

     A.    Plaintiffs Have Not Pleaded a Tying Claim..........................................................28

          1.    Count Three Does Not Plead a Tying Arrangement...................................28

          2.    Plaintiffs Have Not Alleged the Existence of Two Separate Products, a Relevant Market for Either Product, or Harm to Competition......................................................................................................30

     B.    Plaintiffs Lack Antitrust Standing to Assert Count Three.....................................32

IV.   COUNT FOUR FAILS TO PLEAD A VIOLATION OF SECTION 7 OF THE CLAYTON ACT. ................................................................................................................34

     A.    Plaintiffs Lack Standing and Have Not Pleaded a Relevant Market or the Requisite Anticompetitive Effect in an Alleged Relevant Market. .......................34

B.     The Claim Is Time Barred. ...................................................................35

      1.     The Statute of Limitations and Doctrine of Laches Bar Count Four.........35

      2.     Plaintiffs Cannot Plead Around the Statute of Limitations and Doctrine of Laches. ...................................................................36

V.     COUNT FIVE FAILS TO PLEAD AN UNLAWFUL AGREEMENT BETWEEN GOOGLE AND APPLE. ...................................................................40

A.     Plaintiffs' Conclusory Assertion that Google Caused Apple to "Shelve" Its "Plans" for "Entering the General Search Market" Is Not Plausibly Alleged. ...................................................................40

B.     The Complaint Fails to Allege a Sherman Act Violation under Either the *Per Se* Rule or the Rule of Reason. ...................................................................43

C.     Plaintiffs Lack Antitrust Standing to Assert Count Five. ...................................45

CONCLUSION ...................................................................45

# TABLE OF AUTHORITIES

## CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ...................................29

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) .................................5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................3

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) .......................................................33

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................4, 40, 45

*Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287 (6th Cir. 1992) ...........................................7

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).........................26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...............................5, 32, 34

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988)......................................................43

*City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921 (2d Cir. 1981) .................................10

*City of New York v. Grp. Health Inc.*, 649 F.3d 151 (2d Cir. 2011).............................................35

*Comm. on Ways & Means, U.S. House of Reps. v. U.S. Dep't of Treasury*, 45 F.4th 324 (D.C. Cir. 2022) ..............................................................................................................4

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005)................................9, 27

*Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584 (D.D.C. 1995)........................................18, 21

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1 (1st Cir. 2004) ................................................................................................................14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .......................................29

*Fotobom Media, Inc. v. Google LLC*, 2024 WL 1603968 (D.D.C. Feb. 27, 2024).........2, 6, 7, 45

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) ...........................................................18

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)...........................................................7, 14

*Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir. 2000).....................................................24

*Hemp Indus. Assoc. v. DEA*, 36 F.4th 278 (D.C. Cir. 2022)........................................................41

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)...............................................................20

*In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016) ...........................6, 7

*In re Cox Enters., Inc.*, 871 F.3d 1093 (10th Cir. 2017)...............................................................32

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ................9

*In re McCormick & Co.*, 217 F. Supp. 3d 124 (D.D.C. 2016)..............................................43, 44

*In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987 (N.D. Cal. 2010) .........................................32

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999).................................................10

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ..................................................30

iii

*Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2017) ...................1, 4, 5

*Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984)..............................14

*Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016)........................................28

*Langeman v. Garland*, 88 F.4th 289 (D.C. Cir. 2023)..............................................3, 42

*Larson v. Northrop Corp.*, 21 F.3d 1164 (D.C. Cir. 1994)..........................................39

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ..............................43

*McCagg v. Marquis Jet Partners, Inc.*, 2007 WL 2454192 (S.D.N.Y. Mar. 29, 2007) ...............19

*Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38 (D.D.C. 2008) ...........................43, 44

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004)...........................37, 38

*Mulvey v. Am. Airlines Inc.*, 2019 WL 1060877 (D.D.C. Mar. 6, 2019)..................................16

*New York v. Facebook, Inc.*, 549 F. Supp 3d 6 (D.D.C. 2021)................................................13, 38

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) ................................ *passim*

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (en banc)....................................4

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ....................................25

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986)..................15, 25

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) .........................................13, 15, 22, 34

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ...............................10, 11, 14

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ............................33

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ...........................20

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020).......37, 39, 40

*SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39 (1st Cir. 1995) .........................8, 33

*S.E. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608 (8th Cir. 2011) ....................................19

*Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995)..............................................8

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88 (D.D.C. 2013) .... *passim*

*Stamatakis Indus., Inc. v. King*, 965 F.2d 469 (7th Cir. 1992) ....................................33

*Taylor v. Fed. Aviation Admin.*, 351 F. Supp. 3d 97 (D.D.C. 2018) ...............................17

*Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810 (N.D. Cal. 2021)..................................31

*Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261 (8th Cir. 1984) .........................26

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ...............................................12, 45

*United States v. Google LLC*, 687 F. Supp. 3d 48 (D.D.C. 2023)......................................9, 12, 42

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc)....................... *passim*

*United States v Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ....................................23

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)..............26

iv

*W. Assocs. L.P. ex rel. Ave. Assocs. Ltd. v. Market Square Assocs.*, 235 F.3d 629 (D.C. Cir. 2001) ..................................................................................................................22

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010)..................................8

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) .............................................13, 35

## STATUTES AND RULES

Section 1 of the Sherman Act, 15 U.S.C. § 1 ............................................................................3, 40

Section 2 of the Sherman Act, 15 U.S.C. § 2......................................................................... *passim*

Section 3 of the Sherman Act, 15 U.S.C. § 3............................................................................3, 40

Section 4B of the Clayton Act, 15 U.S.C. § 15b ............................................................13, 35, 36

Section 7 of the Clayton Act, 15 U.S.C. § 18 ....................................................................... *passim*

Federal Rule of Civil Procedure 9(b)........................................................................................39

Federal Rule of Civil Procedure 12(b)(6) ............................................................................. *passim*

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2022) ................................................................29

## INTRODUCTION

In its motion to dismiss the original Complaint in this case, Google observed that the Complaint included a compilation of allegations made by other plaintiffs, all of whom are differently situated in crucial respects. As a consequence, Google explained, the claims should be dismissed on multiple grounds, including due to the absence of antitrust standing—a threshold inquiry that determines "whether the plaintiff is a proper party to bring a private antitrust action." *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 981 (D.C. Cir. 2017). Instead of opposing Google's motion, Plaintiff filed an Amended Complaint in which it added a second newspaper publisher as a Plaintiff and attempted to recast some of its allegations. These changes amount to nothing more than rearranging the proverbial deckchairs, however, as the claims remain irretrievably flawed.

Each of the counts fails to state a claim for multiple reasons. Counts One, Three, Four, and Five have in common that Plaintiffs lack antitrust standing to assert the claims. And while Google does not seek dismissal of Count Two on that ground, it too suffers from a fundamental threshold flaw: Plaintiffs have neither pleaded a relevant antitrust market for "online news" nor asserted a plausible argument that Google possesses monopoly power in such a posited market. As detailed below, each count of the Amended Complaint further fails on additional independent grounds.

Count One asserts that Google has unlawfully maintained a monopoly in an alleged market for general search services through a "monopoly broth" of far-flung conduct, including "[a]cquiring companies (such as Android, DeepMind, and YouTube)," entering agreements with Apple and "Android Partners … that make Google the default search engine," and purportedly introducing an artificial intelligence service "without it being ready for use in an effort to undermine competition from Microsoft." Am. Compl. ¶ 335. The claim should be dismissed

1

because Plaintiffs—who publish several newspapers (*id.* ¶¶ 26-29)—lack antitrust standing to complain about this conduct.  As discussed in Section I.A, Plaintiffs are neither "participants" in the alleged general search services market nor experienced an injury in that alleged market.  *Fotobom Media, Inc. v. Google LLC*, 2024 WL 1603968, at *3-4 (D.D.C. Feb. 27, 2024).  Count One should also be dismissed because the "monopoly broth" theory advanced by Plaintiffs is not legally cognizable, and they have not plausibly alleged conduct that has the requisite anticompetitive effect in the asserted general search services market.  *See* Section I.B.

In Count Two, Plaintiffs claim that Google has unlawfully monopolized or attempted to monopolize an alleged market for online news.  But the Amended Complaint does not "define the market by reference to the reasonable interchangeability—or lack thereof" with regard to other obvious channels where users access news, which is a "valid ground for dismissal at the Rule 12(b)(6) stage."  *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.,* 947 F. Supp. 2d 88, 103 (D.D.C. 2013).  Among other things, Plaintiffs have not plausibly alleged that users view Google's search results and content in Plaintiffs' newspapers as substitutes in the alleged market for online news.  Nor have they plausibly alleged that all the other ways people consume news— from television to newspapers and mobile apps to podcasts—are not reasonably interchangeable with the websites that Plaintiffs assert are part of their alleged relevant market.  *See* Section II.A. Count Two should also be dismissed because Plaintiffs have not adequately pleaded that Google possesses monopoly power (or has a dangerous probability of achieving it) in the asserted market for online news or that it has engaged in any exclusionary conduct.  *See* Sections II.B-C.

Plaintiffs allege in Count Three that Google has unlawfully tied "the provision of search traffic" with acquiring "news content for republishing and AI training in the upstream supply chain."  Am. Compl. ¶ 376.  The count should be dismissed on the ground that Plaintiffs have

not asserted antitrust tying because they do not allege that Google is **selling** two separate products.  Moreover, the claim suffers a host of other pleading defects, including a failure to plead relevant markets for two products or harm to competition.  *See* Section III.A.  The claim also fails at the threshold because Plaintiffs lack antitrust standing.  *See* Section III.B.

Count Four alleges that Google violated Section 7 of the Clayton Act by "acquiring entities such as YouTube, Android, and DeepMind."  Am. Compl. ¶ 390.  The claim fails for several of the same reasons referenced above, including a lack of antitrust standing and a failure to plausibly allege the requisite anticompetitive effect in a properly defined market.  *See* Section IV.A.  The four-year statute of limitations and doctrine of laches also bar the claim, which is predicated on acquisitions that were completed and publicly announced more than a decade ago, and in some instances **nearly two decades ago**.  *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 299-301 (D.C. Cir. 2023); *see* Section IV.B.

Count Five claims that Google's Information Services Agreement with Apple violates Sections 1 and 3 of the Sherman Act.  The count should be dismissed because Plaintiffs have not plausibly alleged that Apple's agreement with Google unlawfully caused Apple to "shelve[]" any purported "plans" to "enter[] the general search market in competition with Google" in 2016.  Am. Compl. ¶¶ 399-400; *see* Section V.A.  Furthermore, Plaintiffs have not pleaded a viable claim under either the *per se* rule or the rule of reason.  *See* Section V.B.  Finally, Plaintiffs lack antitrust standing to pursue the claim.  *See* Section V.C.

The Amended Complaint should be dismissed in its entirety.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although a court reviewing a motion to dismiss "accept[s] the

complaint's factual allegations as true," the court is "not bound to accept as true a legal

conclusion couched as a factual allegation." *Comm. on Ways & Means, U.S. House of Reps. v.*

*U.S. Dep't of Treasury*, 45 F.4th 324, 330 (D.C. Cir. 2022).  The court likewise "need not accept

inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the

complaint." *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023); *see Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 558 (2007) (observing that while "it is one thing to be cautious before

dismissing an antitrust complaint in advance of discovery," it is "quite another to forget that

proceeding to antitrust discovery can be expensive").

# I.     COUNT ONE FAILS TO STATE A CLAIM FOR MONOPOLIZATION IN THE ALLEGED GENERAL SEARCH SERVICES MARKET.

Count One of Plaintiffs' Amended Complaint alleges that "Google has unlawfully

maintained" a purported "monopoly in the general search market through a 'monopoly broth' of

anticompetitive acts" that allegedly "have enabled it to exclude rivals."  Am. Compl. ¶ 335.  This

count should be dismissed because Plaintiffs lack antitrust standing and, with respect to at least

some of the conduct alleged, have not even established Article III standing.  Moreover, even if

Plaintiffs had standing to assert Count One, their "monopoly broth" theory is not legally

cognizable, and each of the components of the "broth" does not amount to a well-pleaded claim

for relief because the Amended Complaint does not adequately allege facts amounting to

exclusionary conduct under Section 2 of the Sherman Act.

## A.     Plaintiffs Lack Antitrust Standing to Assert Count One.

A private antitrust plaintiff must do more than allege facts sufficient to show that it

possesses Article III standing.  *Johnson*, 869 F.3d at 981; *see NicSand, Inc. v. 3M Co.*, 507 F.3d

442, 449 (6th Cir. 2007) (en banc) ("[A]ntitrust standing and Article III standing are not one and

the same, and we not only may—but we must—reject claims under Rule 12(b)(6) when antitrust

standing is missing.").  In particular, "[a] private antitrust plaintiff does not acquire standing

merely by showing that it was injured in a proximate and reasonably measurable way by conduct

of the defendant violating the antitrust laws (injury-in-fact)." *Andrx Pharms., Inc. v. Biovail*

*Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001).  "Nor is it enough that the injury be causally

connected to the acts that violate the antitrust laws (causation)." *Id.*  Plaintiffs do not have

antitrust standing unless they establish, among other things, that they seek to redress an antitrust

injury, "which is to say an injury of the type the antitrust laws were intended to prevent and that

flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-*

*Mat, Inc.*, 429 U.S. 477, 489 (1977).  "Additional factors to be considered in determining

whether the plaintiff has 'antitrust standing' include: the directness of the injury, whether the

claim for damages is 'speculative,' the existence of more direct victims, the potential for

duplicative recovery and the complexity of apportioning damages." *Andrx*, 256 F.3d at 806.[1]

The Amended Complaint lays bare the disconnect between Plaintiffs—who characterize

themselves as the owners of certain newspapers (Am. Compl. ¶¶ 26-29)—and the alleged

"general search services market consist[ing] of 'general search engines, which are "one-stop

shops" consumers can use to search the internet for answers to a wide range of queries.'" *Id.* ¶

332.  Count One asserts that Google has "stifle[d] competition in the general search market … by

depriving rivals of scale necessary to improve or maintain quality," which "deprives consumers

of choice and quality in the general search engines available on the market."  Am. Compl. ¶¶

---

[1] As discussed in Section I.B *infra*, Plaintiffs have also failed to plead facts sufficient to
demonstrate that they have Article III standing with respect to at least some of the conduct
alleged.  Because the Court may dismiss the claims on either ground, this section focuses on a
threshold basis for dismissing Count One that would apply even if Plaintiffs could sufficiently
allege Article III standing.  *E.g.*, *Johnson*, 869 F.3d at 981-82 (affirming dismissal for lack of
antitrust standing rather than resolving whether the alleged injury could be redressed for
purposes of determining Article III standing).

341-43.  None of these assertions relates to an alleged injury experienced by Plaintiffs, who do not purport to be current or potential rivals in the alleged market for general search services, and also do not purport to be consumers who use general search engines "to search the internet for answers to a wide range of queries."  *Id.* ¶ 332.  As Google explained in its motion to dismiss the first count of Plaintiffs' original complaint, Plaintiffs lack antitrust standing because they are not "participants" in the general search services market alleged in Count One and do not otherwise plead injuries bearing the requisite relationship to that alleged market.  *E.g.*, *Fotobom Media*, 2024 WL 1603968, at *3 (evaluating "whether the plaintiff is a market 'participant'" and "hold[ing] that Plaintiff lacks antitrust standing to pursue claims with respect to the market for general search services"); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (explaining that "[g]enerally, only those that are participants in the defendants' market can be said to have suffered antitrust injury").

In response to Google's motion to dismiss the original Complaint, Plaintiffs applied a superficial gloss to their allegations by asserting in conclusory fashion that they "are direct purchasers of search traffic from Google" (Am. Compl. ¶ 348) who also "supply quality content for Google's index" by allowing Google to crawl their webpages.  *Id.* ¶ 119; *see, e.g.*, *id.* ¶ 40 (alleging "Google provides *search traffic referrals* to Publishers in exchange for *content*, which Google obtains via crawling and indexing websites").  For a number of reasons, Plaintiffs' strained attempt to portray themselves as "participants" in the general search services market does not confer antitrust standing.

First, the injuries Plaintiffs purportedly have sustained were not experienced ***in the alleged market for general search services***.  This point is dispositive, as it is well established that "[p]arties whose injuries, though flowing from that which makes the defendant's conduct

unlawful, are experienced in another market do not suffer antitrust injury." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020); *see, e.g.*, *Fotobom Media*, 2024 WL 1603968, at *4 (explaining that "the antitrust standing inquiry turns on whether the plaintiff is a participant in the relevant market ***and*** 'suffered its injury in the market where competition is being restrained'" (emphasis added)).  The injuries Plaintiffs allege that they personally experienced involve the profitability of their print and digital newspapers, which indisputably are not part of the alleged general search services market.  The Amended Complaint alleges, for example, that "Plaintiffs and the Class have suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees."  Am. Compl. ¶ 349.  But all of those asserted effects on ***publishers'*** costs and output are experienced outside of the alleged general search services market.  Simply put, Plaintiffs lack standing to pursue Count One because "[p]arties whose injuries are experienced in another market do not suffer antitrust injury."  *Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 158 (ellipsis omitted); *see, e.g.*, *Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 289-91 (6th Cir. 1992) (holding that a broker of the defendant's products who suffered a "loss of commissions" due to the defendant's allegedly anticompetitive "restructuring" of "its brokerage arrangements" lacked antitrust standing because "the relevant market is not the 'broker market,' but rather the sale of [the defendant's] and competitors' products at the wholesale level").

Second, Plaintiffs' attempt to plead antitrust standing fails because it conflicts with numerous opinions explaining the market "participant" requirement for antitrust standing.  The Amended Complaint alleges that "Google and news Publishers have a transactional arrangement in which Publishers supply quality content for Google's index in exchange for Google supplying search traffic to Publishers' websites," and Plaintiffs further assert that "[i]n a competitive

general search market, they could have bargained with other general search engine providers for better terms of trade."  Am. Compl. ¶¶ 119, 350.  This assertion is not supported by well-pleaded factual allegations, but even if it were true, it is still insufficient to confer antitrust standing. Plaintiffs' Complaint is an example of one of the recurring "patterns" where a plaintiff lacks standing, namely a claim that "involves the *supplier* who suffers because an antitrust violation curtails a business that would otherwise have purchased from the supplier."  *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995).  "In general, such a supplier … is held not to have suffered "antitrust injury,'" as it is not "a customer who obtains services in the threatened market or a competitor who seeks to serve that market."  *Id.*  Thus, even if Plaintiffs could plausibly plead that in the absence of the alleged conduct they would have been able to "supply" content to general search engines on terms that generated additional benefits for Plaintiffs, they would not have standing to maintain a claim based on the alleged monopolization of the asserted market for general search services.  *See, e.g.*, *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) ("A supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services.");  *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) (explaining that "[s]uppliers to direct market participants typically cannot seek recovery under the antitrust laws because their injuries are too secondary and indirect to be considered 'antitrust injuries,'" and "a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other").

Third, Count One cannot be salvaged by Plaintiffs' attempt to characterize themselves as "direct purchasers of search traffic from Google" (Am. Compl. ¶ 348) because search traffic cannot be purchased through organic search results.  As this Court well knows, search engine

8

users are the consumers of general search engines—not newspaper publishers like Plaintiffs. The fact that Google and other search engines crawl websites does not make those websites "purchasers of search traffic," and for that reason, Plaintiffs have not alleged facts demonstrating a direct purchaser relationship with Google for antitrust standing purposes.

**B.      Plaintiffs Have Not Adequately Alleged That Google Engaged in Exclusionary Conduct.**

Count One should also be dismissed on the alternative ground that Plaintiffs have failed to plead that Google engaged in "exclusionary conduct" to maintain purported monopoly power in the alleged market for general search services. This is an indispensable element of Plaintiffs' claim, as "having a monopoly does not by itself violate § 2," and a "firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc).

Plaintiffs' scattershot assertions of purportedly anticompetitive conduct—which range from the acquisition of YouTube in 2006 to a product launch in 2023—must each be evaluated separately to determine whether Plaintiffs have satisfied their pleading obligations. *See United States v. Google LLC*, 687 F. Supp. 3d 48, 69 (D.D.C. 2023) (rejecting plaintiffs' contention "that three different *types* of monopolistic conduct… must effectively be viewed as one in order to evaluate harm in the relevant markets"); *see also In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) (explaining that "courts disaggregate the exclusionary conduct into its component parts before applying the relevant law"); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 672 (D.C. Cir. 2005) (evaluating separately "five types of conduct" alleged to have violated the Sherman Act). Moreover, Plaintiffs cannot overcome the deficiencies in their pleading by characterizing disparate conduct as "a 'monopoly

broth' of anticompetitive acts."  Am. Compl. ¶ 335.  "Each legal theory must be examined for its

sufficiency and applicability" because there is no sound basis for the proposition that "the

degrees of support for each legal theory should be added up."  *Intergraph Corp. v. Intel Corp.*,

195 F.3d 1346, 1367 (Fed. Cir. 1999); *see, e.g.*, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,

555 U.S. 438, 457 (2009) (declining plaintiffs' invitation "to join" two "claim[s] that cannot

succeed, and alchemize them into a new form of antitrust liability" because "two wrong claims

do not make one that is right"); *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-

29 (2d Cir. 1981) (explaining that a court must "analyze the various issues individually" under

Section 2 even when they are purportedly "interrelated and interdependent," and "reject[ing] the

notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions

is one or more, the plaintiffs have proved a violation of … section 2 of the Sherman Act").

Plaintiffs have not adequately pleaded that any of the conduct alleged in their Amended

Complaint comprises exclusionary conduct.  Moreover, many of the categories of conduct

alleged by Plaintiffs suffer other defects beyond those already identified, including a failure to

establish Article III standing.  While Count One should be dismissed in its entirety for lack of

antitrust standing, the Court may also dismiss it because Plaintiffs' "monopoly broth" theory is

not legally cognizable and each component of the broth fails as a matter of law.

### 1.    Allegations Relating to Search Distribution Agreements.

As indicated in Section I.A *supra*, Plaintiffs lack standing to pursue an antitrust claim

predicated on allegations that Google "enter[ed] into exclusionary distribution contracts with

Apple, Android Partners, and Browsers that make Google the default general search engine on

their products."  Am. Compl. ¶ 335.[2]  Whatever effect those agreements have, they have no

effect on Plaintiffs and any injury asserted by Plaintiffs is unrelated to Google's successful

competition to win those default agreements.

Furthermore, Plaintiffs have not adequately alleged that Google used "monopoly profits

to pay excessive amounts for those contracts."  *Id*.  The Amended Complaint simply lists alleged

contractual figures; it lacks factual allegations that the referenced revenue share agreements

involve payments that are "excessive" in any legally cognizable sense, *i.e.*, that they are

predatory overpayments rather than above-cost pricing, which is protected as a matter of law.

*E.g.*, *linkLine*, 555 U.S. at 451-52 (affirming dismissal of Section 2 claim "where the defendant's

retail price remains above cost"); *Microsoft*, 253 F.3d at 68 ("The rare case of price predation

aside, the antitrust laws do not condemn even a monopolist for offering its product at an

attractive price, and we therefore have no warrant to condemn Microsoft for offering either IE or

the IEAK free of charge or even at a negative price.").

## 2.    Additional Allegations Relating to Apple.

Plaintiffs likewise have failed to allege facts plausibly establishing an agreement that

Apple would "abandon any potential for using Siri as a search engine … and not give itself

default search engine status in updates of its operating system" (Am. Compl. ¶ 335), and have

not pleaded facts sufficient to demonstrate the requisite anticompetitive effect in the alleged

market for general search services.  As discussed in Section V.A *infra*, the Amended Complaint

does not plausibly allege that a virtual assistant such as Siri is part of the asserted relevant market

or that Apple even had plans for "using Siri" to provide general search services as defined by

---

[2] Google rejects any assertion that these agreements comprise exclusionary conduct, including
for the reasons it presented at trial in *United States v. Google LLC*, No. 20-cv-3010-APM
(D.D.C.).

Plaintiffs.  *Id.*; *see id.* ¶ 84 n.26 (alleging that "Siri Suggestions is a voice assistant search engine for the iPhone that makes suggestions about what a user could do with his or her smartphone"); ¶ 332 (alleging "[t]he general search services market … consists of 'general search engines, which are "one-stop shops" consumers can use to search the internet for answers to a wide range of queries").  Indeed, this Court entered summary judgment with respect to claims regarding the promotion and distribution of Google's virtual assistant because the plaintiffs in *United States v. Google* and *Colorado v. Google* provided no evidence that virtual assistants, like Apple's Siri, had "any substantial anticompetitive effect in search" given that virtual assistants are not used like general search engines.  *Google*, 687 F. Supp. 3d at 86.

Plaintiffs' allegations about Google "[n]egotiating with Apple to potentially extend its exclusionary agreement to GAI [generative artificial intelligence]" are inadequate for all of the same reasons and more.  *Id.* ¶ 335.  For one thing, Plaintiffs have not alleged facts sufficient to establish that they have Article III standing to bring a Section 2 claim based on Google and Apple engaging in "negotiations."  *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 436-38 (2021) (reiterating that in each case "a plaintiff must show … that he suffered an injury in fact that is concrete, particularized, and actual or imminent," and analyzing plaintiffs' failure to establish standing based on a "risk of future harm").  Furthermore, Plaintiffs do not plausibly allege any anticompetitive effect in the alleged relevant market for general search services from two companies purportedly negotiating about generative artificial intelligence technologies.

### 3.    Allegations Relating to Acquisitions.

Plaintiffs' contentions regarding Google "acquiring companies (such as Android, DeepMind, and YouTube) that enabled it to build an exclusionary digital ad search network" fail for the reasons discussed in Section IV *infra*.  Briefly stated, Plaintiffs have not pleaded factual allegations showing why these acquisitions, which did not involve general search engines, were

anticompetitive or had an anticompetitive effect in the alleged market for general search services. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (explaining that Plaintiffs bear the "burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market"). Furthermore, the statute of limitations and doctrine of laches bar Plaintiffs' attempt to challenge acquisitions that occurred at least 10 years ago, and in some instances **nearly 20 years ago**. *See* Section IV.B *infra*.[3]

### 4.   Allegations Relating to Misappropriating Content.

Plaintiffs have not alleged a form of exclusionary conduct through a purported "misappropriation" of their data. *See* Am. Compl. ¶ 335. The Amended Complaint does not allege that Google obtained any of Plaintiffs' data without their consent; to the contrary, Plaintiffs allege that they can "instruct[] GoogleBot not to crawl a specific webpage," but they choose not to do so because they want Google to crawl and index their pages. *Id.* ¶ 157 n.80; *e.g.*, *id.* ¶ 157 (alleging Plaintiffs "can restrict Google from republishing their content as snippets" but doing so may "reduc[e] search traffic"); ¶ 160 (quoting a publisher stating that "Google give[s] you the opportunity to opt out[,] [b]ut obviously we don't want to opt out of all web crawling").

---

[3] Section IV.B addresses the untimeliness of these allegations in the context of Plaintiffs' claim under Section 7 of the Clayton Act, but the same principles apply to their claim under Section 2 of the Sherman Act. *See, e.g.*, *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 603 (6th Cir. 2014) (observing that "the same statute—15 U.S.C. § 15b—provides the [four-year] statute of limitations for each" of Sherman Act Section 2 and Clayton Act Section 7, and concluding that "[t]here is nothing in 15 U.S.C. § 15b that suggests it should be applied one way for merger-acquisition claims under the Sherman Act but differently for merger-acquisition claims under the Clayton Act"); *New York v. Facebook, Inc.*, 549 F. Supp 3d 6, 45 (D.D.C. 2021) (*aff'd sub nom. Meta*, 66 F.4th 288) (holding that "the same laches analysis applies regardless of whether a particular merger is assailed on Section 2 or Section 7 grounds").

Instead, Plaintiffs purportedly are dissatisfied with the financial terms on which they allow their webpages to be crawled, as they allege that, apart from free traffic to their sites, "Plaintiffs have received no compensation from Google and no share in the revenue that Google derives."  *Id.* ¶ 18; *see, e.g.*, *id.* ¶¶ 200, 309, 406(d) (demanding that Google "invest[] significant sums in supporting news or reference dissemination by smaller Publishers").  Even if Plaintiffs could overcome all of the other deficiencies in their pleading, there would be no basis on which to condemn a purported "in-kind exchange of value" and dictate some other form of compensation.  *Id.* ¶ 119; *see, e.g.*, *linkLine*, 555 U.S. at 454 (describing the inability of "a judge or jury to determine a 'fair price' … without acting like a rate-setting regulatory agency" in affirming dismissal of a Section 2 claim); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984) (explaining that "even if the buyer has monopoly power, an antitrust court … will not interfere with a buyer's (nonpredatory) determination of price").

Plaintiffs also allege dissatisfaction with Google's stated policies regarding how Google uses data from the webpages that Plaintiffs allow Google to crawl and index.  *See, e.g.*, Am. Compl. ¶¶ 8, 157, 406(d) (seeking an order "revising Google's practices so that a Publisher who wishes to opt out of SGE would still show up on Google searches").  Again, however, Plaintiffs' allegations are untethered to any form of exclusionary conduct, as "antitrust claims are concerned not with wrongs directed against the private interest of an individual business but with conduct that stifles competition."  *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 4 (1st Cir. 2004); *see, e.g.*, *Qualcomm*, 969 F.3d at 1003 (rejecting the FTC's Section 2 challenge to a licensing policy that was "designed to maximize [the defendant's] profits" because "profit-seeking behavior alone is insufficient to establish antitrust liability").

14

Last, the Amended Complaint lacks any non-conclusory allegations of an anticompetitive effect in the alleged general search services market from Google's alleged misappropriation of Plaintiffs' content without compensation.  As indicated, the Amended Complaint does not allege that Plaintiffs compete in the asserted market for general search services that is the subject of their monopoly maintenance claim.  *See* Section I.A *supra*.  Plaintiffs' contention that they have not been adequately compensated for allowing Google to crawl and index their webpages or have not been permitted to dictate the terms on which Google presents search results does not amount to "a substantial anticompetitive effect that harms consumers *in the relevant market*" for general search services.  *Am. Express*, 585 U.S. at 541 (emphasis added).

### 5.   Allegations Relating to the Readiness of Bard.

Plaintiffs have not pleaded a claim for relief through their contention that Google "introduc[ed] Bard (later known as Gemini) without it being ready for use in an effort to undermine competition from Microsoft and preserve its monopoly in general search."  Am. Compl. ¶ 335.  The law neither imposes a "readiness" standard on the launch of a product or service, nor requires an alleged monopolist to refrain from launching a product or service in order to cede a field to a rival that is also active in the area.  To the contrary, "[a] monopolist, no less than any other competitor, is permitted and indeed encouraged to compete aggressively on the merits."  *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986).  Nothing about Google's alleged launch of Bard constitutes exclusionary conduct within the meaning of Section 2.

### 6.   Allegations Relating to Changes to AdSense.

Plaintiffs also fail to plead exclusionary conduct through their allegations regarding Google "[m]odifying the manner in which it charges Publishers under AdSense by using a cost per impression rather than a cost per click methodology and imposing separate charges for its

services."  Am. Compl. ¶ 335.  How Google allegedly charges for AdSense display advertising on third-party websites (not search advertising on Google Search results pages) does not harm competing general search engines, much less impede their ability to compete against Google.[4]

Moreover, Plaintiffs have not pleaded a substantial anticompetitive effect in the alleged market for general search services.  The Amended Complaint avers that AdSense "enabl[es] Publishers to sell display space to advertisers on their websites."  *Id.* ¶ 275.  It lacks non-conclusory allegations that a change in the way publishers are compensated *for ads placed on their own websites* is "conduct which unfairly tends to destroy competition itself" in the alleged market for general search services.  *Microsoft*, 253 F.3d at 58; *see* Am. Compl. ¶ 332.  In short, a change in how Google charges for *display* ads on third-party websites cannot possibly harm competition among general search engines that, at most, place search ads on their own search results pages.

### 7.     Allegations Relating to Spoliation.

Plaintiffs' allegations of "[s]poliating evidence" are inapt because such conduct is not a cognizable form of exclusionary conduct under Section 2, and Plaintiffs have not plausibly alleged how it "harm[s] the competitive *process* and thereby harm[s] consumers."  *Microsoft*, 253 F.3d at 58.

---

[4] Plaintiffs also have not established Article III standing to complain of this conduct, as they merely allege that "certain Emmerich Newspapers entities have used" AdSense.  *Id.* ¶ 275.  The Amended Complaint does not allege that the Plaintiffs themselves have used AdSense or that any "Emmerich Newspapers entities" have done so since the change to the AdSense terms announced in November 2023, let alone that Plaintiffs have personally experienced an injury that is "particularized" (*i.e.*, that "affect[s] the plaintiff in a personal and individual way") and "concrete" (*i.e.*, that "actually exist[s]").  *Mulvey v. Am. Airlines Inc.*, 2019 WL 1060877, at *3-4 (D.D.C. Mar. 6, 2019) (concluding plaintiffs lacked Article III and antitrust standing because "[s]tanding 'is not dispensed in gross,' and the fact that other consumers purchased airline tickets [from defendants] is irrelevant to the [plaintiff's] lawsuit because 'each plaintiff must demonstrate that it has suffered injury in order to establish standing'").

### 8.      Allegations Relating to California News Sites.

Finally, Plaintiffs—who are publishers of local news publications in Arkansas, Mississippi, and Louisiana—cannot predicate a claim on Google purportedly "[b]anning California news websites from Google Search in retaliation for the introduction of the CJPA [California Journalism Preservation Act]."  Am. Compl. ¶ 335; *see id.* ¶¶ 26-29.  Plaintiffs lack Article III standing to bring a claim based on these allegations because they do not allege the requisite actual or imminent injury-in-fact, and do not even purport to be "Californian news outlets" that were affected by a "temporar[y] banning … from Google Search for certain California-based users."  *Id.* ¶ 10.  It is immaterial whether the proposed class may include "California news websites" (*id.* ¶ 335) because "in the class-action context, named plaintiffs 'must allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *Taylor v. Fed. Aviation Admin.*, 351 F. Supp. 3d 97, 102 (D.D.C. 2018).

Furthermore, Plaintiffs have not alleged that including or omitting links to particular news sites in search results "harm[s] the competitive *process*" in the alleged general search services market.  *Microsoft*, 253 F.3d 58.  Any such theory is not only implausible and absent from the Amended Complaint, but also contradicted by its other allegations.  For example, Plaintiffs allege that "news is incredibly valuable to general search engines" (Am. Compl. ¶ 116), such that a decision by Google not to display certain news websites in its results would ***benefit*** rather than injure competing general search engines.

## II.    COUNT TWO FAILS TO STATE A CLAIM FOR MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF A MARKET FOR ONLINE NEWS.

Count Two asserts that Google has unlawfully monopolized or attempted to monopolize an alleged market for "online news" in violation of Section 2 of the Sherman Act.  Am. Compl.

¶¶ 354-72.  Count Two should be dismissed on several independent grounds.  First, Plaintiffs have not pleaded a relevant market for online news.  Second, the Amended Complaint lacks well-pleaded allegations that Google possesses monopoly power (or a dangerous probability of achieving it) in an alleged online news market.  And third, Plaintiffs have not plausibly alleged that Google engaged in a form of exclusionary conduct.

### A.     Plaintiffs Have Not Adequately Pleaded a Relevant Market.

To plead actual or attempted monopolization under Section 2, "the plaintiff must plead facts sufficient to establish the existence of a relevant market."  *Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 590 (D.D.C. 1995).  Plaintiffs "bear[] the burden of establishing the relevant market," "which traditionally has two components: the product market and the geographic market."  *Sky Angel*, 947 F. Supp. 2d at 102.  Allegations of a relevant product market "the confines of which are only somewhat fleshed out and the players within which remain almost entirely unspecified . . . is not enough."  *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 20 (D.D.C. 2021).  In addition, because "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," "[f]ailure to define the market by reference to the reasonable interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule 12(b)(6) stage."  *Sky Angel*, 947 F. Supp. 2d at 103.  Plaintiffs have not adequately pleaded a relevant market for online news for at least two distinct reasons.

First, Plaintiffs have not plausibly alleged the contours of a market for online news that includes Google Search.  The Amended Complaint asserts in cursory fashion that "[o]nline news publishers include both 'legacy' news outlets … and 'digital native' outlets that produce and/or publish professional works of journalism."  Am. Compl. ¶ 356.  But there are no well-pleaded factual allegations that Google Search is "producing" or "publishing" "professional works of

journalism."  Although Plaintiffs identify search features that display a snippet of content from a webpage along with a link to that page (*e.g.*, *id.* ¶¶ 176-78, 183), they have not plausibly alleged that these features render Google Search reasonably interchangeable with websites that "publish professional works of journalism," such as those operated by *The Helena World*, *Monroe County Argus*, or *The New York Times.*

"Determining the limits of a relevant product market requires identifying the choices available to customers," with a "focus[] on how 'consumers will shift from one product to the other in response to changes in their relative costs.'"  *S.E. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 613 (8th Cir. 2011).  The Amended Complaint does not take on this essential task. Plaintiffs do not plausibly allege, for example, that users planning to consume the news on washingtonpost.com or enterprise-tocsin.com instead do so by visiting Google Search and consuming the kind of two-sentence snippet excerpted in the Amended Complaint.  *E.g.*, Am. Compl. ¶¶ 176-78, 183.  Plaintiffs have lumped together services that are facially different in numerous respects—as Plaintiffs themselves allege in their characterization of general search engines (*e.g.*, *id.* ¶ 332)—without "defin[ing] the market by reference to the reasonable interchangeability" of those "services."  *Sky Angel*, 947 F. Supp. 2d at 103.  The failure to allege a relevant product market for online news in which Google Search competes with Plaintiffs is fatal to their claim that Google has monopolized or attempted to monopolize such as a market, as "it is axiomatic that a firm cannot monopolize a market in which it does not compete."  *McCagg v. Marquis Jet Partners, Inc.*, 2007 WL 2454192, at *6 (S.D.N.Y. Mar. 29, 2007).

Second, even if Plaintiffs could plausibly allege an online news market that "include[es] search engines, news aggregators, and social media platforms" (Am. Compl. ¶ 356), the Amended Complaint still fails to plead a relevant antitrust market because it lacks allegations

regarding the reasonable interchangeability (or lack thereof) of various substitutes that consumers regularly use to obtain news, such as television, newspapers, podcasts, radio, magazines, e-readers, and mobile applications.  *E.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (explaining that "the relevant market is legally insufficient and a motion to dismiss may be granted" if "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand").  To offer one example, the Amended Complaint offers no allegations whatsoever in support of the notion that watching Fox News on TV or accessing the Fox News mobile application are not reasonable substitutes for reading foxnews.com.  *E.g.*, Am. Compl. ¶ 356.

Plaintiffs implausibly attempt to define the alleged online news market around "total U.S. visits … to the flagship websites of" certain "online news outlets"—a list that purportedly includes google.com, reddit.com, facebook.com, duckduckgo.com, instagram.com, and bing.com.  Am. Compl. ¶ 5 n.3 & App. A.  This list of website visits does not even appear to account for the use of mobile apps to access news publications, let alone other ways in which consumers access news such as television, radio, and newspapers.  According to Plaintiffs' implausible attempt to plead a relevant market, a consumer seeking "professional works of journalism" (*Id.* ¶ 355) would turn to duckduckgo.com and instagram.com, but would not consider as reasonable substitutes watching CNN or reading *The New York Times* in hard copy or through its mobile app.  Although Plaintiffs' contorted definition is implausible on its face, it is all the more apparent that dismissal is warranted here because the Amended Complaint does not even include factual allegations explaining the exclusion of these obvious substitutes from the alleged market.  *E.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (explaining that courts must apply "judicial experience and common sense" when applying Rule 12(b)(6)

and dismissing claims based on product markets that "omit many economic substitutes" and are "contorted to meet [plaintiffs'] litigation needs").

### B.    Plaintiffs Have Not Adequately Pleaded the Possession of Monopoly Power or a Dangerous Probability of Achieving It.

Plaintiffs also have not pleaded that Google either possesses "monopoly power in the relevant market" as required for a monopolization claim, *Sky Angel*, 947 F. Supp. 2d at 102, or "a dangerous probability of success in actually monopolizing the relevant market" as required to plead attempted monopolization. *Dial A Car*, 884 F. Supp. at 589.

Plaintiffs' monopoly power allegations are predicated on the assertion that "Google has an estimated market share of 66%" based on the website "traffic data" attached as Appendix A to the Amended Complaint. Am. Compl. ¶ 367 & App. A.  In reference to this traffic data, the Amended Complaint asserts that "Google is by far the largest publisher of online news in the U.S." because "Google.com … and Youtube.com received more than 767.8 billion visits between March 2023 and March 2024."  *Id.* ¶ 366.  This data does not support a market share allegation, however, because the Amended Complaint implausibly counts *every* visit to certain websites (including google.com) irrespective of whether the content displayed bears any relation to online news.  Based on Plaintiffs' implausible assertions, typing "how tall was King George III" into google.com and watching a music video on youtube.com each involve the consumption of online news, even though they bear no resemblance to Plaintiffs' own flawed attempt to define a relevant market.  *E.g.*, Am. Compl. ¶¶ 356-57 (alleging characteristics of "[o]nline news publishers" and "news").  The Amended Complaint also does not consider, among other things, the number of "navigational" queries entered on google.com (*e.g.*, where a user enters a query such as "New York Times" and then clicks nytimes.com).  Plaintiffs cannot plausibly allege a market share by lumping together *every* visit to a selective list of websites (including

google.com) when they make clear throughout the Amended Complaint that many of those visits have nothing to do with online news.  *E.g.*, *id.* ¶¶ 38, 332 (alleging that "Google Search is a one-stop shop that can handle queries on any subject" and "[c]onsumers use general search engines to search the internet for all information needs").

Furthermore, the total number of visitors to google.com and certain other affiliated sites listed in Appendix A to the Amended Complaint (such as youtube.com) does not support a plausible inference that Google "can profitably raise prices substantially above the competitive level" in the alleged market for online news by "cut[ting] back the market's total output." *Microsoft*, 253 F.3d at 51; *see Am. Express*, 585 U.S. at 549 ("Market power is the ability to raise price profitably *by restricting output*").  As indicated above, the Amended Complaint neither alleges how often Google Search purportedly provides search results in response to news-related queries nor asserts that Google charges for such search results.

As Google explained in its motion to dismiss the original Complaint, the allegations Plaintiffs offered in that Complaint undermined rather than supported the assertion that Google possesses a share of the alleged online news market that would plausibly support a claim of actual or attempted monopolization.  In particular, Plaintiffs alleged that Google News was only "the 16th most popular news site in the world" (ECF 1 ¶ 48), behind sites such as nytimes.com, cnn.com, and msn.com.  *See* ECF 26-1 at 20.  Plaintiffs removed those allegations from their Amended Complaint and lumped Google News together with Google Search and Bard in calculating their "traffic data" (Am. Compl. ¶ 367 & App. A), but the original allegations showing the absence of a substantial market share have not vanished from the record.  *E.g.*, *W. Assocs. L.P. ex rel. Ave. Assocs. Ltd. v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir.

2001) (explaining that when deciding a motion to dismiss "it is appropriate for the court to look beyond the amended complaint to the record, which includes the original complaint").

In any event, even Plaintiffs' distorted market share allegations do not satisfy its pleading obligations "[b]ecause a firm cannot possess monopoly power in a market unless that market is also protected by significant barriers to entry," and "a firm cannot threaten to achieve monopoly power in a market unless that market is, or will be, similarly protected." *Microsoft*, 253 F.3d at 82. The Amended Complaint acknowledges that "it is relatively easy to enter the online news market," which highlights the absence of sufficient barriers to entry to establish monopoly power or a dangerous probability of achieving it. Am. Compl. ¶ 124. Although the Amended Complaint also alleges that "the market has a high failure rate" and that "scale and network effects often determine the commercial viability of online news publishers," *id.* ¶¶ 124-27, these conclusory allegations are insufficient to plead monopoly power. According to the Amended Complaint, there are at least "215 *major* online news outlets." *Id.* ¶ 5 n.3 (emphasis added). Under such circumstances, Plaintiffs have not adequately pleaded sufficiently high barriers to entry in the relevant market and therefore have not established an inference of monopoly power. *E.g.*, *United States v Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990) (explaining that "[t]ime after time," courts "have recognized th[e] basic fact" that "[a] high market share" will not "raise an inference of monopoly power … in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors").

## C.     Plaintiffs Have Not Adequately Alleged That Google Engaged in Exclusionary Conduct.

The Amended Complaint also does not plausibly allege that Google has "acquire[d] or maintain[ed], or attempt[ed] to acquire or maintain, a monopoly by engaging in exclusionary conduct" in the alleged market for online news. *Microsoft*, 253 F.3d at 58. Count Two of the

Amended Complaint does not even include a section addressing which purportedly exclusionary conduct Plaintiffs are alleging in connection with that count.  In a section titled "Anticompetitive Effects," however, Plaintiffs assert that "Google's extortionate terms for content distribution, coupled with its default self-preferencing on the SERP, have reduced the financial incentives for rivals to produce and publish news."  Am. Compl. ¶ 369.

The Amended Complaint does not explain what "default self-preferencing" means, let alone advance plausible allegations that it is "conduct which unfairly tends to destroy competition itself."  *Microsoft*, 253 F.3d at 58.  Plaintiffs' scattered use of the phrase "self-preferencing" appears to refer, for example, to a search results page that begins with a featured snippet from a pbs.org webpage followed by a large link to that page and videos uploaded to YouTube by publishers such as BBC News and PBS NewsHour.  Am. Compl. ¶¶ 183-84. Plaintiffs do not plausibly allege that displaying information about, and links to, content from purported competitors in the alleged online news market harms competition in that market.  Nor do they plausibly allege in their passing reference to "self-preferencing" that Google is attempting to offer anything other than a high-quality experience to its users by providing snippets and links responsive to users' queries.  *See e.g.*, *id.*

As discussed in the preceding sections, the flawed premise of Count Two is that every set of search results displayed on google.com is somehow part of an "online news" offering, which competes with dozens of "major online news outlets," such as Instagram, Facebook, and TikTok. Am. Compl. ¶ 5 n.3 & App. A.  Even if Plaintiffs had pleaded a relevant market in which Google possessed monopoly power, Google would be entitled to attempt to provide a better "online news" experience by offering search results featuring snippets, links to videos, generative artificial intelligence, and other features.  *E.g.*, *Goldwasser v. Ameritech Corp.*, 222 F.3d 390,

397 (7th Cir. 2000) ("[E]ven a monopolist is entitled to compete; it need not lie down and play dead, as it watches the quality of its products deteriorate and its customers become disaffected.").

Count Two's separate allusion to purportedly "extortionate terms for content distribution" likewise does not form the basis of a viable Section 2 claim.  Am. Compl. ¶ 369.  As discussed in Section I.B.4 *supra*, Plaintiffs' allegations about how Google uses the content that Plaintiffs allow Google to crawl do not amount to exclusionary conduct, and that does not change when the alleged conduct occurs in an asserted market for online news, where Plaintiffs purportedly compete with Google.  The Amended Complaint alleges that a significant percentage of the visitors to Plaintiffs' sites come from Google Search (*id.* ¶ 16), and they have not pleaded a Section 2 claim by asserting that the percentage would be even higher if Google made (or refrained from making) certain changes to the design of its search results page.  Assuming for the sake of argument that Plaintiffs have plausibly alleged that Google Search competes with Plaintiffs in an online news market, Google is not obligated to orient its business around maximizing the number of visitors to Plaintiffs' sites.  *E.g.*, *Olympia Equip. Leasing*, 797 F.2d at 379 ("Refusing to act as your competitor's sales agent is not an unnatural practice engaged in only by firms bent on monopolization."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) ("If the law were to make a habit of forcing monopolists to help competitors by keeping prices high, sharing their property, or declining to expand their own operations, courts would paradoxically risk encouraging collusion between rivals and dampened price competition—themselves paradigmatic antitrust wrongs.").

Likewise, Plaintiffs have not alleged exclusionary conduct by claiming that Google does not adequately compensate publishers for allowing Google to crawl their webpages or otherwise offer a different menu of options for determining how content may be used after it is crawled.

*See, e.g.*, Am. Compl. ¶¶ 129-36.  The assertion that an alleged monopolist purportedly does not offer sufficiently generous terms for the "inputs" supplied by news publishers is no different than alleging that it charges high prices, which is not sufficient to satisfy the conduct element of a Section 2 claim.  *E.g.*, *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 268 (8th Cir. 1984) (explaining that "setting a high price is not in itself anti-competitive," as "[s]uch conduct is not the exclusionary conduct that violates the antitrust laws, but rather is 'the normal, rational response of a business ... seeking to maximize profits, sales or revenues.'").  It is not a form of exclusionary conduct to decline to pay a purported competitor for content that they agree to provide.  *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts.'"); *Microsoft*, 253 F.3d at 58 (explaining that in a Section 2 case the conduct "must harm the competitive *process* and thereby harm consumers," while "harm to one or more *competitors* will not suffice").

Finally, Plaintiffs cannot salvage Count Two (or any other claim) through their passing reference to "monopoly leveraging."  *E.g.*, Am. Compl. ¶ 363 (alleging "Google [has] a unique ability to leverage its monopoly power in search (and related digital ads markets) to acquire market power in the online news market").  Plaintiffs cannot avoid the obligation to plead the elements of actual or attempted monopolization with respect to the alleged online news market by asserting that Google is "leveraging" an alleged monopoly in a different market.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) (rejecting the notion that possessing a monopoly in one market permits a court to "dispense[] with a requirement that there be a 'dangerous probability of success' in monopolizing a second market"

and adding that "leveraging presupposes anticompetitive conduct" rather than constituting a form of such conduct); *Covad*, 398 F.3d at 672 (rejecting a monopoly leveraging claim because if plaintiff "does not allege any anticompetitive conduct in [defendant's] 'acquisition or maintenance' of monopoly power, then it is of no moment whether [defendant] allegedly exercised monopoly power in two markets rather than one").

## III.   COUNT THREE FAILS TO PLEAD AN UNLAWFUL TYING ARRANGEMENT.

Count Three alleges that Google has violated the Sherman Act by tying "the provision of search traffic" to Plaintiffs with Plaintiffs' supplying of "news content for republishing and AI training in the upstream supply chain." Am. Compl. ¶ 376. With respect to the alleged "tying product," the Amended Complaint asserts that "the provision of search traffic" refers to the "referrals" that Plaintiffs receive when a Google Search user clicks a link to their websites on the search results page. *E.g.*, *id.* ¶¶ 40, 374. And with respect to the alleged "tied product," the Amended Complaint avers that "[t]he supplying of news content for republishing and AI training" refers to the ways in which Plaintiffs allow Google to crawl their webpages and allegedly use the crawled data, such as by providing Featured Snippets in response to user queries and training or grounding artificial intelligence models that generate text in response to user queries. *E.g.*, *id.* ¶¶ 153-57, 377.

"There are four elements to a per se tying violation: (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce." *Microsoft*, 253 F.3d at 85.[5]

---

[5] Plaintiffs do not state explicitly whether they are attempting to plead a *per se* tying claim or one subject to the rule of reason, but the claim fails under either standard for the reasons stated below.

Plaintiffs' claim should be dismissed for several independent reasons, including because they have not alleged that they "purchase" a product at all, let alone that the tying and tied "products" are "separate" products that Google only sells together.  *Id.*  The Amended Complaint also fails to plead a relevant market for either the tying or tied product or harm to competition.  Finally, Plaintiffs lack antitrust standing to pursue their tying claim.     .

**A.    Plaintiffs Have Not Pleaded a Tying Claim.**

**1.    Count Three Does Not Plead a Tying Arrangement.**

Plaintiffs have not pleaded a tying claim under either the *per se* rule or the rule of reason because what they have alleged is simply not antitrust tying.  "A tying arrangement is 'an agreement by a party to sell a product but only on the condition that the buyer also purchase a different (or tied) product,'" and "[t]o state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing," among other things, that "the seller uses actual coercion to force buyers to purchase the tied product."  *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016) (brackets omitted).  The Amended Complaint does not allege an arrangement where ***Plaintiffs*** must "purchase a different (or tied) product" (*id.*) because it does not allege that Plaintiffs are required to purchase two products from Google at all.

To begin, Plaintiffs have not plausibly alleged that they "purchase" the tying product (*i.e.*, "traffic referrals") from Google.  While Google Search users can click links to Plaintiffs' websites when the links are displayed on the Google Search results pages in response to users' queries, Google does not charge Plaintiffs for those clicks or for appearing in search results.[6] The "provision of search traffic" does not involve the purchase of a product in any cognizable

---

[6] Plaintiffs' tying claim is not predicated on purchasing ads on google.com, and they do not allege that they have done so.

sense, and it cannot function as a "tying product" for purposes of pleading a violation of the Sherman Act.

Even setting aside that defect, however, the Amended Complaint plainly does not allege that *Plaintiffs* "also purchase[] a different (or tied) product" from Google, which is an indispensable element of a tying claim. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992). The Amended Complaint instead alleges that *Google is "buying"* from Plaintiffs the purportedly "tied product" (*i.e.*, the "news content for republishing and AI training in the upstream supply chain of the online news market"). Am. Compl. ¶¶ 376-77; *see, e.g.*, *id.* ¶ 16 (alleging that Plaintiffs are "suppliers to Google of news input"); ¶ 149 (asserting that "Publishers are coerced into supplying content for Google's search index"). Plaintiffs have not pleaded a tying claim because tying occurs only when *the defendant sells* the tied product. *E.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (explaining that "[t]o establishing a tying claim," the plaintiff must prove, among other things, that the defendant "tied together the sale of two distinct products or services"). The arrangement Plaintiffs have alleged is not a form of antitrust tying and therefore cannot be the basis for a tying claim under the Sherman Act. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1779 (5th ed. 2022) (distinguishing tying from a situation where "the defendant … sells product #1 only on the condition that the buyer agree to sell product #2 to the defendant" and noting that "no court has ever applied the per se rule to such practices"); *id.* (describing an example of a "bank that is unwilling to loan money to an applicant unless the applicant agrees to open an account at the bank" and explaining that "antitrust generally permits such practices" because "[w]hether or not it is unfair or onerous to the borrower, no threat to competition is likely").

### 2. Plaintiffs Have Not Alleged the Existence of Two Separate Products, a Relevant Market for Either Product, or Harm to Competition.

The Amended Complaint also fails to plead a tying claim for four other reasons.

First, Plaintiffs have not alleged that "the tying and tied goods are two separate products." *Microsoft*, 254 F.3d at 85. Although the Amended Complaint asserts as a legal conclusion that "[t]he tying and tied products are separate products" (Am. Compl. ¶ 377), Plaintiffs in fact characterize the alleged "products" as a single exchange. For example, the Amended Complaint alleges that "Google provides *search traffic referrals* to Publishers in exchange for *content*, which Google obtains via crawling and indexing websites." Am. Compl. ¶ 40; *see, e.g.*, *id.* ¶ 119 ("Google and news publishers have a transactional arrangement in which Publishers supply quality content for Google's index in exchange for Google supplying search traffic to Publishers' websites."). Furthermore, in its allegations concerning the alleged market for general search services, the Amended Complaint identifies only a single "product," *i.e.*, Google Search. For example, Plaintiffs allege that "[o]perating a general search engine involves," among other things, "crawling the web to collect data" and "assembling a SERP through a whole page ranking that incorporates organic search results and, depending on the query, search ads and other features, such as republished news content." *Id.* ¶ 39. There are no plausible allegations that crawling Plaintiffs' sites to collect data for use in a general search engine is a separate "product" from using that data to generate a search results page that may include links to Plaintiffs' sites "and other features." *Id.*; *see, e.g.*, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984) ("[N]o tying arrangement can exist unless there is a sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the former] separately from [the latter].").

Second, the Amended Complaint does not allege the contours of an alleged market for the tying product—*i.e.*, the "provision of search traffic" (Am. Compl. ¶ 377)—let alone adequately plead that Google "has market power in the tying product market." *Microsoft*, 253 F.3d at 85.  The Amended Complaint pleads no plausible basis for conflating the alleged market for general search services (defined from the user's perspective) with a theoretical market for "the sale of search traffic referrals" (defined from a publisher's perspective).  *Id.* ¶ 374.  And the Amended Complaint lacks sufficient allegations to define the contours of a market for "the sale of search traffic referrals" in which Google purportedly has power sufficient to effectuate a tie. For example, the Amended Complaint alleges that Plaintiff Helena's "[t]op two sources of traffic are direct visits to the website and traffic from its Facebook page." Am. Compl. ¶ 307.  In view of the various methods of acquiring visitors, including "direct visits to the website" and "traffic from … Facebook" (*id.*), the Amended Complaint contains no well-pleaded allegations that there is a relevant market for "search traffic referrals" or that Google possesses market power in any such purported market.  *E.g.*, *Sky Angel*, 947 F. Supp. 2d at 103 ("Failure to define the market by reference to the reasonable interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule 12(b)(6) stage."); *see Microsoft*, 253 F.3d at 85 (holding that a plaintiff asserting a "per se tying violation" must establish, among other things, that "the defendant has market power in the tying product market").

Third, Plaintiffs also have not alleged a relevant market for the tied product, *i.e.*, Plaintiffs' "supplying of news content for republishing and AI training" by Google.  Am. Compl. ¶ 377.  Plaintiffs' failure to do warrants dismissal of its tying claim.  *E.g.*, *Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810, 851 (N.D. Cal. 2021) ("[B]ecause [Plaintiff] has failed to properly

define a tied market, there is no triable issue of fact whether the alleged tying arrangement harmed competition in the tied market under the rule of reason analysis.").

Fourth, in addition to failing to plead a relevant market for the tied product in which any purported harm to competition should be measured, the Complaint lacks factual matter sufficient to plead a purported harm to competition. *See In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 997 (N.D. Cal. 2010) ("Conclusory allegations of anticompetitive effect are insufficient without supporting facts as to how competition in the tied markets has actually been reduced or harmed."). Although the Amended Complaint asserts that "Plaintiffs and other Publishers suffer the immediate financial harm" and "consumers suffer in the long run" (Am. Compl. ¶¶ 383), it does not plausibly allege facts demonstrating that the ***purported tie*** (as opposed to any other alleged conduct) has harmed ***competition*** (as opposed to a purported competitor) in any asserted relevant market. *E.g.*, *In re Cox Enters., Inc.*, 871 F.3d 1093, 1108 (10th Cir. 2017) ("Plaintiffs failed to show that [the defendant's] tie, as opposed to consumer choice, defeated these products or kept their manufacturers from selling them.").

## B.    Plaintiffs Lack Antitrust Standing to Assert Count Three.

As discussed above, Count Three asserts that Plaintiffs want Google to provide "search traffic referrals" to their websites (*i.e.*, the alleged "tying product") but do not want "to supply Google with news content for republishing and GAI training" (*i.e.*, the alleged "tied product"). Am. Compl. ¶ 374. As indicated, this is not a cognizable tying claim, and it fails for a series of independent reasons. But even if that were not the case, Plaintiffs do not have antitrust standing to pursue this claim because they have not pleaded an antitrust injury, *i.e.*, "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. The antitrust laws do not permit a self-styled "supplier" or "producer" to seek to alter the "terms of trade" on which "Google is buying news

reporting and news content" (Am. Compl. ¶¶ 7, 26-28, 148, 308) because "[t]he antitrust injury doctrine … 'requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to **consumers**.'" *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) (emphasis added). Plaintiffs have not plausibly alleged that they are a buyer of the purportedly "tied product" or a competitor who cannot compete with the "tied product"; rather, Plaintiffs describe themselves as the "producers" or "suppliers" of the "news content for republishing and GAI training." Am. Compl. ¶ 1 n.1, 119, 374, 377. Although Plaintiffs attempt to allege that their businesses have been harmed by the terms on which they allow Google to crawl and index their webpages, "a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." *Stamatakis*, 965 F.2d at 471 (explaining that a plaintiff does not show antitrust injury by "establish[ing] a decline in sales").

The Amended Complaint does not move the needle by inaccurately characterizing the terms on which Google acquires "news content for republishing and AI training in the upstream supply chain" as a "mass misappropriation of news." Am. Compl. ¶¶ 19, 376, 385. Those allegations sound in copyright, not antitrust, and Plaintiffs have not pleaded a claim of copyright infringement or misappropriation. *E.g.*, *SAS of Puerto Rico*, 48 F.3d at 44 (explaining that antitrust standing is absent where "the central conduct" at issue purportedly "is wrongful *as to [the plaintiff]* only insofar as it may be a common (or civil) law wrong").[7] Plaintiffs do not have antitrust standing to assert their flawed tying claim, and Count Three should be dismissed.

---

[7] A copyright or misappropriation claim would be meritless, and Plaintiffs cannot use the Sherman Act to dress up a legal theory that would fail on its own terms. *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 229 (2d Cir. 2015) (rejecting publishers' copyright infringement claims because "Google's unauthorized digitizing of copyright-protected works, creation of a search functionality, and display of snippets from those works are non-infringing fair uses," and "Google's commercial nature and profit motivation do not justify denial of fair use"); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165, 1168 (9th Cir. 2007) (rejecting publisher's copyright infringement claims because Google's display of copyrighted images in response to

IV.     **COUNT FOUR FAILS TO PLEAD A VIOLATION OF SECTION 7 OF THE CLAYTON ACT.**

In Count Four, Plaintiffs assert that by "acquiring entities such as YouTube, Android, and DeepMind" (Am. Compl. ¶ 390), Google violated Section 7 of the Clayton Act, "which prohibits mergers that may 'substantially … lessen competition, or … tend to create a monopoly.'"  *Meta*, 66 F.4th at 295 (quoting 15 U.S.C. § 18) (ellipses in original).  The same kinds of defects addressed in connection with Plaintiffs' other claims—such as a lack of antitrust standing, a failure to plead a relevant market, and the absence of an anticompetitive effect in any alleged market—are also fatal to Count Four.  This count also fails because all of the mergers that Plaintiffs allege were unlawful occurred more than 10 years ago, and at least two of them occurred ***nearly 20 years ago***.  Plaintiffs have not come close to complying with the statute of limitations or doctrine of laches, and the count should also be dismissed on that basis.

A.     **Plaintiffs Lack Standing and Have Not Pleaded a Relevant Market or the Requisite Anticompetitive Effect in an Alleged Relevant Market.**

The same defects that are fatal to Plaintiffs' attempt to impose liability based on various long-ago mergers in Count One also warrant dismissal of Count Four.  *See* Sections I.A, I.B.3 *supra*.  Among other things, the count should be dismissed for lack of antitrust standing, which likewise is a prerequisite to a claim under Section 7 of the Clayton Act.  *E.g.*, *Brunswick*, 429 U.S. at 489 (articulating the antitrust injury requirement in the context of a Section 7 claim).  In addition, the Amended Complaint lacks well-pleaded allegations that the referenced acquisitions were anticompetitive or have "a substantial anticompetitive effect that harms consumers in the relevant market."  *Am. Express Co.*, 585 U.S. at 542.  One of the alleged markets referenced in

---

user queries was a fair use of the images notwithstanding "[t]he fact that Google incorporates the entire … image into the search engine results").

Count Four is "digital ad" (Am. Compl. ¶ 390), which is not defined anywhere in the Amended Complaint and therefore cannot support a claim for relief. *See City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (explaining that "a plaintiff must allege a plausible relevant market in which competition will be impaired" in order "[t]o state a claim under § 7 of the Clayton Act"). Another asserted market referenced in Count Four is online news, which has not been plausibly alleged for the reasons stated in Section II.A *supra*. And with respect to all of the alleged markets, Plaintiffs have failed to allege factual matter plausibly showing that the referenced acquisitions had a substantial anticompetitive effect in any alleged relevant market.

### B.   The Claim Is Time Barred.

#### 1.   The Statute of Limitations and Doctrine of Laches Bar Count Four.

In all events, Count Four is barred by the statute of limitations and the doctrine of laches. Remarkably, the count is based on acquisitions that occurred and were publicly announced in 2005 (Android), 2006 (YouTube), and 2014 (DeepMind). Am. Compl. ¶ 390; *see id.* ¶¶ 65, 71, 76. Plaintiffs, for their part, have been around since well before the mergers, as the Amended Complaint alleges that "the *Helena World* is one of the oldest newspapers in Arkansas," having been "[f]ounded in 1871," while "Emmerich Newspapers is a century-old local news dynasty in Mississippi." *Id.* ¶ 16. The time for Plaintiffs to bring a claim predicated on any of these acquisitions elapsed many years before the filing of the original Complaint in December 2023.

Insofar as Count Four seeks damages (Am. Compl. ¶ 397), it is untimely because "a Section 7 cause of action challenging an acquisition accrues at the time of the merger or acquisition, and there is a four-year statute of limitations" established by 15 U.S.C. § 15b. *Z Techs*, 753 F.3d at 597, 604 (affirming dismissal of a Clayton Act Section 7 claim filed "approximately five years and three months" after the acquisition at issue); *see also Meta*, 66

F.4th at 299 (explaining that the plaintiffs' Section 7 "causes of action accrued in 2012 when Facebook acquired Instagram and in 2014 when Facebook acquired WhatsApp").

To the extent that this count seeks "injunctive relief and other equitable remedies" (Am. Compl. ¶ 396), it is barred by the doctrine of laches, which "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Meta*, 66 F.4th at 295.  With respect to the first element, "delay in laches is measured by the length of time 'between accrual of the claim and suit'" and may use the aforementioned "four-year statute of limitations for damage actions (15 U.S.C. § 15b) as a 'guideline' for determining what amount[s] to undue delay." *Id.* at 299-300.

There is no question that Plaintiffs unduly delayed bringing suit regarding acquisitions that occurred more than a decade ago at a minimum, and in some cases nearly two decades ago. Am. Compl. ¶¶ 65, 71, 76; *see Meta*, 66 F.4th at 293, 295, 301 (affirming dismissal on laches grounds of a Section 7 claim filed in December 2020 regarding acquisitions occurring between 2012 and 2016).  It is also beyond dispute that the delay is a source of prejudice "[f]or laches purposes." *Meta*, 66 F.4th at 300.  That Google has for years "made business decisions and allocated firm resources based on holding" the acquired companies confirms that prejudice would result from Plaintiffs' attempt to seek equitable relief following its undue delay in bringing suit. *Id.* at 301 (affirming a finding of prejudice from delay in challenging Facebook's acquisitions where the complaint alleged Facebook had been "working to 'integrate' Instagram" and "'combined' WhatsApp data 'across all Facebook products'").

### 2. Plaintiffs Cannot Plead Around the Statute of Limitations and Doctrine of Laches.

The Amended Complaint contains baseless assertions fashioned to avoid the inescapable conclusion that Count Four is time barred.  Plaintiffs allege, for example, that "Google's

acquisitions of Android, YouTube, and DeepMind were critical acquisitions, the use for which has expanded significantly under Google's ownership," and that the purported "anticompetitive maintenance and abuse of its dominant position is continuous, and its extent was not publicly known until 2023, with the release of Bard," "the launch of SGE," "and the unveiling of trial exhibits in the trial in the DC DOJ Case."  Am. Compl. ¶¶ 392-93.  None of these conclusory allegations can revive the untimely challenge to acquisitions from the 2000s and early 2010s.

First, Plaintiffs' assertion that the alleged conduct is "continuous" does not affect the timeliness of the claim because "[o]nce a merger is completed, there is no continuing violation possible under § 7 that would justify extending the statute of limitations beyond four years." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004).  Allowing Plaintiffs to characterize the ongoing development of the acquired entities as a "continuing violation" would eviscerate the statute of limitations and doctrine of laches by "exposing a firm to perpetual liability under the Clayton Act," given that "every subsequent action by the merged firm" is "designed to maintain the merged firm's viability."  *Id.* at 271-72; *see, e.g.*, *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 995 (N.D. Cal. 2020) (holding that "the continuing violation doctrine does not apply in the context of Section 7 claims under the Clayton Act" because it "would write the statute of limitations out of the law by allowing a merger to be challenged indefinitely").

Second, the allegation that the "use" of the acquired entities "has expanded significantly" also cannot revive Plaintiffs' untimely claims.  Am. Compl. ¶ 392; *see, e.g.*, *id.* ¶¶ 70, 75, 393.  Insofar as Plaintiffs are intimating that a change in the way that acquired assets were used after a merger could extend the time to bring a claim under Section 7 of the Clayton Act, courts have expressed appropriate "skepticism" about whether this "hold-and-use theory is even viable"

under any circumstances.  *Facebook*, 549 F. Supp 3d at 42-43 (brackets omitted).  But even assuming for the sake of argument that the theory could toll the statute of limitations under some circumstances, it could not possibly salvage Plaintiffs' claims here.  The Amended Complaint alleges that certain purportedly expanded or changed uses occurred many years ago, such that the claims would be time barred in any event.  *E.g.*, Am. Compl. ¶ 65 (alleging that Android became "the best-selling OS" in 2011); ¶ 73 (alleging that "[b]y 2012, the Pew Organization recognized that YouTube had become a news publisher of its own").  Moreover, the recent product launches alleged by Plaintiffs—such as the "the release of Bard in March 2023" and the "launch of SGE in May of 2023" (Am. Compl. ¶¶ 393)—do not implicate the "hold-and-use theory" at all because they did not exist before the mergers occurred.  *E.g.*, *Midwestern Mach.*, 392 F.3d at 274 (explaining that at most the theory "allows a statute of limitations to be tolled only when an asset is used differently after a merger from the way that it was being used before a merger," and "[i]f the asset did not exist before the merger, logic requires that this theory cannot apply").  Plaintiffs do not allege that products such as Bard and SGE are "assets" that were "used differently" by some other company before Google acquired it.  Nor could Plaintiffs do so, as the allegations involve new features or products developed by Google in recent years, not assets acquired more than a decade ago from Android, YouTube, or DeepMind.  *E.g.*, Am. Compl. ¶¶ 211, 224-25, 393.  If the launch of new features or products years after an acquisition could resuscitate a claim that the acquisition was unlawful, then "'there would in effect be no statute of limitations' and no laches defense to a claim for equitable relief, 'since a Section 7 challenge to the holding or use of assets could be brought at any time.'"  *Facebook*, 549 F. Supp. 3d at 43.

Finally, Plaintiffs cannot plead around the statute of limitations and doctrine of laches by referencing "the unveiling of trial exhibits in the trial in the DC DOJ Case in September of 2023"

or alleging "spoliation of evidence."  Am. Compl. ¶ 393.  Plaintiffs do not allege any legally cognizable connection between these assertions and the acquisitions that occurred between 2005 and 2014, and any such allegation would be inapposite given that the acquisitions were publicly reported when they occurred and were not even the subject of the claims brought in the case tried before this Court in 2023.  Insofar as Plaintiffs intend to suggest that the statute of limitations and doctrine of laches were tolled because information relating to the challenged acquisitions was improperly concealed from them, Plaintiffs did not (and could not) plead the requisite elements for tolling the limitations period based on fraudulent concealment.  Among other things, the Amended Complaint does not allege with particularity that Google took affirmative acts to mislead them about the acquisitions or that they acted diligently to uncover whatever facts about the acquisitions they purportedly did not know that prevented them from pursuing their claims in a timely manner.  *See, e.g.*, *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994) (explaining "that allegations of fraudulent concealment, which toll the statute of limitations, must meet the requirements of Fed. R. Civ. P. 9(b)" and that plaintiffs "must establish that they used due diligence in trying to uncover the facts"); *Reveal Chat Holdco*, 471 F. Supp. 3d at 992-94.  Permitting a plaintiff to wait a decade or more to challenge a merger on the basis that information continues to come to light through the release of internal documents or developments in the marketplace "would effectively nullify the statute of limitations in these cases."  *Reveal Chat Holdco*, 471 F. Supp. 3d at 993.

Count Four should be dismissed because it is time-barred, and any argument that the limitations period has been tolled for years on end is meritless.

## V.     COUNT FIVE FAILS TO PLEAD AN UNLAWFUL AGREEMENT BETWEEN GOOGLE AND APPLE.

In Count Five, Plaintiffs claim that Google and Apple's renewal in 2016 of the Information Services Agreement ("ISA")—an agreement first signed in 2002 under which Apple makes Google Search the default search engine in Apple's Safari web browser software— "constitutes a *per se* violation of the antitrust laws or is otherwise an unreasonable restraint of trade under those statutes." Am. Compl. ¶ 401. The claim is based on a conclusory—and inaccurate—assertion that in 2016 Apple "shelved" its "plans" for "entering the general search market in competition with Google" in exchange for continuing to receive revenue share payments under the ISA. *Id.* ¶¶ 399-400. Plaintiffs also claim that the ISA's "scope may be expanded" as "Google is now in talks with Apple on extending its partnership with Apple to build Google's Gemini artificial intelligence engine into the iPhone." *Id.* ¶ 402. This speculative assertion also cannot form the basis of an antitrust claim.

Plaintiffs' attempt to plead a separate claim based on the ISA fails for several reasons. First, the Amended Complaint lacks plausible allegations to support a rule of reason claim under Sections 1 and 3 of the Sherman Act. Second, the 2016 ISA Amendment is a vertical supply agreement that is not subject to *per se* scrutiny as a matter of law. Third, Plaintiffs lack antitrust standing, including for the reasons stated in Section I.A *supra*.

### A.     Plaintiffs' Conclusory Assertion that Google Caused Apple to "Shelve" Its "Plans" for "Entering the General Search Market" Is Not Plausibly Alleged.

Count Five should be dismissed because the allegation underpinning the claim—*i.e.*, that the 2016 ISA Amendment constitutes an agreement between Google and Apple that Apple will not develop its own general search engine—is not plausibly supported by any well-pleaded facts in the Amended Complaint. Am. Compl. ¶¶ 399-400; *see Twombly*, 550 U.S. at 555 (holding that "[f]actual allegations must be enough to raise a right to relief above the speculative level");

*Hemp Indus. Assoc. v. DEA*, 36 F.4th 278, 288 (D.C. Cir. 2022) (explaining that "construing a complaint liberally in the plaintiff's favor does not entail accepting inferences unsupported by facts or legal conclusions cast in the form of factual allegations" (brackets and quotation marks omitted)).

      The Amended Complaint does not plausibly allege that Apple had "plans" to "enter[] the general search market in competition with Google" that were thwarted by Google.  Am. Compl. ¶¶ 399-400.  The sole allegation in Count Five concerning Apple's "plans" states that "[s]everal years ago … CEO Tim Cook was presented with four options: to build Siri into a general search product; collaborate on a Knowledge-graph based product with Microsoft; invest directly in Bing and turn it into a native Apple search product; or acquire Bing from Microsoft."  *Id.* ¶ 399. According to the Amended Complaint, "those plans were shelved in 2016 when Apple and Google … entered into a renewal of the ISA."  *Id.* ¶ 400.  That allegation is not remotely plausible, as the court filing on which Plaintiffs rely specifies that the consideration of these "options" occurred in the context of Microsoft's discussions with Apple about a potential search partnership *in 2018*.[8]  Apple's purported "plans" in 2018 could not possibly have been "shelved *in 2016*."  *See* Am. Compl. ¶¶ 399-400 (emphasis added).  Moreover, Plaintiffs offer no well-pleaded allegations that Apple wanted to pursue any of these "options" in 2018 (or at any other time), let alone that it refrained from doing so because it believed it had "agreed that it would not compete with Google to develop a search engine of its own."  *Id.*

---

[8] *See* Pls.' Proposed Findings of Fact ¶¶ 1273-74, ECF No. 906 in *United States v. Google*, No. 1:20-cv-3010-APM (D.D.C.) (cited in Am. Compl. ¶ 107 n.43).  In evaluating a motion to dismiss, the Court may consider "documents either attached to or incorporated in the complaint … if they are 'referred to in the complaint,' integral to the claim(s), and if their authenticity is undisputed."  *Langeman*, 88 F.4th at 291-92.

Plaintiffs' other assertions about Apple are equally devoid of allegations that Apple had "plans" to develop a general search engine of its own that were foreclosed by the 2016 ISA Amendment.  For example, Plaintiffs do not plausibly allege that Apple had any plans to develop Siri—a virtual assistant that performs user-requested actions—into a "search engine."  *Id.* ¶ 335. The Amended Complaint does not plausibly allege that a virtual assistant such as Siri competes in the alleged general search services market, and the plaintiffs in *United States v. Google* and *Colorado v. Google* provided no evidence that virtual assistants such as Siri had "any substantial anticompetitive effect in search" given that virtual assistants are not used like general search engines.  *Google*, 687 F. Supp. 3d at 86.

Elsewhere, Plaintiffs allude to a 2018 e-mail from Joan Braddi, which postdates the 2016 ISA Amendment by two years.  Am. Compl. ¶ 93.  That email refers to Apple's Safari Suggestions feature, through which Apple offers Safari users suggested redirection to other websites or content, such as Apple's Weather app in response to a query for "weather today" or a Wikipedia page in response to a query for "Barack Obama."  *See id.* ¶ 92.  The email does not allow for a plausible inference that Apple had plans to build Safari Suggestions (or Siri) into a freestanding general search engine, much less that Apple agreed in the 2016 ISA Amendment to abandon any such plan.  The Safari Suggestions feature is patently different than the Amended Complaint's characterization of "general search engines, which are 'one-stop shops' consumers can use to search the internet for answers to a wide range of queries" (*id.* ¶ 332), and which entail "assembling a SERP through a whole page ranking that incorporates organic search results … and other features."  *Id.* ¶ 39.

Plaintiffs' conclusory assertions regarding the 2016 ISA Amendment are implausible, and Count Five, which is predicated on these inadequate assertions, should be dismissed.

**B.    The Complaint Fails to Allege a Sherman Act Violation under Either the *Per Se* Rule or the Rule of Reason.**

Plaintiffs' contention that the 2016 ISA Amendment "was unlawful *per se*" is foreclosed as a matter of law.  *Id.* ¶ 97.  As the Supreme Court has cautioned, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (internal citations omitted); *see Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 47 (D.D.C. 2008) (explaining that "[t]his *per se* rule is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality" (quotation marks omitted)).  Indeed, "almost all vertical agreements—agreements between firms at different levels in the chain of distribution—must be analyzed under the rule of reason."  *In re McCormick & Co.*, 217 F. Supp. 3d 124, 134-35 (D.D.C. 2016).  The Amended Complaint alleges that the 2016 ISA Amendment is an agreement "between Apple and Google that gave the latter default search engine status on Apple's iPhones" (Am. Compl. ¶ 400)—a paradigmatic example of a vertical agreement "between firms at different levels in the chain of distribution."  *McCormick*, 217 F. Supp. 3d at 135; *see Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).  Accordingly, the conclusory assertion that the 2016 ISA Amendment "was unlawful *per se*" is facially unsupported by well-pleaded factual allegations.[9]

The 2016 ISA Amendment would not be subject to the *per se* rule even assuming, counterfactually, that the agreement contained a provision through which Google purportedly

---

[9] Similarly, according to Plaintiffs' own allegations, the purported agreement under negotiation that involves Apple "'licens[ing] some of Gemini's features to power certain AI features in the new versions of Apple's iPhone and iPad software'" (Am. Compl. ¶ 285) is not subject to *per se* analysis.

required Apple to "shelve[]" its "plans" to "enter[] the general search market in competition with Google."  Am. Compl. ¶¶ 399-400.  A vertical agreement that contains elements of horizontal restraints is still ***not*** subject to the *per se* rule because "the law does not allow a party to simply isolate one particular provision or restraint within an overall agreement and argue, in isolation, that the restraint is subject to *per se* condemnation."  *Meijer*, 572 F. Supp. 2d at 49 (explaining "[t]hat improvident approach has been foreclosed by Supreme Court cases admonishing lower courts to avoid forcing conduct into a particular 'category' and applying the *per se* rule").  In other words, the general inapplicability of the *per se* rule to a vertical agreement holds true even if "aspects of the restraint may appear to be facially anticompetitive" or if the contracting parties are "actual or potential competitors."  *Id.* at 51-52.

Plaintiffs have not pleaded a claim under the rule of reason, which requires "a plaintiff to … demonstrate that the restraint is likely to have anticompetitive effects—that is, 'to impair competition by creating, increasing, or maintaining that market power or by facilitating its exercise, or by otherwise harming consumers.'"  *McCormick*, 217 F. Supp. 3d at 137.  The boilerplate assertion that the 2016 ISA Amendment is "an unreasonable restraint of trade" that resulted in "lost profits from diverted customers, higher average costs of production, and lost licensing fees" is inadequate.  Am. Compl. ¶¶ 401, 403-04.  These purported injuries to Plaintiffs, which were not even experienced in the alleged market for general search services, are not effects on competition in that proffered market.  Moreover, they are based on the unadorned assertion that "[i]n a competitive general search market, [Plaintiffs] could have bargained with other general search engine providers for better terms of trade."  *Id.* ¶ 404.  The Amended Complaint does not plausibly allege that if Apple "enter[ed] the general search market in competition with Google," Apple would have "bargained" with Plaintiffs over how it designed

its search results page or how it used data that Plaintiffs allowed Apple to obtain by crawling their webpages. *Id.* ¶¶ 399, 404; *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.")

**C.   Plaintiffs Lack Antitrust Standing to Assert Count Five.**

Alternatively, the Court should dismiss Count Five because Plaintiffs lack antitrust standing. All of the reasons stated for dismissing Count One in Sections I.A and I.B.1-2 *supra* apply with equal force here. For example, Count Five alleges that Plaintiffs have experienced vague injuries that would not have occurred "but-for Google's exclusionary conduct in the general search market." Am. Compl. ¶¶ 403-04. Plaintiffs, however, are not participants in an alleged general search market. And even if they were, the injuries they purportedly experienced—such as "lost profits" and "lost licensing fees" associated with their news publishing business—were not suffered as a result of harm to competition in that alleged market. *E.g.*, *Fotobom Media*, 2024 WL 1603968, at *4 (explaining that "the antitrust standing inquiry turns on whether the plaintiff is a participant in the relevant market and 'suffered its injury in the market where competition is being restrained'").[10]

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint.

---

[10] As indicated in Sections I.A and I.B.2 *supra*, Plaintiffs do not have antitrust standing to pursue a claim based on the allegation that "Google is now in talks with Apple … to build Google's Gemini artificial intelligence engine into the iPhone" (Am. Compl. ¶ 402), and they also have not established Article III standing to bring such a claim. *See, e.g.*, *TransUnion*, 594 U.S. at 423, 436-38.

Dated: July 12, 2024

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Kenneth C. Smurzynski (D.C. Bar No. 442131)
Graham Safty (D.C. Bar No. 1033312)
Youlin Yuan (D.C. Bar No. 1613542)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
ksmurzynski@wc.com
gsafty@wc.com
yyuan@wc.com

*Counsel for Defendants Google LLC & Alphabet Inc.*