## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HELENA WORLD CHRONICLE, LLC and EMMERICH NEWSPAPERS, Inc., <br><br> *Plaintiffs*, <br><br> v. <br><br> GOOGLE LLC and ALPHABET INC. <br><br> *Defendants*. | Case No.: 1:23-cv-03677 <br><br> HON. AMIT P. MEHTA |

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  LEGAL STANDARD ........................................................................................... 5

III. COUNT ONE STATES A CLAIM FOR MONOPOLIZATION IN THE ALLEGED GENERAL SEARCH SERVICES MARKET. ................................................... 8

   A.   Plaintiffs Have Article III And Antitrust Standing to Assert Count One ........................ 9

   B.   Plaintiffs Have Adequately Alleged That Google Engaged in Exclusionary Conduct .. 13

     1.   Allegations Relating to Search Distribution Agreements. ............................... 14

     2.   Additional Allegations Relating to Apple. ...................................................... 16

     3.   Allegations Relating to Acquisitions. ............................................................. 18

     4.   Allegations Relating to Misappropriating Content And Use of SGE. ........... 19

     5.   Allegations Relating to the Readiness of Bard .............................................. 23

     6.   Allegations Relating to Changes to AdSense................................................. 24

     7.   Allegations Relating to Spoliation. ................................................................ 25

     8.   Allegations Relating to California News Sites ............................................... 26

IV.  COUNT TWO STATES A CLAIM FOR MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF A MARKET FOR ONLINE NEWS ............................................. 27

   A.   Plaintiffs Have Adequately Pled a Relevant Market .................................................... 28

   B.   Plaintiffs Have Adequately Pled the Possession of Monopoly Power or a Dangerous Probability of Achieving It ........................................................................................ 31

   C.   Plaintiffs Have Adequately Alleged That Google Engaged in Exclusionary Conduct In The Online News Market. ........................................................................................... 33

V.   COUNT THREE AS REVISED PLEADS AN UNLAWFUL TYING ARRANGEMENT. ........................................................................................... 35

VI.  COUNT FOUR PLEADS A VIOLATION OF SECTION 7 OF THE CLAYTON ACT. ................................................................................................. 37

   A.   Plaintiffs Have Standing and Have Pled a Relevant Market or the Requisite Anticompetitive Effect in an Alleged Relevant Market ............................................... 37

   B.   The Claim Is Timely. ................................................................................................ 38

     1.   Claim Accrual Took Place Long After The Acquisitions At Issue. ............... 38

     2.   The Statute of Limitations and Doctrine of Laches Do Not Bar Count Four .. 40

VII. COUNT FIVE PLEADS AN UNLAWFUL AGREEMENT BETWEEN GOOGLE AND APPLE .......................................................................................... 42

VIII. CONCLUSION ................................................................................................. 45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
  342 F. Supp. 3d 126 (D.D.C. 2018) .......................................................................... 12

*Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*,
  2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) .......................................................... 42

*Adams v. Quattlebaum*,
  219 F.R.D. 195 (D.D.C. 2004) ................................................................................ 34

*Adams v. Watson*,
  10 F.3d 915 (1st Cir. 1993)........................................................................................ 7

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) .................................................................................. 24

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) .......................................................................... 10, 11

*Am. Nat. Ins. Co. v. FDIC*,
  642 F.3d 1137 (D.C. Cir. 2011) ................................................................................ 6

*Amarel v. Connell*,
  102 F.3d 1494 (9th Cir. 1997) ...................................................................... 10, 12, 13

*American President Lines, LLC v. Matson, Inc.*,
  633 F. Supp. 3d 209 (D.D.C. 2022)................................................................ 12, 27, 28, 32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................. 6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ................................................................................................ 12

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ...................................................................................... 8

*Barker ex rel. United States v. Columbus Reg'l Healthcare Sys., Inc.*,
  977 F. Supp. 2d 1341 (M.D. Ga. 2013) .................................................................... 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................. 5, 6

*Brown Shoe v. United States*,
  370 U.S. 294 (1962) ........................................................................ 28

*City of Groton v. Connecticut Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981) ............................................................ 8

*CopyWatch, Inc. v. Am. Nat'l Red Cross*,
  299 F. Supp. 3d 189 (D.D.C. 2018) ................................................ 34

*Davis v. Liberty Mut. Ins. Co.*,
  871 F.2d 1134 (D.C. Cir. 1989) ..................................................... 46

*Drake v. City of Detroit*,
  266 Fed. Appx. 444 (6th Cir. 2008) .............................................. 34

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) ......................................................... 28

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) .......................................................... 8

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013) ............................................................. 8

*Fotobom Media, Inc. v. Google LLC*,
  2024 WL 1603968 (D.D.C. Feb. 27, 2024) ................................ Passim

*Free FreeHand Corp. v. Adobe Sys., Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ......................................... 42

*Fricke-Parks Press, Inc. v. Fang*,
  149 F. Supp. 2d 1175 (N.D. Cal. 2001) ......................................... 45

*FTC v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ......................................... 28, 29, 39

*FTC v. Facebook, Inc.*,
  581 F. Supp. 3d 34 (D.D.C. 2022) ....................................... 33, 38, 39

*FTC v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) ................................................. 29

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) ............................... 28, 29, 30, 33

*Gaudreau v. Am. Promotional Events, Inc.*,
  511 F. Supp. 2d 152 (D.D.C. 2007).......................................................................... 43

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012).................................................................................... 6

*Howard v. Gutierrez*,
  237 F.R.D. 310 (D.D.C. 2006) ................................................................................. 46

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir.1997) .................................................................................. 32

*Impax Labs., Inc. v. FTC*,
  994 F.3d 484 (5th Cir. 2021) ................................................................................... 45

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016) ............................................................................... 10, 11

*In re Cardizem CD Antitrust Litig.*,
  332 F.3d 896 (6th Cir. 2003)................................................................................... 45

*In re Cox Enterprises, Inc.*,
  871 F.3d 1093 (10th Cir. 2017) .................................................................................. 8

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  733 F. Supp. 2d 1348 (N.D. Ga. 2010)....................................................................... 8

*In re EpiPen (Epinephrine Injection USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) ............................................................................... 8, 14

*In re Evanston Nw. Healthcare*,
  2008 WL 2229488 (N.D. Ill. May 29, 2008).............................................................. 42

*In re Generic Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018)........................................................................... 8

*In re Google Digital Advert. Antitrust Litig.*,
  2024 WL 895155 (S.D.N.Y. Mar. 1, 2024)................................................................. 44

*In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187  (S.D.N.Y. 2019) .................................................................. 24, 46

*In re Magnesium Oxide Antitrust Litig.*,
  2011 WL 5008090 (D.N.J. Oct. 20, 2011) ................................................................ 45

*In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*,
   2017 WL 11830269 (D.D.C. June 13, 2017)............................................................. 38

*Intergraph Corp. v. Intel Corp.*,
   195 F.3d 1346 (Fed. Cir. 1999) ........................................................................... 13

*Jones v. Varsity Brands, LLC*,
   618 F. Supp. 3d 713 (W.D. Tenn. 2022) ............................................................. 41

*Kartell v. Blue Shield of Mass., Inc.*,
   749 F.2d 922 (1st Cir. 1984)................................................................................. 8

*Las Vegas Sun, Inc. v. Adelson*,
   2022 WL 17721101 (D. Nev, Dec. 15, 2022) ..................................................... 30

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................. 6

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
   334 U.S. 219 (1948) ........................................................................................... 11

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004) ......................................................................... 8, 39

*Molock v. Whole Foods Mkt., Inc.*,
   297 F. Supp. 3d 114 (D.D.C. 2018).................................................................... 27

*Nance v. Emages, Inc.*,
   2022 WL 2116581 (N.D. Ill. June 13, 2022)...................................................... 34

*Nat'l Aviation Trades Ass'n v. C.A.B.*,
   420 F.2d 209 (D.C. Cir. 1969)........................................................................... 28

*New York v. Facebook, Inc.*,
   549 F. Supp. 3d 6 (D.D.C. 2021)............................................ 14, 39, 40, 44

*New York v. Meta Platforms, Inc.*,
   66 F.4th 288 (D.C. Cir. 2023)....................................................................... 14, 43

*Newcal Indus., Inc. v. Ikon Off.*,
   513 F.3d 1038 (9th Cir. 2008) ........................................................................... 28

*Osborn v. Visa Inc.*,
   797 F.3d 1057 (D.C. Cir. 2015)....................................................................... 6, 7

*Palmer v. BRG of Ga., Inc.*,
    498 U.S. 46 (1990) ................................................................................................ 45

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014) .............................................................................................. 40

*Philips Med. Sys. (Cleveland, Inc.) v. Buan*,
    2021 WL 15361622 (N.D. Ill. April 19, 2021).......................................................... 8

*Pintando v. Miami Dade Housing Agency*,
    501 F.3d 1241 (11th Cir. 2008) ............................................................................. 34

*Rumble, Inc. v. Google, LLC*,
    2022 WL 3018062 (N.D. Cal. July 9, 2022) ........................................................... 35

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ................................................................................................ 6

*Schuler v. United States*,
    617 F.2d 605 (D.C. Cir. 1979)................................................................................. 6

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ............................................................................. 5, 8

*Sitts v. Dairy Farmers of Am.*,
    276 F. Supp. 3d 195 (D. Vt. 2017) ........................................................................ 11

*Snow v. Align Tech., Inc.*,
    586 F. Supp. 3d 972 (N.D. Cal. 2022).................................................................... 45

*Sparrow v. United Air Lines, In*c.,
    216 F.3d 1111 (D.C. Cir. 2000).............................................................................. 33

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ................................................................................. 40

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ................................................................................................ 5

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ................................................................................................ 5

*Tennant v. District of Columbia*,
    2020 WL 4464505 (D.D.C. Aug. 3, 2020) ............................................................... 8

*Times–Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953) ........................................................................... 29

*United Press Int'l, Inc. v. Global One News, Inc.*,
    2020 WL 2572483 (M.D. Tenn. May 21, 2020) ...................................... 30

*United States v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957) ........................................................................... 39

*United States v. Google LLC*,
    687 F. Supp. 3d 48 (D.D.C. 2023).................................... 8, 13, 14, 18

*United States v. Google LLC*,
    2024 WL 3647498 (D.D.C. Aug. 5, 2024) ...................................... Passim

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ........................................................................... 29

*United States v. ITT Cont'l Baking Co.*,
    420 U.S. 223 (1975) ........................................................................... 39

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).......................................................... 8, 14

*United States v. Second Chance Body Armor Inc.*,
    2016 WL 3033937 (D.D.C. Feb. 11, 2016) ............................................ 8

*Wilson v. Plummer*,
    2015 WL 3867389 (S.D. Ohio June 23, 2015) ...................................... 34

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ............................................................. 41

**Statutes**

15 U.S.C. § 18 .......................................................................................... 39
U.S. Const. art. III ....................................................................................... 4

**Rules**

Fed. R. Civ. P. 9 ....................................................................................... 42
Fed. R. Civ. P. 12 ............................................................................. 5, 6, 7, 8
Fed. R. Civ. P. 56 ....................................................................................... 8
Fed. R. Civ. P. 15 ...................................................................................... 46

## I.     INTRODUCTION

Plaintiffs Helena World Chronicle, LLC ("HWC") and Emmerich Newspapers, Inc. (collectively, "Plaintiffs") are Publishers of websites that professionally gather, produce, and publish digital news content, which consists of verified information and opinion on current events and culture in text, image, or video format. Amended Complaint ("AC") ¶ 1 n.1. Plaintiffs filed an antitrust class action against Google, LLC and its parent entity, Alphabet, Inc. (collectively, "Google") on behalf of themselves and "all Publishers of text-based digital news products that publish such content online, who are domiciled in, or have offices in, the U.S., and whose websites have been indexed by Google during the period from November 1, 2019, to the date on which this Class is certified." *Id*. ¶ 320.

This is a simple case. Google has a stranglehold over the United States general search engine services market. It has a 90% share of that market and Google Search accounts for 95% of online searches conducted over mobile devices. *See United States v. Google LLC*, No. 20-cv-3715 (APM), 2024 WL 3647498, at *8, 74-80 (D.D.C. Aug. 5, 2024) ("*Google II*"). (The governmental case before this Court will be referred to generally herein as the "DOJ Search Case"). It has achieved this power in part through making Google Search the default search engine on both mobile phones manufactured by Apple, Inc. ("Apple") (through an agreement in dating back to 2002) and mobile phones running a platform created by Android, which Google acquired in 2005. *Id*. at *51-64, 97-110. Google is also an internet content provider, thanks to, among other things, its acquisition of YouTube in 2006. In short, Google has created a powerful, multifaceted ecosystem that it can use to crush competition in other online markets.

This case is about one such market: online news. Most recently, Google is using its power in the search engine services market to coerce Publishers to hand over without compensation their

stored data in order to train Google's Generative Artificial Intelligence ("GAI") platform, originally known as Bard (now rechristened as Gemini). This platform, operating in conjunction with Google Search, responds to natural language inquiries by directing users to what Google calls the "Search Generative Experience" ("SGE", rechristened in May of 2024 as "AI [Artificial Intelligence] Overviews"), which displays at the top of the page Google's own news summaries, patched together from the news content scraped from Publishers. These summaries are intended to render superfluous the news websites used to create them, thus ensuring that viewers will not visit those websites, which are relegated to the bottom of Google's Search Engine Results Page ("SERP").

While Google previously presented SERPs utilizing "Featured Snippets" of online news stories from Publishers, at least each "snippet" was taken directly from a website hyperlinked right below it. SGE is much worse. When a search engine user utilizes SGE to check news, he or she is directed to a SERP where the top of the page consists of a GAI-created summary fashioned from material scraped without compensation from multiple Publishers' websites and presented without attribution. The sources for the summary are pushed down to the bottom of the SERP, where users are unlikely to see or click on them because they have already read Google's summary. As things now stand, Publishers have no ability to opt out of SGE. If and when that changes, it is almost certain that Publishers choosing to opt out will no longer be listed on that GAI-generated SERP (as was the case with "Featured Snippets")

The result of this practice is that: (a) Google's GAI-generated summary now accounts for 66% of online news searches and (b) Publishers are being driven from the market in droves, to the detriment of American journalism.

This is not just Plaintiffs' view of things. In a joint statement issued on July 23, 2024, four competition-regulating bodies (the European Commission ("EC"), the United Kingdom's Competition & Markets Authority ("CMA"), the United States Department of Justice ("DOJ"), and the Federal Trade Commission ("FTC")) all agree that use of AI or AI-enabled services may allow firms with digital platforms that already have substantial market power "to extend or entrench the positions that they were able to establish through the last major technological shift to the detriment of future competition."[1]

Google's dominance in the United States general search services market was obtained through a variety of anticompetitive means. These consist of: (a) entering into exclusionary distribution contracts with Apple, Android device partners, and other web browser manufacturers to make Google the default search engine on their products; (b) using its monopoly status to pay excessive amounts for these contracts; (c) requiring Apple in 2016 to abandon any potential for using Siri or any other Apple platform as a competing search engine; (d) acquiring three companies (Android, YouTube, and Deep Mind) to help build an exclusionary search network; (e) introducing Bard (now Gemini) in early 2023, a GAI platform that was not ready for prime time and was instead rushed to market in order to nullify the impact of an introduction of a similar product from Microsoft Corporation ("Microsoft") (which owns the number two search engine in the United States) and prevent it from obtaining any competitive advantage; (f) misappropriating news content from Publishers' websites in order to develop Bard/Gemini and its associated SGE program and then using SGE to compete unfairly against Publishers; (g) telling Publishers that if

---

[1] EC, CMA, DOJ and FTC, *Joint Statement on Competition in Generative AI Foundation Models and AI Products* (July 23, 2024) ("Joint Statement"), https://www.justice.gov/atr/media/1361306/dl#:~:text=Guided%20by%20our%20respective%20laws,that%20these%20technologies%20could%20provide.

they opted out of SGE, they ran the risk of becoming invisible on Google's AI-generated SERPs; (h) modifying the manner in which Google charges Publishers under AdSense by using a cost per impression rather than a cost per click methodology and imposing separate charges for its services; (i) negotiating with Apple to use Gemini on Apple's mobile devices; (j) spoliating evidence where Google internally admits that its conduct might be anticompetitive; and (k) threatening California news websites with a ban from Google Search in reaction to the proposed California Journalism Preservation Act ("CJPA"), which would require Google to pay for news content taken from Publishers. *Id*. ¶ 58.

Plaintiffs contend further that Google is using its power in the general search services market to gain monopoly control over the United States online news market, where it now has a 66% market share. *Id*. ¶ 367.

Google does not dispute the vast majority of the facts pled in the AC. Instead, it asserts that those facts do not give rise to the antitrust claims Plaintiffs have pled.

*First*, it contends that whatever it might have done in connection with Counts One, Three, Four and Five, (1) Plaintiffs have no right to sue because, as Google says in 12 references scattered throughout its brief, they supposedly lack standing under Article III of the United States Constitution (Google Brief ("MPA") at 4-5 & n.1, 10, 12, 16 n.4, 17, 45 n.10); and (2) Plaintiffs supposedly lack antitrust standing, as Google says in 32 more references throughout its brief (*id*. at 1-10, 16, 28, 32-34, 40, 45). These arguments fail to take into account decisions by many courts (including this one) that support the conclusion that entities such as Plaintiffs are properly viewed as "participants" in the relevant markets at issue here.

**Second**, Google claims that each item of conduct summarized above, when viewed on a piecemeal basis, consists of nothing but innocent or permissible acts, an argument belied by Google's own internal admissions of antitrust concerns and by the relevant caselaw.

**Third**, as to Count Two, Google's main argument is that the relevant market is improperly defined, an argument that is belied by the sources cited in the AC, and which is inconsistent with decisions in this Circuit about how relevant markets should normally be defined, including a decision by this Court.

**Fourth**, as to Count Four, Google contends that Plaintiffs' claims are untimely. Even though the caselaw says otherwise.

**Fifth**, as to Count V, Google contends that its deal with Apple is a harmless vertical distribution agreement, even though caselaw supports the conclusion that it constitutes a *per se* violation of the Sherman Act.

For all of these reasons and others, Google's dismissal motion should be rejected in its entirety.

## II.    LEGAL STANDARD

Google gives short shrift to the legal standards applicable to motions to dismiss, but those standards deserve a more in-depth analysis. In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*") (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n. 1 (2002)). In ruling on the sufficiency of a complaint, it is to be considered *in its entirety*. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs*")"). Indeed, "[a]ctions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015)

("*SD3*").

A complaint is construed liberally in plaintiffs' favor. *Hettinga v. United States,* 677 F.3d 471, 476 (D.C. Cir. 2012) ("*Hettinga*") (quoting *Schuler v. United States,* 617 F.2d 605, 608 (D.C. Cir. 1979) ("*Schuler*") (internal quotations omitted)). The Court must grant plaintiffs "the benefit of all inferences that can be derived from the facts alleged." *Hettinga*, 677 F.3d at 477 (quoting *Schuler*, 617 F.2d at 608). "To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Hettinga,*, 677 F.3d at 476 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "Determining whether a complaint states a plausible claim for relief will[ ]... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Google's jurisdictional argument is based on Fed. R. Civ. P. 12(b)(1) (*see* Google Motion at 1), which was discussed at length in *Osborn v. Visa Inc.*, 797 F.3d 1057 (D.C. Cir. 2015), where the D.C. Circuit reversed a finding of no standing in an antitrust case. There, the appellate court said:

> A plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation. *See Lujan* [*v. Defenders of Wildlife*], 504 U.S. [555] at 561 [(2004)]. Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks omitted); *see also Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (observing that on a Rule 12(b)(1) motion, we "grant[ ] plaintiff the benefit of all inferences that can be derived from the facts alleged").

6

797 F.3d at 1063-64. The D.C. Circuit found that the plaintiffs' theories of causation were sufficiently concrete and particularized, were fairly traceable to the actions of defendants, and were redressable by judicial decision. *Id*. It said these factors applied to economic assumptions as well; "[i]ndeed, allegations of economic harm 'based on standard principles of 'supply and demand''" are "routinely credited by courts in a variety of contexts." *Id*. at 1065 (quoting *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993)).

Importantly, the D.C. Circuit chided the lower court for relying on summary judgment cases in deciding a dismissal motion:

> In deciding that the Plaintiffs had failed to establish injury and redressability, the District Court relied on cases that had been decided at summary judgment…. On a motion for summary judgment by a defendant, the question is not whether the plaintiff has asserted a plausible theory of harm, but rather whether the plaintiff has offered sufficient evidence for a reasonable jury to conclude that its theory is correct…. A Rule 12(b)(1) motion, however, is not the occasion for evaluating the empirical accuracy of an economic theory. Because the economic facts alleged by the Plaintiffs are specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleadings stage.

797 F.3d at 1065-66. Other cases in this Circuit concur in making this distinction with respect

to Rule 12(b)(6) motions as well.[2] So do cases outside this Circuit.[3] Here, Google relies

substantively on numerous cases decided on summary judgment or on post-trial motions or

appeals.[4]

## III.   COUNT ONE STATES A CLAIM FOR MONOPOLIZATION IN THE GENERAL SEARCH SERVICES MARKET.

With respect to Count One, Google asserts: (1) lack of both Article III standing and antitrust

standing (MPA at 4-9) and (2) failure to allege adequately exclusionary conduct with respect to

the various types of conduct summarized above (*id*. at 9-17). None of these arguments justify

dismissal of the AC.

---

[2] *See Tennant v. District of Columbia*, No. 19-2949 (BAH), 2020 WL 4464505, at *8 (D.D.C. Aug. 3, 2020) ("Defendant's reliance on *George* is misplaced. That case was an appeal from the grant of summary judgment, a far different procedural posture than this one…. While a summary judgment plaintiff may be required to 'establish[ ] a *prima facie* case' of discrimination, …a plaintiff resisting a motion to dismiss need not 'establish' anything. At the motion to dismiss stage, a plaintiff need only plead facts that could 'plausibly' establish the elements of a retaliation claim"); *United States v. Second Chance Body Armor Inc*., No. 04-280 (RWR), 2016 WL 3033937, at *3 (D.D.C. Feb. 11, 2016) ("A defendant may file a motion to dismiss on the grounds that the plaintiff 'fail[ed] to state a claim upon which relief can be granted.' Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need show only that her 'factual allegations are enough to raise a right to relief beyond the speculative level[.]' …However, a plaintiff's complaint will not survive a motion for summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a).").

[3] *See, e.g., SD3*, 801 F.3d at 425; *Evergreen Partnering Grp., Inc. v. Pactiv Corp*., 720 F.3d 33, 44 (1st Cir. 2013); *Erie Cnty., Ohio v. Morton Salt, Inc*., 702 F.3d 860, 868 (6th Cir. 2012); *In re Generic Pharms. Pricing Antitrust Litig*., 338 F. Supp. 3d 404, 442 n. 211 (E.D. Pa. 2018); *Barker ex rel. United States v. Columbus Reg'l Healthcare Sys., Inc.*, 977 F. Supp. 2d 1341, 1346 (M.D. Ga. 2013); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1359-60 (N.D. Ga. 2010); *Philips Med. Sys. (Cleveland, Inc.) v. Buan*, No. 1:19 CV 02648, 2021 WL 15361622, at *3 (N.D. Ill. April 19, 2021).

[4] *See In re EpiPen (Epinephrine Injection USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ("*EpiPen*"); *In re Cox Enterprises, Inc.*, 871 F.3d 1093 (10th Cir. 2017); *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ("*Microsoft*"); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984); *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921 (2d Cir. 1981) ("*Groton*"); *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004) ("*Midwestern*"); *United States v. Google LLC*, 687 F. Supp. 3d 48 (D.D.C. 2023) ("*Google I*").

### A.  PLAINTIFFS HAVE STANDING TO ASSERT COUNT ONE.

Plaintiffs are "participants" in the relevant market for United States general search services.

Google's arguments to the contrary are without merit and wrong as a matter of law.

The AC alleges the following at ¶ 40:

> Google Search is not free. Its platform involves a series of valuable exchanges with three key customers—search users, website publishers, and advertisers. Google provides search traffic referrals to Publishers in exchange for content, which Google obtains via crawling and indexing websites. Google provides search results to users in exchange for their attention to links, ads, and content published on Google's SERP. Google then sells search ads to advertisers, monetizing the content it acquires from publishers and the attention it acquires from users. The following graphic illustrates this process.



Thus, it is alleged that Google *refers* general search traffic to Publishers who function as its customers in that respect. Google also *extracts* content data from Publishers that it uses as an input its search results. These interactions alone are sufficient to establish that Publishers are customers of Google in the United States search market. The AC further alleges that Google's share of the market is 90% and that numerous barriers to entry exist in that market. AC ¶¶ 42-50.

Google, however, says that a party must be a "participant" in the domestic general search market in order to have standing to sue it, and that Plaintiffs fail to satisfy that requirement because

they are *suppliers*, rather than competitors or customers, in that market, relying on this Court's opinion in *Fotobom Media, Inc. v. Google LLC*, No. 22-CV-00712 (APM), 2024 WL 1603968 (D.D.C. Feb. 27, 2024) ("*Fotobom*") and the Second Circuit's opinion in *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016) ("*Aluminum*"). MPA at 7.

Plaintiffs do not dispute the need to plead participation, but assert that they have done so, as indicated above. Even if one were to accept the argument that Plaintiffs were were *only* suppliers to Google, the cases on which Google principally relies **undermine** its assertion at page 8 of its brief that a supplier **cannot** be a market participant.

The Ninth Circuit first addressed the standing of a suppliers in *Amarel v. Connell,* 102 F.3d 1494 (9th Cir. 1997) ("*Amarel*"). It said at page 1510 (emphases added): "[m]oreover, **standing is appropriate in certain cases where the plaintiff is 'a supplier of goods or services who can prove that he suffered lower selling prices or diminished volume or other profit reduction** as a result of illegal conduct by the defendant(s).' *Areeda and Hovenkamp*, Antitrust Law at ¶ 375a."

Subsequently, in *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057-58 (9th Cir. 1999) ("*AmAd*"). The Ninth Circuit stated (emphasis added):

> While consumers and competitors are most likely to suffer antitrust injury, there are situations in which other market participants can suffer antitrust injury. *See generally* Areeda & Hovenkamp, Antitrust Law (1995 & 1998 Supp.) (analyzing possible antitrust injury of indirect purchasers (§ 371), potential entrants (§ 374), **suppliers** (§ 375), licensors and landlords (§ 376), and dealers (§ 362c)). Not surprisingly, courts routinely recognize the antitrust claims of market participants other than consumers or competitors. A number of our opinions do use the phrase 'competitor or consumer' as a rough gloss on the *Associated General/Bhan* 'market participant' test. But those cases usually concern parties who are clearly not participants of any kind in the restrained market.

The Ninth Circuit gave examples of cases concerning such situations. 190 F.3d at 1057 n. 6

The Second Circuit adopted a similar position in *Aluminum*, saying: "[c]ourts have also 'recognize[d] the antitrust claims of market participants other than consumers or competitors,' *e.g.*,

potential new market entrants, **suppliers**, and dealers. *Am. Ad Mgmt., Inc.,* 190 F.3d at 1057 & n.6 (citing cases)." 833 F.3d at 158 (emphasis added).[5]

This Court in *Fotobom* adopted explicitly the approach of the Second and Ninth Circuits. 2024 WL 1603968, at *4. It stated that:

> The court is persuaded by this articulation of antitrust injury. *See generally Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (The Sherman Act 'does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers'). Therefore, in determining whether Plaintiff has plausibly pleaded antitrust injury, the court does not strictly confine itself to asking whether Plaintiff is a 'consumer or competitor' in the market for general search services.

It is true that the Court did not find that the plaintiff in that case--who ran a software company that made a keyboard application for mobile devices called "Keyboard +"-- had standing in the search market, but that was because "Keyboard+ does not exhibit the most basic characteristics of a specialized search engine. Moreover, even if Keyboard+ could be considered some species of specialized search, Plaintiff agrees that such products do not compete with general search engines, like Google." *Id*. at *5. That is not the case here. Plaintiffs here have never alleged that they compete with Google in the general search market. They are, however, forced by Google to supply it with their content data and Google does refer general searches to them. That suffices to establish their "participant" status.

The AC alleges harm in the general search services market resulting from Plaintiffs' relationship to Google. Publishers to whom Google directs search traffic are compelled by it to provide against their will access to their data for purposes of training its GAI. AC ¶¶ 342-43.

---

[5] This was technically *dictum* since the case involved three groups of end-users and they *admitted* that they functioned solely in a different market. *Id*. at 162. *See Sitts v. Dairy Farmers of Am.*, 276 F. Supp. 3d 195, 202-03 (D. Vt. 2017) (denying motion to dismiss on the ground of standing even though some plaintiffs were current or former suppliers to defendants).

Google is less incentivized to innovate and improve search quality because it pays enormous bribes to companies like Apple in order to maintain its default status on mobile equipment. *Id.* ¶ 344. And Google's conduct chills competition from potential entrants like Apple. *Id.* ¶ 345. By reducing competition in search, Google deprived consumers of choice and quality in the general search engines available on the market; a less effective search engine connects fewer consumers with Publishers, thereby eroding the business and profitability of the latter. *Id.* ¶ 346. Google's 95% power over search engine referrals on mobile devices eliminates competition from potential rivals that would benefit Publishers; "Google can dictate the terms of trade not just for itself but for the entire market." *Id.* ¶ 347. Finally, as noted in ¶ 348 of the AC, "Plaintiffs and Publishers are direct purchasers of search traffic from Google. As part of Google's anticompetitive scheme, it has simultaneously imposed an overcharge on Plaintiffs and the Class, in the form of forced, royalty-free licensing, and a reduction of outputs, in the form of zero-click searches and dwindling search traffic" to Publishers' websites. *Id.* ¶ 348.

All of these consequences constitute not merely Article III injury, but **antitrust injury**—injury of the type the antitrust laws were intended to address—as well. *See, e.g., Amarel*, 102 F.3d at 1509 ("[a]nother form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.'" (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983)); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 137 (D.D.C. 2018) ("*3201 Cinema*") (treating reduced output, increased price, and diminished quality as antitrust injuries); *American President Lines, LLC v. Matson, Inc.,* 633 F. Supp. 3d 209, 221 (D.D.C. 2022) ("*APL*") (finding antitrust standing and citing *Amarel* and *3201 Cinema,* even though "APL does not provide much detail about the diminished quality or increased prices that customers have experienced in retaliation for

shipping with APL").

**B. PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT GOOGLE ENGAGED IN EXCLUSIONARY CONDUCT.**

Before responding to Google's discussion of individual exclusionary acts, Plaintiffs first need to address its contention that *on a motion to dismiss*, each of those acts must be viewed separately in isolation from each other. MPA at 9-10.

To begin with, most of the cases on which Google relies for this argument are decisions on summary judgment (*e.g.*, *Google*, *EpiPen, Groton*) or on review of a judgment after a full evidentiary hearing on a motion for a preliminary injunction (*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999)). They are not decisive in the context of a motion to dismiss, where the Supreme Court in *Tellabs* has said that the complaint must be evaluated as a whole.

Moreover, even if summary judgment or trial merits decisions are controlling in this context, this Court in *Google I* did *not* say that aggregation of various items of alleged conduct was banned. Instead, it said that, *in the context of a summary judgment motion*, "when determining whether plaintiffs have met their *prima facie* burden, courts can only aggregate conduct that is itself deemed anticompetitive (*even if only minimally so*)." 687 F. Supp. 3d at 68 (emphases added). The Merriam-Webster dictionary defines "minimal" as "very small or slight."[6] This Court recognized that once the claimed exclusionary conduct was viewed separately, then it could "'evaluate the evidence in totality to see if any synergistic effect saves [the plaintiff's] case.'" *Id*. at 69 (quoting *EpiPen*, 44 F.4th at 982)).

Consequently, even assuming *arguendo* that this standard applicable to examination of a

---

[6] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/minimal (last visited August 11, 2024).

plaintiff's *prima facie* case on a motion for summary judgment can be imported wholesale into deciding a Rule 12(b)(6) motion, giving the Plaintiffs all inferences in their favor, they have plausibly pled exclusionary conduct by a monopolist designed to both protect its monopoly power and leverage it to take over another market.[7]

In the subsections that follow, Plaintiffs will address each of the items of conduct discussed in the MPA at pages 10-21.

### 1. Allegations Relating to Search Distribution Agreements.

With respect to allegations that Google entered into exclusionary contracts with Apple, Android partners, and Browsers that made it the default search engine, Google contends: (a) that Publishers suffered no injury from this conduct and (b) there are no adequate allegations that Google used its monopoly profits to pay excessively for such a privilege. MPA at 10-11. These

---

[7] To be clear, Plaintiffs believe that the D.C. Circuit in *Microsoft* (decided on review of a bench trial) did ***not*** resolve the issue of whether a series of alleged anticompetitive acts alleged by a plaintiff in a Section 2 case need to be considered as a whole in deciding whether they constitute an antitrust violation. There, the appellate court said that it did not need to "pass upon plaintiffs' argument … because the District Court did not point to ***any*** series of acts, each of which harms competition only slightly but the cumulative effect of which is significant enough to form an independent basis for liability." 253 F.3d at 78 (emphasis added). The issue was also not resolved in the later case of *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021) ("*Facebook I*"), *aff'd sub nom. New York v. Meta Platforms, Inc.,* 66 F.4th 288 (D.C. Cir. 2023) ("*Meta*"). There, Judge Boasberg analyzed the "course of conduct" doctrine, which he described as the theory that "competition can die from a thousand paper cuts as easily as from one large blow." 549 F. Supp. 3d at 47. He noted that use of the doctrine had not been decided in *Microsoft*. *Id*. He did ***not*** reject the doctrine, however; indeed, he suggested that "[o]n this view, it would be appropriate and indeed necessary to aggregate the effects of various, say, exclusive-dealing or bundling arrangements that on their own did not foreclose enough of the market to affect competition but, when evaluated together, did have that forbidden effect." *Id*.
He nevertheless ruled categorically that this view could not be applied in the specific case before him, which involved unilateral refusals to deal by a monopolist. This was because, in his view, such refusals to deal are usually tolerated in spite of their having a pronounced anticompetitive effect because judicial intervention to compel such dealing would be worse than the harm sought to be remedied. *Id*. On appeal, the D.C. Circuit in *Meta* adopted the rationale expressed at pages 44-48 of Judge Boasberg's opinion in *Facebook I* without further comment. 66 F.4th at 300 n. 13. Here, of course, Plaintiffs' claims do ***not*** depend on Google's refusal to deal with Publishers; instead, they claim that Google ***is*** dealing with them in a manner that is ***intended to drive them out of the online news market***.

arguments simply ignore what is pled in the AC.

The first of these points has been discussed above. The members of the proposed Class were injured in the general search market because of Google's dominance. There can be no real dispute that Google is a dominant monopolist in general search services in the United States as this Court so found in *Google II*. 2024 WL 3647498 at \*125-28. Google does not meaningfully dispute it. As noted earlier, the AC alleges that Google has 90% of that market and its platform accounts for 95% of searches conducted though mobile phones. *See* AC ¶¶ 42-43. Google earns monopoly profits as a result. In 2022, Alphabet, its parent company, made more than $282 billion in revenue. *Id*. ¶ 36. Publishers suffered from this dominance because there were no significant alternative search engines from which to choose. Their data were mined by Google and they had to accept its SGE or be "ghosted" from search results. *Id*. ¶¶ 238-42. The result was harm in the form of lost income, inability to choose from other meaningful search alternatives, and loss of innovation.

In *Google II*, this Court found that agreements between Google and Apple, Android smartphone manufacturers, and browser developers constituted exclusionary conduct in the general search services market in violation of Section 2 of the Sherman Act. 2024 WL 3647498 at \*94-108. The Court further found that the agreements resulted in no competitive benefits. *Id*. at \*120-25. The AC discusses those same agreements. Therefore, a motion to dismiss as to them, which is subject to a more relaxed standard than a summary judgment motion, should be denied.

Facts are also pled that support the inference that Google made huge payments to Apple in order to have a position as the default search engine on Apple's Safari browser. Under the 2016 amendments to the Information Sales Agreement ("ISA") between the two companies, Google didn't offer its search engine free of charge; instead, ***it paid Apple 40% of its net search advertising***

*revenue*. *Id*. ¶ 94. Between January of 2017 and August of 2021, Google's payments to Apple increased from $418 million to $1.5 billion--more than 250%. Between 2014 and 2022, Google's total annual ISA payments to Apple skyrocketed from $2.2 billion annually to ***$20 billion***. The latter figure constituted ***17.5% of Apple's 2020 operating income***. *Id*. Since the ISA extension in 2016 had a ten-year term, Apple will likely receive an estimated ***$180 billion*** in exchange for agreeing not to compete with Google Search.*Id*. ¶400. *See also Google II,* 2024 WL 3647498at *50-55.

In the DOJ Search Case, it was noted at trial that "in negotiating this Apple contract, if [Google] had equally capable rivals, it wouldn't be able to make that kind of money. Apple would simply play them off against each other. So, when you see that level of profit, it's telling you that there's a really big gap and they have a lot of market power." AC ¶ 95. A fair inference to be drawn from all of these allegations is that these payments were excessive and contributed to Google's search services monopoly that it has leveraged into dominance in the online news market.

## 2. Additional Allegations Relating to Apple.

Google next challenges the adequacy of allegations concerning whether its discussions and contracting to get default status on Apple devices were anticompetitive. MPA at 11-12. Again, however, the allegations of the AC support such a claim.

Apple and Google entered into the initial ISA in 2002 and subsequently entered into various extensions of it, culminating in the present version, signed in 2016. AC ¶¶ 83-94. As early as 2009 and again in 2012, Apple told Google that it sought the option, but not the obligation, to prioritize Google Search as the default search engine on its devices; Google rejected this idea on both occasions. *Id*. ¶¶ 89, 91. Apple introduced a "Suggestion" feature to its mobile devices in 2013 that guessed the user's search intent and then directed him or her to a responsive website, functioning as a type of search engine. *Id*. ¶ 92. John Giannandrea ("Giannandrea"), now Apple's

Senior Vice-President of Machine Learning and AI, recognized that this feature competed with Google Search: "every query that we provide an answer to *is a query that doesn't go to Google.*" *Id*. (Emphases added).

Tim Cook ("Cook"), the CEO of Apple, was interested in entering the general search market. He had been looking at doing so by such means as turning Siri into a search engine or buying Microsoft's Bing search engine. *Id*. ¶ 399.

Google responded to all of this by modifying the ISA to incorporate "a structure that prevents [Apple] from diverting queries and destroying value." *Id*. ¶ 92. In 2016, the ISA was renewed for ten years and further modified. Joan Braddi ("Braddi"), Google's head of product partnerships, described the new contract as containing an agreement that Apple "could not expand farther than what they were doing in Sept 2016 (*as we did not wish for them to bleed off traffic*)". *Id*. ¶ 96 (emphases added). Pursuant to the revised ISA, Apple cannot: (1) offer a search engine choice screen; (2) pre-select a different default search engine in Safari's private browsing mode; (3) offer a different default search engine on different Apple devices (*e.g.*, different defaults on mobile, as distinct from desktop devices); (4) offer a different default search engine in the United States or any part thereof; (5) materially expand Apple's Suggestions feature in Safari; and (6) run advertisements on Apple's Siri or Spotlight without giving Google the right-of-first-refusal to control those advertisements. *Id*. ¶ 84. Cook indicated to Google in 2018 that "I imagine us as being able to be *deep, deep partners*; *deeply connected where our services end and yours begin* and see[] no natural impediment to us working together." *Id*. ¶ 100 (emphases added).

In *Google* I, on which Google relies, the record involving Google and Apple was found to justify a trial with respect to a claim of improper exclusive dealing. 687 F. Supp. 3d at 72-73. In *Google II*, the Court determined the ISA was exclusionary in violation of the Sherman Act. 2024

WL 3647498 at *94-108. The facts alleged in the AC support the reasonable inference that Google basically paid Apple to stay out of the search engine market by giving it 40% of Google's search revenue. Plaintiffs legitimately contend that this agreement violates Section 1 of the Sherman Act, for reasons to be explained below.[8]

### 3. Allegations Relating to Acquisitions.

Google also attacks Plaintiffs' discussion of three acquisitions by it: Android in 2005, YouTube in 2006, and DeepMind in 2012. MPA at 12-13. It says that these claims are barred by the relevant statute of limitations and the doctrine of laches and have nothing to do with the search engine market. The first two of these arguments will be dealt with in a later section of this brief; the third is belied by the allegations of the AC.

All three of these acquired companies are heavily involved in Google's GAI platform introduced in 2023 that is now a major part of its search engine. AC ¶¶ 70, 75, 78. Android smartphones are now powered by the "AI Core," which enables Google to publish GAI-generated summaries of online news content and will give Google's GAI-generated news content a default distribution position on Android devices--all of which are facilitated by Google's coerced misappropriation of Publishers' content. These capabilities further cemented Google's power in the general search market. AC ¶ 70. YouTube, which is part of Google's search network, is now equipped with GAI and can provide video summaries akin to what is being done with SGE. *Id*. ¶ 75. In April of 2023, DeepMind merged with Google's Google Brain division to form Google DeepMind, as part of the company's ongoing work on GAI, which is now embedded in Google's search engine. *Id*. ¶ 78.

---

[8] Plaintiffs also referred in the AC to Apple's plans to use Google's Gemini on iPhones. AC ¶ 335. Those have not been announced yet, but are expected to be announced in the fourth quarter of this year.

Beyond these uses, the AC alleges that YouTube is utilized by Google to siphon news from legitimate publishers and self-preference video search results from YouTube presenters, as occurred earlier this year with respect to HWC. *Id*. ¶ 74. In addition, 45% of United States mobile operating devices use the Android platform. *Id*. ¶ 66. Google has entered into Mobile Application Distribution Agreements ("MADAs") with (a) original equipment manufacturers of Android devices (including Samsung and Motorola) and (b) Revenue Sharing Agreements ("RSAs") with mobile phone carriers that sell Android devices (including Verizon, AT&T, and T-Mobile). *Id*. ¶¶ 106, 108. Pursuant to all of these agreements, Google Search is designated as the default search engine, thus contributing to Google's dominant monopoly in the United States general search services market. *Id*. ¶¶ 107-08. *See Google II*, 2024 WL 3647498 at *99-101. The Court called these agreements, along with the ISA with Apple, "exclusive dealing agreements" that allowed Google to foreclose competition in 50% of the domestic general search services market. *Id*. at 103-104. As it stated, "[t]he agreements have three primary anticompetitive effects: (1) market foreclosure, (2) preventing rivals from achieving scale, and (3) diminishing the incentives of rivals to invest and innovate in general search." *Id*. at 104.

And, as noted in the AC, the European Commission found self-preferencing agreement between Google and Android providers similar to its practices in the United States to be unlawful. Once again, the similar allegations in the AC should not be eliminated at the pleading stage, where a more relaxed standard is applicable.

### 4. Allegations Relating to Misappropriating Content and Use of SGE.

**Scraping of Content**. Google's argument with respect to misappropriation of Publisher content is that: (a) the AC fails to allege that putative Class members did not consent to the scraping of their data, (b) that all they are really complaining about is how Google uses that scraped data, and (c) that Plaintiffs are not participants in the market for general search services. MPA at 13-15.

As explained above, the third objection is simply inaccurate; Plaintiffs assert that the compulsory scraping of their data by Google is one way they participate in that market. Plaintiffs will address the other two arguments.

In ¶ 155 of the AC, it is stated that:

> Google has forced Publishers to provide training content that Google's GAI products can plagiarize. Since at least 2017, Google trained its LLMs [Large Language Models used to train AI] on Plaintiffs' and Publishers' content without informing or compensating Publishers…. Google purported to provide an opt-out ability to Publishers in September of 2023, but if a Publisher exercised that opportunity, Google Search would no longer include its website at the top of the SERP. As further discussed below, the Autorité de la concurrence ('French Competition Authority') determined in 2023 that this conduct was anticompetitive.

Thus, for much of the relevant period, Publishers had *no idea* that their data was being scraped. This fact is inconsistent with the notion of informed consent.  It was only beginning in late 2022, when GAI platforms were first introduced to the public, that people began to realize how LLMs were created by scraping the data from third party websites without prior permission and without compensation.

Confronted with the outcry over this misappropriation of content, Publishers sought the ability to opt out of such scraping. Google purported to offer them one in September of 2023, through something called Google Extended, but it did not work with SGE (now AI Overviews). *Id*. ¶ 232. And if a Publisher opted out of SGE, it would be excluded from Google's SERP. Google's ***own GAI chatbot, Bard, admitted all of this and more*** in a May 2023 interview, and discussed the harm thereby inflicted, as set forth in ¶ 233 of the AC (emphases added):

> Furthermore, Bard explained, third-party websites that want to control their own data and opt to shield Bard from scraping their content would face consequences. '***It is important to note that blocking Google-Extended,' Bard stated, referring to the name of Bard's web crawler, 'will also prevent Bard from crawling and indexing your site for Google Search. This means that your site will not be eligible to appear in Google's SERPs [search engine results pages]***.'

****

> *Bard lays out other damaging impacts that GAI could have on third-party websites that rely on Google. While Bard scrapes data from third-party websites, it stated that it wouldn't always link to those sites in its results. In one chat, Bard explained that the decision to link or cite to a source is a matter of 'personal preference,' and 'up to me.'*

> *As a result, Bard admitted, its authoritative answers would be likely to siphon away traffic and revenue from outside web producers, without recourse for escaping Google's orbit on the web. 'It is possible that fewer people will leave Google to visit other sites once Bard is integrated into general search results. This could lead to a decrease in traffic to those sites and make it harder for them to create sustainable business models,' Bard stated.*

Marc Najork, a Distinguished Research Scientist at Google DeepMind, confirmed this bleak assessment in a presentation given in July of 2023. AC ¶ 239.

All of this was tied to Google's conduct in the general search market. As the French Competition Authority, which fined Google 250 million Euros in March of 2024 for this conduct, said: "the scale of its misconduct was all the 'more significant' given 'Google's dominant position on the generalist search services market.'" *Id*. ¶ 274.

Finally, as all of this reflects, Publishers are not just receiving no compensation for misappropriation of their data; ***their very continuing independent existence is at risk***. *See id.* ¶¶ 297-314.

**Use of SGE**. Related to the foregoing are Plaintiffs' allegations with respect to Google's use of GAI in the form of SGE. As explained in the Introduction, the advent of SGE allowed Google to use the data scraped from Publishers' websites to create news summaries that appeared at the top of a SGE-enabled SERP and led to users reading the summary to ignore websites that were the sources of the summary.

Paragraph 238 of the AC describes the harmful effects of SGE and Publishers' reaction to it:

21

> *If publishers want to prevent their content from being used by Google's AI to create those summaries, they must use the same tool that would prevent them from appearing in Google search results. That would make it difficult for people using search to find the publishers that choose not to be involved in SGE.*
>
> *Google says that the AI-generated summaries are put together from many web pages and that the links are designed to be a starting point to learn more. The company describes SGE as an opt-in experiment for users, who will help develop and improve the product.*
>
> \*\*\*\*
>
> Publisher concerns relate to a number of issues. *They include the issue of web traffic; whether publishers will be credited as the providers of information that appears in the SGE summaries; and whether those summaries are correct. Most importantly, publishers want to be paid for the content on which Google and other AI companies train their AI tools.*
>
> \*\*\*\*
>
> *The new [previously mentioned stopgap opt-out] tool does not permit publishers to block their content from being used for SGE without disappearing from traditional Google search.*
>
> *Publishers want evidence that people are using their websites to secure advertisers. Showing up in Google search is important to their business. The design for SGE has pushed the links that appear in traditional search further down the webpage. That might reduce traffic to those links by as much as 40 percent, said an official at one of the publishers.*
>
> *More worrying is the possibility that people searching the web will avoid clicking any of the links if the SGE passage meets the users' need for information.*

(Emphases added). In October of 2023, Google said that an opt-out option might be made available in later models of GAI, but it has not happened yet. *Id*. ¶ 232. The "AI Overviews" version of SGE was made available in May of 2024 and it still does not permit Publishers to opt out of Google's use of summaries based on their extracted data.

As the EC, CMA, DOJ, and FTC said in their very recent Joint Statement with respect to platforms that have substantial market power at multiple levels related to the AI stack, such firms can use that power to their own advantage through control of AI or AI-enabled services: *"firms*

*with existing market power in digital markets could entrench or extend that power in adjacent AI markets or across ecosystems, taking advantage of feedback and network effects to increase barriers to entry and harm competition; that lack of choice for content creators among buyers could enable the exercise of monopsony power; and that AI may be developed or wielded in ways that harm consumers, entrepreneurs, or other market participants.* " Joint Statement at 1 (emphases added).

### 5.  Allegations Relating to the So-Called "Readiness" of Bard.

Google asserts that there is no "readiness" standard applicable to its decision to introduce Bard in of 2023. MPA at 15. However, it misperceives the purpose of these allegations.

In late 2022, Microsoft introduced the GAI chatbot Chat GPT, which was created by Open AI and was positioned as a "Google killer" that would be a real threat to Google's search engine monopoly. AC ¶ 202. Google initially dismissed the idea of introducing its own GAI chatbot in response, saying it didn't want the "reputational risk" of hastily introducing a half-baked product. *Id*. ¶ 211.

However, Chat GPT captured the public imagination and Google promptly reversed its position and introduced Bard in February of 2023, something that was perceived as a "strategic commercial countermeasure." *Id*. ***Google' own employees criticized*** the introduction, calling Bard "a pathological liar" and "worse than useless: please do not launch." *Id.* ¶¶ 214-16. They were not wrong. Bard was shown to be an inferior product, prone to mistakes, and inventing falsehoods in answering questions. *Id.* ¶¶ 217-23. But this "strategic countermeasure", as bad as it was, accomplished Google's goal of blunting the success of ChatGPT and preserving Google's market share in general search services. *Id.* ¶¶ 226-27.

The caselaw is clear that "changes in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section

2." *In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019) ("*Keurig*") (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010)).  In analyzing the effect of a new product introduction, one looks at conduct associated with that introduction. *Id*. Here, the introduction of Bard, accompanied by the creation of SGE, the fact that a Publisher could not opt out of it without being erased from Google's GAI-generated SERP, and the subsequent modifications to AdSense (discussed below) provide that additional context. At the very least, Google's conduct is sufficiently anticompetitive, within the meaning of this Court's ruling in *Google*.

### 6.  Allegations Relating to Changes to AdSense.

Google's argument on AdSense is that it has nothing to do with general search services. MPA at 15-16. However, this argument ignores how it operated in tandem with Google's SGE.

SGE was introduced in in May of 2023 and, as explained earlier, provided news summaries in response to searches. Sources for those summaries were relegated to the bottom of Google's SERP. The issue thus created for Google was that if a viewer did not click through to a website because he or she got all the information from Google's summary, how could it monetize its services by selling advertisements to such websites? The answer was AdSense, introduced in November of 2023. Google used to pay third party websites for advertising by using a unitary revenue-sharing structure with Publishers and basing payment on the number of click-throughs on advertisements displayed on a Publisher's website; with AdSense as modified, payment per clicks (where a Publisher was paid for each time a viewer clicked on an advertisement at its website) were replaced by payments per impression (where a Publisher was charged if the viewer merely saw the advertisement, but never clicked on it). AC ¶¶ 276-77. This was highly injurious to online Publishers, for whom advertising revenue is their lifeblood. As one commentator noted, this tactic allowed Google to increase its monopoly profits through general search services at the expense of

third parties like Publishers, thus causing many of them to go out of business. *Id.* ¶ 277. These allegations further support Google's monopoly power in search and how it can be leveraged.

**7.   Allegations Relating to Spoliation.**

Google argues that Plaintiffs' spoliation of evidence claims had no effect on the search market. MPA at 16. But such acts of spoliation furthered Google's illegal monopolization of the that market by concealing and making it harder to prove its misconduct.

The AC alleges that in September of 2008, Google took the extraordinary step of taking "off the record" the Google corporate default setting for Google Talk, the company's internal chat system, so that communications regarding anticompetitive efforts were no longer preserved. AC ¶ 287. *See Google II,* 2024 WL 3647498 at *133.

In 2003, Google began training "its employees not to utilize terms or phrases that might subject to antitrust scrutiny. In that year, he wrote a memorandum saying: 'we also have to be sensitive about antitrust considerations. Look at it this way: we are currently a dominant player in an industry, and we are trying to discourage entry by a potential competitor. . .. We should be careful about what we say in both public and private. 'Cutting off the air supply,' and similar phrases should be avoided." AC ¶¶ 288-89. Google also developed testimony from its employees to create "fake privilege" claims that could be used to shield evidence of anticompetitive conduct from outside scrutiny. *Id.* ¶¶ 293-94. As discussed below in Section VI.B, a federal judge recently excoriated it for this unethical conduct. *Id.* ¶ 295.[9]

A company does not engage in such tactics unless it believes it is or may be violating the law and wants to cover up those actual or potential violations. The rampant spoliation of evidence

---

[9] Similarly, Google has misled Publishers to their detriment by telling them in 2023 that there would be an "out-out" option from SGE, when none has been available to this day. AC ¶ 232.

within Google described above supports an adverse inference that it violated the antitrust laws. It also supports the view, discussed below in Section V.B that Google sought to hide its exclusionary intention from antitrust regulators and market participants. Again, this conduct is, at the very least, minimally anticompetitive, within the meaning of this Court's ruling in *Google*.

**8. Allegations Relating to California News Sites.**

Finally, there is the matter of Google's efforts to block news articles from California Publishers in a bid to quash the CJPA—a proposed bill that would compel Google to share advertising revenue with Californian news outlets. *Id*. ¶ 164. For the sake of full disclosure to the Court, very recent news articles have indicated that there is an agreement between Google and the State of California whereby the CJPA would be shelved in exchange for Google paying roughly $175 million over time to compensate Publishers for use of their content and another $50 million to supposedly "improve" AI.[10] Both legislators and Publishers have criticized the deal. *Id.* Google

---

[10] Press Release, Assemblymember Buffy Wicks, District 14, *Assemblymember Wicks Secures Agreement with State, Major Tech Companies to Support the Work of California Journalists* (Aug. 21, 2024), https://a14.asmdc.org/press-releases/20240821-assemblymember-wicks-secures-agreement-state-major-tech-companies-support. Organizations of Publishers have heavily criticized the deal. "'Google is a dominant monopoly that reaps significant revenue off scraping and repackaging quality news content, depriving publishers of the opportunity to monetize their content and reinvest in journalists,' said News/Media Alliance President & CEO Danielle Coffey. 'Today's announcement reinforces the need for federal legislation and potential court remedies to address this broken marketplace.'" Press Release, News Media Alliance, *News/Media Alliance Statement on California Governor Newsom, Assemblymember Wicks Announcement with Google, Ensuring Tech Platform Pays for Journalism* (Aug. 21, 2024), https://www.newsmediaalliance.org/release-news-media-alliance-statement-california-governor-newsom-assemblymember-wicks-announcement-with-google/. Likewise, the Media Guild of the West called the deal a "shakedown" and said that "[n]ot a single organization representing journalists and news workers agreed to this undemocratic deal with one of the businesses destroying our industry….The future of journalism should not be decided in backroom deals. The Legislature embarked on an effort to regulate monopolies and failed terribly. Now we

says that the named Plaintiffs are not harmed by this conduct. MPA at 17. But the point is that this is a ***recurring practice*** by Google. It engaged in similar conduct against Publishers in Canada. AC ¶ 163. Its conduct with respect to the CJPA was intended as a warning shot to deter other state legislatures from introducing similar legislation. This is a proper basis for a prohibitory injunction precluding Google from engaging in similar conduct in other states. Alternatively, in a class action like this one, The Court can properly defer consideration of Article III standing issues to the juncture where class certification is considered. *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 129-30 (D.D.C. 2018), *aff'd on other grounds sub nom. Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293 (D.C. Cir. 2020). If the Court is inclined to reject this allegation because there is no class representative from California, Plaintiffs request that they be given the opportunity to locate and add one.

**Summation**. In sum, viewing the complaint in its entirety, Plaintiffs have alleged cognizable claims of exclusionary conduct sufficient to permit discovery to proceed. *See APL*, 633 F. Supp. 3d at 230, 231 & 232 (allowing discovery to proceed on claims deemed to be possibly marginal or uncertain).

## IV.   COUNT TWO STATES A CLAIM FOR MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF A MARKET FOR ONLINE NEWS.

Google contends that Count Two of the AC--that it unlawfully monopolized or attempted to monopolize the United States online news market--is deficient for three reasons. ***First***, it contends that Plaintiffs have failed to plead a relevant market for online news. MPA at 18-21.

---

question whether the state has done more harm than good." Press Release, The NewsGuild-CWA, *America's journalists oppose California's backroom deal between AI companies and news bosses* (Aug. 22, 2024), https://newsguild.org/americas-journalists-oppose-californias-backroom-deal-between-ai-companies-and-news-bosses/.

***Second***, it contends that there are no well-pled allegations that Google possesses monopoly power (or a probability of achieving it) in that market. *Id*. at 21-23. ***Third***, it argues that no exclusionary conduct by Google within that market is adequately alleged. *Id*. at 23-27. None of these arguments are valid.

## A.  PLAINTIFFS HAVE ADEQUATELY PLED A RELEVANT MARKET.

Google ignores the fact that pleading adequately a relevant market in the D.C. Circuit is far from the onerous task that it now claims. As explained in the 2022 decision in the *APL* case (633 F. Supp. 3d at 222):

> Defining a market often 'involves inquiry into economic realities and industry practice.' *Nat'l Aviation Trades Ass'n v. C.A.B.*, 420 F.2d 209, 213–14 (D.C. Cir. 1969) (citing *Brown Shoe* [*v. United States,*], 370 U.S. [294] at 325 [(1962)] …] Thus, market definition is predominantly a factual rather than a legal inquiry. [*FTC v.*] *Facebook, Inc*., 560 F. Supp. 3d [1] at 13 [(D.D.C. 2021) ("*Facebook II*")], citing *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)). For this reason, antitrust complaints generally are dismissed on market definition grounds only if they are 'glaringly deficient' and dismissals on such grounds are 'relatively rare.' *Id*. at 16–17 (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 444 (4th Cir. 2011)).

This Court in *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ("*Sysco*") has recognized three "established principles" in defining a relevant market.[11]

"The ***first*** is that the 'product' that comprises the market need not be a discrete good for sale." *Id*. at 26 (emphasis added). This Court went on to cite *United States v. Grinnell Corp*., 384 U.S. 563, 572 (1966) for the proposition that a single market can combine "a number of different products or services where that combination reflects commercial realities." 113 F.Supp. 3d at 26.

***Second***, "'the mere fact that a firm may be termed a competitor in the overall marketplace

---

[11] The Court expressed these principles in the context of review of a proposed merger under Section 7 of the Clayton Act, rather than Section 2 of the Sherman Act, but the relevant market standards under each statute are similar. *See Facebook II*, 560 F. Supp. 3d at 31..

does not necessarily require that it be included in the relevant product market for antitrust purposes.'" *Id.* (quoting *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997)). As an example, this Court said that "fruit can be bought from both a grocery store and a fruit stand, but no one would reasonably assert that buying all of one's groceries from a fruit stand is a reasonable substitute for buying from a grocery store." 113 F. Supp. 3d at 26.

The Court stated the ***third*** principle as defining the market as narrowly as possible. "That is, 'a relevant market cannot meaningfully encompass [an] infinite range [of products]. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn.'" *Id.* (quoting *Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n. 31 (1953)).

Here, no one disputes that the relevant geographic market with respect to Count Two is nationwide. The relevant product market pled is online news, as distinct from physical newspapers, magazines, and the like. The distinction is a justifiable one. As pled in the AC, a 2023 study estimated that ***86% of Americans regularly consume news from digital devices***. AC ¶ 117. The market reality is that most people in America get their news digitally; usage of physical news media is waning and has been for years. Even if physical newspapers and magazines might be deemed as competitors to online news to some degree, as the Court noted in *Sysco*, that does ***not*** mean they should be deemed as participants in the market identified by Plaintiffs.

Thus, it is appropriate to distinguish between the two types of news distribution. Courts as well have referred to online news markets. *See Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-01667-GMN-VCF, 2022 WL 17721101, at *1 (D. Nev, Dec. 15, 2022) (distinguishing between "newspaper and digital news markets"); *United Press Int'l, Inc. v. Global One News, Inc.*, No. 3:18-cv-00910, 2020 WL 2572483, at *4 (M.D. Tenn. May 21, 2020) (referring to the online

market for news distribution).

Google contends that there are no allegations in the AC that users visit it for news, as opposed to visiting websites like washingtonpost.com. (a website that itself falls within the definition of the proposed Class). MPA at 19. Once again, however, it is studiously ignoring what is said in the AC, where it is further alleged that **80% of Google searches are for informational content**. AC ¶ 118.

Google also argues that there are no well-pled allegations that it is a news Publisher that is producing or publishing "professional works of journalism." MPA at 19. Once more, it reaches this conclusion by disregarding the allegations of the AC. News publication has been a goal of Google for years. Since the 9/11 tragedy, "Google launched Google News to supplement and drive traffic to its core general search service. Since then, Google has repeatedly invested in 'developing news products and features' for Google Search, YouTube, Discover, and more. Today, news is one of the top options on Google's menu bar and Google fills the SERP with answer boxes and horizontal carrousels featuring news." AC ¶ 115. Thus, Google's criticisms of the AC are misleading and do not justify dismissal.

The fact is that, contrary to the arguments in its brief, Google **needs** professional-looking content from Publishers to meet users' demand for news. Josh Cohen, a Senior Business Product Manager of Google News, admitted this in 2010: "[w]e don't have a product without high quality content to index, whether it's on Google News or Google overall." *Id*. ¶ 118.

Finally, Google contends that it cannot be argued that a user seeking "professional works of journalism" would go to duckduckgo.go or Instagram rather than reading the *New York Times* or watching CNN. MPA at 20. But this ignores this Court's third principle discussed above: **pick the narrowest possible market**. Here, as explained above, that market is online news, not news on

television or in print media. *At the very least, and as expressed in the quote from APL, this is not one of those "relatively rare" cases where the market definition can be resolved on dismissal.*

**B.  PLAINTIFFS HAVE ADEQUATELY PLED THE POSSESSION OF MONOPOLY POWER OR A DANGEROUS PROBABILITY OF ACHIEVING IT.**

With respect to whether the AC pleads adequately market power, it most certainly does. Google has 66% of the online news market, as shown in this chart from ¶ 122 of the AC:



The combination of Google and YouTube accounts for 767.8 billion visits between March of 2023 and March of 2024. The next highest is Reddit at 52.3 billion. AC ¶ 121.

These figures are more than sufficient to establish monopolization, let alone attempted monopolization.[12] *APL*, 633 F. Supp. 3d at 224 (citing *Image Tech. Servs., Inc. v. Eastman Kodak*

---

[12] This Court has said that an attempted monopolization claim can be satisfied by a market share exceeding 50%. *Fotobom*, 2024 WL 1603968, at *11.

*Co.*, 125 F.3d 1195, 1206 (9th Cir.1997)). Plaintiffs have also pled substantial barriers to entry or success in the market (AC ¶¶ 124-28), which obviates Google's criticisms on that score (MPA at 23). These factual allegations are enough to deny dismissal of Count Two.

Google's main comeback is that the numbers represented in the previous chart overcount the number of visits searching for news. *Id*. at 21-22. But even if that was the case, the gap between visits to Google/YouTube and visits to others is so huge that Google/YouTube would still dominate.

In addition, this is the type of fact-intensive argument that cannot and should not and cannot be resolved at the motion to dismiss stage. The caselaw bears this out. In *Fotobom*, a similar type of dispute arose in connection with the accuracy of plaintiff's market share data and the plaintiff said, "that arguments regarding the evidentiary support for its market share allegations are inappropriate at the motion-to-dismiss stage." 2024 WL 1603968, at *11. This Court agreed, accepting as true the plaintiff's number. *Id*. at *12. Similarly, in *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022)*,* the analogous issue of whether the FTC could rely on Comscore data to show a high market share arose, with Facebook claiming that the data was neither accurate nor complete. *Id*. at 48. The court responded that "Facebook will be given ample opportunity to advance such arguments down the line, perhaps in a potential 'battle of the experts.' At this juncture, however, the Court 'must treat the complaint's factual allegations as true.'" *Id*. (quoting *Sparrow v. United Air Lines, In*c., 216 F.3d 1111, 1113 (D.C. Cir. 2000)). Google also contends that Plaintiffs are no longer using a document from the original complaint that supposedly demonstrated its lack of market dominance. MPA at 22-23. To begin with, Plaintiffs' counsel did not have access to the data used in the AC before the initial complaint was filed. Additionally, this is once more the type of factual dispute that cannot and should not be resolved on a motion to

dismiss. Moreover, under the Federal Rules of Civil Procedure, the filing of an amended complaint

supersedes its predecessor and renders it a nullity.[13]

### C. PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT GOOGLE ENGAGED IN EXCLUSIONARY CONDUCT IN THE ONLINE NEWS MARKET.

Google's final argument is that no exclusionary conduct in the online news market has

been pled. MPA at 23-26. That is incorrect for several reasons. AC ¶¶ 129-35, 232-38, 349.

**First**, by using news content without paying for it, Google provides itself with an

artificially low cost of production in news publishing, which places all the competitors who do pay

for news content (through labor or licensing) at a cost disadvantage.

**Second**, Google raises rival Publishers' average cost of production because Publishers have

fewer customers or subscribers relative to their sunk fixed costs.

**Third**, Google raises its rivals' total costs through increasing the cost of customer

acquisition. Since zero-click searches are a lost opportunity for a Publisher to obtain a customer

from a relatively inexpensive channel (search-engine optimization), Publishers must obtain

marginal customers through increasing spend on other marketing channels. As an example, since

fewer users on Google Search click through to Publishers' websites, Publishers could try to

compensate by driving additional traffic from the Google SERP through increasing their purchases

of search advertisements or through other brand-building initiatives, which has had the potential

to cause a significant number of exits and prevents Publishers from obtaining minimum efficient

---

[13] *E.g.*, *Pintando v. Miami Dade Housing Agency*, 501 F.3d 1241, 1244 (11th Cir. 2008); *Drake v. City of Detroit*, 266 Fed. Appx. 444, 448 (6th Cir. 2008); *CopyWatch, Inc. v. Am. Nat'l Red Cross*, 299 F. Supp. 3d 189, 197 (D.D.C. 2018); *Adams v. Quattlebaum*, 219 F.R.D. 195, 197 (D.D.C. 2004); *Nance v. Emages, Inc.*, No. 20 C 6316, 2022 WL 2116581, at *5 (N.D. Ill. June 13, 2022); *Wilson v. Plummer*, No. 3:12-cv-337, 2015 WL 3867389, at *4 n. 4 (S.D. Ohio June 23, 2015).

scale, thereby deterring entry.

**Fourth**, Google's exclusionary conduct has increased the cost of data acquisition for Publishers. The data that Google collects on search users is not routinely shared with Publishers.  Examples of data that Publishers lose from zero-click searches include dwell time on specific content. In order to obtain similar data, Publishers would have to obtain marginal customers through other (potentially more expensive) marketing channels.

**Fifth**, Google's conduct has forced Publishers to take costly actions to protect themselves, such as introducing paywalls. In fact, between 2017 and 2019 the percentage of United States newspapers with active paywalls rose by 16%. This may result in Publishers losing search traffic from blue links because it requires technical expertise to allow paywalled content to appear in search results.

**Sixth**, Google diminishes Publishers' ability to pay for these costs by withholding licensing payments for the use of their content and services for republishing or GAI training.

**Finally**, Google now uses SGE/AI Overview to minimize traffic to Publishers' websites by putting at the top of the SERP a summary of Publishers' news (misappropriated through website scraping) that causes users to skip visiting the sources.

In short, "Google's extortionate terms for content distribution, coupled with its default self-preferencing on the SERP, have reduced the financial incentives for rivals to produce and publish news." AC ¶ 369.[14]   The 2023 amended version of the DOJ-FTC Merger Guidelines make the

---

[14] Google professes not to know what the phrase "its default-self-preferencing on the SERP" with respect to SGE means. MPA at 24. What it obviously means is that the Google summary for SGE will ***always*** appear at the top of the SERP. The term has been used in other antitrust cases filed against Google where it prefers itself over competitors to the disadvantage of the latter. *See, e.g., Rumble, Inc. v. Google, LLC*, No. 21-cv-00229, 2022 WL 3018062, at *3 (N.D. Cal. July 9, 2022).

point in the merger context that this type of conduct can run afoul of the antitrust laws:

> ***The Agencies protect competition on a platform in any markets that interact with the platform. …A platform operator that is also a platform participant may have a conflict of interest whereby it has an incentive to give its own products and services an advantage over other participants competing on the platform. Platform operators must often choose between making it easy for users to access their preferred products and directing those users to products that instead provide greater benefit to the platform operator.*** Merging with a firm that makes a product offered on the platform may change how the platform operator balances these competing interests. ***For example, the platform operator may find it is more profitable to give its own product greater prominence even if that product is inferior or is offered on worse terms after the merger—and even if some participants leave the platform as a result. This can harm competition in the product market for the advantaged product, where the harm to competition may be experienced both on the platform and in other channels.***[15]

All of these practices operate as exclusionary tactics aimed at members of the proposed Publisher Class.

## V. COUNT THREE AS REVISED PLEADS AN UNLAWFUL TYING ARRANGEMENT.

In Count Three, Plaintiffs allege that Google engaged in a tying in violation of Section 7 of the Clayton Act; Plaintiffs believe this violation can be examined under either a *per se* or Rule of Reason theory. Google responds that no tying arrangement or separate tied product that is the subject of a sale has been validly pled and that standing and injury are also not adequately alleged. MPA at 28-33.

Most of these criticisms are a function of the fact that Plaintiffs' counsel inartfully pled in the AC what the tied product actually was, thus causing confusion to Google and the Court.  For that, they apologize to the Court and to defense counsel and, if the Court wishes, they are willing to rectify the problem by repleading Count Three.

---

[15] DOJ & FTC, *Merger Guidelines* 25-26 (Dec. 18, 2023) (emphases added; footnote omitted), https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf).

Plaintiffs did mean to say that the tying product is general search services provided by Google. What they also meant to say, but did not say, is that the tied product is the "Search Generative Experience"--SGE (now AI Overviews)--that Google began to provide in 2023. Plaintiffs clearly pled that the general search services market and the online news market are separate and that Google is dominant in both. AC ¶¶ 332, 355-56. SGE is part of Google's GAI platform and is a separate product from Google Search; Google's own personnel distinguish between its AI products and Search. *Id.* ¶¶ 219, 221. The European and domestic antitrust regulators in their Joint Statement cited earlier also recognize GAI as a distinct product.

As noted above, the harms caused to Publishers from this tying arrangement are multifaceted. "To survive, Publishers must try to lower costs by reducing output and downsizing or raise prices on subscriptions or sales. With the closure of name-brand digital natives like BuzzFeed News, it is clear many will not survive. The overall inventory of professionally produced news in the U.S. market is declining in quantity, quality, and variety." *Id.* ¶ 383. In addition to Google unjustly enriching itself at Publishers' expense, members of the proposed Class are alleged to have suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees. *Id.* ¶ 384.

All of this is cognizable antitrust injury regardless of whether the tying arrangement is treated as a *per se* or Rule of Reason violation. As the Court said in *Fotobom*, at the pleading stage, it need not decide which of these theories applies, because that decision is best postponed until the time comes to decide summary judgment. 2024 WL 1603968, at *10. "Thus, at the motion to dismiss stage, a plaintiff need only 'plausibly alleg[e] that the agreement unreasonably restrains trade.'" *Id.* at *9 (quoting *In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, No. 15-mc-1825 (ESH), 2017 WL 11830269, at *3 (D.D.C. June 13, 2017)). This is satisfied by:

(a) sketching the outline of injury to competition with supporting factual detail and pleading an injury beyond the impact felt by the Plaintiffs themselves. 2024 WL 1603968, at *9. With the correct tied product as clarified above, Plaintiffs have done exactly that.

Finally, Google cannot be heard to say this not a tying arrangement because there was no "sale". There is a coerced "sale" of the tying and tied products between Google and Publishers here, and the price of the sale is the compelled scraping of Publishers' data for free and the concomitant loss of revenue as users flock to Google's news products derived from that scraping and leave Publishers with fewer and fewer visitors.

## VI.   COUNT FOUR PLEADS A VIOLATION OF SECTION 7 OF THE CLAYTON ACT.

Count Four is based on Section 7 of the Clayton Act and, as noted above, relates to three acquisitions by Google: Android in 2005, YouTube in 2006, and DeepMind in 2012. Google asserts two grounds for dismissing this Count: (1) lack of standing and failure to plead a relevant market (MPA at 34-35); (2) the claim is barred by the the four-year statute of limitations and by the doctrine of laches (*id*. at 35-39). Both are without merit.

### A.   PLAINTIFFS HAVE STANDING AND HAVE PLED A RELEVANT MARKET OR THE REQUISITE ANTICOMPETITIVE EFFECT IN AN ALLEGED RELEVANT MARKET.

As noted above, Plaintiffs are participants in the search and online news markets, both of which have been affected adversely by these acquisitions. Viewing the AC in its totality, a basis for standing has been adequately pled. Google reiterates its contention that there is no sufficiently pled online news market (MPA at 35), and Plaintiffs incorporate by reference their response in Section II.A above. Google further argues that this claim is time-barred (*id*. at 35-39), an argument that Plaintiffs will address in the subsections below.

**B.  THE CLAIM IS TIMELY.**

**1.  Claim Accrual Took Place Long After the Acquisitions at Issue.**

Google asserts that the relevant statute of limitations is four years, but that begs the issue

of four years *from when*. Google contends that the relevant dates are 2005, 2006, and 2014, when

its respective acquisitions of Android, YouTube and Deep Mind occurred. It ignores the relevant

law. As stated by Judge Boasberg in *Facebook II*, 560 F.Supp. 3d at 31 (quoting *United States v.*

*ITT Cont'l Baking Co.*, 420 U.S. 223, 241–42 (1975)) (emphases in original):

> The Supreme Court has clearly stated that the term 'acquisition' as used in
> Section 7 of the Clayton Act — which prohibits purchases 'the effect of [which]
> may be substantially to lessen competition, or to tend to create a monopoly,' 15
> U.S.C. § 18 — does not refer to 'a discrete transaction but [rather] a status which
> continues until the transaction is undone.'… In other words, 'acquisition ...
> mean[s] both the purchase of rights in another company *and* the retention of those
> rights,' such that Section 7's 'ban against [certain] acquisitions ... include[s] a ban
> against *holding* certain assets,' not just 'obtaining' them in the first place.

In *Facebook I*, Judge Boasberg recognized that some acquisitions may not manifest themselves as

inherently anticompetitive until subsequent market developments occur. 549 F.Supp.3d at 42

(citing the example of *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957)

("*duPont*"), where it took 30 years from the initial stock acquisition for the anticompetitive aspects

of the acquisition to manifest themselves). *See also Google II*, 2024 WL 3647498, at *79.

Google relies primarily relies primarily on *Midwestern*, an Eighth Circuit decision

affirming the grant of summary judgment for the defense, rather than dealing with a motion to

dismiss. The court there distinguished the situation before it from *duPont* on the ground that the

airline merger at issue in the case before it was viewed as anticompetitive from the outset. 392

F.3d at 272-73. A similar point was made by Judge Boasberg in *Facebook I* with respect to the

acquisitions at issue there. 549 F.Supp. 3d at 41-42.

In the context of the equitable doctrine of laches, a similar concept applies. As the Fourth

Circuit said in *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 716-17 (4th Cir. 2021), delay with respect to laches is measured not from the date of the challenged acquisition, but from when the plaintiff discovers or with reasonable diligence could have discovered the facts giving rise to his antitrust causes of action and was able to pursue a claim.

Therefore, the fact that this case was not filed until 2023 is also not dispositive of the issue of laches. As the Fourth Circuit further explained at page 718 of its opinion in *Steves*:

> And, as the Supreme Court has explained, laches doesn't require a plaintiff to 'sue soon, or forever hold [their] peace.' *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 682 (2014) (cleaned up). In other words, a plaintiff need not challenge an illegal act immediately after it happens; it may wait until it 'can estimate whether' the act threatens it with irreparable harm. *See id*. at 682–83….

In light of the foregoing, Google's defense of untimeliness in this case cannot be resolved on a motion to dismiss. The three companies acquired are being used differently now, at least in part. In neither 2005 nor 2006 nor 2014 did Google have 90% of the general search services market. In those years, its dominant share of the online news market did not exist. In those years, GAI as an adjunct to general search services was unknown. As noted above, each of the companies in question is alleged to have been involved in Google's anticompetitive uses of AI in 2023-24, and in the case of what is now Google DeepMind, that entity was only created by the merger of DeepMind and Google's Google Brain division in April of 2023. It is only earlier this year that Google is alleged to have used YouTube to retaliate against HWC. AC ¶ 74. Thus, the AC at ¶ 79 correctly asserts that "[a]t the time of approval of these acquisitions, it was neither known nor foreseen that the newly created structure would in fact be used to substantially lessen competition in lines of commerce related to Google's general search services monopoly, including in ads, GAI, and digital new and content publishing. Over time, however, this is exactly how Google entrenched and extended its dominance."

But even if the Section 7 claim is assumed to have accrued earlier than Plaintiffs assert, it is still not time-barred. Plaintiffs assert that each of these three acquired companies are subject to the "continuing violation" and "hold and use" exceptions to the statute of limitations and the doctrine of laches. Plaintiffs further contend that Google engaged in fraudulent concealment of its conduct. And, as to laches, Plaintiffs note that it has no application to purely forward-looking claims for injunctive relief. These are all discussed in the section below.

### 2.  The Statute of Limitations and Doctrine of Laches Do Not Bar Count Four.

Google argues that neither the continuous conduct principle nor the "hold and use" exception apply here. MPA at 36-39. Plaintiffs disagree as to both and contend that that the doctrine of fraudulent concealment applies here as well. And they further contend that the doctrine of laches has no applicability to the forward-looking equitable relief that they seek. Each of these arguments is addressed below.

**Continuing Violation**. Google primarily relies on the Eighth Circuit's decision in *Midwestern* (a decision affirming a defense summary judgment rather than a motion to dismiss) for the proposition that the "continuing violation" exception to the statute of limitations is inapplicable in cases arising under Section 7 of the Clayton Act. MPA at 37. However, this characterization overstates the caselaw. As pointed out in *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713 (W.D. Tenn. 2022), while the exception has been held not to apply to "price increases in the merger-acquisition context", it "may apply 'where a party… undertook action, in addition to price increases, to monopolize a market." *Id*. at 721. In support of this argument, the district court cited the Sixth Circuit's opinion in *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598 (6th Cir. 2014), one of the very cases on which Google relies. MPA at 35. Here, Plaintiffs have ***not*** alleged price increases as a direct result of the acquisitions of Android, YouTube, or Deep Mind. Instead, they contend that the acquisitions enabled Google to create an ecosystem that helped

cement its dominance in the general search market and further helped enable it to leverage that power to dominate the online news market.

**"Hold and Use" Exception**. A recognized exception to both a statute of limitations and a laches defense is the "hold and use" exception, under which if assets are used in a different manner from the way that they were used when an initial acquisition occurred, and that new use injures the plaintiff, he or she has four years from the time that the injury occurs to sue.[16] As noted above, Plaintiffs have pled new uses of Google Mind, YouTube, and Android that harmed them. Given that the Court is dealing with a motion to dismiss where all inferences should be drawn in Plaintiffs' favor, the Court should not rule that the claims in Count Four are time-barred on this ground.

**Fraudulent Concealment.** The evidence of Google's misconduct was substantially affected by the pervasive spoliation of evidence within Google that is described above and that only became known in recent court actions against it. These allegations of fraudulent concealment, which are set forth in exacting detail at ¶¶ 286-96 of the AC, and which Google does not contest, more than satisfy the requirements of Fed. R. Civ. P. 9(b). As noted in ¶¶ 294-95 of the AC (emphases added):

> This [Google's conduct] led the presiding judge [in a lawsuit involving the Google Play Store], the Honorable Richard Donato, to say that "*he was 'profoundly concerned' about the testimony concerning fake privilege and the 'abundance of evidence' about Google employees who didn't save their chats*. *'I am forming a deep concern that there is an ingrained systemic culture of suppression of relevant evidence within Google,' the judge said.*" On November 16, 2023, at a hearing held specifically to confront Kent Walker, Google's Chief Legal Officer, on its document preservation practices, Judge Donato excoriated him, saying that "you of all people should have known that there was no excuse for not preserving chats."

---

[16] *See, e.g., Free FreeHand Corp. v. Adobe Sys., Inc.*, 852 F. Supp. 2d 1171, 1188-89 (N.D. Cal. 2012); *Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, No. C 08-01035 HSW, 2008 WL 4830740, at *6 (N.D. Cal. Nov. 6, 2008); *In re Evanston Nw. Healthcare*, No. 07 CV 4446, 2008 WL 2229488, at *4, 7 (N.D. Ill. May 29, 2008).

More recently, *Judge Donato has said that he has "never seen anything so egregious" as Google's spoliation of evidence, that it was "deeply troubling" to him, and that it constituted a "frontal assault on the fair administration of justice."*

In addition, the full scope of Google's anticompetitive activity did ***not*** become clear until the last year or so, when the trial in the DOJ Search Case occurred before this Court. Many exhibits and some of the testimony in the DOJ Search Case trial were presented under seal and it was only as a result of later agreements between the parties, as well as orders in response to repeated requests by the *New York Times,* that ultimately led to their disclosure. *See, e.g.,* DOJ Search Case, ECF Nos. 714, 716, 725, 731, 738, 892.

**Inapplicability of the Doctrine of Laches to Future Injunctive Relief Claims**.  Courts in this Circuit have also held that generally, the doctrine of laches ***does not apply*** to claims for future injunctive relief. *See Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152, 159 (D.D.C. 2007) (citing numerous cases). Plaintiffs ask solely for that. *See* AC ¶ 406(d). Unlike the States in *Meta* (66 F.4th at 302) (on which Google principally relies (*see* MPA at 3, 35)), they ***do not seek to undo*** the already completed acquisitions that they identify.

Therefore, when the AC is viewed as a whole, Plaintiffs have sufficiently pled that their claims are not time-barred.[17]

## VII.   COUNT FIVE PLEADS AN UNLAWFUL AGREEMENT BETWEEN GOOGLE AND APPLE.

Finally, Google argues that Count Five, which deals with the ISA between Apple and Google, should be dismissed. MPA at 40-45.

A threshold question is whether this agreement should be examined under the Rule of

---

[17]  In the event that the Court disagrees, the allegations regarding these acquisitions at paragraphs 60-80 of the AC can still be considered for background purposes and should not be dismissed. *See In re Google Digital Advert. Antitrust Litig.*, 21-md-3010 (PKC), 2024 WL 895155, at *10 (S.D.N.Y. Mar. 1, 2024).

Reason or the *per se* rule. Google says the former should apply, claiming the argument for the latter is "foreclosed as a matter of law." *Id*. at 43. Once again, it misstates the applicable law.

Here, as discussed above, it is alleged that Google, as a result of the 2016 version of the ISA, **paid Apple 40% of its annual advertising revenue obtained from being the default search engine for the Safari browser in order to get a contractual commitment that Apple would not expand the scope of its "Suggestion" feature**, which guessed the user's search intent and then directed him or her to a responsive website. Giannandrea, an Apple executive, recognized at the time that this feature competed with Google search: "**every query that we provide an answer to is a query that doesn't go to Google**." AC ¶ 92 (emphases added). Cook of Apple had been looking at entering the search market by such means as turning Siri into a search engine or buying Microsoft's Bing search engine. *Id*. ¶ 399. The 2016 ISA solved Google's concerns about this potential competition by creating "**a structure that prevents [Apple] from diverting queries and destroying value.**" *Id*. ¶ 92 (emphases added).

This agreement was a *per se* violation of Section 1 of the Sherman Act. As the Fifth Circuit has said, "[i]ndeed, paying a potential competitor not to compete is so detrimental to competition that normally it is a *per se* violation of the antitrust laws. *See Palmer v. BRG of Ga., Inc*., 498 U.S. 46, 48–49 (1990)." *Impax Labs., Inc. v. FTC,* 994 F.3d 484, 493 (5th Cir. 2021). [18]

---

[18] *Accord, e,g*., *In re Cardizem CD Antitrust Litig*., 332 F.3d 896, 908 (6th Cir. 2003) ("[I]t is one thing to take advantage of a monopoly that naturally arises from a patent, but another thing altogether to bolster the patent's effectiveness in inhibiting competition by paying the only potential competitor $40 million per year to stay out of the market."); *Snow v. Align Tech., Inc*., 586 F. Supp. 3d 972, 978 (N.D. Cal. 2022) ("[a]s the Supreme Court has recognized, a market division agreement between potential competitors constitutes a horizontal restraint on trade"); *Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1180) (N.D. Cal. 2001) ("[n]o less so, section 1 makes allocations of product markets illegal, even when such allocations are unaccompanied by price fixing or other restraints. …. The proscription against market allocations or divisions extends to potential as well as actual competitors").

Thus, Google's repeated references to Apple standing in a vertical position to it ignore the evidence cited in the AC that Apple was definitely interested in competing against Google in the search engine market. That is why Braddi, Google's head of product partnerships, described the 2016 ISA as containing an agreement that Apple "could not expand farther than what they were doing in Sept 2016 (*as we did not wish for them to bleed off traffic*)". AC ¶ 96 (emphases added). *See Google II,* 2024 WL 3647498, at *51-53. Google contends that Braddi was just talking about Apple's "Suggestion" feature, which it says was not a competitive threat. MPA at 42. But if that was true, why did Google insist on having all of these restrictions on Apple included in the 2016 ISA? Why would Braddi be even mentioning the possibility of Apple potentially bleeding off traffic from Google? A fair inference from all of this is that **Google viewed Apple as a potential competitor.** *See Google II*, 2024 WL 3647498, at *51-53. Google's current advocacy of a countervailing interpretation does not entitle it to dismissal of Count Five.

In sum, these allegations more than suffice for pleading purposes. *See In re Magnesium Oxide Antitrust Litig.*, No. 10-5943 (DRD), 2011 WL 5008090, at *16 (D.N.J. Oct. 20, 2011) ("Sumitomo fails to present, nor is the Court aware of, any authority requiring a purchaser plaintiff to specifically establish, at the pleading stage, that the parties to a horizontal agreement to allocate a given market were competitors or potential competitors in that market. To require Plaintiffs, pre-discovery, to establish Sumitomo's background and experience in the CCM market, its financial capability to enter that market, and the specific steps taken by Sumitomo to enter it, would be overly onerous, as much of this information is likely to be exclusively in the hands of Sumitomo"). *See also Keurig*, 383 F. Supp. 3d at 244 (declining to dismiss a claim based primarily on a single paragraph describing a licensing agreement with a potential competitor).

Google's final argument about Count Five is that Plaintiffs suffered no injury from the

2016 ISA. MPA at 45. That is not what is pled in the AC. The combination of Google's default position as the search engines of both Apple and Android phones gave it a combined 95% share of searches through mobile phones in the United States. AC ¶ 43. This harmed Publishers in the search services market and allowed Google to leverage itself to a 66% share in the online news market. *Id*. ¶ 367. These are significant allegations sufficient to confer standing. The motion to dismiss Count Five should be denied.

## VIII.   CONCLUSION

For all of the foregoing reasons, Google's motion to dismiss should be denied in its entirety. If the Court disagrees in whole or in part and, given the fact that this is the first time in this case that the Court has dealt with these claims, leave to file a Second Amended Complaint should be granted. Pursuant to Fed. R. Civ. P.  Rule 15 (a)(2), a court "should freely give leave" to amend a pleading "when justice so requires." "It is common ground that Rule 15 embodies a generally favorable policy toward amendments." *Howard v. Gutierrez*, 237 F.R.D. 310, 312 (D.D.C. 2006) (quoting *Davis v. Liberty Mut. Ins. Co*., 871 F.2d 1134, 1136-37 (D.C. Cir. 1989)).

Dated:  September 10, 2024                              Respectfully submitted,

By:     /s/ Michael D. Hausfeld
Michael D. Hausfeld (D.C. Bar No. 153742)
Scott A. Gilmore (D.C. Bar No. 1002910)
**HAUSFELD LLP**
888 16th Street N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
mhausfeld@hausfeld.com
sgilmore@hausfeld.com
mboltax@hausfeld.com

Scott Martin
**HAUSFELD LLP**

33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100
smartin@hausfeld.com

Michael P. Lehmann
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
mlehmann@hausfeld.com

Michael L. Roberts
Erich P. Schork
Kelly A. Rinehart
Sarah DeLoach
**ROBERTS LAW FIRM US, PC**
1920 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (501) 821-5575
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us
kellyrinehart@robertslawfirm.us
sarahdeloach@robertslawfirm.us

John W. ("Don") Barrett
Katherine B. Riley
**BARRETT LAW GROUP, P.A.**
404 Court Square North
P.O. Box: 927
Lexington, MS 39095
Telephone: (662) 834-2488
donbarrettpa@gmail.com
kbriley@barrettlawgroup.com
NTMaddux@barrettlawgroup.com

Michael J. Flannery
**CUNEO GILBERT & LaDUCA, LLP**
Two City Place Drive
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

46

Pamela Gilbert
Daniel M. Cohen
Lissa Morgans
**CUNEO GILBERT & LaDUCA, LLP**
4725 Wisconsin Avenue, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
pamelag@cuneolaw.com
danielc@cuneolaw.com
lmorgans@cuneolaw.com

Charles J. Cooper
Vincent J. Colatriano
Harold S. Reeves
**COOPER & KIRK**
1523 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 220-9600
ccooper@cooperkirk.com
vcolatriano@cooperkirk.com
hreeves@cooperkirk.com

*Attorneys for the Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 10th day of September 2024, a true and correct copy of the foregoing has been served to all counsel of record via the Court's CM/ECF system.

<u> /s/ Michael D. Hausfeld</u>
Michael D. Hausfeld