**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HELENA WORLD CHRONICLE, LLC and
EMMERICH NEWSPAPERS, INC.

*Plaintiffs*,

v.

GOOGLE LLC and ALPHABET INC.,

*Defendants*.

Case No. 1:23-cv-03677

HON. AMIT P. MEHTA

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

**<u>TABLE OF CONTENTS</u>**

I.  COUNT ONE FAILS TO STATE A CLAIM FOR MONOPOLIZATION IN THE ALLEGED GENERAL SEARCH SERVICES MARKET. ...................................1

    A.  Plaintiffs Lack Antitrust Standing to Assert Count One...........................................1

    B.  Plaintiffs Have Not Adequately Alleged That Google Engaged in Exclusionary Conduct. ...........................................................................................5

        1.  Allegations Relating to Search Distribution Agreements............................6

        2.  Additional Allegations Relating to Apple....................................................7

        3.  Allegations Relating to Acquisitions. ..........................................................7

        4.  Allegations Relating to Misappropriating Content. .....................................8

        5.  Allegations Relating to the Readiness of Bard. .........................................10

        6.  Allegations Relating to Changes to AdSense. ............................................10

        7.  Allegations Relating to Spoliation. ............................................................11

        8.  Allegations Relating to California News Sites. ..........................................11

II.  COUNT TWO FAILS TO STATE A CLAIM FOR MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF A MARKET FOR ONLINE NEWS..............12

    A.  Plaintiffs Have Not Adequately Pleaded a Relevant Market.................................12

    B.  Plaintiffs Have Not Adequately Pleaded the Possession of Monopoly Power or a Dangerous Probability of Achieving It.................................................14

    C.  Plaintiffs Have Not Adequately Alleged That Google Engaged in Exclusionary Conduct. .........................................................................................17

III.  COUNT THREE FAILS TO PLEAD AN UNLAWFUL TYING ARRANGEMENT.................................................................................................18

IV.  COUNT FOUR FAILS TO PLEAD A VIOLATION OF SECTION 7 OF THE CLAYTON ACT. .........................................................................................................20

    A.  Plaintiffs Lack Standing and Have Not Pleaded a Relevant Market or the Requisite Anticompetitive Effect in an Alleged Relevant Market. ......................20

    B.  The Claim Is Time Barred. ...................................................................................21

V.  COUNT FIVE FAILS TO PLEAD AN UNLAWFUL AGREEMENT BETWEEN GOOGLE AND APPLE. ...............................................................................................23

CONCLUSION..........................................................................................................................25

### <u>TABLE OF AUTHORITIES</u>

## CASES

*Amarel v. Connell*, 102 F.3d 1494 (9th Cir. 1996) ..................................................................3, 4

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) ............................1, 3

*\*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) .............................2, 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................2, 14

*Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696 (9th Cir. 2001)...............2

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005)........................................5

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1 (1st Cir. 2004) ...............................................................................................................................................8

*\*Fotobom Media, Inc. v. Google LLC*, 2024 WL 1603968 (D.D.C. Feb. 27, 2024)............ *passim*

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) ......................................................15, 21

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) ..........................................................15

*Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407 (D.D.C. 1988)............................................3

*In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016) .................................4

*In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987 (N.D. Cal. 2010) .........................................19

*Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713 (W.D. Tenn. 2022) .....................................22

*Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984)................................................9

*Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016)...............................................................18

*Las Vegas Sun, Inc. v. Adelson*, 2022 WL 17721101 (D. Nev. Dec. 15, 2022) ...........................14

*Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38 (D.D.C. 2008) ........................................25

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004)................................23

*\*New York v. Facebook, Inc.*, 549 F. Supp 3d 6 (D.D.C. 2021)....................................5, 21, 22, 23

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) .................................................5

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) .............................................5

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).................................................17

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020).............22, 23

*SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39 (1st Cir. 1995) ................................3

*Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995)............................................................3

*\*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88 (D.D.C. 2013) ......12, 13

*Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810 (N.D. Cal. 2021) ..............................................19

*Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261 (8th Cir. 1984) ................................9

*United Press Int'l, Inc. v. Global One News, Inc.*, 2020 WL 2572483 (M.D. Tenn. May 21, 2020) ....................................................................................................................................13

*United States v. Google LLC*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024) ...........................6, 7, 24

*\*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) ........................ *passim*

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ..............17

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) ..................................3

## STATUTES AND RULES

Section 1 of the Sherman Act, 15 U.S.C. § 1 .............................................................................23, 24

Section 2 of the Sherman Act, 15 U.S.C. § 2 ......................................................................... *passim*

Section 3 of the Sherman Act, 15 U.S.C. § 3 .................................................................................23

Section 7 of the Clayton Act, 15 U.S.C. § 18 ...........................................................20, 21, 22, 23

Federal Rule of Civil Procedure 9(b) ............................................................................................39

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................3, 5, 12

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2022) ......................................................................4

As Google explained in its brief in support of its Motion to Dismiss, each count of the Amended Complaint should be dismissed on multiple independent grounds. Plaintiffs' Opposition comes up short at each turn by failing to rebut Google's dispositive points and failing to cite case law indicating that Plaintiffs are plausibly entitled to relief.

## I.   COUNT ONE FAILS TO STATE A CLAIM FOR MONOPOLIZATION IN THE ALLEGED GENERAL SEARCH SERVICES MARKET.

Count One of the Amended Complaint fails because Plaintiffs lack antitrust standing and have not alleged exclusionary conduct under Section 2 of the Sherman Act.

### A.   Plaintiffs Lack Antitrust Standing to Assert Count One.

Plaintiffs' Opposition fails to undermine any of the three grounds for dismissal set forth in Google's Opening Brief. The Opposition does not cite a single case in which a court found antitrust standing under circumstances analogous to those alleged here. That is no surprise, as Plaintiffs cannot plead that they "suffered [their] injury in the market where competition is being restrained" or that they are "participant[s] in the relevant market." *Fotobom Media, Inc. v. Google LLC*, 2024 WL 1603968, at *4 (D.D.C. Feb. 27, 2024).

First, it is undisputed that "[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999). The injuries purportedly experienced by Plaintiffs involve the diminished revenue and profitability of their newspapers. *E.g.*, Am. Compl. ¶ 349. Even if Plaintiffs could plausibly "allege that they are potential participants in the [asserted general search services] market, and this is the market where competition allegedly has been restrained," Count One should be dismissed because Plaintiffs' purported "*injuries* were not experienced in the [alleged general search services] market, but rather in [a different] market" where they earn money by delivering

1

the news to their customers.  *Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 705 (9th Cir. 2001).

In response to this dispositive point, Plaintiffs recite alleged injuries that they have not personally experienced, such as an assertion that "Google is less incentivized to innovate and improve search quality because it pays" for "default status" and an allegation that "Google deprived consumers of choice and quality in the general search engines available."  Opp. 12. These are not cognizable antitrust injuries because they were not experienced by Plaintiffs, who are newspaper publishers rather than general search users.  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001) ("[T]he injury must affect ***the plaintiff's*** business or property." (emphasis added)); *see, e.g.*, Am. Compl. ¶ 349 (alleging Plaintiffs "have suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees"). Plaintiffs also do not move the needle by alleging a contrived connection to their businesses through assertions that more "competition from potential rivals" to Google Search "would benefit Publishers" in negotiating "terms of trade" with search engines or that "a less effective search engine connects fewer consumers with Publishers, thereby eroding the business and profitability of the latter."  Opp. 12.  For one thing, these alleged injuries to Plaintiffs' "business and profitability" are experienced outside the asserted general search services market, which is why Plaintiffs lack antitrust standing.  For another, the Amended Complaint lacks "factual content" that would "allow[] the court to draw the reasonable inference" that Plaintiffs' websites would be crawled on different terms or they would receive more visitors if not for the conduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Second, Google's Opening Brief explained that Plaintiffs are not "participants" in the alleged general search services market even though they attempt to characterize themselves as

input suppliers to general search engines.  Br. 7-8; *see, e.g.*, Opp. 9, 11 (asserting that Google "extracts content data from Publishers that it uses as an input [in] its search results" and that publishers "are compelled … to provide against their will access to their data" (emphasis omitted)).  Google cited several analogous cases rejecting Plaintiffs' theory of antitrust standing on the ground that "[s]uppliers to direct market participants typically cannot seek recovery under the antitrust laws."  *E.g.*, *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995).  Courts routinely reject Plaintiffs' theory of harm—namely, that if rival general search engines were more numerous or widely used, then Plaintiffs could somehow earn "licensing fees" or otherwise "generat[e] revenue" from providing content to search engines.  *E.g.*, Am. Compl. ¶¶ 200-01; *see W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (citing cases for the proposition that "[a] supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services");  *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 40-41, 44 (1st Cir. 1995) (affirming Rule 12(b)(6) dismissal of supplier's claims due to lack of antitrust injury); *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 412, 420-21 (D.D.C. 1988) (dismissing claims because plaintiff "lacks standing to challenge" alleged monopolization of "the *blood supply* market" by the Red Cross notwithstanding allegations that the conduct harmed plaintiff's ability to sell "blood *screening test equipment*" to the Red Cross).

The Opposition does not include a single case holding that a purported supplier is a market "participant" under the circumstances alleged here.  Instead, Plaintiffs point to opinions in which courts cited a treatise for the proposition that suppliers may have antitrust standing "in certain cases" that involved suppliers who were also the defendant's competitors.  Opp. 10-11; *see Amarel v. Connell*, 102 F.3d 1494, 1509-10 (9th Cir. 1996); *Am. Ad Mgmt.*, 190 F.3d at

1057; *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016).  As the cited treatise observes, antitrust standing does ***not*** exist where, as here, Plaintiffs allege that the lack of competition in a downstream market (*i.e.*, general search services) has affected the terms on which Plaintiffs supply that market.  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 350a (5th ed. 2022).  For example, when the "[d]efendants are the plaintiff's customers and … restrain competition in their own downstream selling market and then reduce or eliminate their purchases of inputs from the plaintiff … [t]he plaintiff generally lacks standing."  *Id.*  Likewise, when "[a]n immediate victim of illegal conduct by the defendant(s) is the plaintiff's customer, who then buys fewer inputs from the plaintiff … [t]he plaintiff generally lacks standing ***unless the plaintiff competes with the defendant***."  *Id.* (emphasis added).  Plaintiffs admit that they "have never alleged that they compete with Google in the general search market," Opp. 11, which distinguishes this case from those where a supplier has standing.  *E.g., Amarel*, 102 F.3d at 1510 ("The plaintiff supplier's injury is sufficiently direct ***where that supplier 'both competes with defendants and is their target***.'" (emphasis added)).

Finally, Plaintiffs cannot base antitrust standing on the assertion "that Google refers general search traffic to Publishers who function as its customers in that respect."  Opp. 9 (emphasis omitted).  Again, Plaintiffs cite no precedent supporting the proposition that they are "direct purchasers."  It is undisputed that Plaintiffs do not "purchase" search traffic because Google never sells placement in its organic search results.  *E.g.*, Am. Compl. ¶ 332 (alleging "[t]he general search services market consists of general search engines, which are one-stop shops consumers can use to search the internet for answers to a wide range of queries" (quotation marks omitted)).

4

**B.      Plaintiffs Have Not Adequately Alleged That Google Engaged in Exclusionary Conduct.**

Google's Opening Brief explained that Count One should also be dismissed on the ground that Plaintiffs have not pleaded that Google engaged in "exclusionary conduct" to maintain purported monopoly power in the alleged market for general search services.  Br. 9-17.

Before addressing the specific conduct alleged, Plaintiffs take issue with Google's observation that in order to determine whether Plaintiffs have satisfied their pleading obligations, each form of purportedly anticompetitive conduct must be evaluated separately rather than as a "monopoly broth" of disparate conduct.  Am. Compl. ¶ 335.  Although Plaintiffs assert that "most of the cases on which Google relies for this argument are decisions on summary judgment" (Opp. 13), a court does not ignore legal doctrine when evaluating the sufficiency of a complaint.  Indeed, the D.C. Circuit has endorsed this approach by evaluating separately "five types of conduct" alleged to violate the Sherman Act *when reviewing an order granting a Rule 12(b)(6) motion*.  *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 669, 672 (D.C. Cir. 2005).  This District likewise has evaluated on a Rule 12(b)(6) motion whether each of the acts alleged by plaintiffs were "independent violations" of the antitrust laws and has rejected the notion "that a series of unilateral acts that do not violate the antitrust laws may be aggregated into an unlawful course of conduct."  *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 28 (D.D.C. 2021) (quotation marks omitted) (*aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023)).  And the Supreme Court has held on review of an order resolving a motion to dismiss that it will not "join" two "claim[s] that cannot succeed, and alchemize them into a new form of antitrust liability."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 444-45 457 (2009).

Plaintiffs' "monopoly broth" theory is no more cognizable at this stage of the case than it would be at any other stage, and Count One should be dismissed because it is expressly predicated on a "broth" of conduct.  Am. Compl. ¶ 335.  Alternatively, the Court should dismiss the count because none of the forms of conduct alleged by Plaintiffs is sufficient to state a claim for relief under Section 2.

### 1.    Allegations Relating to Search Distribution Agreements.

Plaintiffs argue that this Court's treatment of the search distribution agreements in *United States v. Google LLC*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024) permits their claims to advance. Opp. 15.  Unlike the government plaintiffs in that case, however, Plaintiffs here are private entities who must establish antitrust standing.  *Andrx*, 256 F.3d at 805-06.  As discussed in the Opening Brief and Section I.A. *supra*, Plaintiffs cannot satisfy this requirement.

In connection with the search distribution agreements, Plaintiffs claim "harm in the form of lost income, inability to choose from other meaningful search alternatives, and loss of innovation."  Opp. 15.  But any "income" Plaintiffs purportedly lost as a consequence of Google Search being preinstalled or set as the default search engine is an injury suffered in the market where Plaintiffs' newspapers compete, not in the alleged general search services market where competition purportedly was restrained by the distribution agreements.  *Fotobom Media*, 2024 WL 1603968, at *4 ("[T]he antitrust standing inquiry turns on whether the plaintiff is a participant in the relevant market and suffered its injury in the market where competition is being restrained" (quotation marks omitted)).  Moreover, any alleged reduction in the ability "to choose from other meaningful search alternatives" or "loss of innovation" is not an injury experienced by Plaintiffs at all, as they do not purport to be general search users.  *Andrx*, 256 F.3d at 806.

### 2.      Additional Allegations Relating to Apple.

In addressing Plaintiffs' additional allegations relating to Apple, the Opposition focuses in part on the terms of the Information Services Agreement (ISA) that involve setting Google as the default search engine in Safari.  Opp. 16.  Any theory based on that agreement fails for lack of antitrust standing for the same reasons described in the preceding sections.  Moreover, any theory based on the claim that Apple "was interested in entering the general search market" (Opp. 17) fails for those same reasons and because no well-pleaded factual allegations support the assertion or demonstrate the requisite anticompetitive effect in the alleged market for general search services.  *See* Section V *infra*.  The same flaws undermine any theory predicated on provisions of the ISA relating to Safari Suggest, which this Court found have not "led to any actual competitive harm or threat of such harm."  *Google*, 2024 WL 3647498, at *117 ("Nor have Plaintiffs produced any evidence that would suggest that, since 2016, Apple has purposely reduced or limited the number of 'suggestions' it offers users.").  Finally, Plaintiffs' allusion to the use of "Google's Gemini on iPhones" (Opp. 18) is unavailing because of the absence of plausible allegations of an anticompetitive effect in the asserted general search services market from ***negotiations*** regarding possible generative artificial intelligence technologies.

### 3.      Allegations Relating to Acquisitions.

In its Opening Brief, Google explained that Plaintiffs' contention that Google engaged in exclusionary conduct through acquisitions occurring at least a decade ago is time barred and, alternatively, is not supported by factual allegations showing why these acquisitions had an anticompetitive effect in the alleged market for general search services.  Br. 12-13, 35-39.  Plaintiffs respond by rattling off a series of irrelevant assertions that purportedly connect the three acquired entities—Android, YouTube, and DeepMind—to generative artificial intelligence or search distribution agreements.  Opp. 18-19.  But none of those assertions even suggests that

*the acquisitions themselves* comprise exclusionary conduct, and Plaintiffs cite no precedent for

the proposition that an acquisition can be challenged under Section 2 if an acquired technology is

developed for many years and subsequently has some connection to other challenged conduct.

For example, the accusation that in 2024 Google allegedly is party to "exclusive dealing

agreements" with Android device manufacturers and carriers that sell Android devices (Opp. 19)

says nothing about whether an acquisition of a company *19 years earlier* had an anticompetitive

effect in the alleged general search services market.

### 4. Allegations Relating to Misappropriating Content.

Google's Opening Brief explained why Plaintiffs' assertion that Google misappropriated

their content for use in generative artificial intelligence does not comprise exclusionary conduct

(Br. 13-15), and the Opposition does not rebut any of Google's arguments.

Although the Amended Complaint alleges that publishers have always been able to

instruct Google not to crawl their webpages (*see* Br. 13), the Opposition asserts that "Publishers

had *no idea* that their data was being scraped … without prior permission and without

compensation" for use in generative artificial intelligence models.  Opp. 20.  Plaintiffs' argument

is inapposite because the Opposition does not explain how the use of Plaintiffs' data for purposes

to which they purportedly did not consent is "conduct that stifles competition" among general

search engines, as distinct from a purported "wrong[] directed against the private interest of an

individual business."  *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357

F.3d 1, 4 (1st Cir. 2004).  Notably, the Opposition does not cite a single case indicating that an

alleged misappropriation of data from a supplier can be conduct that "harm[s] the competitive

*process* and thereby harm[s] consumers."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58

(D.C. Cir. 2001) (en banc).  Plaintiffs' allegations amount to nothing more than a failed claim of

misappropriation or copyright infringement, which is not a proper basis for a monopolization claim. *See* Br. 33 n.7.

The same defects pervade Plaintiffs' theory that Google purportedly "does not permit Publishers to opt out of Google's use of summaries" in "AI Overviews" that are "based on their extracted data." Opp. 22. Plaintiffs allegedly want a different "opt-out option" than what Google presently offers for publishers who do not wish to appear in its search results (Opp. 22), but they offer no basis on which to conclude that the menu of options Google makes available to publishers is "conduct which unfairly tends to destroy competition itself." *Microsoft*, 253 F.3d at 58. As Google explained in its Opening Brief, acquiring inputs on terms that a supplier finds unfavorable is not anticompetitive conduct. *See, e.g.*, *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984) (rejecting theory that alleged monopolist's "payments for doctors' services are 'too low'" because "[a] legitimate buyer is entitled to use its market power to keep prices down" and "[t]he claim that [the defendant's] price scheme is 'too rigid' … is properly addressed to [the defendant] or to a regulator, not to a court"). The assertion that the "terms of trade" Google offers publishers are too one-sided is no different than a claim that an alleged monopolist charges a price that is too high. "Such conduct is not the exclusionary conduct that violates the antitrust laws, but rather is 'the normal, rational response of a business … seeking to maximize profits, sales or revenues.'" *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 268 (8th Cir. 1984) ("[S]etting a high price is not in itself anti-competitive.").

Finally, Plaintiffs have no answer to Google's observation that they cannot plead that any alleged misappropriation "has the requisite anticompetitive effect" in the asserted general search services market. *Microsoft*, 253 F.3d at 58-59. Plaintiffs' arguments are based on the alleged impact of Google's policies on ***publishers***, who Plaintiffs "have never alleged … compete with

Google in the general search market." Opp. 11.  Because there are no well-pleaded allegations that the purported misappropriation or use of data for generative artificial intelligence harmed competition among general search engines, it cannot serve as the basis for Count One.

### 5.   Allegations Relating to the Readiness of Bard.

The Opposition confirms that Plaintiffs have not pleaded a Section 2 claim by asserting that Google launched its Bard chatbot even though Bard purportedly was "shown to be an inferior product." Opp. 23.  Plaintiffs cite no authority indicating that it is unlawful to release a product unless it is demonstrably superior to a rival's offering, and any such principle would plainly stifle competition and innovation.  Plaintiffs also have not plausibly alleged that the introduction of Bard had a substantial anticompetitive effect in the asserted general search services market.

### 6.   Allegations Relating to Changes to AdSense.

Plaintiffs likewise have not pleaded the requisite anticompetitive effect in the alleged general search services market by alluding to changes to AdSense, which "enabl[es] Publishers to sell display space to advertisers on their websites." Am. Compl. ¶ 275.  Through a series of irrelevant assertions, the Opposition suggests that changes to how advertisers are compensated for ads placed on their own websites somehow followed from the introduction of the Search Generative Experience (SGE) on google.com.  But Plaintiffs' theory still does not amount to a plausible allegation that charging for ads *on publishers' websites* on a cost-per impression basis harmed competition *among general search engines*.  Plaintiffs merely make baseless allegations

that the AdSense changes were unfavorable to website publishers—a group that Plaintiffs "have never alleged … compete[s] with Google in the general search market."  Opp. 11.

### 7.     Allegations Relating to Spoliation.

Plaintiffs do not cite a single case indicating that spoliation or a policy regarding communications within a company can serve as the basis for a Section 2 claim.  Opp. 25-26. Nor could they, as any question about whether spoliation has occurred or an adverse inference is appropriate in a given case is categorically distinct from whether a plaintiff can plausibly allege exclusionary conduct.

### 8.     Allegations Relating to California News Sites.

Finally, the Opposition does not address how Google's alleged "efforts to block news articles from California Publishers" (Opp. 26) resulted in significant anticompetitive effects in the alleged general search services market.  As Google explained, Plaintiffs offer no allegations that Google's decision not to show news results harms the competitive process among general search engines, and if anything, it should boost search rivals given Plaintiffs' assertion that "news is incredibly valuable to general search engines."  Am. Compl. ¶ 116; *see* Br. 17.

Plaintiffs' statement that they are seeking "a prohibitory injunction precluding Google" from temporarily "block[ing] news articles" on google.com (Opp. 26-27) highlights the persistent disconnect between Plaintiffs' allegations and what the law requires.  Plaintiffs are newspaper publishers who make various assertions that Google should do something to provide them with more revenue—whether by generating additional traffic to their websites, paying licensing fees to access their content, selling ad space on their websites on different terms, or transferring money to them pursuant to legislation.  But none of this amounts to a claim under Count One, which requires Plaintiffs to make two showings that are manifestly absent: first, that Plaintiffs "suffered" their alleged "injury in the market" for general search services, *Fotobom*

*Media*, 2024 WL 1603968, at *4, and second that Google engaged in "conduct which unfairly tends to destroy competition itself" in that alleged market.  *Microsoft*, 253 F.3d at 58.

## II.    COUNT TWO FAILS TO STATE A CLAIM FOR MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION OF A MARKET FOR ONLINE NEWS.

Count Two should be dismissed because Plaintiffs have not plausibly alleged a relevant market for online news, the possession of monopoly power (or a dangerous probability of achieving it) in that alleged market, or the presence of exclusionary conduct.

### A.    Plaintiffs Have Not Adequately Pleaded a Relevant Market.

Google's Opening Brief explained that Plaintiffs have not pleaded a relevant market for online news.  Br. 18-21.  Although Plaintiffs contend that alleging a relevant market is not an "onerous task" (Opp. 28), it is beyond dispute that "[f]ailure to define the market by reference to the reasonable interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule 12(b)(6) stage."  *Sky Angel U.S. LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013).  The Amended Complaint falls short in two distinct ways.

First, Plaintiffs have not plausibly alleged that the search results on google.com are reasonably interchangeable with "[o]nline news outlets [that] publish … professional works of journalism."  Am. Compl. ¶ 355.  The Opposition asserts that "80% of Google searches are for informational content," but that does not support the plausibility of an alleged online news market that includes Google Search.  Opp. 30 (emphasis omitted).  The Amended Complaint does not aver that Google Search users who are dissatisfied with the results of an "informational" query—such as "when did World War II end"—would view *The Helena World* or *Monroe County Argus* as a reasonable substitute for satisfying that query or countless others.  Plaintiffs also do not move the needle by arguing that Google "invested in 'developing news products and features' for Google Search" or that it "fills the SERP with answer boxes and horizontal

carrousels featuring news." Opp. 30. The Amended Complaint does not plausibly allege that the search results displayed in response to news-related queries are themselves news publications that are reasonably interchangeable with the "professional works of journalism" that comprise the alleged relevant market. Am. Compl. ¶¶ 355-57.

Second, Plaintiffs also have not adequately pleaded a relevant market for online news because the Amended Complaint lacks sufficiently "detailed allegations … regarding the supposed lack of interchangeability between" the services offered by "industry participants." *Sky Angel*, 947 F. Supp. 2d at 103. For example, the Opposition does not dispute that Plaintiffs' gerrymandered market includes visits to instagram.com and foxnews.com yet ***excludes*** every use of the Instagram and Fox News mobile apps. The Opposition does not even attempt to justify this arbitrary distinction between webpage and app visits. Moreover, the Amended Complaint does not plausibly allege that a consumer would regard viewing a news snippet on google.com as a reasonable substitute for reading an article on nytimes.com, yet the same consumer would ***not*** regard as reasonable substitutes watching MSNBC, listening to NPR, or reading the print version of The New York Times. The Opposition does not salvage Plaintiffs' flawed market definition by asserting that "86% of Americans regularly consume news from digital devices." Opp. 29 (emphasis omitted). That statement says nothing about how many Americans ***also*** regularly consume news from non-digital sources, and it undermines Plaintiffs' attempt to carve out some of the ways in which users "regularly consume news from digital devices," such as through mobile apps. Finally, the two cases Plaintiffs cite for the proposition that courts "have referred to online news markets" are inapposite. Opp. at 29. One of the cited opinions merely observes that the parties "compete in the online market as news-distribution services" in the context of analyzing trademark infringement claims. *United Press Int'l, Inc. v. Global One News, Inc.*,

2020 WL 2572483, at *4 (M.D. Tenn. May 21, 2020).  And the other cited opinion does nothing more than reference in passing "the relevant newspaper and digital news markets" without analyzing the viability of any such markets or suggesting that they included Google Search or were otherwise defined in the convoluted manner Plaintiffs allege here.  *Las Vegas Sun, Inc. v. Adelson*, 2022 WL 17721101, at *1 (D. Nev. Dec. 15, 2022).

**B.     Plaintiffs Have Not Adequately Pleaded the Possession of Monopoly Power or a Dangerous Probability of Achieving It.**

Google's Opening Brief explained that Count Two should also be dismissed because Plaintiffs have not pleaded that Google possesses monopoly power in the alleged online news market or a dangerous probability of success in monopolizing that asserted market.  Br. 21-23. Plaintiffs attempt to satisfy their pleading obligation solely through a compilation of visits to 215 webpages and contradictory assertions about barriers to entry.  Opp. 31-33.  Both sets of allegations are implausible and cannot support a claim of actual or attempted monopolization.

As the Opposition acknowledges, Plaintiffs assert that Google has a 66% share of the alleged market only because they inaccurately assume that ***every single visit*** to google.com, youtube.com, and certain other Google-owned sites involves the consumption of online news. Opp. 31-32.  In "[d]etermining whether a complaint states a plausible claim for relief," the Court must "draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  Plaintiffs ask the Court to defy that edict by arguing that Google's share of the alleged online news market can be gleaned from counting every visit to Google's sites.  Plaintiffs suspend disbelief about what users actually do on google.com despite alleging throughout their Complaint that the defining feature of Google Search is that users enter queries on all subjects, a vast number of which are unrelated to the news.  *E.g.*, Am. Compl. ¶¶ 38, 332.  And they urge the Court to make a baseless

assumption despite having alleged in their original Complaint that Google's news aggregation site (news.google.com) is only "the 16th most popular news site in the world."  ECF 1 ¶ 48.

Plaintiffs' flawed market share assertions bear no resemblance to the allegations that withstood a motion to dismiss in *FTC v. Facebook*, 581 F. Supp. 3d 34 (D.D.C. 2022).  In that case, the plaintiffs offered "three metrics to measure market share" that were "consistent with common sense" and also "extensively allege[d] that the metrics are regularly used by Facebook, its competitors, and relevant data collectors to assess market power."  *Id.*  at 47, 50.  Here, by contrast, Plaintiffs offer no allegations in support of measuring market share in the alleged online news market by counting the total number of visits to websites such as google.com and youtube.com that are indisputably used for purposes unrelated to online news.  Nor do Plaintiffs offer any allegations in support of omitting usage of mobile apps, which vastly understates the usage of other services included in the alleged relevant market.  As the *Facebook* court explained in an earlier opinion, "where the market is idiosyncratically drawn … allegations as to a particular market share carry much less meaning."  *FTC v. Facebook*, 560 F. Supp. 3d 1, 17 (D.D.C. 2021) (cleaned up).  While Plaintiffs' arbitrary definition of the alleged relevant market is reason enough to dismiss the claim, the flaws are all the more apparent when viewed in light of Plaintiffs' failure to allege anything resembling a reasonable estimate of market share.  *See id.* at 20 (holding that "the existence of market power is at the heart of any monopolization claim," and "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed").

Plaintiffs also cannot salvage Count Two by citing *Fotobom Media*, where this Court observed that it was "a close call" whether the plaintiff pleaded a dangerous probability of success in monopolizing the alleged relevant market.  2024 WL 1603968, at *12.  There, the

plaintiff cited "Google's share of Play Store downloads" of mobile keyboard applications, which the Court read "as illustrative of Google's [Android keyboard application] market dominance" for purposes of determining the plausibility of the pleadings.  *Id.*  No such inference can be drawn from Plaintiffs' counting of website visits because it is undisputed that users visit google.com or youtube.com for innumerable reasons that are not "illustrative of" how often those sites are used to consume online news.  The Court also indicated that "allegations regarding Google's exclusive dealing and tying arrangements" were "market realities [that], if true, plausibly establish the conditions for monopolization."  *Id.* at *12.  Here, by contrast, there are no plausible allegations that the asserted market is "ripe for potential monopolization," *id.*, because it includes large firms such as Meta and TikTok that garner tremendous amounts of user attention in addition to the websites of established and successful news publishers such as nytimes.com and foxnews.com.  As Google explained in its Opening Brief, the Amended Complaint does not permit a plausible inference that Google "can profitably raise prices substantially above the competitive level" in the alleged market for online news by "cut[ting] back the market's total output."  *Microsoft*, 253 F.3d at 51.

Furthermore, even if the Court accepted Plaintiffs' market share allegations, it should still dismiss Count Two because the Amended Complaint does not plausibly allege that significant barriers to entry protect the asserted online news market.  *See id.* at 82 ("Plaintiffs must not only show that barriers to entry protect the properly defined … market, but that those barriers are 'significant.'").  The Opposition responds to this point in a single sentence referencing the Amended Complaint.  Opp. 32.  As Google's Opening Brief explained, however, the cited paragraphs acknowledge that "it is relatively easy to enter the online news market" (Am. Compl. ¶ 124), and the Amended Complaint identifies what Plaintiffs contend are at least "***215 major***

online news outlets." *Id.* ¶ 5 n.3 (emphasis added).  Plaintiffs offer no authority for the notion that an alleged market with those characteristics has significant barriers to entry.  Irrespective of Google's purported share of the alleged online news market, Count Two should be dismissed because Plaintiffs have not pleaded "that new rivals are barred from entering the market and … that existing competitors lack the capacity to expand their output to challenge the [defendant's] high price."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995).

## C.    Plaintiffs Have Not Adequately Alleged That Google Engaged in Exclusionary Conduct.

Finally, Count Two should be dismissed because Plaintiffs have not plausibly alleged that Google engaged in exclusionary conduct in the asserted online news market.  Br. 23-27.  The Opposition repeats several alleged effects on news publishers, such as increases to their "average cost of production" and introduction of "paywalls."  Opp. 33-34.  But the vast majority of what Plaintiffs purport to describe is not ***conduct*** engaged in by Google and therefore does not satisfy their pleading burden.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*").

Insofar as Plaintiffs are attempting to allege that Google engaged in "default self-preferencing on the SERP" (Opp. 34), the theory fails for the reasons stated in the Opening Brief.  Br. 24-25.  Plaintiffs do not identify any elements of purported "self-preferencing," let alone plead them.  Nor do they respond to any of Google's arguments, including that there are no allegations of Google Search endeavoring to provide anything other than a high-quality experience for its users through featured snippets and generative artificial intelligence features on the SERP.

To the extent that Plaintiffs are trying to allege that Google does not adequately compensate publishers for crawling their sites or using the crawled data, that theory fails for the reasons described above and in the Opening Brief.  *See* Section I.B.4 *supra*; Br. 25-26.  As those sections explain, there is no rule requiring Google to pay a licensing fee to crawl Plaintiffs' sites or offer additional options for determining how crawled data is used.  Likewise, there is no obligation for Google to direct some predetermined number of Search users to Plaintiffs' sites.  As with so many other sections of the Opposition, Plaintiffs do not cite a single case to the contrary (Opp. 33-35), even though Google cited a half dozen cases explaining why Plaintiffs' allegations do not amount to exclusionary conduct under Section 2.  Br. 24-26.

## III.   COUNT THREE FAILS TO PLEAD AN UNLAWFUL TYING ARRANGEMENT.

Count Three claims unlawful tying in violation of Sections 1 and 3 of the Sherman Act.  In the face of Google's arguments for dismissal, Plaintiffs abandoned the tying theory alleged in the Amended Complaint, characterizing it as an instance of having "inartfully pled … what the tied product actually was."  Opp. 35.  Although Count Three should be dismissed for the reasons stated, Plaintiffs try to recharacterize the claim in the Opposition by asserting that "the tying product is general search services provided by Google" and "the tied product is the 'Search Generative Experience'—SGE (now AI Overviews)—that Google began to provide in 2023."  Opp. 36.  Plaintiffs' third attempt at pleading a tying claim also fails.

First, Plaintiffs' new theory should be dismissed because they have not plausibly alleged that "the tying and tied goods"—*i.e.*, Google's "general search services" and SGE—"are two separate products."  *Microsoft*, 253 F.3d at 85.  It is undisputed that SGE is and always has been part of Google Search.  *See, e.g.*, *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) ("Relevant evidence of separate and distinct consumer demand for the tying product and the tied product is, *inter alia*, the history of the products being, or not being, sold separately.").  For

example, the Amended Complaint acknowledges that the SGE results are generated by entering a query at google.com and appear on the SERP, just like all of the other results Google provides to Search users.  *E.g.*, Am. Compl. ¶¶ 250-52.  Moreover, Plaintiffs expressly allege that SGE is a "search feature" by asserting that publishers "allow Google to scrape and republish their content through search features such as People Also Ask, Featured Snippets, ***and SGE***."  Am. Compl. ¶ 157 (emphasis added); *see also id.* ¶ 228 (alleging SGE involves "us[ing] a GAI program that publishes an 'answer' on top of the search results").  Even in their Opposition, Plaintiffs refer to SGE as "a major part of [Google's] search engine," not a product distinct from Google Search. Opp. 18.  Plaintiffs' novel argument to the contrary is based on two paragraphs of the Amended Complaint referencing ***Bard*** (Opp. 36), which Plaintiffs characterize as "a GAI chatbot."  Am. Compl. ¶ 152.  Unlike SGE, Bard was not a "search feature" that appears on the Google SERP. In short, there is no plausible basis for concluding that one type of search result provided by Google Search (*i.e.*, the result provided by SGE) is a separate product from Google Search itself.

Second, Plaintiffs' new tying claim should be dismissed because they do not allege a relevant market for the tied product.  *See Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810, 851 (N.D. Cal. 2021).  Plaintiffs assert "that the general search services market and the online news market are separate" (Opp. 36), but they do not contend that only SGE is part of the alleged online news market.  Instead, Count Two is premised on the (baseless) assertion that Google Search itself "participates in the online news market."  Am. Compl. ¶ 359.

Third, Plaintiffs have not alleged harm to competition in the tied market.  *See In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 997 (N.D. Cal. 2010).  The Opposition repeats conclusory allegations that "Publishers must try to lower costs … or raise prices on subscriptions" (Opp. 36), but they do not connect these purported harms to competition in

whichever market SGE supposedly inhabits or attribute them to the alleged tie (as opposed to other circumstances or conduct).  *See* Br. 32.

Fourth, Plaintiffs have not experienced an antitrust injury.  The Opposition relies on the assertions that Plaintiffs have "suffered lost profits from diverted customers" and "lost licensing fees" as they purportedly are not adequately compensated for the "scraping" and use of their data in Google Search features.  Opp. 36-37.  As described in detail elsewhere, these allegations do not amount to antitrust injury, but instead appear to be an attempt to repackage copyright or misappropriation claims as purported antitrust violations.  *See* Section I.A *supra*; Br. 32-33.

## IV.   COUNT FOUR FAILS TO PLEAD A VIOLATION OF SECTION 7 OF THE CLAYTON ACT.

Count Four challenges three acquisitions that occurred between 10 and 20 years ago. Like the other counts, it should be dismissed on multiple independent grounds.

### A.   Plaintiffs Lack Standing and Have Not Pleaded a Relevant Market or the Requisite Anticompetitive Effect in an Alleged Relevant Market.

Before turning to the fact that Count Four is plainly untimely, the count should be dismissed for three reasons described in Google's Opening Brief.  Br. 34-35.  First, Plaintiffs lack antitrust standing.  *See* Section I.A *supra*.  Second, Plaintiffs have not defined a relevant market for purposes of the claim: they do not even attempt to define the "digital ad" market referenced in the Amended Complaint, and have failed to plead a relevant market for online news.  *See* Section II.A *supra*.  Third, Plaintiffs have not plausibly alleged that the acquisitions themselves—which are distinct from conduct occurring years later that merely bears some tangential relationship to the acquired entities—had a substantial anticompetitive effect in any alleged relevant market.

B.      The Claim Is Time Barred.

Google's Opening Brief explained that Count Four is barred by the four-year statute of limitations and doctrine of laches because the claim challenges three acquisitions that occurred and were publicly announced between 2005 and early 2014.  Br. 35-39.  In response, Plaintiffs cite cases brought by the U.S. government (Opp. 38), which are wholly inapposite in this private action because laches does not apply to the United States.  *New York v. Facebook*, 549 F. Supp. 3d at 36.  Plaintiffs also argue that the term "acquisition" in Clayton Act Section 7 refers to "both the purchase of rights in another company and the retention of those rights."  Opp. 38 (emphasis omitted) (quoting *FTC v. Facebook*, 560 F. Supp. 3d at 31).  However, Plaintiffs ignore that the same court explained that this "is a principle of *substantive liability*; it says nothing about when a plaintiff's cause of action accrues, or, by the same token, when it becomes time barred (or when delay becomes unreasonable)."  *New York v. Facebook*, 549 F. Supp. 3d at 42 ("[E]ven if Facebook's continued holding of Instagram and WhatsApp violates Section 7 in some sense at this very moment, that does not make a present challenge timely.").

Plaintiffs' contention that their cause of action accrued at some recent point (Opp. 39) conflicts with the case law, which provides that as a general matter, "a Section 7 action challenging the initial acquisition of another company's stocks or assets accrues at the time of the merger or acquisition, giving the plaintiff four years from that time to sue."  *New York v. Facebook*, 549 F. Supp. 3d at 35 (cleaned up).  Moreover, Plaintiffs' own allegations highlight that Count Four is not grounded in new developments.  *E.g.*, Am. Compl. ¶ 111 (alleging google.com has been "the largest website in the world … every year since 2010"); ¶ 65 (alleging Android has been "the best-selling OS since 2011").  In any event, the launch of new products or features does not reset the clock for challenging a long-ago acquisition, as "[s]uch a result would write the statute of limitations for Section 7 damages actions out of the Clayton Act and similarly

eliminate the laches defense that Congress expected to govern Section 16's cause of action for injunctive relief." *New York v. Facebook*, 549 F. Supp. 3d at 42. Likewise, the assertion that the acquired companies "are being used differently now" (Opp. 39) does not restart the limitations period, but rather confirms that challenging long-ago deals would be prejudicial. *New York v. Facebook*, 549 F. Supp. 3d at 37. The *Facebook* court observed that it was "aware of no case, and the States provide none, in which a plaintiff other than the United States (against which laches does not apply) … was awarded equitable relief after such long post-acquisition delays in filing suit." *Id.* at 36. Plaintiffs' delay in this case is considerably ***longer*** than in *Facebook*.

Google's Opening Brief explained that none of the exceptions to the statute of limitations or laches applies here, and the Opposition does not change that ineluctable conclusion. First, numerous courts have held "that the continuing violation doctrine does not apply in the context of Section 7 claims under the Clayton Act" because it "would write the statute of limitations out of the law by allowing a merger to be challenged indefinitely." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 995 (N.D. Cal. 2020); *see* Opp. 40-41. The case cited by Plaintiffs did not hold otherwise, but rather denied a motion to dismiss "because Plaintiffs sufficiently allege[d] a continuing violation of other, non-acquisition, anticompetitive conduct." *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 721 (W.D. Tenn. 2022).

Second, courts have expressed doubt about whether Plaintiffs' "hold-and-use theory is even viable." *New York v. Facebook*, 549 F. Supp. 3d at 43; *see* Opp. 41. To the extent that the theory is viable, it does not apply here because the only recent conduct complained of involves product features—such as generative artificial intelligence models—that indisputably did not exist at the time of the acquisitions. "If the asset did not exist before the merger, logic requires

that [the hold-and-use] theory cannot apply." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392

F.3d 265, 274 (8th Cir. 2004).

Third, Plaintiffs have not come close to alleging fraudulent concealment of publicly

announced acquisitions under Rule 9(b).  Opp. 41-42.  Assertions of spoliation in other matters

have nothing to do with the timeliness of Plaintiffs' claims because those cases did not challenge

the lawfulness of acquisitions, and the documents in question were internal business records that

would not have been made public contemporaneously in any event.  Plaintiffs also "fail to allege

how they acted diligently in trying to uncover the facts giving rise to their claims." *Reveal Chat

HoldCo*, 471 F. Supp. 3d at 994 (dismissing Clayton Act Section 7 claim notwithstanding

allegations of fraudulent concealment).

Fourth, Plaintiffs cannot salvage their claim by seeking only "future injunctive relief."

Opp. 42.  The *Facebook* court rejected this very argument because any "truly prospective relief"

would be unmoored from a Clayton Act Section 7 claim given that it would not "restore the

competition allegedly lost as a result of" the acquisitions, which "is required of a remedy for a

Section 7 violation." *New York v. Facebook*, 549 F. Supp. 3d at 44 (cleaned up).

## V.    COUNT FIVE FAILS TO PLEAD AN UNLAWFUL AGREEMENT BETWEEN GOOGLE AND APPLE.

Count Five claims that the 2016 amendment to the ISA violates Sherman Act Sections 1

and 3 because Apple purportedly "shelved" its "plans" for "entering the general search market in

competition with Google" and "agreed that it would not compete with Google to develop a

search engine of its own."  Am. Compl. ¶¶ 399-400.  As Google explained in its opening brief,

the claim should be dismissed because it is not supported by well-pleaded facts.  Br. 40-45.

In response, Plaintiffs assert that through the 2016 ISA amendment Google received "a

contractual commitment that Apple would not expand the scope of its 'Suggestion' feature."

Opp. 43 (emphasis omitted).  However, the Amended Complaint is devoid of factual allegations

that the 2016 ISA Amendment places any restrictions on Apple's ability to directly answer

search queries through Safari Suggestions.  Nor does the Amended Complaint provide factual

allegations that Safari Suggestions are or ever could have been a general search engine that

competed in the alleged general search services market.  And this Court already found following

a trial on the issue that there is no evidence that the contractual provision Plaintiffs reference "led

to any actual competitive harm or threat of such harm."  *United States v. Google*, 2024 WL

3647498, at *117.  That is because "Apple does not view the … clause as limiting Apple at all on

Suggestions," and there is no "evidence that would suggest that, since 2016, Apple has purposely

reduced or limited the number of 'suggestions' it offers users."  *Id.*  Plaintiffs' allusion to

Safari's "'Suggestion' feature" cannot possibly support a claim that Google paid Apple not to

compete in the general search services market.

Plaintiffs also do not state a claim by asserting that "Apple had been looking at entering

the search market by such means as turning Siri into a search engine or buying Microsoft's

Bing," but "[t]he 2016 ISA solved Google's concerns about this potential competition."  Opp.

43.  As Google observed in its Opening Brief, Apple's consideration of these "options" (Am.

Compl. ¶ 399) occurred two years *after* it entered the 2016 ISA amendment.  Moreover,

Plaintiffs do not allege that Apple preferred to operate its own general search engine, let alone

that it refrained from doing so because it believed the 2016 ISA amendment precluded it.  Br. 41.

The Opposition offers no response to these dispositive points.

Furthermore, there is no factual or legal basis for Plaintiffs' assertion that the 2016 ISA

amendment "was a *per se* violation of Section 1 of the Sherman Act."  Opp. 43.  As indicated

above, the Amended Complaint lacks any well-pleaded allegations that the contract was an

agreement not to compete.  But even assuming, counterfactually, that Plaintiffs could overcome

that obstacle, the agreement still would not be subject to a *per se* rule.  *E.g.*, *Meijer, Inc. v. Barr*

*Pharms., Inc.*, 572 F. Supp. 2d 38, 47-50 (D.D.C. 2008).  In *Meijer*, the contract at issue

expressly prohibited a party from "selling" a product "in the United States for five years," *id.* at

47—a provision that indisputably does not appear in the 2016 ISA amendment.  Nevertheless,

the court held that "the Agreement cannot be condemned as a *per se* unreasonable restraint of

trade" because "[t]he *per se* rule is reserved for restraints that are anticompetitive in all or nearly

all instances, not those that are anticompetitive depending on particular market dynamics."  *Id.* at

50.  Needless to say, there is no precedent for applying a *per se* rule to an agreement to set a

default search engine in a browser.  And for good reason: any firm's decision to buy an input

rather than making the input itself inevitably results in the buyer not competing, and even

"exclusive supply relationships are consistently analyzed under a rule of reason."  *Id.* at 48.

Finally, Count Five should be dismissed on the independent ground that Plaintiffs lack

antitrust standing for the reasons stated in Section I.A *supra*.  The Opposition asserts that

"Google's default position" on "Apple and Android phones" has "harmed Publishers in the

search services market" (Opp. 45), but Plaintiffs do not say how they experienced a cognizable

injury in that alleged market.  Plaintiffs also do not respond to the dispositive point that they do

not plausibly allege that the "terms of trade" they purportedly could negotiate with search

engines would differ if Apple operated a general search engine.  *See* Br. 45.  Because there is no

basis on which to conclude that Plaintiffs are "participants" in the alleged general search services

market or suffered their purported injuries in that alleged market, they do not have standing to

bring Count Five.  *Fotobom Media*, 2024 WL 1603968, at *4.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint.

25

Dated: October 25, 2024

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Kenneth C. Smurzynski (D.C. Bar No. 442131)
Graham Safty (D.C. Bar No. 1033312)
Youlin Yuan (D.C. Bar No. 1613542)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
ksmurzynski@wc.com
gsafty@wc.com
yyuan@wc.com

*Counsel for Defendants Google LLC & Alphabet Inc.*