**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| **HELENA WORLD CHRONICLE, LLC et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-cv-03677 (APM)** |
| | ) | |
| **GOOGLE LLC et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**MEMORANDUM OPINION**</u>

## I.    INTRODUCTION

This case is yet another in the volley of antitrust lawsuits brought against Defendant Google LLC arising from its dominance in the market for general search services.  Plaintiffs Helena World Chronicle, LLC and Emmerich Newspapers, Inc. are publishers of digital news whose content is indexed and delivered by Google to its users via its search engine results pages ("SERPs") and its generative AI ("GenAI") platforms.  Plaintiffs bring this action on behalf of themselves and others similarly situated against Google and its parent company Defendant Alphabet, Inc. alleging violations of the Sherman Act and Clayton Act in the general search services and online news markets.  Plaintiffs assert that Google has leveraged its power in the general search services market, which it achieved through a veritable "monopoly broth" of anticompetitive acts, to monopolize or attempt to monopolize the online news market, resulting in Google functionally becoming "America's largest news publisher."

Defendants move to dismiss on a variety of grounds.  They argue, in the main, that Plaintiffs (1) lack antitrust standing to assert claims related to the general search services market,

(2) fail to plead a relevant market or monopoly power in the online news market, (3) fail to plead a cognizable tying arrangement, and (4) are time-barred from bringing their Clayton Act claim.

For the reasons that follow, Defendants' Motion to Dismiss the Amended Complaint, ECF No. 38, is granted.

## II.    BACKGROUND

Because this matter comes before the court on a motion to dismiss, the court takes Plaintiffs' well-pleaded factual allegations as true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and recites the factual background accordingly.

Many of Plaintiffs' allegations concerning Google's history as a company, general search engine ("GSE"), participation in the GenAI market, and relationships with browsers and device manufacturers are chronicled in *United States v. Google LLC* (*Google Liability*), 747 F. Supp. 3d 1 (D.D.C. 2024), and *United States v. Google LLC* (*Google Remedies*), 803 F. Supp. 3d 18 (D.D.C. 2025).[1]  The court here will focus on those allegations unique to Plaintiffs' claims.

### A.    Online News

#### 1.    *Online News and Search*

Online news is distributed through web traffic.  Am. Compl., ECF No. 27, ¶ 139. Web traffic can be direct (users navigate directly to a publisher's website) or external (users are referred to a publisher's website through another source).  *Id.*  The most common way users come to an online news site is through external search traffic—that is, visits to websites via a search engine, or "user clicks" from a search.  *Id.* ¶ 8.

---

[1] The court deems it appropriate to consider these decisions, as Plaintiffs' Amended Complaint liberally references the *Google Liability* proceedings, including this court's liability determination, trial exhibits and testimony, and the parties' filings.  *See, e.g.*, Am. Compl., ECF No. 27, ¶¶ 43, 45, 47, 82, 84, 95, 101–102, 105, 109, 112, 118, 190, 219, 287, 332.

Google supplies 95% of all such search traffic. *Id.* ¶ 140. For example, Google is the second-largest source of traffic to NYTimes.com (direct navigation is the largest). *Id.* ¶ 142. The same is true for smaller news outlets. Plaintiff Helena World Chronicle, based in Arkansas, publishes two online news websites—HelenaWorld.org and MonroeCountyArgus.com. *Id.* ¶ 26. Google is the second largest source of traffic to HelenaWorld.org (again, direct navigation is the first). *Id.* ¶ 143. Plaintiff Emmerich Newspapers, based in Mississippi, publishes 22 news websites. *Id.* ¶ 28. Google is the foremost source of traffic for at least two of them. *Id.* ¶¶ 142–145.

Plaintiffs contend that, because of Google's monopoly in general search services, publishers of online news content "have only one meaningful provider for the largest source of external traffic: Google." *Id.* ¶ 146; *see id.* ¶ 144 (showing that, after Google.com, the two next highest search engines from which Plaintiff Emmerich Newspapers received external search traffic were DuckDuckGo.com at 0.17% and Brave.com at 0.15%). Plaintiffs argue that "search traffic referrals," or the directing of search traffic, is a monopoly product. *Id.* ¶ 137.

### 2. *Google and Online News*

After the September 11, 2001 attacks, Google realized that its Search platform did not have a way to deliver breaking news to users. *Id.* ¶ 114. In response, Google began displaying links to news organizations' websites on its front page and launched "Google News." *Id.* ¶¶ 114–115. News has since become a prominent feature of Google's SERPs and other Google products like YouTube in large part because it is a powerful tool in Google's business model. *Id.* Put simply, news makes search better. *Id.* ¶ 116 ("[T]imely, broad, and deep news coverage is critical to attracting users and strong engagement."). Frequently crawling and indexing web content, including digital news, produces fresher, higher quality search results that in turn generate more

revenue, more engagement, and more scale (or user data). *See id.* ¶¶ 119, 338, 342; *Google Liability*, 747 F. Supp. 3d at 49–52 ¶¶ 86–106; *id.* at 161–62 (image of "network effects" flywheel).

This interaction between digital news content and Google Search lies at the heart of Plaintiffs' claims. In Plaintiffs' view, these seemingly disparate product markets (online news and general search services) interact as follows. To develop a high-quality search engine, Google must build a comprehensive search index. A search index is built by crawling websites, including those that contain digital news content, like Plaintiffs'. Am. Compl. ¶ 8. That relationship is symbiotic: "Google provides *search traffic referrals* to Publishers in exchange for *content*, which Google obtains via crawling and indexing websites." *Id.* ¶ 40; *see also id.* ¶ 119 (quoting "Google's senior business product manager for Google News" as explaining that "[t]here's a balance there of the benefit that we certainly get from being able to index the content, and the benefit we give to publishers in the form of traffic"). For Google, the indexed content allows it to deliver higher-quality search results to users, which produces more engagement and more ad revenue. *Id.* ¶ 40. The dynamic is similar for online news publishers. More search traffic to their sites means more engagement and more ad revenue, which allows them to produce better content. *Id.* ¶ 127.

But because publishers of online news "are dependent on Google's monopoly product—search referrals—Google can coerce them to supply news, without pay." *Id.* ¶ 153. And Google does this in a way that allows them "to attempt to monopolize the online news market." *Id.* ¶ 151. This conduct takes two primary forms. The first involves its GenAI offerings. Google uses publishers' news content without compensation both to train its GenAI products and to "ground" them, which is a process that enables GenAI products to produce results about current events. *Id.* ¶¶ 151–152. Publishers can opt their content out of training or grounding Google's GenAI

4

products, but it comes at a cost: organic links to their websites will no longer appear at the top of Google's SERPs, which gets the most views and clicks. *Id.* ¶¶ 155–158. Not appearing as a top organic link reduces search traffic to publishers' sites. *See id.* Publishers also cannot revoke content already used to train Google GenAI products. *Id.* ¶ 156.

Second, Google republishes online news content "above the fold" on Google's SERPs, "giving itself the default position as the front page of the news." *Id.* ¶ 151. Google does so in the form of features like People Also Ask, Featured Snippets, and AI Overviews (formerly known as Search Generative Experience, or SGE), which are natural language answers or suggestions provided in response to a user query, *see id.* ¶¶ 170–178, 228–229, and that appear at the top of Google's SERPs, *id.* ¶¶ 157–158. Because these features essentially aggregate and summarize publishers' original news content, users are likely to be satisfied with the response returned and forego clicking and navigating to the original news content used to create those summaries, thereby decreasing search traffic to publishers' websites. *Id.* ¶¶ 157–161, 302. Publishers who wish to restrict Google from republishing their content through such features can only do so at the expense of being downgraded on the SERP, which also leads to lower search traffic. *Id.* ¶ 157.

Google uses its monopoly power in other ways to online publishers' detriment. For instance, it conditions publishers' use of its search optimization tools. *Id.* ¶ 162. Publishers can optimize search traffic through tools such as the Google Publisher Center and Google Search Console. *Id.* But to use these tools, Google requires online publishers to give Google "a perpetual, irrevocable, worldwide, sublicensable, royalty-free, and non-exclusive license to Use content submitted." *Id.*

Google also can boycott entire regions where publishers seek legislative solutions to nonpayment of such licenses. For example, Google responded to lawmakers' attempts in Spain,

5

Australia, Canada, and recently California at requiring Google to negotiate payments with publishers by blocking access to news in those regions. *Id.* ¶¶ 163–165.

As a result of all this, Plaintiffs contend, "Google Search is now a publishing platform for news that competes with other Publishers for attention, user engagement, and ad revenue." *Id.* ¶ 182.

At no point in these interactions between publishers and Google is there an exchange of money. *See id.* ¶ 119. This self-evidently benefits Google and harms online news sites. By indexing and republishing their original content without paying a fee, Google maintains artificially low costs of production in online news publishing, while at the same time raising publishers' costs of customer acquisition, data acquisition, and protective measures (like paywalls) and diminishing their ability to bear these costs. *Id.* ¶¶ 131–136.

## B.   Google's Acquisitions

According to Plaintiffs, Google's myriad of acquisitions has allowed it to dominate the market for general search services. *Id.* ¶ 60. Plaintiffs focus on three: Android, YouTube, and DeepMind. In all three cases, Plaintiffs contend, "[a]t the time of approval of these acquisitions, it was neither known nor foreseen that the newly created structures would in fact be used to substantially lessen competition in lines of commerce related to Google's general search services monopoly, including in ads, [GenAI], and digital news and content publishing." *Id.* ¶ 79.

### 1.   Android

Google acquired Android in 2005. *Id.* ¶ 65. Android is among the largest mobile operating systems in the world and in the United States. *Id.* ¶ 66. As of the filing of Plaintiffs' Amended Complaint, Google maintained exclusive distribution agreements with Android device manufacturers to set Google Search as the default search engine on various key search access

points. *Id.* ¶¶ 66–69; *see Google Liability*, 747 F. Supp. 3d at 97–106 ¶¶ 348–398. Plaintiffs allege that "Google has also continually developed new uses for Android devices," including in 2024, when it launched Gemini Nano, a GenAI product that "enable[s] Google to publish [GenAI]-generated summaries of online news content" and "give[s] Google's [GenAI]-generated news content a default distribution position on Android devices." Am. Compl. ¶ 70.

### 2. *YouTube*

Google acquired YouTube, a digital video platform, in 2006. *Id.* ¶ 71. The SERPs Google delivers in response to news-related queries often include a "Videos" panel that links directly to YouTube "regardless of whether a different third-party publisher originally served the YouTube video from a news article or webpage outside of YouTube." *Id.* ¶ 72. For example, when Plaintiff Helena World Chronicle published on its website controversial body-worn camera footage it obtained through a public records request, Google Search users who encountered that video were diverted to a YouTube channel that had copied that video from Plaintiff's website rather than to Plaintiff's website itself. *Id.* ¶ 74.

Plaintiffs allege that Google has expanded the uses of YouTube since its acquisition, citing a 2012 finding by the Pew Organization that YouTube had "become a news publisher of its own." *Id.* ¶ 73. In 2023, Google announced that it would use GenAI to expand the types of content available on YouTube. *Id.* ¶ 75. And YouTube now offers GenAI-powered features that help content creators generate ideas for videos, make individualized suggestions to creators, and provide video summaries. *Id.*

### 3. *DeepMind*

Google acquired the AI company DeepMind Technologies in 2014. *Id.* ¶ 76. DeepMind started out creating neural network models designed to mimic human short-term memory, which

are the predecessor of today's GenAI platforms and integrations.  *Id.* ¶ 77; *see Google Remedies*, 803 F. Supp. 3d at 45 ¶ 5 (explaining neural models).  Plaintiffs contend that DeepMind's mission "changed significantly" in 2023, when it merged with Google's existing Google Brain division to form Google DeepMind.  *Id.* ¶ 77.  The integration of GenAI into Google's SERPs, Plaintiffs maintain, entrenched Google's "walled garden" search engine "by enabling it to publish to users exponentially more of the news content Google misappropriates from news Publishers, without users ever needing to leave Google's SERP."  *Id.* ¶ 78.

## C.     Plaintiffs' Claims

The geographic market for all Plaintiffs' claims is the United States.  *Id.* ¶¶ 333, 365.

Count I of Plaintiffs' Amended Complaint alleges violations of Sections 2 and 3 of the Sherman Act in the general search services market.  Plaintiffs argue that "Google has unlawfully maintained and abused its monopoly in the general search market through a 'monopoly broth' of anticompetitive acts," including entering into exclusionary contracts with browser and device manufacturer partners; forcing Apple to forego developing its own GSE; acquiring companies like Android, DeepMind, and YouTube; gathering and republishing cost-free news content; prematurely launching the GenAI product Bard, now Gemini; and spoliating evidence.  *Id.* ¶ 335. As a result of such acts, "[o]ver 95% of all search traffic referrals to Publishers are sold by Google." *Id.* ¶ 337.

Count II alleges violations of Sections 2 and 3 of the Sherman Act in the online news market.  Plaintiffs contend that Google is a participant in this market in five simultaneous ways: as "(1) a downstream publisher of content to consumers, (2) a purchaser of upstream news content, (3) a seller of search distribution to Publishers, (4) a seller of news production products to Publishers, and (5) a seller of ad space and ad services to Publishers."  *Id.* ¶ 363.  Plaintiffs estimate

that Google's share of the online news market is 66% because, between March 2023 and March 2024, Google.com (including "news.google.com" and "gemini.google.com") and YouTube.com collectively received more than 767.8 billion visits. *See id.* ¶¶ 121–122, 366; *see also id.*, App. A, ECF No. 27-1 [hereinafter App. A]. According to Plaintiffs, this makes Google "by far the largest publisher of online news in the U.S." *Id.* ¶ 366.

Count III alleges an unlawful tying agreement in violation of Sections 1 and 3 of the Sherman Act. In their Amended Complaint, Plaintiffs identify the tying product as "the provision of search traffic in the general search market" and the tied product as "news content for republishing and AI training in the upstream supply chain of the online news market." *Id.* ¶ 376. But in their opposition, Plaintiffs attempt to replead, now identifying the tying product as "general search services provided by Google" and the tied product as "'Search Generative Experience'-- SGE (now AI Overviews)." Pls.' Opp'n to Defs.' Mot. to Dismiss the Am. Compl., ECF No. 40 [hereinafter Pls.' Opp'n], at 35–36.

Count IV alleges violations of Section 7 of the Clayton Act. Plaintiffs assert that Google's acquisitions of Android, YouTube, and DeepMind substantially lessened competition or tended to create a monopoly in various lines of commerce or activities affecting commerce, "including general search services, online news and digital ad[s]." *Id.* ¶ 390. Though these acquisitions occurred in 2005, 2006, and 2014, respectively, Plaintiffs allege that the extent of Google's violations did not become clear until 2023, after the launches of Gemini and AI Overviews and the disclosure of trial exhibits during the *Google Liability* proceedings. *See id.* ¶ 393.

Finally, Count V alleges that the 2016 Information Services Agreement, or ISA, between Google and Apple violates Sections 1 and 3 of the Sherman Act. *Id.* ¶¶ 398–405. Plaintiffs claim that Google and Apple unlawfully colluded to exchange (1) Google's default distribution on

Apple's products and Apple's foregoing entering the general search services market for (2) enormous ad-revenue shares.  *Id.* ¶ 400; *see also Google Liability*, 747 F. Supp. 3d at 89–96 ¶¶ 290–332 (describing the history of the ISA and Apple's negotiations with other search engines). Plaintiffs characterize this as an unlawful "agreement among potential competitors to reduce competition" in the general search services market.  Am. Compl. ¶ 401.

Plaintiffs bring these claims individually and on behalf of "[a]ll Publishers of text-based digital news products that publish such content online, who are domiciled in, or have offices in, the U.S., and whose websites have been indexed by Google during the period from November 1, 2019, to the date on which this Class is certified."  *Id.* ¶ 320.  Their primary harms include lost profits, higher costs of production, and lost licensing fees.  *See, e.g.*, *id.* ¶ 349.

The end result of Google's monopolies, Plaintiffs contend, is a "death blow to America's already ailing news industry."  *Id.* ¶ 13.

## III.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court must accept as true all factual allegations contained in the complaint, *Twombly*, 550 U.S. at 556, and construe the complaint in the plaintiff's favor, *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).  But it must not do the same for "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor should it "accept inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint," *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023).

In antitrust cases, the plaintiff must allege sufficient "fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]," *Twombly*, 550 U.S. at 556,

and the court must bear in mind that, while "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery," it is "quite another to forget that proceeding to antitrust discovery can be expensive," *id.* at 558 (internal citations omitted). Ultimately, the district court "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.*

## IV.    DISCUSSION

### A.    General Search Services

Counts I, III, IV, and V are premised in whole or in part on Google's alleged monopoly in the general search services market. To survive a motion to dismiss, Plaintiffs must plausibly establish that they have antitrust standing as to these claims. They have not.

While all plaintiffs in federal court must demonstrate Article III standing, a private antitrust plaintiff must also show antitrust standing. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Chief among the requirements of antitrust standing is antitrust injury. *Andrx Pharms. v. Biovail Corp.*, 256 F.3d 799, 812 (D.C. Cir. 2001) (citing 2 Phillip E. Areeda et al., *Antitrust Law* ¶ 337a (2d ed. 2000)). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 125 (1969) (a cognizable antitrust injury is "the type of loss that the claimed violations . . . would be likely to cause"); *see also* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 337a (5th ed. & Supp. 2025) [hereinafter Areeda & Hovenkamp] ("[A]n antitrust violation can cause many types of injury, but only some of these are antitrust injury."). The injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," *Brunswick*, 429 U.S. at 489, and it is not enough that the injury is merely

11

"causally related to an antitrust violation," *Atl. Richfield*, 495 U.S. at 334.  In other words, "the antitrust standing inquiry turns on whether the plaintiff is a participant in the relevant market and 'suffered its injury in the market where competition is being restrained.'"  *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 44 (D.D.C. 2024) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)); *accord In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016).

Plaintiffs claim to be participants in the general search services market with antitrust standing under two theories.  Primarily, Plaintiffs fashion themselves as "suppliers" of "quality content for Google's index."  Am. Compl. ¶ 119; *see id.* ¶ 40 ("Google provides *search traffic referrals* to Publishers in exchange for *content*, which Google obtains via crawling and indexing websites.").  Alternatively, and simultaneously, Plaintiffs describe themselves as "direct purchasers of search traffic from Google."  *Id.* ¶ 348.  Neither theory holds water.

### 1.      Supplier Theory

"While consumers and competitors are most likely to suffer antitrust injury, there are situations in which other market participants can suffer antitrust injury."  *Am. Ad Mgmt.*, 190 F.3d at 1057 (citing Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (1995 & 1998 Supp.)).  For example, a supplier may be a participant in a market where competition is being restrained when buyers in that market form a cartel to lower the price of the supplied product.  *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995).  A supplier in that case has suffered an antitrust injury because its harms flow directly from the anticompetitive conduct.  *See Brunswick*, 429 U.S. at 489; *South Dakota v. Kan. City S. Indus., Inc.*, 880 F.2d 40, 47 (8th Cir. 1989) ("Suppliers are allowed standing only if they were directly involved in the market."); *accord* 2A Areeda & Hovenkamp

12

¶ 391b2 ("[S]uppliers who receive prices below the competitive level . . . selling in a cartelized market . . . are comparable to the direct purchasers from a seller's cartel.").

But "[a] supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010); *see also SAS of P.R.*, 48 F.3d at 44 ("[In general,] the supplier who suffers because an antitrust violation curtails a business that would otherwise have purchased from the supplier . . . is held not to have suffered 'antitrust injury'; while there may be a violation and a causal harm to the supplier, the failed business is the immediate victim and the preferred plaintiff." (emphasis omitted) (citing 2 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 375 (rev. ed. 1995))); *accord* 2A Areeda & Hovenkamp ¶ 350c ("When the [anticompetitive conduct] is unlawful because of its actual or potential effects downstream, the supplier is not a participant in that market." (emphasis omitted)).  In that situation, the supplier is not comparable to "a customer who obtains services in the threatened market or a competitor who seeks to serve that market," *SAS of P.R.*, 48 F.3d at 44, so the supplier's injuries are deemed "too secondary and indirect to be considered 'antitrust injuries,'" *see Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) (citation omitted).

That is precisely the mold of Plaintiffs' supplier theory and for that reason they lack antitrust standing.  Plaintiffs allege that "Google and news Publishers have a transactional arrangement in which Publishers supply quality content for Google's index in exchange for Google supplying search traffic to Publishers' websites," Am. Compl. ¶ 119, and that "[i]n a competitive general search market, [Plaintiffs] could have bargained with other general search engine providers for better terms of trade," *id.* ¶ 350.  Plaintiffs therefore plead that they are suppliers to the general search services market where competition is impaired—in other words, that "competition is

reduced in the downstream market in which [Plaintiffs] sell[] goods or services." *See W. Penn Allegheny*, 627 F.3d at 102.

The injuries Plaintiffs allege prove this point. Plaintiffs assert that "Google's exclusionary conduct stifles competition in the general search market" by "depriving rivals of scale necessary to improve or maintain quality," "reduc[ing] the incentives for Google, current rivals, potential entrants, and distributors to compete on quality and price," "depriv[ing] consumers of choice and quality in the general search engines available on the market," and "foreclos[ing] competition in the sale of search traffic to Publishers." Am. Compl. ¶¶ 341–347; *see also* Pls.' Opp'n at 11 ("The [Amended Complaint] alleges harm in the general search services market . . . ."). These may very well be the result of "stifle[d] competition in the general search market." But they are exactly that: a reduction in competition in the *downstream market*—that is, the general search services market—to which Plaintiffs supply their content.

The harms Plaintiffs *themselves* allegedly suffer are not within the general search services market at all. By Plaintiffs' own description, the general search services market consists of "general search engines, which are 'one-stop shops' consumers can use to search the internet for answers to a wide range of queries." Am. Compl. ¶ 332 (quoting *United States v. Google LLC* (*Google Summary Judgment*), 687 F. Supp. 3d 48, 56 (D.D.C. 2023)). By contrast, Plaintiffs are publishers of "text-based digital news products that publish such content online" who have allegedly "suffered lost profits from diverted customers, higher average costs of production, and lost licensing fees" specifically as publishers of online news, not as general search engines. *Id.* ¶¶ 320, 349. Nowhere do Plaintiffs grapple with Defendants' argument that these are not harms experienced in the general search services market. *See* Defs.' Mot. to Dismiss the Am. Compl., ECF No. 38 [hereinafter Defs.' Mot.], Mem. of P. & A. in Supp. of Defs.' Mot., ECF No. 38-1

[hereinafter Defs.' Mem.], at 6–7.  Nor can the court see how such harms could be.  Plaintiffs are precisely those "[p]arties whose injuries, though flowing from that which [allegedly] makes the defendant's conduct unlawful, are experienced in another market."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).  Such parties "do not suffer antitrust injury."  *Id.*

Plaintiffs offer little in response.  They do no more than assert that suppliers may sometimes have antitrust standing and state in conclusory fashion that the injuries alleged "constitute not merely Article III injury, but antitrust injury."  Pls.' Opp'n at 9–12 (emphasis omitted).  They offer no other reason to conclude that the injuries alleged are not "too secondary and indirect to be considered 'antitrust injuries.'"  *See Serfecz*, 67 F.3d at 597 (citation omitted).  At least as to the supplier theory, Plaintiffs have not adequately pleaded antitrust standing as to claims concerning the general search services market.

### 2.    *Purchaser Theory*

Plaintiffs describe themselves as simultaneously "direct purchasers of Google's search referral services and unwitting suppliers to Google of news input."  Am. Compl. ¶ 16.  To start, the court cannot see how this can be.  If Plaintiffs "sell" their content to Google in exchange for search traffic but also purport to buy this search traffic, then search traffic would be both the good purchased from Google and the consideration furnished to Google for that purchase.  It cannot be both.

But even as pleaded in the alternative, Plaintiffs' purchaser theory fails.  Simply put, Plaintiffs have not pleaded any facts to support it.  The Amended Complaint does not allege that Google sells to publishers the placement of organic search results in exchange for either money or content.  Plaintiffs offer no well-pleaded facts to support any such commercial agreement.

15

The court knows from experience that Google crawls the web, or takes a copy of as much of the web as possible, to build its search index. *Google Liability*, 747 F. Supp. 3d at 38 ¶ 28. This involves crawling the HTML on websites and then crawling again the links within those web pages. *Id.* Google does this recursively because the web is constantly changing and growing. *Id.* Google generally does not pay—in dollars or in kind with search traffic—to crawl, and Plaintiffs have not offered well-pleaded facts to the contrary. They do not claim to have entered into any written or oral commercial agreement whereby they provide money or news content to Google as consideration for search referrals; they allege no actual agreement to purchase of any kind. *Cf.* Am. Compl. ¶ 16 (alleging they are "*unwitting* suppliers to Google of news input" (emphasis added)). Instead, they cryptically claim that they have a "transactional arrangement" with Google to supply news content in exchange for search traffic. *Id.* ¶ 119. That is a "legal conclusion couched as a factual allegation" that the court is not bound to accept as true. *Papasan*, 478 U.S. at 286. At most, Plaintiffs have pleaded that Google crawls the web and acquires at no cost content from online news sites, which voluntarily make their data available in the hope that Google users will navigate there by clicking links that appear on the SERP. Online news publishers are in no sense purchasers in that scenario.

The closest the Amended Complaint comes to a factual pleading to support the purchaser theory is that Google "has simultaneously imposed [an] overcharge on Plaintiffs and the Class, in the form of forced, royalty-free licensing, and a reduction of outputs, in the form of zero-click searches and dwindling search traffic." Am. Compl. ¶ 348. And in their opposition, Plaintiffs state without more that "Google refers general search traffic to Publishers who function as its customers in that respect. Google also extracts content data from Publishers that it uses as an input [in] its search results" and that "[t]hese interactions alone are sufficient to establish that Publishers

16

are customers of Google in the United States search market." Pls.' Opp'n at 9 (emphases omitted). But this only explains the way Google acquires and uses publishers' data. Plaintiffs' mere characterization that they are "overcharge[d] . . . in the form of forced, royalty-free licensing" does not plausibly make them "customers in that respect." *Cf. Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). Plaintiffs have not plausibly alleged they are purchasers in the market for general search services.

*   *   *

Antitrust standing must be established as to each claim, *see Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 981 (D.C. Cir. 2017), and the court must reject claims for which the plaintiff cannot establish antitrust standing, *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) (en banc). Because Plaintiffs have not pleaded sufficient facts to establish antitrust standing in the general search services market, the court dismisses Counts I and V in their entirety and Counts III and IV insofar as they relate to that product market.

### B.    Online News

Counts II, III, and IV are premised in whole or in part on Google's alleged monopoly or attempted monopoly in the online news market. Defendants argue that claims related to the online news market should be dismissed for several reasons, including that Plaintiffs fail to plausibly allege that (1) online news is a relevant product market, (2) Google possesses monopoly power in that market (or a dangerous probability of achieving it), or (3) Google engaged in any exclusionary conduct. *See* Defs.' Mem. at 17–18. The court will assume without deciding that Plaintiffs have pleaded a relevant market. *See Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 590 (D.D.C. 1995) (explaining that defining a relevant market is an "essential element[]" of a monopolization

17

claim).  The more obvious reason to dismiss these claims is that Plaintiffs have not plausibly established that Google has monopoly power in the online news market.

There are two elements to a violation of Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *accord United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (per curiam).  "Monopoly power is the power to control prices or exclude competition."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *Microsoft*, 253 F.3d at 51 ("More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level." (citing 2A Areeda et al., *Antitrust Law* ¶ 501, at 85 (1995))).  And "[w]hile merely possessing monopoly power is not itself an antitrust violation, it is a necessary element of a monopolization charge."  *Id.* (internal citations omitted).  The possession of monopoly power may be proven with direct or indirect evidence, but because the former is rare, monopoly power is often "inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."  *Id.*

Plaintiffs' primary factual allegation that Google possesses "a dominant share" of the online news market rests on the contention that "Google has an estimated market share of 66%."  Am. Compl. ¶¶ 122, 189, 198.  As support, Plaintiffs point to Appendix A of their Amended Complaint ("Traffic Data Chart") and a bar graph and pie chart contained in paragraphs 121 and 122, respectively, that help visualize the data in the Traffic Data Chart.  *See id.* ¶¶ 121–122.  These figures purport to show that, between March 2023 and March 2024, 66% of "Total U.S. Visits" to the "top 215 news sites" were collectively to Google.com, including "Search/News/Bard" and "gemini.google.com," and YouTube.com.  *See id.*; App. A.  Among the other "top 215 news sites" are Reddit.com, Facebook.com, Yahoo.com (including News and Finance), Wikipedia.org,

18

DuckDuckGo.com, Twitter.com, Instagram.com, Bing.com, and TikTok.com. Am. Compl. ¶ 121. Of these, the second and third most trafficked "news sites" are Reddit.com (4.5%) and Facebook (4.2%). *Id.* ¶ 122.

It is important to unpack Plaintiffs' market share theory. The numbers on which they rely reflect "*total*" visits to a site, regardless of purpose. Because 66% of *all* visits to these websites were to Google.com, YouTube.com, or gemini.google.com, Plaintiffs infer that Google possesses that same share of 66% in the online news market. That inference is utterly fanciful. It is at once both wildly overinclusive and underinclusive.

The number is overinclusive because the Traffic Data Chart captures *every* visit to these websites regardless of whether the visit's purpose is to seek news content. That may be a reasonable inference for obvious online news sites like FoxNews.com and NYTimes.com, which appear on the Chart. *Id.* ¶¶ 121–122; App. A. But it is certainly not for the likes of Google.com, YouTube.com, Reddit.com, Facebook.com, Instagram.com, and other general search engines (e.g., Bing and DuckDuckGo) or social media sites (e.g., Twitter and TikTok). The way Plaintiffs see it, a visit to YouTube.com to watch an old music video, to Instagram.com to view a loved one's social media posts, or to Reddit.com to join a thread about the best cookies in the District of Columbia each count towards defining online news market shares. That presumption is no less absurd for visits to Google.com. For example, it fails to account for navigational queries—queries that reflect a user's intent to navigate directly to a particular website, such as to Amazon.com— which make up a large portion of Google's queries. *See Google Liability*, 747 F. Supp. 3d at 40 ¶ 39 ("[A]t a given time, Google's top five queries by query volume are navigational queries, and nearly 12% of all Google queries are navigational queries." (internal citations omitted)). Nor does it account for commercial queries—queries seeking information on a product or service—which

also constitute a substantial fraction of Google's queries.  *Id.* at 40 ¶ 38 ("Commercial queries . . . constitute . . . 20% of Google's queries."); Am. Compl. ¶ 118.[2]  Plaintiffs themselves acknowledge that "[c]onsumers use general search engines to search the internet for *all* information needs."  Am. Compl. ¶ 332 (emphasis added).  Yet, they have offered nothing to discern how many of the 767.8 billion visits to Google.com and YouTube.com collectively between March 2023 and March 2024 were for the purpose of seeking news.

Plaintiffs' market share figure is overinclusive in another respect.  Among the 427.5 billion visits to Google.com are visits to "gemini.google.com," or Gemini (then known as Bard), Google's GenAI chatbot.  *Id.* ¶ 121.  While there are certainly overlapping use cases between GSEs and chatbots, chatbots have a multitude of use cases that GSEs do not.  *See Google Remedies*, 803 F. Supp. 3d at 47–48 ¶ 13.  To incorporate such uses into the baseline share calculation for the online news market underscores how completely untethered it is from reality.

At the same time, the number is underinclusive because, although it includes visits to these websites from "[a]ll [d]evices," Am. Compl. ¶¶ 121–122, it does not appear to capture visits to these platforms through mobile applications.  That the Traffic Data Chart counts visits to specific URLs suggests these are only visits through browsers, even if on a mobile device.  *See Google Liability*, 747 F. Supp. 3d at 45 ¶ 64 (distinguishing visits through the Google Search app from visits to www.google.com); *id.* at 44 ¶ 58 (listing search applications and direct web searches to a specific URL as distinct search access points); *cf. id.* at 60 ¶ 155 (recognizing that a certain statistic

---

[2] The Amended Complaint alleges that, in the *Google Liability* proceedings, Google's expert witness Dr. Mark Israel "confirmed that news is central to Google's business model, testifying . . . that 80% of Google searches are for informational content; commercial queries make up 20%."  Am. Compl. ¶ 118; *see also id.* ¶ 338; *Google Liability*, 747 F. Supp. 3d at 40 ¶¶ 37–38.  That assertion grossly mischaracterizes Dr. Israel's testimony.  He never equated noncommercial queries with queries for news content.  The 80% figure represents queries that simply are not commercial, that is, queries where the user expresses a commercial intent.  *Google Liability*, 747 F. Supp. 3d at 40 ¶¶ 37–38.  The 80% captures navigational queries, which can be commercial or noncommercial, *id.* at 40 ¶ 39, and, more significantly, the infinite variety of searches that have nothing to do with current events.  Dr. Israel's testimony provides no support for Plaintiffs' 66% market share allegation.

as to online traffic "omits traffic through mobile applications"). The purported market share figures therefore do not reflect visits to popular news apps like The New York Times, CNN, Fox News, and The Washington Post. The Traffic Data Chart's failure to account for app visits makes Plaintiffs' market share figures unreliable.

The only retort Plaintiffs offer is that, even if it were true that the numbers are overinclusive, "the gap between visits to Google/YouTube and visits to others is so huge that Google/YouTube would still dominate." Pls.' Opp'n at 32. Maybe, maybe not. Plaintiffs cannot rely on pure conjecture to establish market share to allege monopoly power. Plaintiffs' "huge" gap premise is no more than that.

And in any case, possessing a large market share is alone insufficient to establish monopoly power. *See Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975) ("[I]t is now well settled that market share, while being perhaps the most important factor, does not alone determine the presence or absence of monopoly power."). Additional allegations evidencing market power, such as high barriers to entry, are needed. *See Microsoft*, 253 F.3d at 51 (citing *Grinnell*, 384 U.S. at 571); *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990) ("Time after time, we have recognized this basic fact of economic life: A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors." (citation omitted)). But Plaintiffs fail to provide those, too. In fact, they have admitted that it is "relatively easy to enter the online news market," Am. Compl. ¶ 124, and that there are at least "215 major online news outlets," *id.* ¶ 5 n.3. Although they go on to say that the "market has a high failure rate" and that "scale and network effects often determine the commercial viability of online news publishers," *id.* ¶¶ 124–128, these do not amount to a

sufficient pleading that Google "prevent[s] new rivals from timely responding" were it, say, to degrade its product in the online news market, *see Microsoft*, 253 F.3d at 51.

This is not a fact issue, as Plaintiffs argue, that cannot be resolved at the motion to dismiss stage. *See* Pls.' Opp'n at 32. Plaintiffs cite *Fotobom Media, Inc. v. Google LLC* and *FTC v. Facebook, Inc.* (*Facebook III*) to make this point. *Id.* But the deficiencies in Plaintiffs' pleadings do not resemble the issues raised in *Fotobom* or *Facebook III*.

In *Fotobom*, this court held that Google's alleged market share as an indicator of monopoly power in the Android keyboard application product market could survive a motion to dismiss. Although it was a "close call," a plausible inference could still be made from the facts alleged that Google held a "market share of greater than 50 percent." 719 F. Supp. 3d at 53–54. Such facts included relative download figures for Google's keyboard and rival keyboard apps, widespread preloads of Google's product, and publications touting Google as the market leader. *Id.* Plaintiffs allege no similar facts here.[3] And in *Facebook III*, the court permitted the plaintiff's allegations of market share to proceed to discovery over the defendant's objection that the data underlying the allegations was unreliable, because reliability of data was an issue to be had out in a "battle of the experts," not by the court on a motion to dismiss. 581 F. Supp. 3d 34, 48 (D.D.C. 2022). In this case, no expert is needed to find that Plaintiffs' market share data is "unreliable." No credible expert would calculate market share in the way Plaintiffs have: by simply extrapolating the percentage share of all URL visits, regardless of purpose, into share percentages of a discrete market for online news, which is characterized by low barriers to entry and hundreds of competitors. More is needed to plausibly allege monopoly power.

---

[3] Plaintiffs do allege that Microsoft President Brad Smith submitted written testimony to the House Judiciary Committee in 2021 stating that "Google has effectively transformed itself into the 'front page' for news, owning the reader relationship and relegating news content on their properties to a commodity input." Am. Compl. ¶ 166. Without more, this statement from a direct competitor is not enough to establish even an inference of market power.

The court is not to "accept inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint." *Langeman*, 88 F.4th at 294. Because there can be no violation of Section 2 of the Sherman Act without well-pleaded allegations of monopoly power and because the inferences Plaintiffs maintain as to monopoly power in the online news market are not borne out by the facts set out in the Amended Complaint, the court dismisses Count II in its entirety and Counts III and IV insofar as they concern an online news market.

## C.    Tying

Count III of the Amended Complaint alleges that Google was engaged in an unlawful tying arrangement. Specifically, it maintains that "the provision of search traffic in the general search market" (the tying product) was conditioned on Plaintiffs providing Google with "news content for republishing and AI training in the upstream supply chain of the online news market" (the tied product). Am. Compl. ¶ 376. But in their opposition, Plaintiffs submit that counsel "inartfully pled" the tied product in the Amended Complaint and provide that "they are willing to rectify the problem by repleading Count Three." Pls.' Opp'n at 35. What they apparently "meant to say" was that the tying product is "general search services provided by Google" and that the tied product is "SGE"—or Search Generative Experience—"(now AI Overviews)." *Id.* at 36.

To start, Plaintiffs cannot replead their claim in their opposition brief. *See Schmidt v. United States*, 749 F.3d 1064, 1069 (D.C. Cir. 2014). Defendants moved to dismiss the claim in the Amended Complaint on multiple grounds. *See* Defs.' Mem. at 27–33. Because Plaintiffs' opposition does not even attempt to defend the claim as alleged in the Amended Complaint, Plaintiffs have effectively abandoned and conceded it. *See CSX Transp., Inc. v. Com. Union Ins.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996).

23

But the court believes Plaintiffs' reframed tied product is also not quite what they "meant to say," either.  As explained below, what Plaintiffs likely meant to plead is that the tied product is not AI Overviews but the Gemini chatbot.

In any event, regardless of how Plaintiffs might have pleaded the tied product, Count III falls flat.  The court does not need to consider whether Plaintiffs have adequately pleaded an unlawful tying arrangement under either a per se or rule of reason theory, a relevant market, or harm to competition.  *See* Defs.' Mem. at 30–32; Pls.' Opp'n at 35–36.  On all three versions of their unlawful tying claim, Plaintiffs fail from the jump to allege a tying arrangement at all.

### 1.    *Tying Arrangements*

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958).  To establish unlawful tying, the plaintiff must show that (1) the arrangement involves two (or more) separate products and (2) the seller "force[s] the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995 (9th Cir. 2023) (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)); *see also Microsoft*, 253 F.3d at 85 (setting forth the four elements of a per se tying claim, including "the tying and tied goods are two separate products" and "the defendant affords consumers no choice but to purchase the tied product from it"); *accord* 10 Areeda & Hovenkamp ¶ 1752.

24

### 2.    *"News Content" as Tied Product*

Although conceded, for completeness, the court will address Plaintiffs' tying claim as it appears in the Amended Complaint.  Recall, as originally pleaded, Plaintiffs assert that search traffic is the tying product and news content is the tied product.

What Plaintiffs describe is not the buying of two separate products, but rather a single exchange: Google's "provision of search traffic" for Plaintiffs' "news content for republishing and AI training."  *See* Am. Compl. ¶ 376.[4]  If anything, it is Google who is "buying" the purported tied product (news content), not Plaintiffs.  The exchange is therefore characterized more accurately as a sale of one product conditioned on the reciprocal supply of another, not a purchase conditioned on another purchase.  *See id.* ¶ 380 ("Google has conditioned the sale of search traffic on the supply of news content . . . .").  Coercive or not, *see id.* ¶ 374, this is simply not a tying arrangement in the way courts have understood it.  *Cf.* 10 Areeda & Hovenkamp ¶ 1779 (describing the situation where "defendant who sells product #1 only on the condition that the buyer agree to sell product #2 to the defendant" as one to which courts have never applied the per se rule but rather have chalked up to "hard bargaining"); *Fotobom*, 719 F. Supp. 3d at 50–51 (permitting tying claim to proceed over motion to dismiss because the tying product (GSuite) contained a bundle of "must-have" applications that could plausibly force Android carriers and manufacturers to preload the tied product (Gboard)).

### 3.    *Gemini as Tied Product*

Plaintiffs' repleaded tying claim is that "the tying product is general search services provided by Google" and "the tied product is [AI Overviews] that Google began to provide in

---

[4] The court here accepts Plaintiffs' characterization of their own pleading.  As earlier discussed, Plaintiffs have not plausibly alleged that they "buy" traffic referrals from Google at all, as Plaintiffs have no agreement with Google to pay for search referrals either with money or in-kind content.  Defs.' Mem. at 28–29; *see also supra* Section IV.A.2.

2023." Pls.' Opp'n at 36. AI Overviews poses an acute threat to Plaintiffs because it is a "search experience that uses [GenAI] to provide users with overviews of search topics without having to click on individual webpages." Am. Compl. ¶ 17. Google is able to deliver this product to users because AI Overviews is trained or grounded on news content supplied by Plaintiffs. *Id.* ¶¶ 152–153, 228–239.

Defendants counter that Google Search and AI Overviews are not separate products, as required to establish a tying arrangement. Defs.' Reply in Supp. of Defs.' Mot., ECF No. 41 [hereinafter Defs.' Reply], at 18–19. They are correct. Plaintiffs' own allegations establish AI Overviews as an integrated feature of Search. Am. Compl. ¶¶ 250–251 (showing AI Overview results atop a SERP); *see also id.* ¶ 157 (describing AI Overviews as a "search feature[]" alongside People Also Ask and Featured Snippets).[5]

What Plaintiffs appear to really mean is that the tied product is Gemini. As Defendants point out, Plaintiffs' revised tying theory is based on portions of the Amended Complaint referencing Bard—now Gemini—which Plaintiffs describe as a "[GenAI] chatbot," *id.* ¶ 152. *See* Defs.' Reply at 19; Pls.' Opp'n at 36 ("[AI Overviews] is part of Google's [GenAI] platform and is a separate product from Google Search." (citing Am. Compl. ¶¶ 219, 221)). And elsewhere

---

[5] Even measured against legal standards, Google Search and AI Overviews are not separate products. "To constitute two separate products, there must be sufficient consumer demand so that it is efficient for a firm to provide the products separately." *Epic Games*, 67 F.4th at 995 (cleaned up) (quoting *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 462 (1992)); *see also Microsoft*, 253 F.3d at 86–88 (describing consumer-demand test for separate products). The inquiry "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Par.*, 466 U.S. at 19 & n.30. In response to a given user query, Google's SERPs may deliver many types of results, including organic links, ads, vertical offerings, and AI Overviews. *See* Am. Compl. ¶ 39; *see also Google Liability*, 747 F. Supp. 3d at 41–42 ¶¶ 41–45; *id.* at 52 ¶ 101; *Google Remedies*, 803 F. Supp. 3d at 45–47 ¶¶ 6–11. It is hard to imagine consumer demand for one type of Google's search results as separate from consumer demand for Google Search as a whole; demand for Google Search is inclusive of the demand for AI Overviews and any other item on Google's SERPs. *See* Am. Compl. ¶ 39 ("Operating a general search engine involves . . . assembling a SERP through a whole page ranking that incorporates organic search results and, depending on the query, search ads and other features, such as republished news content."). If AI Overviews is a separate product from Google Search, then so is potentially every other type of search result Google delivers. Plaintiffs do little more than make the conclusory assertion that AI Overviews "is a separate product from Google Search." Pls.' Opp'n at 36.

in the Amended Complaint, Plaintiffs describe AI Overviews as offering "a conversational mode, suggesting follow up questions, and enabling the user to 'chat' with [it] to ask further questions." *See* Am. Compl. ¶ 228. The subsection about "SGE" also includes many references to "Bard" and chatbots. *See id.* ¶¶ 228–239. Still, even with Gemini identified as the proper tied product, the pleadings do not make out a plausible tying arrangement.[6]

Again, Plaintiffs do not buy two products, if any. The only thing they "buy," according to them, is search traffic. They do not "buy" anything else. Instead, they claim that they are coerced to *supply* news content to Google to train Gemini models and enable AI-generated responses. But Plaintiffs do not "buy" those responses or receive any traffic from Gemini. In fact, their allegation is that Gemini diverts and reduces traffic to Plaintiffs' websites. *See, e.g.*, *id.* ¶¶ 233–234, 306. Plaintiffs attempt to defend the existence of a "coerced 'sale' of the tying and tied products" by arguing that "the price of the sale is the compelled scraping of Publishers' data for free and the concomitant loss of revenue as users flock to Google's news products derived from that scraping and leave Publishers with fewer and fewer visitors." Pls.' Opp'n at 37. But, even if that were true, it describes only a two-way exchange—search traffic for the coerced "sale" of news content. That is not an unlawful tie in the traditional sense. *See* 10 Areeda & Hovenkamp ¶ 1779.[7]

---

[6] Gemini may very well be a separate product. Gemini is not a "search feature" that appears on the Google SERP. *See* Defs.' Reply at 19. It was launched as a chatbot to compete with ChatGPT, *see* Am. Compl. ¶ 211, and as of now, GSEs and chatbots maintain some mutually exclusive use cases, *see Google Remedies*, 803 F. Supp. 3d at 47–48 ¶ 13. When Plaintiffs filed the Amended Complaint, AI Overviews contained some conversational, chat-like features. *See* Am. Compl. ¶ 228. But AI Overviews today is not a chatbot and is distinct from Gemini. *See Google Remedies*, 803 F. Supp. 3d at 55 ¶ 47 ("Bard has since transformed into the Gemini app, which is a GenAI chatbot product that relies on Gemini LLM models to produce results. AI Overviews is a GenAI search feature based on a branch of the Gemini LLM family." (internal citations omitted)).

[7] The "tying" arrangement, even as revised, may not raise anticompetitive concerns. "The anticompetitive potential, if any, is that the defendant" by conditioning the sale of its product #1 on the buyer's supply of its product #2 "preempts the supply of product #2, thereby foreclosing its own rivals from obtaining the supplies they need in order to compete with the defendant." 10 Areeda & Hovenkamp ¶ 1779. Here, there is no contention that Google's "tying" of search traffic to Plaintiffs' supply of news content for training and grounding its GenAI products has any impact on Google's rivals. The inventory or quality of news content is not diminished. Bing and DuckDuckGo, for example, can acquire it for their search and GenAI products just as Google does.

Under no theory do Plaintiffs adequately plead that there was "an agreement by [Google] to sell [search traffic] but only on the condition that [Plaintiffs] also purchase[] a different (or tied) product, or least agree[] that [they] will not purchase [search traffic] from any other supplier." *See N. Pac. Ry. Co.*, 356 U.S. at 5–6.  Count III is therefore dismissed.

### D.    Acquisitions

Count IV alleges that Google's acquisitions of Android, YouTube, and DeepMind substantially lessened competition or tended to create a monopoly "in various lines of commerce or activities affecting commerce, including general search services, online news and digital ad[s]" in violation of Section 7 of the Clayton Act.  Am. Compl. ¶ 390.  For reasons already discussed, Count IV also fails.  Plaintiffs lack antitrust standing in the general search services market. *See supra* Section IV.A.  And assuming an online news market exists, Plaintiffs have failed to establish market power, which is also a critical element of a Section 7 claim.  *See supra* Section IV.B; *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 274 (8th Cir. 2004) ("Section 7 of the Clayton Act . . . requires proof of market power; in fact, the main purpose of section 7 is to limit mergers that increase market power." (omission in original) (internal quotation marks and citation omitted)); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) ("Merger enforcement, like other areas of antitrust, is directed at market power." (internal quotation marks and citation omitted)); 2B Areeda & Hovenkamp ¶ 531a (observing that defining a relevant market is "typically not a goal in itself" but rather a mechanism to determine the plausibility that a defendant's conduct will "create, enlarge, or prolong market power").  As for the "digital ad[s]" market, Plaintiffs nowhere define such a market.  That Section 7 claim therefore does not even leave the starter's gate. *See United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593

28

(1957) ("Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act.").

But independently, Count IV is also time-barred under the statute of limitations.

### 1.      Clayton Act Repose

Section 7 of the Clayton Act prohibits "acquisition[s]," "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18. An "acquisition" under Section 7 is "not a discrete transaction but a status which continues until the transaction is undone."  *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 242 (1975). Section 7 therefore does not ban "only the initial transaction of acquisition"; it also includes "a ban against holding certain assets."  *Id.* at 241.  In other words, "'acquisition' can mean, and in the context of [Section] 7 of the Clayton Act does mean, both the purchase of rights in another company and the retention of those rights."  *Id.*

Because Plaintiffs seek both damages and equitable relief, *see* Am. Compl. ¶¶ 396–397, Sections 5 and 16 of the Clayton Act are relevant.  For claims seeking damages under Section 7, Section 5 of the Clayton Act imposes a limitations period of four years.  15 U.S.C. § 15b. For claims brought by private plaintiffs seeking injunctive relief under Section 16, the equitable doctrine of laches applies, which "bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002).  *See New York v. Meta Platforms, Inc.*, 66 F.4th 288, 296 (D.C. Cir. 2023) ("[E]ntities entitled to sue for an antitrust injunction are . . . subject to 'the same conditions and principles' for injunctive relief applicable in courts of equity.  One of those 'conditions' or 'principles' is laches." (internal citations omitted)).  Both the limitations and laches periods are measured by the time lapsed "between accrual of the claim and suit."  *Gull Airborne Instruments,*

29

*Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982); *see also Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014).

Defendants argue that the causes of action as to the acquisitions of Android, YouTube, and DeepMind accrued in 2005, 2006, and 2014, respectively, on the dates the acquisitions occurred— nearly 10 to 20 years *before* this lawsuit was filed. *See* Defs.' Mem. at 34–35. Plaintiffs' primary argument is that, notwithstanding the dates of those acquisitions, the causes of action did not accrue until around 2023, after the launches of Gemini and AI Overviews and the disclosure of trial exhibits in the *Google Liability* proceedings. *See* Pls.' Opp'n at 38–39. Moreover, Plaintiffs characterize Google's alleged "anticompetitive maintenance and abuse of its dominant position" as "continuous" and allege that the uses of Android, YouTube, and DeepMind have "expanded significantly under Google's ownership." Am. Compl. ¶¶ 392–393.

Although the statute-of-limitations and laches analyses are somewhat overlapping, *see infra* Section IV.D.3, and the parties' arguments blur them at times, the court addresses them separately, starting with the statute of limitations.

### 2.    *Statute of Limitations*

In general, a Section 7 acquisition challenge accrues at the time of the acquisition. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050–51 (8th Cir. 2000); *see also Meta*, 66 F.4th at 299 (holding that Clayton Act causes of action against Facebook "accrued in 2012 when Facebook acquired Instagram and in 2014 when Facebook acquired WhatsApp"). But because Clayton Act claims can challenge the "holding as well as obtaining" of assets, injuries arising from acquisitions may occur *after* such acquisitions. *Midwestern Mach.*, 392 F.3d at 272 (quoting *Concord Boat*, 207 F.3d at 1050). And because the statute begins to run when "a defendant commits an act that injures a plaintiff's business," *Zenith Radio Corp. v. Hazeltine*

*Rsch., Inc.*, 401 U.S. 321, 338 (1971), a Section 7 challenge may accrue at some point after the initial acquisition, *accord* 2 Areeda & Hovenkamp ¶ 320c5 ("[W]hile the rule tying the statute of limitation in merger cases to the date of the merger is strong, it must nevertheless be regarded as presumptive.").

But Plaintiffs' arguments as to why the general rule does not apply in this case fail. The court takes each argument in turn.

> a.      Continuing Violations

Plaintiffs maintain that "continuing violation[s]" stemming from the acquisitions have restarted the limitations period. *See* Pls.' Opp'n at 40. Where there are "continuing violation[s]" of the antitrust laws, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 338b (rev. ed. 1995)). But these overt acts "must be more than the unabated inertial consequences of the initial violation." *Midwestern Mach.*, 392 F.3d at 270. They must instead be "new and independent acts that inflict new and accumulating injury on the plaintiff." *Id.* at 271 (cleaned up).

For this reason, courts have not applied the continuing-violation theory in the Clayton Act context. *Midwestern Machinery Co. v. Northwest Airlines, Inc.* is instructive. In *Midwestern Machinery*, the plaintiffs argued that, after merging with another airline, the defendant airline's actions preventing low-cost carriers from entering a particular airport constituted continuing violations that restarted the limitations clock. *Id.* The Eighth Circuit disagreed. It explained:

> If the initial violation was the merger itself, none of the 'continuing violations' [the plaintiff] alleges can justify restarting the statute of limitations because these acts were not undertaken to further an illegal policy of merger or to maintain the merger. Otherwise, every business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continued to desire to be

> merged. Once the merger is completed, the plan to merge is completed, and no overt acts can be undertaken to further that plan [and] there is no continuing violation possible under [Section] 7 that would justify extending the statute of limitations beyond four years.

*Id.* Continuing violations are therefore most typically found in the RICO and Sherman Act conspiracy contexts, where each meeting to "fine-tune" the cartel independently furthers the conspiracy. *Id.* at 269–70; *see also Z Techs.*, 753 F.3d at 599 ("In a conspiracy, each price increase requires further collusion between multiple parties to maintain the monopoly; in a merger-acquisition case, however, the cause of harm is the merger itself. The subsequent price increases do not further the company's monopoly because the company has already obtained the monopoly."). This does not mean that all acts occurring after an acquisition are immunized from being deemed antitrust violations. But such acts are not "continuing violations" of the acquisition; rather, they are independent violations of other antitrust laws. *See* 2 Areeda & Hovenkamp ¶ 320c5 (explaining the *Midwestern Machinery* court's rationale).

The logic of *Midwestern Machinery* is just as apt here. The acquisitions of Android, YouTube, and DeepMind were consummated long ago. There can be no overt acts to further an acquisition where the plan to acquire has been completed. To the extent "the acquisitions enabled Google to create an ecosystem that helped cement its dominance in the general search market and further helped enable it to leverage that power to dominate the online news market," Pls.' Opp'n at 40–41, this is no "more than the unabated inertial consequences of the initial violation." To hold otherwise would be to qualify any post-acquisition act as a "continuing violation" that restarts the limitations clock. Such a result would "expos[e] a firm to perpetual liability under the Clayton Act." *Midwestern Mach.*, 392 F.3d at 271–22.

Plaintiffs cite *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 721 (W.D. Tenn. 2022), for the proposition that a continuing-violation theory may hold up in a Clayton Act context "where

a party . . . undertook action, in addition to price increases, to monopolize a market." Pls.' Opp'n at 40. But the court so held in *Jones* because the plaintiffs adequately pleaded "a continuing violation of other, non-acquisition, anticompetitive conduct" including exclusive agreements and other exclusionary practices to survive a motion to dismiss. 618 F. Supp. 3d at 721. That is precisely in line with *Midwestern Machinery*: antitrust violations *other than* the acquisition itself may *independently* be the basis for continuing violations. *Cf. Free FreeHand Corp. v. Adobe Sys.*, 852 F. Supp. 2d 1171, 1187 (N.D. Cal. 2012). But the consequences of the acquisition alone cannot constitute the continuing violations of such acquisition. A continuing-violations theory simply does not make logical sense in the context of Plaintiffs' Section 7 claims.

b.      Hold and Use

Next, Plaintiffs assert that "if assets are used in a different manner from the way that they were used when an initial acquisition occurred, and that new use injures the plaintiff, he or she has four years from the time that the injury occurs to sue." Pls.' Opp'n at 41. This notion—known as "hold and use"—has been viewed by some courts with skepticism, *see New York v. Facebook, Inc.* (*Facebook I*), 549 F. Supp. 3d 6, 42–43 (D.D.C. 2021), *aff'd sub nom. Meta*, 66 F.4th 288; *see also Midwestern Mach.*, 392 F.3d at 273–74, but the thrust of the theory is this: Because "holding as well as obtaining assets" can constitute a violation of Section 7, *Concord Boat*, 207 F.3d at 1050 (quoting *ITT*, 420 U.S. at 240), the hold and later use of acquired assets after the initial acquisition can restart the limitations period if that later use injures the plaintiff. But the clock is reset only if the use of those assets is new or different from the way they were used at the time of the merger. *Midwestern Mach.*, 394 F.3d at 272. Actions or effects like increases in price or reduction in quality are not new or different uses but rather "are mere 'inertial consequences' that one naturally expects to flow from" an anticompetitive acquisition, *Z Techs.*, 753 F.3d at 601–

33

02 (citation omitted), and thus do not restart the limitations period. *Facebook I*, 549 F. Supp. 3d at 43. And like the continuing-violations theory, the hold-and-use theory cannot apply where doing so would render the statute of limitations a nullity. *See Concord Boat*, 207 F.3d at 1052.

Plaintiffs have not pleaded sufficient facts to render this theory plausible. As to Android, Plaintiffs allege merely that "Google has also continually developed new uses for Android devices," including in 2024, when it launched Gemini Nano, which allows Google to publish GenAI-generated summaries of online news content on Android devices. *See* Am. Compl. ¶ 70. And as to YouTube, Plaintiffs vaguely state that "Google has greatly expanded the uses for that platform," including by equipping it with GenAI-generated video summaries similar to AI Overviews in 2023, and that the Pew Organization called YouTube "a news publisher of its own" in 2012. *Id.* ¶¶ 73–75; *see also* Pls.' Opp'n at 18. Even taking these facts in the light most favorable to Plaintiffs, these do not amount to different uses of Android and YouTube.[8] Google may have changed the quality of these assets, but that is not enough to restart the clock. *See Facebook I*, 549 F. Supp. 3d at 43 (holding that Facebook's rolling back of privacy protections on WhatsApp, changing the type of content that appears on its various platforms, and removing popular features from Instagram did not constitute "different uses" of those assets). If the launch of one or even multiple discrete features on a given asset were to constitute a different use resetting the limitations period, "there would in effect be no statute of limitations," since any holding or use of an acquired asset could restart the clock *ad infinitum*. *See Concord Boat*, 207 F.3d at 1052.

The same principles negate applying the theory to DeepMind. Plaintiffs allege that DeepMind "started out creating neural network models," a type of model used in the development of AI and GenAI technologies. Am. Compl. ¶ 77; *Google Remedies*, 803 F. Supp. 3d at 45 ¶ 5.

---

[8] As to YouTube, even if the Pew Organization's characterization were sufficient to plead a new use, the statute would have restarted in 2012 and run by 2016.

But DeepMind's mission "changed significantly" in 2023 when it merged with Google's existing Google Brain division to form Google DeepMind "as part of the company's ongoing efforts to accelerate work on [GenAI] in response to OpenAI's [GenAI] platform, ChatGPT."  Am. Compl. ¶ 77.  But that is all.  At most, the Amended Complaint makes out that there was an internal restructuring at Google involving DeepMind as part of Google's "ongoing" GenAI work.  It would be one thing if Plaintiffs showed, for example, that Google DeepMind abandoned Search-related enhancements to create an entirely independent product not involving neural network models that caused injury.  But there is no indication that the pre- and post-merger uses are different at all, let alone what those uses are with any specificity.

Plaintiffs repeatedly refer to the post-acquisition development of GenAI features or products on Android and YouTube as evidence of different uses.  *See, e.g.*, *id.* ¶¶ 70, 75; Pls.' Opp'n at 39–41.  The court has already spelled out why these do not constitute new or different uses of Android and YouTube.  And if the "assets" Plaintiffs allege for purposes of the hold-and-use theory are those GenAI features or products themselves, that would be an even less successful argument.  There can be no new or different use of an asset if the asset did not exist at the time of the acquisition. *Midwestern Mach.*, 392 F.3d at 274.

Plaintiffs also repeatedly invoke 2023, the year they filed suit, throughout the Amended Complaint as a kind of magic number, seemingly in an attempt to plead around the statute of limitations.  For example, they allege that the extent of Google's anticompetitive acts was not known until 2023, "with the release of [Gemini] in March 2023, the launch of [AI Overviews] in May of 2023, and the unveiling of trial exhibits in the trial in the DC DOJ Case in September of 2023." *Id.* ¶ 393.  Google DeepMind came about in 2023, *id.* ¶ 77, and so did certain GenAI tools on YouTube, *id.* ¶ 75.  Plaintiffs also describe a single example from 2023 to 2024 of how

YouTube is "used by Google to siphon news" from online news publishers by redirecting traffic to its own platforms. *See id.* ¶ 74. But mere repetition cannot revive barred claims. Plaintiffs have not identified any allegedly anticompetitive conduct—in 2023 or otherwise—that could make a challenge to Google's acquisitions timely.

The sole cases that Plaintiffs cite to support their hold-and-use theory are inapposite. *See* Pls.' Opp'n at 41 n.16. In *Free FreeHand Corp. v. Adobe Systems Inc.*, the court found that a Section 7 claim brought outside the four-year limitations period survived a motion to dismiss based on a "new use." 852 F. Supp. 2d at 1188–90. There, the defendant Adobe had acquired the plaintiff's illustration software FreeHand, which previously had competed with Adobe's illustration software Illustrator. At the time of the acquisition, FreeHand was "an actively developed and supported piece of software and a living breathing product" with its own user base. *Id.* at 1188. But after the acquisition, Adobe "effectively crippled and killed FreeHand while scavenging its bones for features to incorporate into Illustrator." *Id.* Adobe also stopped developing FreeHand and steered FreeHand users to purchase Illustrator. *Id.* The court held that, at least on a motion to dismiss, the plaintiffs had pleaded sufficient facts to show that Adobe had used FreeHand in a different manner from the way it was used at the time of the acquisition, and thus the statute of limitations could be restarted. *Id.* at 1188–89. Plaintiffs' allegations here come nowhere near those facts; they do not allege that Google so changed the character of Android, YouTube, or DeepMind that any of them were "effectively crippled and killed" or "scaveng[ed]" for parts to use in a competing product. Moreover, the statute there was restarted only after two years. *See Free FreeHand*, 852 F. Supp. 2d at 1188–90. Plaintiffs ask that the statute be restarted after nearly 10 to 20 years.

36

As for the other two cases, the first found that the plaintiff failed to allege a new use that would reset the statute of limitations because the plaintiff did not plead any such use with specificity.  *See Abbyy USA Software House, Inc. v. Nuance Comm'cns*, No. C 08-01035, 2008 WL 4830740, at \*6 (N.D. Cal. Nov. 6, 2008).  And the second permitted claims to proceed over a limitations defense because the plaintiffs had pleaded enough facts to potentially apply either the discovery rule or Section 5(i) of the Clayton Act, which tolls the statute as to private plaintiffs during the pendency of a similar civil proceeding brought by the United States.  *See In re Evanston Nw. Healthcare*, No. 07 CV 4446, 2008 WL 2229488, at \*3–7 (N.D. Ill. May 29, 2008).  Neither, therefore, lends Plaintiffs any support.

It may be, as Plaintiffs claim, that the acquisitions of Android, YouTube, and DeepMind facilitated the integration of GenAI into Google's SERPs, which ultimately entrenched Google's "'walled garden' search engine by enabling it to publish to users exponentially more of the news content Google misappropriates from news Publishers, without users ever needing to leave Google's SERP."  Am. Compl. ¶ 78.  But this has no effect on the limitations period.  The facts alleged do not support the hold-and-use theory as to any of the acquisitions, and the rest of Plaintiffs' allegations (that Google has "continually developed new uses for Android devices," "greatly expanded the uses for" YouTube, and that DeepMind's mission "changed significantly") are conclusory.

c.      Fraudulent Concealment

Finally, Plaintiffs allege that Google's fraudulent concealment tolled the statute of limitations.  The court does not dwell on this argument long.  To make out a claim for fraudulent concealment, plaintiffs must meet the requirements of Federal Rule of Civil Procedure 9(b) and

37

"establish that they used due diligence in trying to uncover the facts." *See Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994) (internal quotation marks and citation omitted).

Other than pointing out instances of Google allegedly spoliating evidence in other cases or identifying the *Google Liability* trial exhibits as revealing new information, *see* Am. Compl. ¶ 393, Plaintiffs do not "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b). For example, Plaintiffs do not allege that Google took any affirmative acts to mislead them specifically or the public generally. *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 992–93 (N.D. Cal. 2020) (citing *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 505 (9th Cir. 1988)). Nor do they cite any authority to support a theory that, absent some legal duty, mere nondisclosure can constitute fraudulent concealment. *See* 2 Areeda & Hovenkamp ¶ 320e ("Unless the parties stand in a fiduciary relationship requiring disclosure to the plaintiff, mere silence or failure to volunteer information about one's activities does not generally constitute fraudulent concealment.").

And nowhere do Plaintiffs allege "how they acted diligently in trying to uncover the facts giving rise to their claims." *See Reveal Chat Holdco*, 471 F. Supp. 3d at 994; *see also Klehr*, 521 U.S. at 194 (concluding that, in the context of civil RICO actions, which are subject to the four-year limitations period of the Clayton Act, plaintiff must still establish "reasonable diligence" to toll the statute of limitations even where there is active fraud and ongoing concealment of the fraud). Because Plaintiffs' allegations to support a fraudulent-concealment theory are either conclusory or absent, it does not toll the statute of limitations.

### 3.    Laches

Because the "doctrine of laches is premised upon the same principles that underlie statutes of limitation," *Midwestern Mach.*, 392 F.3d at 277 (internal quotation marks and citation omitted),

Defendants argue that the same reasons Plaintiffs' claims for damages are barred by the statute of limitations justify the application of laches to bar Plaintiffs' claims for equitable relief. *See* Defs.' Mem. at 35–39. Plaintiffs offer mostly the same retorts, *see* Pls.' Opp'n at 38–42, but add that laches does not apply at all because the doctrine categorically does not bar claims for truly prospective injunctive relief, *id.* at 42. Plaintiffs do not seek divestiture as a remedy. *See* Am. Compl. ¶ 406(d); *see also Facebook I*, 549 F. Supp. 3d at 43–44 (explaining that divestiture is "not generally thought of as 'prospective' but rather 'retroactive in character'" (citation omitted)). Instead, they demand forward-looking behavioral "guardrails to restore and ensure a fair and level competitive playing field around Google's publishing and dissemination of digital informational content in its general search services and search ad services," including permitting publishers to opt out of AI Overviews without being demoted on the SERP, requiring publishers' consent to use their content to train Google's GenAI products, sharing chatbot training data with rivals, and establishing a compliance committee, among other things. Am. Compl. ¶ 406(d). Defendants insist this argument fails, too, because "any 'truly prospective relief' would be unmoored from a Clayton Act Section 7 claim." Defs.' Reply at 23 (citing *Facebook I*, 549 F. Supp. 3d at 44).

The court need not reach these issues. Plaintiffs do not have a basis for the prospective equitable relief sought in the first place. To the extent that the requested relief is aimed at restoring competition in the general search services market, Plaintiffs lack antitrust standing to seek it. *See supra* Section IV.A. And to the extent it is aimed at restoring competition in the online news market, Plaintiffs have failed to plausibly allege that Google possesses monopoly power in it or that the market is characterized by an absence of competition or high barriers to entry. *See supra* Section IV.B; Section IV.D. As for digital ads, Plaintiffs have not even attempted to define the

relevant market, plead Google's dominance in it, or identify any anticompetitive conduct. *See supra* Section IV.D.  None of the equitable relief sought therefore rests on any valid grounds.

Antitrust remedies must be "tailored to fit the wrong." *Microsoft*, 253 F.3d at 107.  With no wrong plausibly alleged to right, the court has no occasion to decide whether laches bars the prospective equitable remedies Plaintiffs seek.  *Cf. In re Am. Fed. of Gov't Emps., AFL-CIO*, 837 F.2d 503, 507 (D.C. Cir. 1988) (declining to decide whether an agency had unreasonably delayed because the relief sought would not be warranted anyway).

*   *   *

The court recognizes that it "should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint."  *See Firestone v. Firestone*, 76 F.3d 1205, 1208–09 (D.C. Cir. 1996); *see also Meta*, 66 F.4th at 301 ("To be sure, a 'complaint seldom will disclose undisputed facts clearly establishing the defense' of laches."  (quoting *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 532 (D.C. Cir. 2010))).  But the court still maintains "the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," *Twombly*, 550 U.S. at 558, and Plaintiffs have not alleged sufficient facts to force Google into discovery so long after the causes of action accrued.  *See also Facebook I*, 549 F. Supp. 3d at 48.  And the court also dismisses the Clayton Act claims for the independent reasons outlined above.  *See supra* Section IV.D.

"Repose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened."  2 Areeda & Hovenkamp ¶ 320a.  The acquisitions of Android, YouTube, and

40

DeepMind may very well have been anticompetitive.  But Plaintiffs are 10 to 20 years too late; those claims are now stale.

## V.      CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Complaint, ECF No. 38, is granted.  A final, appealable Order accompanies this Memorandum Opinion.

Dated:  March 20, 2026

Amit P. Mehta
United States District Judge